# **Exhibit L**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> AMERICAN AIRLINES, INC. <br><br> *Defendant*. | C.A. No. 4:24-cv-00980-ALM <br><br> **JURY TRIAL DEMANDED** |

## REBUTTAL DECLARATION OF JOSEPH D. CAMP

I, Joseph D. Camp, declare as follows:

1. My name is Dr. Joseph Camp. I am a Professor of Electrical and Computer Engineering and the Director of the Autonomous Drone Teaming Lab at the Southern Methodist University.

2. If called to testify under oath in court, I could and would testify competently to the facts stated herein.

3. I have been retained by Intellectual Ventures I LLC and Intellectual Ventures II LLC ("IV") as an independent expert consultant in this proceeding.

4. I have been asked to submit this declaration on behalf of IV. More specifically, I have been asked to review and respond to the declaration of Michael T. Goodrich, Ph.D., regarding U.S. Patent No. 7,324,469 ("'469 Patent"). My opinions are set forth below.

5. I am being compensated at a rate of $1000 per hour for my work in this proceeding. My compensation is in no way contingent on the nature of my findings, the presentation of my findings in testimony, or the outcome of this or any other proceeding. I have no other interest in this proceeding.

6. All of my opinions stated in this Declaration are based on my own personal knowledge and professional judgment. I am over 18 years of age and, if I am called upon to do so, I would be competent to testify as to the matters set forth in this declaration.

## I. BACKGROUND AND QUALIFICATIONS

7. My background and expertise that qualify me as an expert are described in detail in my Curriculum Vitae attached as Attachment A, which further includes an accurate list of all publications authored by me in the previous 10 years and a list of all cases in which I testified as an expert at trial or by deposition during the previous 4 years. Below I have summarized those qualifications, as well as any other background and expertise relevant to the technical issues in this case:

8. My industry experience includes a range of engineering and research roles across leading organizations. At Intel Corporation in Austin, Texas (Hardware Design Engineer/Co-op, May 2002 – August 2003), I used Perl and MySQL to develop a regression management system database to store and analyze test results for a next-generation gigabit-speed network processor. Earlier at Intel Corporation in Folsom, California (Component Design Engineer/Co-op, January 2000 – August 2000), I used Perl to port and debug 133 full-chip tests for the P64H2 bridge from PCI/PCI-X to Hublink buses, originally developed for the P64H, using the Bus Functional Language on the PCI Bus.

9. My engineering foundation was shaped by early aerospace- and networking-related work at NASA's Johnson Space Center in Houston, Texas (Pre-Co-op, May 1998 – August 1999), where I programmed in the 4th Dimension database environment to build an operational database for the X-38 Emergency Crew Return Vehicle. I also performed a mathematical correlation of an infrared lamp experiment in a vacuum chamber for the TransHab inflatable habitat module for the International Space Station. Even earlier, as a SHARP Apprentice (May 1997 – August 1997), I

2

created a FORTRAN simulation of antenna reception performance for the Tracking and Data Relay Satellite (TDRS) system intended for the International Space Station.

10. My educational background includes a B.S. with honors in Electrical and Computer Engineering (ECE) from UT-Austin in 2003, an M.S. in ECE from Rice University in 2006, and a Ph.D. in ECE from Rice University in 2009. My master's thesis focused on a novel multi-tier architecture for deploying a mesh network in which multiple frequency bands were aggregated to provide Internet access to over 4000 users in an underserved community in Houston. My Ph.D. dissertation focused on addressing observed performance problems in the deployed mesh network based on stretching the existing wireless standards to serve a large area in a multihop/mesh topology with multiple frequency bands. The main performance issues identified pertained to HARQ-type signaling that reduced the effective throughput of in-field wireless links. For my Ph.D. dissertation, I was honored to receive the Ralph Budd Award for Best Engineering Thesis at Rice University.

11. In the summer of 2009, I was hired as an Assistant Professor at SMU in the Electrical and Computer Engineering Department. I received the NSF Faculty Early Career Development Program (CAREER) award in 2012. In 2014, I was additionally honored to receive the Golden Mustang Teaching Award, which is given to one pre-tenured faculty per year. In 2016, I received tenure and promotion to Associate Professor. In 2021, I received promotion to Professor and the Gerald J. Ford Research Fellowship, and was promoted to ECE Department Chair, ad interim, in November of 2022, where I served in that capacity until August of 2024.

