# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

INTELLECTUAL VENTURES I LLC AND
INTELLECTUAL VENUTRES II, LLC,

        Plaintiff,

    vs.

AMERICAN AIRLINES, INC.,

        Defendant.

Civil Action No. 4:24-cv-00980

JURY TRIAL

## AMERICAN AIRLINES, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     LEGAL STANDARDS ........................................................................................1

        A.      Lexicography Standards............................................................................1

        B.      Prosecution Disclaimer Standards ...........................................................2

III.    PERSON OF ORDINARY SKILL IN THE ART.................................................3

IV.     '844 PATENT .....................................................................................................3

        A.      "root image" ('844 patent, claims 7, 11)................................................3

V.      '722 PATENT .....................................................................................................6

        A.      "input source" ('722 patent, claim 14)....................................................6

        B.      "identify a category of the update message based on the
                input source" ('722 patent, claim 14) .....................................................8

VI.     '785 PATENT ...................................................................................................11

        A.      "network address" ('785 patent, claims 30, 37)....................................11

        B.      "network route director" ('785 patent, claim 30)...................................13

VII.    '469 PATENT ...................................................................................................15

        A.      "a remote location experiencing a relatively high volume of
                transient traffic" ('469 patent, claim 24).............................................15

        B.      "a relatively high volume of transient traffic" ('469 patent,
                claim 24) ...............................................................................................17

VIII.   '582 PATENT ...................................................................................................21

        A.      "partition" ('582 patent, claim 1)..........................................................22

        B.      "description of all said partitions" ('582 patent, claim 1)....................23

        C.      simultaneously executing at least a respective one of the
                subtasks of the computer-executable process in each of at
                least some of said processors on a respective one of the
                partitions" ('582 patent, claim 1)...........................................................27

        D.      "on a first-come/first-served basis" ('582 patent, claim 1)..................28

i

IX.    CONCLUSION...............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alnylam Pharms., Inc. v. Moderna, Inc.*,
138 F.4th 1326 (Fed. Cir. 2025) ..................................................................................6, 7

*AstraZeneca LP v. Apotex, Inc.*,
633 F.3d 1042 (Fed. Cir. 2010)....................................................................................1, 4, 5

*August Tech. Corp. v. Camtek, Ltd.*,
655 F.3d 1278 (Fed. Cir. 2011)....................................................................................10

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017)....................................................................................2

*Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*,
262 F.3d 1258 (Fed. Cir. 2001)....................................................................................11, 16

*Computer Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1366 (Fed. Cir. 2008).....................................................................................passim

*Cypress Lake Software, Inc. v. Samsung Electronics America, Inc.*,
382 F. Supp. 3d 586 (E.D. Tex. 2019) ........................................................................19

*Edwards Lifesciences LLC v. Cook Inc.*,
582 F.3d 1322 (Fed. Cir. 2009).....................................................................................6, 11

*GE Lighting Sols., LLC v. Lights of Am., Inc.*,
663 Fed. App'x 938 (Fed. Cir. 2016).............................................................................17

*Genuine Enabling Tech. LLC v. Nintendo Co.*,
29 F.4th 1365 (Fed. Cir. 2022) ....................................................................................2

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
902 F.3d 1372 (Fed. Cir. 2018).....................................................................................19

*Iridescent Networks, Inc. v. AT&T Mobility, LLC*,
933 F.3d 1345 (Fed. Cir. 2019).....................................................................................13

*MBO Lab'ys, Inc. v. Becton, Dickinson & Co.*,
474 F.3d 1323 (Fed. Cir. 2007)....................................................................................2, 9

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014).......................................................................................................26

*Omega Eng'g, Inc, v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003)....................................................................................2

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc)...................................................... passim

*Purdue Pharma L.P. v. Endo Pharms. Inc.*,
    438 F.3d 1123 (Fed. Cir. 2006)...................................................................2, 9

*Sinorgchem Co. v. Int'l Trade Comm'n*,
    511 F.3d 1132 (Fed. Cir. 2007)............................................................ passim

*Standard Oil Co. v. Am. Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985).........................................................................2

*Tate Access Floors, Inc. v. Maxcess Techs., Inc.*,
    222 F.3d 958 (Fed. Cir. 2000).......................................................................11

*U.S. Well Servs., Inc. v. Halliburton Co.*,
    No. 21-367, 2022 WL 819548 (W.D. Tex. Jan. 17, 2022) ....................................18

*Wasica Finance GmbH v. Cont'l Auto. Sys., Inc.*,
    853 F.3d 1272 (Fed. Cir. 2017)....................................................................11

**TABLE OF EXHIBITS**

| Ex. No. | Description |
|---------|-------------|
| 1. | U.S. Patent No. 8,332,844 ("the '844 Patent") (see Dkt.1-2) |
| 2. | U.S. Patent No. 8,407,722 ("the '722 Patent") (see Dkt.1-3) |
| 3. | U.S. Patent No. 7,949,785 ("the '785 Patent) (see Dkt.1-4) |
| 4. | U.S. Patent No. 7,324,469 ("the '469 Patent") (see Dkt.1-6) |
| 5. | U.S. Patent No. 7,257,582 ("the '582 Patent") (see Dkt.1-7) |
| 6. | Declaration of Michael T. Goodrich in Support of Claim Construction, served on August 4, 2025 as required by P.R. 4-3. |
| 7. | Response Declaration of Michael T. Goodrich in Support of Claim Construction, filed with this brief[1] |
| 8. | Reply Under 37 C.F.R. § 1.116, February 9, 2012 ('722 Patent) |
| 9. | Applicant Arguments/Remarks Made in an Amendment in response to Ex Parte Reexamination, Non-Final Action, dated Jan. 8, 2025 ('785 Patent) |
| 10. | https://www.computer-dictionaryonline.org/definitions-n/network-address.html |
| 11. | Deposition of Michael T. Goodrich regarding claim construction |
| 12. | Patent Owner Preliminary Response filed by IV ('582 Patent) |
| 13. | https://www.merriam-webster.com/dictionary/description |
| 14. | First Amendment, March 2, 2007 ('582 Patent) |
| 15. | Application for '582 Patent as originally filed ('582 Patent) |

---

[1] IV filed claim construction declarations from two experts with its brief in violation of P.R. 4-3. *See* Dkts. 77-13, 77-14. American filed a Motion to Strike and Enforce P.R. 4-3. *See* Dkt.78. IV also fails to cite any opinion of its experts in its brief, waiving any reliance on them. If declarations are permitted that are not in compliance with the deadline set by the local rules, American provides Dr. Goodrich's Response Declaration.

## I.    INTRODUCTION

Intellectual Ventures ("IV") asks the Court to refrain from construing the meaning of any claim term in the Asserted Patents.[2] IV's no-constructions belie the intrinsic record. American's constructions account for the patentees' lexicography and disavowals. IV may not like the patentees representations, but the proper claim construction must account for them.

## II.    LEGAL STANDARDS

The purpose of claim construction is to give claim terms the meaning understood by a person of ordinary skill in the art at the time of invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-14 (Fed. Cir. 2005) (en banc). The plain meaning of claim language ordinarily controls *unless* (as here) the patentee acts as his own lexicographer and provides a special definition for a particular claim term or the patentee disavows the ordinary scope of a claim term either in the specification or during prosecution. *Phillips*, 415 F.3d at 1313.