12. Over my career, I have published over 90 peer reviewed conference and journal papers, most of which are affiliated with IEEE, and received over $6M in federally funded grants.

## II.     MATERIALS REVIEWED

13.     The opinions contained in this declaration are based on documents I reviewed, as well as my professional experience, education, and knowledge.

14.     In forming my opinions expressed in this declaration, I have reviewed the '469 Patent and the prosecution history for the '469 Patent. I have also reviewed other materials referred to in this declaration in support of my opinion. I have also reviewed the Declaration of Michael T. Goodrich and materials cited in that declaration relating to the '469 Patent.

15.     My opinions contained in this Declaration are based on the documents I reviewed and my knowledge and professional judgment. My opinions have also been guided by my appreciation of how a person of ordinary skill in the art would have understood the state of the art, the prior art, and the claims and the specification of the '469 Patent at the time of the alleged invention.

## III.    LEGAL STANDARDS

16.     I am not an attorney. I understand that claim construction is solely a matter for a court to decide and, in general, the ordinary meaning of the claim terms used in the patent to one of ordinary skill in the art is determined in the context of the patent's specification and the file history.

17.     I understand that a person of ordinary skill in the art is a hypothetical person who is presumed to have known the relevant art at the time of the invention.

18.     I understand that factors that may be considered in determining the level of ordinary skill in the art may include: (1) type of problems encountered in the art; (2) prior art solutions to those problems; (3) how quickly innovations are made; (4) sophistication of the technology; and (5) educational level of active workers in the field. In a given case, every factor may not be present, and one or more factors may predominate.

19. I understand that a person of ordinary skill in the art is a person of ordinary creativity, and would have the capability of understanding the scientific principles applicable to the pertinent art.

20. I understand that claims are construed from the perspective of a person of ordinary skill as of the effective filing date of the patent application.

21. I understand that persons of ordinary skill in the art are deemed to read the claims in the context of the entire patent, including the specification and prosecution history. In other words, the terms are not considered in a vacuum.

22. I understand that, in the context of claim construction, the specification is the single best guide to the meaning of the claim terms.

23. I understand that claim terms should be given their ordinary and customary meaning within the context of the patent in which the terms are used, *i.e.*, the meaning that the term would have a person of ordinary skill in the art in question at the time of the invention in light of what the patent teaches.

24. I understand that the factors to be considered in determining the level of ordinary skill in the art include: (1) the educational level of individuals involved in the field of technology; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; and (5) the sophistication of the technology in the art. I further understand that, in a given case, one or more factors may be given greater weight or may not be present.

25. I understand that the plain and ordinary meaning is determined from the language of the claims, the specification, and the prosecution history of the patent at issue.

26. I understand that, in construing a claim term, one looks primarily to the intrinsic patent evidence, which includes the patent abstract, specification, claims, and figures, and its prosecution history.

27. I understand that extrinsic evidence may also be useful in interpreting patent claims when the intrinsic evidence itself is insufficient.

28. I understand that the usual and customary meaning of a claim term can be altered by the patent applicant if they choose to act as their own "lexicographer" and clearly set forth in the patent a different meaning of a claim term.

29. I understand that the meaning of a claim term can also be altered during the patent examination process by a clear and unequivocal disclaims and disavowals by the patent applicant makes about the meaning or scope of the term, and that such statements are recorded in the prosecution history of the patent application.

30. I understand that if a claim term is ambiguous or unclear, the term must be construed to determine how a person of ordinary skill in the art would have resolved in light of the rest of the patent specification, patent claims, and the application's prosecution history.

31. I understand that a claim is not indefinite, as long as it, having been read in light of the intrinsic evidence, informs one of skill in the art at the time of the invention about the scope of the invention with reasonable certainty.

32. I understand that it is improper to import limitations from embodiments in the specification.

33. I understand that it is improper to import limitations from other parts of the claims and rendering a claim term duplicative.

34. I understand that it is improper to import additional or different language from other independent claims that would render such claims superfluous.

## IV. PERSON OF ORDINARY SKILL IN THE ART

35. In his declaration, Dr. Goodrich offers the following opinion as to the standard of a person of ordinary skill in the art for the '469 Patent.

> Based on my review of the Patents-in-Suit and my consideration of the abovementioned factors, it is my opinion that a person of ordinary skill in the art ("POSITA") as of the respective priority dates for the Patents-in-Suit would have had a Bachelor's degree in electrical engineering, computer science, or the like, and/or two or more years of industry experience in networking and distributed computing. Additional experience may make up for a lack of education and vice versa. For example, each of the Patents-in-Suit discloses inventions involving computational devices and networking.