### A.    Lexicography Standards

"[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1051-52 (Fed. Cir. 2010) (quoting *Phillips*, 415 F.3d at 1316). The specification need not reveal such a definition explicitly. *Id.* (citing *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001). "[W]hen a patentee uses a claim term throughout the entire patent specification in a manner consistent with only a single meaning, he has defined that term 'by implication.'" *Id.* (quoting *Bell Atlantic*, 262 F.3d at 1271).

---

[2] The "Asserted Patents" for purposes of this brief are the '785 Patent, '844 Patent, '582 Patent, '722 Patent, '469 Patent, and U.S. Patent No. 8,027,326. IV added six additional patents that will be analyzed using the Court's claim construction process at a later time. Dkt. 81.

### B.    Prosecution Disclaimer Standards

"Prosecution disclaimer 'preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.'" *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017) (quoting *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003)). "[T]he doctrine of prosecution disclaimer ensures that claims are not 'construed one way in order to obtain their allowance and in a different way against accused infringers.'" *Id.* at 1360 (quoting *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995)). Disclaimer may occur through amendment or argument. *Id.* at 1359. Prosecution disclaimer "protects the public's reliance on definitive statements made during prosecution." *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022) (quoting *Omega*, 334 F.3d at 1324).

Prosecution disclaimer occurs when the patentee makes express representations to the examiner disavowing claim scope to induce a patent grant. *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985). To invoke this doctrine, the statements disclaiming scope must be clear and unmistakable. *Omega*, 334 F.3d at 1326. Such clear and unmistakable disclaimer statements include arguments made to convince the Patent Office of patentability, such as when the patentee "draw[s] distinctions between the patented invention and the prior art." *MBO Lab'ys, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007). These arguments are particularly useful because they show "the patentee intended to surrender territory, since they indicate in the inventor's own words what the invention is not." *Id.*; *see also Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008); *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006).

### III.    PERSON OF ORDINARY SKILL IN THE ART

A court determines the proper construction of a claim term from the viewpoint of the hypothetical person of ordinary skill in the art (POSITA). *Phillips*, 415 F.3d at 1313. The Asserted Patents relate to computational devices and networking. A person of ordinary skill in the art as of the respective priority dates for the Asserted Patents would have had a bachelor's degree in electrical engineering, computer science, or the like, and/or two or more years of industry experience in networking and distributed computing. Additional experience may make up for a lack of education and *vice versa*. Ex.6 at ¶21.

### IV.    '844 PATENT

The '844 Patent is directed to technology for caching and indexing for block-level distributed application management. "The technology involves storing blocks of a root image on a first storage unit and storing blocks of leaf images on respective second storage units. The leaf images include additional data blocks not previously contained in the root image and changes made by respective compute nodes to the blocks of the root image." Ex.1 at 2:35-43. Further, the '844 Patent discloses that it operates at the block level, below the file system, making it file system and operating system independent. Ex.1 at 5:63-6:3. The system for root image caching and indexing in a block-level distributed application environment in Figure 2.

### A.    "root image" ('844 patent, claims 7, 11)

| American's Construction | Plaintiffs' Position |
|---|---|
| a read-only base set of data blocks, operating beneath the file system, that provide the common portion of the application environment | No construction or meaning provided |

Claim 7 requires "storing blocks of a root image of said compute nodes." A POSITA would have understood that the patentees acted as their own lexicographers by defining "root

image" to mean "a read-only base set of data blocks, operating beneath the file system, that provide the common portion of the application environment." Ex.6 at ¶54; Ex.7 at ¶¶31-33.

Looking first to the claim language, claim 7 provides a description of what a "root image" is: "blocks of a root image" (Ex.1 at 11:29) and "blocks of said root image" (Ex.1 at 11:37, 11:39, 11:57). Hence, a root image is a set of data blocks.

The patentees defined "root image" in the specification as "a *read-only base image* (or 'root' image) *of the application environment*[.]" Ex.1 at 2:13-14 (emphasis added). The patentees' lexicography of the meaning of "root image" governs. *AstraZeneca*, 633 F.3d at 1051-52 (quoting *Phillips*, 415 F.3d at 1316). The specification teaches that the root image contains data "initially common to the compute nodes" and is not changed by individual nodes. Ex.1 at 5:27-32. This commonality is essential to the claimed system's efficiency. *E.g.* Ex.1 at 10:37-43.

Further, the specification specifies that the alleged invention "involves storing blocks of a root image of the compute node on a first storage unit." For example, the specification teaches that "by storing data at the block level, embodiments are able to operate beneath the file system and thus are designed to be file system and operating system independent." Ex.1 at 7:58-62. This definition of what it means to store "data at the block level" (i.e., "operate beneath the file system") also governs. *AstraZeneca*, 633 F.3d at 1051-52. Thus, a read-only base set of data blocks, operating beneath the file system, that provide the common portion of the application environment, is the root image.

The specification distinguishes root images from the files themselves. The '844 Patent at 5:51-58 teaches:

> For example, a particular file on the root image may comprise twenty blocks of data (e.g., blocks 1-20). One compute node (e.g., compute node 220a) desires to make a change to this file which involves a modification of only a few specific blocks of the file (e.g., blocks 4-9). In this example, only the modified

> blocks (e.g., blocks 4-9) will be stored in the compute node's leaf image (e.g., leaf image stored on second storage device 250a) plus some small overhead.

The '844 Patent repeatedly emphasizes that the invention operates at the block level, below the file system, and is therefore file system and operating system independent. *E.g.,* Ex.1 at 5:63-6:3, 7:58-62. Using images to operate at the block level is not a mere feature of a preferred embodiment, but a fundamental aspect of the invention that enables the claimed advantages, such as rapid deployment and operating system independence. Ex.6 at ¶10; Ex.7 at ¶¶35-36.

IV contends that America's construction "attempts to import limitations into the claim language." Dkt.77 at 6. IV incorrectly interprets disclosures regarding embodiments where the first storage unit 240 is read-only to mean that the root image does not need to be read-only. While a root image is always "read-only" as its contents do not change, it would be possible to store a root image on a storage unit that itself is read only (like a CD-ROM) or it could be stored on a storage unit that is not read only (like a disk drive). In storage units that are not read only, the blocks of a root image on such a storage unit may be moved. In the case of moving disk blocks (whose contents are themselves read only), the locations of those blocks would necessarily change but the block itself does not. Ex.7 at ¶¶12, 32.

IV further contends that there is no lexicography, because "[n]o such clear definition exists here." Dkt.77 at 7. For lexicography, there is no requirement that the definition be explicit. *AstraZeneca*, 633 F.3d at 1051-52 ("[A] claim term may be clearly redefined without an explicit statement of redefinition.")). "[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'" *Id.*; *see also Phillips*, 415 F.3d at 1321 ("Even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the

meaning may be found in or ascertained by a reading of the patent documents.") (quoting *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004)).

## V.    '722 PATENT

The '722 Patent is directed to routing/transferring information "through digital networks and in particular to transferring information for remotely updating content at client devices through the digital networks." Ex.2 at 1:24-27. Claim 14 is a method claim that requires "providing, using a processing device of an ***input source***, a data representation to a client device" and requires that a "gateway device" "identify a category of the update message ***based on the input source***." Ex.2 at 23:55-56 and 24:3-5 (emphasis added).