Goodrich Decl. at ¶ 21.

36. For purposes of this declaration, I have applied the standard described in Dr. Goodrich's declaration. Under Dr. Goodrich's definition, I qualify as a POSITA.

## V. '469 PATENT

37. The '469 Patent addresses the problem of delivering high-speed Internet access to rural or remote locations where wired infrastructure is unavailable or prohibitively expensive. The invention uses a satellite link as the backhaul to the Internet, delivering connectivity through a local-area hotspot to user devices. '469 Patent at 1:35-57 and 2:1-27.

38. The system includes a satellite dish for receiving and transmitting data, a router for local distribution, and a subscriber access unit that performs user authentication, accounting, and traffic management. These core components may be supplemented with wireless extender units, phased-array antennas, and amplifiers to adapt coverage to the physical layout of the deployment site. '469 Patent at 3:54-67, 4:1-46, and 5:33-67.

39. The patent lists specific examples of suitable rural locations such as rest areas, restaurants, truck stops, rural hotels, conference centers, motels, and state park lodges (col. 1, ll. 59-65), which a person of ordinary skill would recognize as high-turnover environments. The system can be powered by conventional AC mains or solar energy, the latter enabling installations where grid power is unavailable. '469 Patent at 1:34-46 and 3:43-67.

40. Figures 3 and 4 illustrate flexible configurations in which extender units and long-range antennas are positioned away from the primary hotspot to expand coverage. The modular nature of the components allows for both fixed and redeployable installations, depending on the needs of the site. '469 Patent at Fig. 3, Fig. 4, 5:33-67, and 6:1-32.

## VI. DISPUTED '469 PATENT CLAIM TERMS

41. I have reviewed the opinions offered by Dr. Goodrich in paragraphs 88-98 of his declaration, and I understand that Dr. Goodrich offers two opinions: (1) the claim term "remote location" should be interpreted to mean "a fixed remote location"; and (2) the term "a relatively high volume of transient traffic" is indefinite. For the reasons below, I disagree with those opinions.

42. I understand that IV asserts infringement of claim 24 of the '469 Patent. Claim 24 recites, in part, a "satellite dish," a "router," and a "subscriber access unit" that "are located in a remote location a experiencing a relatively high volume of transient traffic." '469 Patent at 8:24-43. Claim 24 is reproduced below.

> 24. An Internet Hotspot comprising:
> a satellite dish communicating with the Internet via one or more data links with a satellite;
> at least one router operatively coupled to the satellite dish;
> a subscriber access unit operatively coupled between the satellite dish and the at least one router, the subscriber access unit being capable of authenticating a subscription account associated with a user prior to allowing the user access to the Internet; and
> a web-ready device operatively coupled to the at least one router, the web-read device having a browser application operating thereon for accessing the Internet;
> wherein the satellite dish, at least one router and the subscriber access unit are located in a remote location a experiencing a relatively high volume of transient traffic;
> wherein the user may authenticate the subscription account and access the Internet at the remote location by establishing a data connection between the web-ready device and the router.

A. **"remote location"**

43. In his declaration, Dr. Goodrich opines that the term "remote location" would have been understood by a POSITA to mean a "fixed remote location." Goodrich Decl. at ¶ 89. I disagree.

44. Dr. Goodrich cites the specification at 3:43-55, 3:55-60, and generally the embodiments described in Figures 1-4 and corresponding description at 4:17-24, 5:4-7, 5:32-35, 5:60-63, and 6:7-10, to support his opinion. Dr. Goodrich also cites to an embodiment described at 3:67 that allegedly "discuss increased coverage in the context of 'large or multi-floor sites.'" Goodrich Decl. at ¶ 92.

45. The plain language of claim 24 does not recite "fixed," nor does the '469 Patent specification recite a "fixed" remote location. In fact, the word "fixed" is never used in the specification. The only words that are used with "location" are "rural" (1:53, 1:55, 2:38, 2:42, 3:3, 4:19, and 4:21), "remote" (3:7, 3:11, and 3:12), and "central" (4:39), where the latter ("central")

9

is only used with respect to the Internet location (item 26 in Figures 1-4, see below) that the satellite would relay to the satellite dish.