### A.    "input source" ('722 patent, claim 14)

| American's Construction | Plaintiffs' Position |
|---|---|
| information provider and/or dynamic content provider | No construction or meaning provided |

The patentees acted as their own lexicographers by defining the term "input device" as "information provider and/or dynamic content provider." The patentees ***expressly*** defined the term "input source" twice in the specification. At 3:15-16, the patentees defined "input source" as "the information provider or a dynamic content provider":

> the information provider or a dynamic content provider (generically referred to as an "input source") that provided the live object simply sends an update message to the routing network.

Ex.2 at 3:15-16; *see also* 11:21-24.

Here, the patentees set off "input source" by quotation marks, which is a "strong indication that what follows is a definition." *Sinorgchem Co. v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (citing *Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000)); *Alnylam Pharms., Inc. v. Moderna, Inc.*, 138 F.4th 1326, 1333 (Fed. Cir. 2025) (same). The patentees also used the phrase "referred to," which "'conveys an intent for [that

sentence] to be definitional.'" *Id.* (quoting *ParkerVision, Inc. v. Vidal*, 88 F.4th 969, 976 (Fed. Cir. 2023)).

At 13:26-28, the patentees similarly defined "input source": "The input source 210, i.e., the information provider 108 and/or dynamic content provider 116 can use a variety of tools to generate the update messages." Here, the patentees used the notation "i.e.," which means "that is," and indicates what follows is a definition of "input source": "information provider and/or dynamic content provider." *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009) ("the specification's use of 'i.e.' signals an intent to define the word to which it refers, 'malleable'"). The patentees are bound by their express definition of "input source." *Sinorgchem*, 511 F.3d at 1136 (citing *Durel Corp. v. Osram Sylvania Inc.*, 256 F.3d 1298, 1303-04 (Fed. Cir. 2001)); *Phillips*, 415 F.3d at 1316.

IV contends that "there is no lexicography" and therefore "input source" has its "ordinary and customary meaning, *i.e.*, a source of input." Dkt.77 at 9. [*Note*: IV's use of the term "*i.e.*" to indicate that what follows is their definition of "input source."] As to the sentence at 3:15-16 of the specification, IV contends that this sentence "generically refers" to "information provider" and "dynamic content provider" as examples of "input sources." Dkt.77 at 10. IV ignores Federal Circuit precedent that the use of the term "***referred to***" demonstrates an intent to define the term. *Alnylam*, 138 F.4th at 1333 (quoting *ParkerVision*, 88 F.4th at 976 (finding that the term "refer to" in the sentence: "Storage modules and storage capacitances, on the other hand, refer to systems that store non-negligible amounts of energy from an input EM signal" conveys an intent to be definitional)) (emphasis added). As to the sentence at 13:26-28, IV simply ignores it.

IV looks elsewhere in the specification, contending that unlabeled boxes 710C and 710D in Figure 7 depict certain "undefined" input sources and therefore "the specification describes

other potential sources of input." Dkt.77 at 10. IV's alleged reliance on other portions of the specification is improper. "When the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term." *Sinorgchem*, 511 F.3d at 1138 (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998)).

Moreover, based on the express definition of "input source" as an "information provider and/or dynamic content provider," a POSITA would have understood unlabeled boxes 710C and 710D, which depict "input sources" (*see* Ex.2 at 16:60-61; 17:36-39; 17:45-48), to depict either an information provider, a dynamic content provider, or both, similar to box 710A, which is labeled "Information Provider, and box 710B, which is labeled "Dynamic Content Provider." Ex.7 at ¶65. Nowhere in the specification do the patentees state that either box 710C or 710D represent anything other than an "information provider" or a "dynamic content provider."

IV further ignores Figure 1, which shows the "routing network," including multiple "information providers" (108) and "dynamic content providers" (116). The patentees describe this routing network environment as including "hundreds" of "information providers 108" and "multiple dynamic content providers 116," but, consistent with their definition, do not describe the environment as including any other type of "input source." Ex.2 at 4:55-65.

**B.    "identify a category of the update message based on the input source" ('722 patent, claim 14)**

| American's Construction | Plaintiffs' Position |
|---|---|
| identify a category of the update message based on the information provider or dynamic content provider but not on the category/topic of the message content | No construction or meaning provided |

The phrase "identify a category of the update message based on the input source" should be construed to mean "identify a category of the update message based on the <u>information</u>

provider or dynamic content provider **but not on the category/topic of the message content**." (emphasis added). American addressed the parties' dispute regarding the definition of "input source" (underlined) in the previous section.

The language "but not on the category/topic of the message content" is necessary because during prosecution, the patentees distinguished prior art on the grounds that the prior art "teaches identifying categories based on category/topic of the message content," whereas "in contrast, [the claims] recite, *inter alia*, 'identify a category of the update message based on the input source'":

> This section of Chandra [prior art reference], relied on by the Examiner, discloses that if the **data content of the message** matches the specified values of the subscription, then the message is delivered to the one or more subscribers (or clients) of that subscription. This is not the same as "identify a category of the update message <u>based on the input source</u>," as recited in claims 26, 33, 39, 45, 51, and 57, using their respective language.
>
> The Examiner, for example, on page 3 of the Office Action, relies on the above sections of Chandra to allegedly show "identifying each category based on the category/topic of the message content." By this statement, the Examiner appears to agree that Chandra teaches identifying categories **<u>based on category/topic of the message content</u>**. In contrast, claims 26, 33, 39, 45, 51, and 57 recite, *inter* alia, "identify a category of the update message <u>based on the input source</u>," using their respective language.

Ex.8 at 18-19 (emphasis in original).

The patentees' statements that the claims, which "identify a category of the update message **based on the input source**," are distinguished from the prior art, which, unlike the claims, identifying categories **based on category/topic of the message content**," are a disclaimer of claim scope. *E.g. Computer Docking*, 519 F.3d at 1374 (Fed. Cir. 2008) ("A patentee could [make a disclaimer], for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art"); *MBO Lab'ys*, 474 F.3d at 1330 (Fed. Cir. 2007); *Purdue Pharma*, 438 F.3d at 1136; Ex.6 at ¶87; Ex.7 at ¶¶68-70. The court should therefore

construe this term to **exclude** the subject matter disclaimed, *i.e.*, excluding identifying categories **based on category/topic of the message content**.

IV contends that the patentees' statement did not disclaim claim scope, because the statement "merely notes that the prior art fails to disclose the pending claim language 'identify a category of the update message based on the input source,' because it identifies categories 'based on category/topic of the message content.'" Dkt.77 at 12. IV's contention **confirms** the disclaimer. According to IV, the patentees distinguished the prior art for failing to disclose the claim language because the prior art instead "identifies categories 'based on category/topic of the message content.'" Consistent with the Federal Circuit cases cited above, that is a disclaimer.