FIG.1

46. Claim 1 recites "installing the satellite dish, router and subscriber access unit in a rural location…" A POSITA would understand that the word "installing" simply means placing and configuring the equipment for use at a location. In industry practice, installation does not inherently require that the equipment remain in place indefinitely.

47. The specification reinforces deployment flexibility. It describes the use of solar power, which is common in temporary or semi-portable field installations. *See, e.g.,* '469 Patent at Abstract, 1:1:38-41, 3:47-52, It also describes extender units and long-range antennas that can be moved or repositioned to adapt coverage to changing conditions, for example in Figures 3 and 4.

48. The modular architecture of the '469 Patent allows components to be redeployed as needed. In real-world scenarios, an operator could install the system at one qualifying site, operate it for a period, and later relocate it to another qualifying site without departing from the claim scope or the specification. The functional operation of the claimed system, including authentication of transient users, routing of traffic through the subscriber access unit, and communication with a satellite, does not depend on the hotspot being permanently fixed in one location.

49. A POSITA would therefore understand that the invention encompasses permanent, semi-permanent, and temporary deployments, so long as the chosen site meets the "relatively high volume of transient traffic" condition. Nothing in the claims or the specification imposes a fixed-location requirement.

**B.     "relatively high volume of transient traffic"**

50. In his declaration, Dr. Goodrich opines that, "a POSITA could not have ascertained the meaning of the phrase "relatively high volume of transient traffic" with reasonable certainty from the patent's specification and prosecution history." Goodrich Decl. at ¶ 94. I disagree.

51. Dr. Goodrich reasons that a threshold or quantile value would be needed to define "relatively high" volume of traffic. Goodrich Decl. at ¶ 95. However, in wireless engineering practice, "relative" terms are used routinely when making site selection and capacity planning decisions. Engineers often classify sites into categories such as "low," "medium," and "high" traffic based on observation, historical usage data, or publicly available information such as Department of Transportation traffic counts or tourism board statistics.

52. A POSITA would use the examples provided in the patent as benchmarks. For example, a rural truck stop with hundreds of unique visitors daily would plainly fall into the "relatively high volume of transient traffic" category, whereas a remote farmhouse serving the

11

same three residents year-round would not. This determination is objective and consistent with ordinary engineering judgment.

53. Given the specification's context and the common, accepted use of relative traffic assessments in the industry, the term informs a POSITA about the scope of the claim with reasonable certainty. No fixed numeric threshold is necessary to meet the definiteness standard.

54. Dr. Goodrich also claims that "transient traffic" is not defined, claiming that there would need to be a time period specified. Goodrich Decl. at ¶ 95-98.

55. In my opinion, a POSITA would not require a fixed numerical time period to understand the meaning of "transient" as used in the '469 Patent. The specification itself anchors the term in concrete, real-world examples, such as truck stops, state park lodges, rural hotels, and conference centers (*'469 Patent*, 1:59–65) that a POSITA would immediately recognize as high-turnover locations. These are venues where the user population changes frequently over the course of a day, a week, or a season, in contrast to fixed-population rural environments. The nature of these examples conveys the intended scope without the need for a quantified duration.

56. The term "transient" is not a metric measured in hours or days but rather a qualitative descriptor that captures the essential characteristic of the user base: temporary presence. This characteristic directly impacts network design decisions. For example, in a transient environment, authentication flows are optimized for walk-up users without preexisting accounts, bandwidth allocation must account for unpredictable demand spikes, and the capital investment in satellite infrastructure is weighed against short-term usage patterns rather than long-term subscriber retention. These engineering considerations turn on the *nature* of the location's traffic patterns, not on any specific numerical time limit.

57. Imposing an artificial time threshold to define "transient" would risk excluding clear embodiments contemplated by the patent, such as seasonal lodges where guests may stay for several days, or roadside rest areas where visitors remain for less than an hour. In each case, the common thread is that users are present temporarily and are not part of a fixed, resident population. A POSITA, guided by the examples and purpose described in the specification, would readily understand the term "transient" in its intended scope without the need for a prescribed duration.

58. Accordingly, it is my opinion that: (a) the claims do not require that the hotspot be permanently fixed in one location, and (b) "relatively high volume of transient traffic" is definite, providing a POSITA with sufficient context to evaluate candidate sites.

59. I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief, formed after reasonable inquiry under the circumstances.

Executed on the __26__ day of August, 2025, in ___Dallas_____, Texas.

_____
Joseph D. Camp