IV further contends that the specification "describes many ways of identifying a category of an update message, and therefore, the claim, which 'requires that the identification of a category of the update message be done *based on* the input source," "can be based on other information as well." Dkt.77 at 11-12 (emphasis in original). This is not correct, as the claim language itself is limited to identifying a category of the update message "**based on the input source**," and therefore, contrary to IV's contention, the claimed identification **cannot** be based on any information **other than the input source**. This means that, even though the specification may describe alternative ways of identifying a category of the update message, the patentees chose to claim only the way that is "based on the input source" (and disclaim any other basis to obtain the patent). *August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1285 (Fed. Cir. 2011) ("The mere fact that there is an alternative embodiment disclosed in the [asserted patent] that is not encompassed by [our] claim construction does not outweigh the language of the claim, especially when the court's construction is supported by the intrinsic evidence") (quoting *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008)).

## VI.    '785 PATENT

The '785 Patent is directed to maintaining virtual communication networks and routing messages in such networks. Ex.3 at 5:48-60. It discloses a private virtual dynamic network for computing devices coupled to public networks or private networks. This enables computing devices anywhere in the world to join into private enterprise intranets and communicate with each other. Ex.3 at Abstract.

### A.    "network address" ('785 patent, claims 30, 37)

| American's Construction | Plaintiffs' Position |
|---|---|
| Internet protocol or IP address | No construction or meaning provided |

Claim 30 requires "return[ing] a network address associated with a network route director[.]" Ex.3 at 36:52-53. A POSITA would have understood "network address" to mean an "IP address" based on the inventors' definition of "network address" in the specification as an IP address. Ex.6 at ¶¶37-45; Ex.7 at ¶¶18, 21-24.

Figure 7 is "a flow chart describing the overall process for communicating." Ex.3 at 8:16-17. As the flow chart shows at Step 656, the VCN Manager (a DNS server receiving and responding to DNS requests, Ex.3 at 12:26-31) provides a triplet of addresses: (1) *a public IP address for the Network Route Director*; (2) a private IP address; and (3) a virtual IP address for the destination. This step directly tracks the language of claim 30, which recites that the DNS server "return[s] *a network address associated with a network route director*, a private network address associated with a second device in the virtual network, and a virtual network address associated with the second device." Ex.3 at 36:52-56. Thus, Figure 7 and claim 30 show that "network address" refers to an IP address. The same is confirmed in Step 2406 of Figure 24, where the VCN Manager returns the "IP address of RD" (Route Director), as well as the private IP address and the virtual IP address for the destination. Ex.3 at 14:34-40, 31:24-33.

11

Further, the specification uses the term "IP address" interchangeably with "network address." *E.g.,* Ex.3 at 1:44-45, 1:48-50, 9:15-17, 10:17-39, 10:42-50, 12:48-53, 13:33-40, 27:1-5, 28:30-33. "The interchangeable use of two terms is akin to a definition equating the two." *Edwards Lifesciences*, 582 F.3d at 1329; *see also Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 968-969 (Fed. Cir. 2000); *Bell Atlantic*, 262 F.3d at 1274-75; *Wasica Finance GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1282 (Fed. Cir. 2017). Accordingly, the patentees defined "network address" and "IP address."

Additionally, in its response to an Office Action during reexamination, the patentees explained that the DNS reply, as illustrated in Figure 7 and as claimed in claim 30, generated by the VCN Manager includes an IP address, thereby confirming that this IP address is the "network address" recited in the claims. Ex.9 at 12-13. The patentees explained that "the response from the DNS server includes a numeric IP address" and further explained that "a DNS request is responsible for resolving a domain name, such as www.example.com, into its corresponding IP address (e.g., 93.184.216.34) so that devices can locate and communicate with the server hosting the desired resource." *Id*. (emphasis added). These representations show that the "network address" described in the claims is defined as an IP address associated with the Network Route Director returned by a DNS server. The patentees disclaimed any broader meaning.

The inventors' definition and disclaimer is consistent with the general definition of "network address". For example, Computer Dictionary Online defines "network address" as "[t]he network portion of an IP address[.]" Ex.10. Contrary to IV's argument (Dkt.77 at 15-16), there is no contradiction in the computer-dictionary.org definition. In the context of a DNS response, it is entirely appropriate to refer to a network address as an IP address, because the function of DNS is to translate domain names into IP addresses. Ex.7 at ¶23. These IP addresses

12

are the core type of network addresses used to locate devices on the Internet or within an internal network. This definition of "network address" is consistent with the intrinsic record.

IV contends that "American's proposed construction is problematic because it proposes to construe 'network address' for one instance but ignores the other instances where a type of 'network address' recited elsewhere in claim 30." Dkt.77 at 15. The term in dispute is "network address" (associated with a network route director as used in claim 30), not the separate terms "private network address" or "virtual network address." The term "network address" in claim 30 would have been understood by a POSITA when reading the claims in view of the specification and prosecution history as "IP address." Ex.6 at ¶45; Ex.7 at ¶24.

### B.    "network route director" ('785 patent, claim 30)

| American's Construction | Plaintiffs' Position |
|---|---|
| a publicly addressable device configured to route encapsulated packets to and from entities located in a private network portion of a virtual network | No construction or meaning provided |

Claim 30 of the '785 Patent requires "return[ing] a network address associated with a network route director[.]" A POSITA would have understood "network route director" to mean "a publicly addressable device configured to route encapsulated packets to and from entities located in a private network portion of a virtual network." Ex.6 at ¶46; Ex.7 at ¶25.

The patentees acted as their own lexicographers. Network Route Director is a coined term as shown by the consistent and repeated (24 times) capitalization of the term in the specification. *E.g.*, Ex.3 at 10:24-27, 11:9-14. A coined term must be construed by analyzing "whether the intrinsic evidence provides objective boundaries to the scope of the term." *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1353 (Fed. Cir. 2019). The specification, declares that the Network Route Director "*is* a stand-alone unit that runs on the public side of the Internet" enabling communication "inside one or more private networks from the public

13

network." Ex.3 at 11:9-13 (emphasis added). Under *Sinorgchem*, use of the word "is" "signif[ies] that a patentee is serving as its own lexicographer," and "must be bound by the express definition." *Sinorgchem,* 511 F.3d at 1136 (internal citations omitted). The express definition requires that a Network Route Director must reside on the public side of the network and allow entities behind private networks to be reached.

The patentees confirmed this definition during reexamination by stating that "the problem of the current invention [] is how to route through a route director to the virtual address." Ex.9 at 19. This explanation, which applies to "the current invention," not merely to an embodiment, definitively narrows the understanding of the "network route director" so that it must route packets to a virtual address. Given the patentees' statement that the "invention" resolves the challenge of directing traffic through a route director, the Network Route Director recited in the claims must necessarily perform the step of routing data to a virtual address. Such a statement constitutes a clear and unmistakable disclaimer, narrowing the claim scope. *E.g.*, *Computer Docking*, 519 F.3d at 1374.

Consistent with the patentees' lexicography and disclaimer, the specification and claims describe a communication flow between a private source or "first" device and a private destination or "second" device facilitated by a Network Route Director:

> Network Route Directors (NRDs) 520 facilitate routing traffic into and out of private address domains without requiring reconfiguration of a firewall 517 protecting the domain 550. As in UDP encapsulation, a special field in the system join packet (explained below) tells the Member Agent which TCP encapsulation port to use as the source port. The NRD will then re-encapsulate virtual-traffic in UDP-encapsulation before passing it on to other elements of the virtual network.

Ex.3 at 13:51-59; *see also id.* at 13:6-7, 27:13-15, 28:26-27, 32:53-59.

14

This explanation shows a "network route director" would have been understood by a POSITA as "a publicly addressable device configured to route encapsulated packets to and from entities located in a private network portion of a virtual network." Ex.6 at ¶50; Ex.7 at ¶28.

IV contends that American "reads limitations into claim 30". Dkt.77 at 16-17. IV errs by ignoring the patentees' lexicography and disclaimers. *Sinorgchem*, 511 F.3d at 1138 ("When the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term.")

## VII.    '469 PATENT

The '469 Patent is directed to installing paid satellite hotspots in "remote locations experiencing a high volume of transient traffic," *which it describes solely by examples:* "rest areas, restaurants, truck stops, rural hotels, conference centers, motels and state park lodges." Ex.4 at 3:52-55. The '469 Patent explains that one could practice the purported invention by "installing the satellite dish and router in a rural location, which experiences a relatively high volume of transient traffic." Ex.4 at 1:38-56, 4:18-28.

### A.    "a remote location a experiencing a relatively high volume of transient traffic" ('469 patent, claim 24)

| American's Construction | Plaintiffs' Position |
|---|---|
| a fixed remote location experiencing a relatively high volume of transient traffic | No construction or meaning provided |

Claim 24 requires that the claimed hardware components (satellite dish, router, and subscriber access unit) "are located in a remote location a experiencing a relatively high volume of transient traffic." Ex.4 at 8:36-39. The '469 Patent specification contemplates only *fixed* remote locations, *i.e.*, "areas that experience high volume transient traffic, such as rest areas, restaurants, truck stops, rural hotels, conference centers, motels and state park lodges." *Id.* at 1:42-44. None of these exemplary "remote locations," nor any exemplary embodiments in the

specification, discuss a *mobile* "remote location," and the patent does not identify any method of providing Internet connectivity in a non-stationary environment. Ex.6 ¶92.

A POSITA "would have understood 'remote location' in the context of claim 24 of the '469 Patent to mean 'a fixed remote location.'" *Id.* ¶89. The specification confirms that the hotspot remains stationary, while the user moves to and from it. Ex.4 at 3:55-59 ("[T]he signal is always 'live,' all the wireless user would have to do is move within the transceiver's field (an approximately radius of 0.2 to 0.4 miles when an amplifier is used, in an exemplary embodiment)."); *accord* Ex.6 ¶91. The specification "over and over and over again reinforc[es] that when it is referring to a remote location, it's referring to a fixed remote location as opposed to, say, a mobile remote location." Ex.11 at 53:4-9.

IV urges the Court to overlook the patent as a whole to focus instead on one statement: "The "Hotspots' can be located anywhere there is 120 volt electricity available or access to the sun for a solar panel and enough space to house the transceiver and mount a satellite dish."[3] Ex.4 at 1:38-41; Dkt.77 at 19-20. But the '469 Patent does not claim *all* hotspots, nor could it; as the claims and the very next sentence confirm the claim addresses hotspots that "would best be located in areas that experience high volume transient traffic, such as rest areas, restaurants, truck stops, rural hotels, conference centers, motels and state park lodges." Ex.4 at 1:41-44. Claim 24 is limited to hotspots in "remote locations experiencing a high volume of transient traffic." Ex.4 at 8:37-39. Every "remote location" contemplated by the patent is a ***fixed*** remote location from which users come and go.

---

[3] Even if the Court were to consider and credit Dr. Camp's untested declaration, he does not explain (and the '469 Patent's specification does not support) his conclusion that "the invention encompasses permanent, semi–permanent, and temporary deployments, so long as the chosen site meets the 'relatively high volume of transient traffic' condition." Dkt.77-13 ¶49.

Despite IV's contention that no construction is necessary, it argues that a "mobile remote location" falls within the claim, so long as it "has an electrical source and sufficient space to house necessary components for the Hotspot." Dkt.77 at 20. However, where claim terms are used consistently throughout the specification, "claims are not entitled to any broader scope." *Bell Atlantic.*, 262 F.3d at 1273. The '469 Patent's specification provides no disclosure regarding the provision of "mobile" hotspots—it refers only to fixed remote locations—so claim 24's scope should be so limited.

**B.    "a relatively high volume of transient traffic" ('469 patent, claim 24)**

| American's Construction | Plaintiffs' Position |
|---|---|
| Indefinite as to "relatively high" and "transient" | No construction or meaning provided |

The term "a relatively high volume of transient traffic" is indefinite under Section 112: "relatively high" and "transient" are terms of degree, and the patent provides no standard by which a POSITA could measure them. When a term of degree is in a claim, "the patent must provide some standard for measuring that degree such that the claim language provides enough certainty to one of skill in the art when read in the context of the invention." *GE Lighting Sols., LLC v. Lights of Am., Inc.*, 663 Fed. App'x 938, 940 (Fed. Cir. 2016) (cleaned up). Put another way, "the patent must provide that additional information in the form of objective boundaries" to be sufficiently definite. *Id.* (quotes omitted). Any objective boundaries are entirely lacking here.

Neither claim 24 nor the specification provide any boundaries on what constitutes "a relatively high volume of transient traffic." IV argues that this term is sufficiently definite because the specification provides "multiple examples" of locations that experience "high volume transient traffic." Dkt.77 at 20. But even those exemplary locations are inconsistent: as IV admits, "a POSITA (and even a layman) would appreciate and readily understand that some

of these exemplary locations have *different* volumes of traffic." *Id.* (emphasis added). Indeed, a rural restaurant (Ex.4 at 3:54) may see a few dozen patrons per day, while a conference center (Ex.4 at 3:54-55) may see many thousands. Are both quantities a "relatively high volume?" A rural restaurant's patrons may visit for an hour, where a conference center's patrons may stay for days on end. Are both visits "transient?" As Dr. Goodrich explains:

> [A] person of ordinary skill in the art would need to know what is relative and what that means. And the patent doesn't say. Instead it just gives examples . . . But then in my opinion a person of ordinary skill in the art would have no guidance -- absolutely none -- on where the boundaries are. What about something else, say, the office that I work in? Is that in scope or not? A person of ordinary skill has no way of deciding that or determining it. The Patent gives no guidance for that.

Ex.11 at 83:19-84:12; Ex.6 ¶98 ("a POSITA would be at a loss as to whether the time period to apply is even in minutes, hours, or days, or how would this differ from a location that does not receive transient traffic, e.g., because its visitors stay for a 'longer' time or because its visitors come back repeatedly").

IV argues this term is definite based on two unhelpful definitions from Dictionary.com. The first defines the term "relatively" to mean "in a relative manner." Dkt.77 at 20-21 (citing Dkt.77-10). This definition confirms that the claim does not provide the required objective boundaries—only "a relative" measure without any point of comparison. IV's second dictionary definition defines the term "transient" to mean "not lasting, enduring, or permanent; transitory." *Id.* at 21 (citing Dkt.77-11). Again, this only confirms the term's subjectivity: by this definition, a user's home or office could experience "transient traffic" if they move cities or change jobs. IV repeatedly confirms that its reading of the claim language is subjective. *Id.* ("a location having a *proportionally* high volume of transitory traffic" (emphasis added)); *id.* (arguing "this term can be simply understood as a relatively high or proportionally high (as opposed to low) volume of

transitory traffic").[4] The patent fails to identify any objective metes and bounds of "relatively high" or "transient." A person of ordinary skill is left with no measure by which to determine whether traffic is high enough or transient enough to infringe, rendering claim 24 indefinite under Section 112.

Courts routinely find similar claim terms indefinite. For example, in *US Well Services, LLC, et al. v. Liberty Energy, Inc.*, the court found the term "high pressure" indefinite because the patent "does not provide an objective boundary or baseline that would allow a person of ordinary skill in the art to differentiate between 'high pressure' and other types of pressure (i.e., non-high pressure)." No. 24-839, Docket No. 111 at 14 (S.D. Tex. May 30, 2025); *see also U.S. Well Servs., Inc. v. Halliburton Co.*, No. 21-367, 2022 WL 819548, at *9 (W.D. Tex. Jan. 17, 2022) (finding indefiniteness where inventors failed to provide "some objective boundaries for what they considered 'high pressure' to mean"). Adding "relatively" to "high" does nothing to clarify the scope of what is claimed; a POSITA cannot differentiate between "relatively high" and other volumes of traffic. *See* Ex.11 at 87:9-18 ("the word relatively is indefinite because the Patent gives no guidance at all, zero, to a person of ordinary skill in the art as to what that means. Relative to what? It doesn't say. Relative to a threshold? Doesn't say. There's no guidance, period. In another patent, maybe there would be guidance. But in this case, there's none."). "[A] term of degree that is purely subjective and depends on the unpredictable vagaries of any one

---

[4] Even if the Court were to consider Dr. Camp's untested statements, they "provide[] no insight into how to test for a "relatively high volume of transient traffic." Ex.7 at ¶80. Likewise, Dr. Camp's attempt to describe the claimed locations as "high-turnover," Dkt.77-13 at ¶55, "still does not provide a POSITA with reasonable certainty for determining whether a remote site is experiencing a relatively high volume of 'transient traffic.'" Ex.7 at ¶82.

person's opinion is indefinite." *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018) (cleaned up).[5]

In *ParkerVision, Inc. v. MediaTek, Inc*., the Court found the term "relatively efficient power transfer" indefinite where the patent failed to "indicate where the boundary is between 'relatively efficient power transfer' and not 'relatively efficient power transfer.'" No. 22-1163, Dkt.70 at 43-44 (W.D. Tex. Apr. 29, 2024). Here, too, neither the patent nor IV explain what the boundary is between "relatively high" and not "relatively high," and between "transient" and "not transient". Indeed, the only reference to "transient" in the specification is by reference to the varied examples above. Ex.4 at 3:52-55. These are insufficient to provide a standard for measuring the scope of the term. *Cypress Lake Software, Inc. v. Samsung Electronics America, Inc.*, 382 F. Supp. 3d 586, 609-10 (E.D. Tex. 2019) (finding term indefinite where the "intrinsic evidence does not provide an objective criterion for determining what is 'more convenient' or 'permits a user to conveniently enter' the second user input").

Each of IV's authorities confirm that the '469 Patent's lack of objective boundaries render "a relatively high volume of transient traffic" indefinite. In *Resh, Inc. v. Robert Conrad, Inc.*, the court found that the specification "describes a wide variety of materials and their relative qualities" that would "provide *objective boundaries*" to the term at issue." No. 22-1427, 2023 WL 8482869, at *8 (N.D. Cal. Dec. 7, 2023) (emphasis added). In *Niazi Licensing Corp. v. St. Jude Medical S.C., Inc.*, the court found that the "claim language itself provides guidance on

---

[5] IV briefly argues that AA "fails to consider the claims as a whole," because it fails to "evaluate surrounding claim language to understand its scope." Dkt.77 at 21. But IV does not explain how any "surrounding claim language" provides *objective* benchmarks by which "relatively high" or "transient" could be measured. Instead, IV hypothesizes new examples that only further confound the analysis, concluding that "a residential manager of a rural hotel" would "not be included" but *failing to explain by what analysis it came to this conclusion*. Dkt.77 at 21. Indeed, IV's expert suggests that a "residential manager of a rural hotel" *would* be included if his residence lasted a "season." *See* Dkt.77-13 at ¶55.

what ['pliable'] means" such that the "intrinsic record provides *objective boundaries* by which a skilled artisan could determine the scope of the claims." 30 F.4th 1339, 1349 (Fed. Cir. 2022) (emphasis added). Nothing in the record provides such *objective boundaries* here.

Similarly, in *Actavis Laboratories UT Inc. v. UCB, Inc.*, the court concluded that the term "relatively more rigid" was not indefinite where the claim used "relatively" to compare between one specific material and another—here, IV provides no comparison for the "relatively high volume" term. No. 15-1001, 2016 WL 3678987, at *8-10 (E.D. Tex. July 11, 2016). In *Guangdong Alison Hi-Tech Co. v. Int'l Trade Comm'n*, the court found that the specification provided sufficient hard metrics ("fineness," "thermal conductivity," "density") concerning the material components of fibers to render the term at issue definite. 936 F.3d 1353, 1360-62 (Fed. Circ. 2019). In *iLife Technologies Inc. v. Body Media, Inc.*, the court found that the specification consistently explained "the processor can determine when body activity is relatively small to inactive as a function of the environmental representation." 90 F. Supp. 3d 415, 441 (W.D. Penn. 2015). No analogous process is provided here; the specification provides no criteria by which a POSITA can determine whether something is a "relatively high volume of transient traffic."

## VIII.    '582 PATENT

The '582 Patent discloses a method for logically subdividing a computer executable process into sub task partitions and distributing descriptions of the partitions to perform the sub tasks in a first-come/first-served basis and then combining (*e.g.*, "merging") all the sub task outputs into at least one output. Ex.5 at Abstract, claim 1. Claim 1 is a method claim that, among other things, requires "(a) automatically determining file allocation and logically subdividing records of said input file into a plurality of partitions;" "(b) distributing descriptions of all of said partitions to each of a plurality of subtask processors"; "(c) simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said

processors on a respective one of the partitions"; and "(d) thereafter repeating step (c) in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis." Ex.5 at 6:44-61.

### A.    "partition" ('582 patent, claim 1)

| American's Construction | Plaintiffs' Position |
|---|---|
| well-defined part of the input file | No construction or meaning provided |

The patentees acted as their own lexicographers by defining "partition" as a "well-defined part of the input file." The patentees *expressly* defined the term "partition" at 3:36-41:

> A logical partition in this context is a well-defined part of the input or output. A very simple way to define a partition, which in many cases is the most efficient, would be to define the partitions as consecutive ranges on the input or output, ranging from one relative byte address to another relative byte address or from one relative track address to another.

Here, the patentees used the term "is"—"[a] logical partition in this context *is* a well-defined part of the input or output"—which signifies that the patentees are acting as their own lexicographers. *Sinorgchem*, 511 F.3d at 1136 ("Moreover, the word 'is,' again a term here in the specification, may signify that a patentee is serving as its own lexicographer."); *Phillips*, 415 F.3d at 1316. Thus, the patentees clearly, deliberately, and precisely defined the term "partition" as a "well-defined part of the input file." [*Note*: American added the term "file" at the end of the definition to conform to the language of the claim which describes "subdividing records of said input *file* into a plurality of partitions."].

IV contends that "there is no lexicography" and American's construction "limits 'partition' to a particular embodiment." Dkt.77 at 24. IV's contentions are peculiar as they are contrary to its contention to the PTAB. Two weeks before it filed its Claim Construction Brief, IV told the PTAB that, "in the context of the '582 patent, a logical partition is a well-defined part

of the input file," quoting the '582 Patent at 3:36-41 and 3:52-59. Ex.12 at 4-5. This is exactly American's construction: "well-defined part of the input file."

Here, IV contends that examples in the specification of "what a partition could be" somehow mean that the term is not defined as a "well-defined part of the input file." Those examples do not change the fact that the patentees defined "partition" as a "well-defined part of the input file"; instead, they provide ***examples*** of partitions, *i.e.*, examples of "well-defined parts of the input file." IV further contends that the words "in this context," as used in the sentence— "[a] logical partition in this context is a well-defined part of the input or output" (Ex.5 at 3:36-37)—means that the specification is describing an example, not a definition. Dkt.77 at 24. The sentence containing "in this context" must be read together with the previous sentences— "[i]nput files 9 are, thus, logically partitioned into n logical partitions …. In Fig. 1, these logical partitions are numbered as 1 to 6." Ex.5 at 3:32-35. Thus, "in this context" refers to logically partitioning a file into partitions, which is the "context" of step (a) of claim 1, which, like the specification, describes the logical partitioning of a file into partitions. And IV represented to the PTAB that this is "the context of the '582 patent." Ex.12 at 4-5.

**B.    "description of all said partitions" ('582 patent, claim 1)**

| American's Construction | Plaintiffs' Position |
|---|---|
| statements giving a characteristic(s) of all of the well-defined parts of the input file for use in distributing the load without a special load process, wherein such statements are distinct from the input file itself | No construction or meaning provided |

There are four parts to the proper construction of "description of all said partitions": (i) statements giving a characteristic(s) of; (ii) well-defined parts of the input file; (iii) for use in distributing the load without a special load process; and (iv) wherein such statements are distinct from the input file itself.

*First*, the phrase "statements giving a characteristic(s) of" is the ordinary and customary meaning of "description." The patentees did not provide a special definition for the term "descriptions" in the specification and therefore a POSITA would have understood that the term "descriptions," in the context of claim 1 and the '582 Patent, to have its ordinary meaning. The term "descriptions" is defined by Merrian-Websters as "a statement or account giving the characteristics of someone or something." *Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."); Ex.13; Ex.6 at ¶73. A POSITA would have understood that this definition of "description" is consistent with the use of that term by the patentees in the claims and during prosecution. Ex.6 at ¶73. IV contends that American's reliance on a layman dictionary definition is improper given "the technical relationship between 'descriptions' and the 'partitions.'" Dkt.77 at 25. IV, however, does not offer a technical dictionary definition of "description" or construe "description" based on the specification and this "technical relationship."

*Second*, the phrase "well-defined parts of the input file" is the meaning of "partition," as described in the previous section.

*Third*, the phrase "for use in distributing the load without a special load process" is necessary because the patentees disclaimed claim scope during prosecution when distinguishing the claims from the prior art. During prosecution, the patentees responded to the examiner's rejection of the claims by distinguishing prior art and explaining that the "amended claims, refer to a distribution of a description of the work to be done. The sharing process can use such a description to distribute the load without a special load process." Ex.14 at 7; Ex.6 at ¶64. This

representation to overcome the prior art is a classic disclaimer. *Computer Docking Station*, 519 F.3d at 1374 ("A patentee could [make a disclaimer], for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art").

IV contends that there was no disclaimer of claim scope, because "[w]hile the text of the file history removes the requirement for a centralized load process that uses load information to make scheduling decisions, it does not preclude centralized coordination or the use of load information in making scheduling decisions." Dkt.77 at 26. IV is incorrect.

The patentees represented during prosecution that the prior art required a "special load process that uses load information to distribute the load," whereas, with the invention, "there is no special process" and therefore the amended claims, which "refer to a distribution of the work to be done," "can use such a description to distribute the load without a special load process." The patentees agreed that this limitation enabled the claims to be allowable over the cited art:

> The primary difference between the instant invention and the [prior art] is that these systems rely on a special control process that uses load information to distribute the load between processors that share the load. With the instant invention as defined in the claims there is no such process. The prior art's load information is not created with the process of the instant invention. Instead, the load information is done as a byproduct of the fact that the load-sharing process take parts of the load on a first-come/first-served basis.
>
> * * *
>
> The amended claims, refer to a distribution of a description of the work to be done. The sharing process can use such a description to distribute the load without a special load process.
>
> For these reasons the instant invention is clearly allowable over the cited art.

Ex.14 at 7-8. These statements disclaimed claim scope by clearly characterizing the invention in a way to overcome the prior art rejections, *i.e.*, the patentees told the Examiner that a distinction of the amended claims over the prior art is that there is no special process that uses load information. Ex.7 at ¶¶48-49.

25

*Fourth*, the phrase "wherein such statements are distinct from the input file itself" is necessary because the patentees disclaimed claim scope by amending the claims from requiring "distributing said partitions" to requiring "distributing descriptions of all of said partitions." Exs. 14 and 15. As originally filed, claim 1(b) referred to distributing the partitions themselves: "(b) ***distributing said partitions*** to a plurality of processors and activating respective subtasks of the computer-executable process in each of said processors, each subtask reading and processing said partitions on a first come first serve basis." Ex.15 (Original Application at 15) (emphasis added). After the examiner rejected claim 1 over the cited prior art, the applicant amended claim 1(b) to specify that ***descriptions*** of the partitions are distributed, not the partitions themselves: "(b) distributing descriptions of all of said partitions to each of a plurality of subtask processors and activating. . ." Ex.14 at 2 (underlining and strikethrough in original).

A POSITA would have understood that the intrinsic record distinguishes descriptions of partitions from the partitions themselves. For example, the specification provides examples of descriptions of partitions, which are distinguished from the data in the partitions. Ex.5 at 3:52-59; Ex.6 at ¶¶66-67. The specification shows "descriptions" of partitions are different from the partitions themselves, *i.e.*, a POSITA would understand that the intervals, [0,100000], [100001,200000], [200001,300000], [300001,end] to be descriptions of partitions, which are different than the data itself for each of the ranges of the data. Ex.6 at ¶70.

IV contends that "there is nothing in the claims that require the description to either be a part of the input file, or not to be a part of the input file," but admits that the claims "require that 'descriptions' of the partitions are distributed to the subtask processors." Dkt.77 at 26. IV ignores the claim amendment, which changed the claim from stating "distributing said partitions" to stating "distributing ***descriptions*** of all said partitions." When the patentees amended the claim

they disavowed any claim scope to distributing partitions and limited the claims to distributing descriptions of partitions.

> ### C. simultaneously executing at least a respective one of the sub tasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions" ('582 patent, claim 1)

| American's Construction | Plaintiffs' Position |
|---|---|
| Indefinite | No construction or meaning provided |

Step 1(c)—"simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions"—is indefinite. "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention". *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

Here, claim 1(c), when read in light of the specification and the prosecution history, fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention. Claim 1(c) requires "***simultaneously*** executing ***at least a respective one of the subtasks*** of the computer-executable process in each of at least some of said processors on a respective one of the partitions." Ex.5 at 6:52-55 (emphasis added). A POSITA would have understood that simultaneously executing sub tasks can only occur when there are at least two sub task processors executing at the same time, by the plain and ordinary meaning of "simultaneously." Ex.6 at ¶82.

But claim 1(c) requires "simultaneously executing at least a respective ***one*** of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions." Ex.5 at 6:52-55 (emphasis added). The phrase "***at least*** a respective ***one*** of the subtasks" includes instances where there is only ***one*** sub task. Given the

express requirements for a plurality of sub task processors in the claim, a POSITA would be unable to reasonably determine what it means to *simultaneously* execute *one* sub task by itself, as is encompassed by claim 1(c). Ex.6 at ¶82; Ex.7 at ¶¶58-59. Therefore, a POSITA could not have ascertained the meaning of this limitation with "reasonable certainty" from the patent's specification and prosecution history. *Id.*

IV contends that claim 1(c) is not indefinite by attempting to re-write claim 1(c): "claim 1 can be understood to *require at least two subtasks* and at least two subtask processors." Dkt.77 at 27 (emphasis added). Claim 1(c) does not "require" at least *two* sub tasks, as IV contends. Instead, the plain language of claim 1(c) requires simultaneously executing *at least one* of the sub tasks: "simultaneously executing *at least* a respective *one of the subtasks*. . ." (emphasis added), where, contrary to IV's re-writing, "at least one subtask" includes "one subtask." IV cannot re-write the claim to save it.

### D.    "on a first-come/first-served basis" ('582 patent, claim 1)

| American's Construction | Plaintiffs' Position |
|---|---|
| selecting the earliest unprocessed partition for execution without the use of a control process that uses load information for such selection | No construction or meaning provided |

There are two parts to the proper construction of "on a first-come/first-served basis," which is part of claim 1(d): (i) "selecting the earliest unprocessed partition for execution (ii) without the use of a control process that uses load information for such selection."

*First*, the phrase "selecting the earliest unprocessed partition for execution" addresses the meaning of "*first-come*/first-served" in the context of the claims. Claim 1(d) requires "thereafter repeating step (c) in at least some of the subtask processors each with another unprocessed partition *on a first-come/first-served basis*." Ex.5 at 6:59-61 (emphasis added). According to claim 1(d), what is being taken "on a first-come/first-served" basis is "another unprocessed

partition." Claim 1(d) provides no guidance as to how to determine which "unprocessed partition" is "first-come," as the specification teaches that some sub tasks may run faster than others. Ex.5 at 6:19-22.

The specification states that "each said sub task processing the partitions defined by said logical partition in a ***first come first serve basis***." Ex.5 at 1:67-2:2. In an example, the sub tasks operate on the unprocessed partitions in the order in which they were logically subdivided, *i.e.*, "Input 1" is processed first, then "Input 2," then "Input 3," then "Input 4," then "Input 5," and, last, "Input 6." Ex.5 at 6:14-37; Figure 4. The phrase—"selecting the earliest unprocessed partition for execution"—is therefore consistent with this example by describing the earliest unprocessed partition as being the "first-come" unprocessed partition.

IV contends that American's construction is "inconsistent with multiple descriptions in the '582 Patent that allow for the inclusion of an internal or external scheduler that considers dependencies," citing '582 patent at 3:13-19 and 3:64-67. Dkt.77 at 30. But IV's specification citations do not speak to the construction of the term. Nothing in those two citations address the meaning of "first-come/first-served." A "scheduler" does not determine which partition is the "first-come" partition. Further, in describing the use of the "scheduler," the specification provides no guidance on determining which "unprocessed partition" is "first-come." Instead, the specification states that the sub task "repeatedly tries to allocate for itself and then process, an input partition that has not been allocated yet." Ex.5 at 4:1-3. Moreover, without any construction (as IV proposes), the phrase "on a first-come/first-served basis" would be indefinite, as it provides no guidance for determining which unprocessed partition is "first-come."

*Second*, the phrase "without the use of a control process that uses load information for such selection" is required because, as discussed, *supra*, with respect to the term "descriptions of

29

all of said partitions," the patentees disclaimed claim scope during prosecution when distinguishing the claims from the prior art. Ex.6 at ¶76; Ex.7 at ¶¶53-55. The patentees responded to the examiner's rejection of the claims by distinguishing prior art and stating that

> The primary difference between the instant invention and the process disclosed in [the prior art] is that ***these systems rely on a special control process that uses load information to distribute the load between processors that share the load***. ***With the instant invention as defined in the claims there is no such process***. The prior art's load information is not created with the process of the instant invention. Instead, the load sharing is done as a byproduct of the fact that the load-sharing process take parts of the load on a first-come/first-served basis.

> A comparison would be to a road intersection where, according to the prior art, there is a traffic light that determines who can go when. The instant is more like such an intersection with a four-way stop so that the individual drivers determine who can go and when.

> This is a major improvement since in addition to ***eliminating the control process it also eliminates the need to collect and maintain load information***, which it is very difficult to do and almost impossible to define so as to anticipate all possible processors that might execute the subtasks."

* * *

> For these reasons the instant invention is clearly allowable over the cited art.

Ex.14 at 7-8 (emphasis added). This representation to overcome the prior art is a classic disclaimer. *Computer Docking Station*, 519 F.3d at 1374 ("A patentee could [make a disclaimer], for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art").

IV contends that American is relying on the "four-way stop" example. Dkt.77 at 30. American is ***not*** relying on the "four-way stop" example. As discussed, American is relying on the patentees' clear and unmistakable statements distinguishing the claims from the prior art.

## IX.    CONCLUSION

For the foregoing reasons, the Court should adopt American's constructions and reject IV's contention that no construction is necessary for the disputed terms.

30

Dated: September 9, 2025

MCKOOL SMITH, P.C.

*/s/ John B. Campbell*
John B. Campbell
Texas State Bar No. 24036314
jcampbell@McKoolSmith.com
Kenneth M. Scott
Texas State Bar No. 24137497
kscott@McKoolSmith.com
MCKOOL SMITH, P.C.
303 Colorado Street Suite 2100
Austin, TX 78701
Telephone: (512) 692-8700
Telecopier: (512) 692-8744

Emily Tannenbaum
New York State Bar No. 5928130
MCKOOL SMITH, P.C.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 402-9400
Telecopier: (212) 402-9444

Casey L. Shomaker
Texas State Bar No. 24110359
cshomaker@mckoolsmith.com
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Alan P. Block
California State Bar No. 143783
ablock@mckoolsmith.com
MCKOOL SMITH, P.C.
300 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Telephone: (213) 694-1054
Telecopier: (213) 694-1234

ATTORNEYS FOR AMERICAN
AMERICAN AIRLINES, INC.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on September 9, 2025.

*/s/ John B. Campbell*
John B. Campbell
