# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC and | ) | |
| INTELLECTUAL VENTURES II LLC, | ) | |
| | ) | Case No. 4:24-cv-980 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN AIRLINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY DECLARATION OF MICHAEL T. GOODRICH
IN SUPPORT OF CLAIM CONSTUCTION**

I, Michael T. Goodrich, hereby declare as follows:

1.    I have been retained as an expert witness by American Airlines, Inc. ("American Airlines") to provide information to the Court concerning patent claims from the perspective of the "person of ordinary skill in the art" ("POSITA"). I have been asked to respond to the August 26, 2025, Opening Claim Construction Brief ("IV Brief") by Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC ("IV"), including its exhibits, which include a declaration by Dr. Joseph D. Camp ("Camp Decl.") and a declaration by Dr. Eyal de Lara ("de Lara Decl.") providing rebuttal opinions to my opening declaration regarding claim construction. The opinions set forth below are true to the best of my knowledge, and if called to testify, I can testify competently to them.

2.    I have reviewed United States Patent No. 8,332,844 ("the '844 Patent"), United States Patent No. 8,407,722 ("the '722 Patent"), United States Patent No. 7,949,785 ("the '785 Patent"), United States Patent No. 7,324,469 ("the '469 Patent"), and United States Patent No. 7,257,582 ("the '582 Patent") (collectively, the "Patents-in-Suit"), as well as their file histories, the November 2, 2024, Complaint, and other documents cited in this declaration. I have also reviewed the Opening Claim Construction Brief by IV and its exhibits. I include by reference the entirety of my opening declaration on claim construction, which I signed August 4, 2025 ("My Opening Declaration"). I am also including as materials considered every citation that I make in this declaration, including the transcript from my August 8, 2025, deposition for this matter ("My Depo.").

3.    A list of other recent cases in which I have signed a Protective Order or have testified as an expert either at a trial, hearing, or deposition, or have submitted statements/opinions, is attached to my opening declaration.

4.     My time is being billed at a rate of $800 per hour plus any direct expenses incurred. My compensation is based solely on the amount of time that I devote to activity related to this case and is in no way affected by any opinions that I render. I receive no other compensation from work on this action. My compensation is not dependent on the outcome of this matter.

## I.  QUALIFICATIONS

5.     I include by reference the Qualifications section from My Opening Declaration.

## II.  PERSON OF ORDINARY SKILL IN THE ART

6.     I include by reference the Person of Ordinary Skill in the Art (POSITA) section from My Opening Declaration.

## III.  LEGAL UNDERSTANDINGS

7.     I include by reference the Legal Understandings section from My Opening Declaration.

## IV.  OVERVIEW OF THE PATENTS-IN-SUIT

8.     I include by reference the Overview of the Patents-in-Suit section from My Opening Declaration.

## V.  ADDITIONAL TECHNICAL BACKGROUND

### A.  The TCP/IP Reference Model

9.     The software and hardware for computer networks are organized according to abstraction layers that define the protocols and functionality that supports communication between computing devices in the network. The hardware and software that functions on a given layer uses interfaces and functionalities that are provided by the layer(s) lower in the framework and that hardware and software in turn provides interfaces and functionalities for higher layers.

Two of the most popular such reference models are the **OSI Model** and the **TCP/IP Reference Model**. The OSI Model has 7 layers, and the TCP/IP Reference Model has 4, but they both have related terms and functionalities:



https://www.computernetworkingnotes.com/ccna-study-guide/similarities-and-differences-between-osi-and-tcp-ip-model.html.

10.    In this declaration, I focus on the (updated) TCP/IP Reference Model, since this is the model used in the '785 Patent. Indeed, the '785 Patent includes an explanation of this model as a part of its specification, which I excerpt below, since it matches my opinion as to the understanding of a POSITA regarding this model:

> Most machines on the Internet use the TCP/IP (Transmission Control Protocol/Internet Protocol) reference model to send data to other machines on the Internet. The TCP/IP reference model includes four layers: the physical and data link layer, the network layer, the transport layer, and the application layer. The physical layer portion of the physical and data link layer is concerned with transmitting raw bits over a communication channel. The data link portion of the Physical and Data Link layer takes the raw transmission facility and transforms it into a line that appears to be relatively free of transmission errors. It accomplishes this task by having the sender break the input data up into frames, transmit the frames and process the acknowledgment frames sent back by the receiver.

The network layer permits a host to inject packets into a network and have them travel independently to the destination. On the Internet, the protocol used for the network layer is the Internet Protocol (IP).

The transport layer is designed to allow peer entities on the source and destination to carry on a "conversation." On the Internet, two protocols are used. The first one, the Transmission Control Protocol (TCP), is a reliable connection-oriented protocol that allows a byte stream originating on one machine to be delivered without error to another machine on the Internet. It fragments the incoming byte stream into discrete segments and passes each one to the network layer. At the destination, the receiving TCP process reassembles the received segments into the output stream. TCP also handles flow control to make sure a fast sender cannot swamp a slow receiver with more segments than it can handle. The second protocol used in the transport layer on the Internet is the User Datagram Protocol (UDP), which does not provide the TCP sequencing or flow control. UDP is typically used for one-shot, client server type requests-reply queries for applications in which prompt delivery is more important than accurate delivery.

The transport layer is typically thought of as being above the network layer to indicate that the network layer provides a service to the transport layer. Similarly, the transport layer is typically thought of as being below the application layer to indicate that the transport layer provides a service to the application layer.

The application layer contains the high level protocols, for example, Telnet, File Transfer Protocol (FTP), Electronic Mail-Simple Mail Transfer Protocol (SMTP), and Hypertext Transfer Protocol (HTTP).

'785 Patent at 3:1-46.

11.    Accordingly, a POSITA would understand that when the '785 Patent uses the term "network" as an adjective, it is often referring to functionality that exists at the network layer in the TCP/IP Reference Model, which uses the Internet Protocol (IP).

### B. Disk Blocks

12.    In a tutorial that, based on my education and experience, is accurate, Amazon Web Services explains that *block storage* is technology that controls data storage and storage devices. It takes any data, like a file or database entry, and divides it into blocks of equal sizes.[1] The block storage system then stores the data block on underlying physical storage in a manner that is

---

[1] See https://aws.amazon.com/what-is/block-storage/.

optimized for fast access and retrieval. Developers prefer block storage for applications that require efficient, fast, and reliable data access. One can think of block storage as a more direct pipeline to the data. In contrast, file storage has an extra software/hardware layer consisting of a file system (NFS, SMB) to process before accessing the data. That is, disk block storage operates at a layer below that of a file system. A file may comprise one or more blocks (or parts of blocks) and a block may include one or more files (or parts of files).[2]

### C. Satellite Dishes and Phased Array Antennas

13.    A ***satellite dish*** is a dish-shaped parabolic antenna designed to receive or transmit information by radio waves to or from a communication satellite. For example, the following is a definition from a well-known technical dictionary:

> **satellite dish** *n*. A parabolic (dish-shaped) reflector and antenna that is used for transmitting and receiving signals between the ground and earth satellites. Satellite dishes are commonly used for receiving television transmissions.

> *Microsoft Computer Dictionary*, 5th edition, 2002.

14.    The parabolic shape reflects and focuses signals to the dish's focal point.[3] Accordingly, a satellite dish for Internet access must be aligned so that it is pointing with a clear line-of-sight to a geostationary communication satellite. For example, the following is an explanation of how satellite Internet service works, by Hughes Network Systems, LLC, which markets itself as providing Internet access to rural areas:

---

[2] *Id.*
[3] *See, e.g.*, https://www.antenna-theory.com/antennas/reflectors/dish.php. *See also, e.g.*, *Antenna Theory and Design*, 3rd edition, by Warren L. Stutzman and Gary A. Theile, 2012, at 391.

Home / About Hughesnet / How Does Satellite Internet Work?

# How Does Satellite Internet Work?

Satellite internet connects homes and businesses across the country. Other internet services require extensive and expensive infrastructure, frequently unavailable in rural locations. In contrast, satellite internet only requires a satellite dish and modem for reliable connectivity, no matter how remote your location.

So how does satellite internet work, and what are its benefits? Here, we'll break down the basics, from how satellites transmit internet data to installation requirements and availability in your area.

## The Fundamentals of Satellite Internet



### Orbiting Satellites & Ground Stations

There are three main types of orbiting satellites: low Earth orbit (LEO), medium Earth orbit (MEO), and geostationary Earth orbit (GEO). Each serves different purposes, from GPS and Earth observation to communications. Hughesnet® uses geostationary satellites (GEO), which remain fixed over one point on the Earth's surface, allowing us to provide broad internet coverage across the United States—even in rural or remote areas where landline coverage is not available.

### Data Transmission Flow: A Primer

For home satellite internet, data travels from the home's satellite dish to the orbiting satellite, to the ground station, out to the internet, and then back again. Here's how the process works:

**Step 1:** A request for a Web page is sent from your computer to a satellite about 22,000 miles out in space. At this altitude, the satellite's period of rotation (24 hours) matches the Earth's, and the satellite always remains in the same spot over the Earth (geosynchronous orbit).

**Step 2:** The satellite contacts the Hughes Network Operations Center (NOC) which locates the specific Website you have requested.

**Step 3:** The Website beams the information back along the same path to the NOC, then to the satellite, and then to your computer or device through your Hughesnet dish and modem.



https://www.hughesnet.com/about-hughesnet-satellite-internet/how-satellite-internet-works.

15.     Further, the following is an exemplary set of steps for setting up an Internet satellite

dish by Hughes Network Systems, LLC:

**Strategic Location Planning**

Professional installers have many elements to consider when installing a satellite dish. The first consideration is regulation and safety. Installers will know the regulations in your area and will avoid installing the dish in an area close to any power lines or other service utilities. Also, it will be placed at least 4 feet from the ground to ensure the safety of young children.

Most importantly, your dish must have a clear and unobstructed view of the southern sky to receive the satellite signal. Your technician will also strategize with you about whether that signal will remain unobstructed for the duration of the service. For example, if you have trees that are likely to grow and obstruct the view, installers will consult with you about that location.

In addition to the location of your dish, installers will need to determine the location of the modem in your house and the coaxial jack that will connect your modem to the satellite dish signal. This location will need to be easily accessible from both the inside and the outside of your house.

**Maintaining and Aligning the Equipment**

First, the Installers must plan the best way to maintain the multiple pieces of equipment needed. First, the method of installing a satellite dish on the roof, wall, or external structure must be determined for best service. This can be done with a wall mount or a roof mount.

Second, the installers align the dish to get maximum strength from the signal. They must find the proper tilt to the dish using a signal meter and tighten the equipment so that it stays in place.

Third, they run the two coaxial cables from the satellite to the coaxial cable jack and seal their points of entrance with water-resistant compression fitting.

https://www.hughesnet.com/blog/everything-goes-installing-satellite-dish.

16.    For example, the above instructions stress that the satellite dish needs to stay in place, so it can maintain its alignment and clear line of sight to the satellite. In contrast, a ***phased array antenna*** creates a beam of radio waves that can be electronically steered to point in different directions without moving the antenna.[4]  That is, through the use of computing and digital signal processing hardware and software, a phased array antenna does not need to be mechanically steered and can be used with different geometries, including conforming to the skin of an aircraft. Since a phased antenna array does not need to be physically pointed toward a communication satellite, it is useful for mobile applications, such as for use on an airplane. For

---

[4] *See, e.g.*, *Antenna Theory and Design*, 3rd edition, by Warren L. Stutzman and Gary A. Theile, 2012, at 271.

example, an early satellite system for providing Wi-Fi on airplanes, Connexion by Boeing, used

phased array antennas:



Figure 5.  Photo of Boeing receive phased array antenna mounted on an aircraft fuselage.

"Connexion By Boeing - Broadband Satellite Communication System For Mobile Platforms," by William H. Jones and Michael de La Chapelle, MILCOM Proceedings Communications for Network-Centric Operations: Creating the Information Force, 2001, at Fig. 5. https://ieeexplore.ieee.org/abstract/document/985939

## VI.  CLAIM CONSTRUCTION RESPONSES

### A.  The '785 Patent

17.    Claim 30 recites:

30. A virtual network manager, comprising:

a network interface configured for data communication via a virtual network that is defined by a domain name having an associated public network address;

a memory and a processor to implement a register module configured to register devices in a virtual network, the register module further configured to:

receive a registration request from an agent associated with a device;

distribute a virtual network address to the device when the device is registered in the virtual network, the device being identified to other devices in the virtual network by the virtual network address; and

a DNS server for the virtual network, the DNS server configured to[:]

receive a DNS request from a first device in the virtual network, and

return a <u>network address</u> associated with a <u>network route director,</u> [b] a private network address associated with a second device in the virtual network, and [c] a virtual network address associated with the second device.

### i. "network address"

18.     Claim 30 of the '785 Patent requires "return[ing] a network address associated with a network route director[.]" '785 Patent at 36:52-53. As I explained in My Opening Report, in my opinion, a POSITA would have understood "network address" in the context of the '785 Patent to mean an "IP address." I include by reference my discussion regarding this claim term from My Opening Declaration.

19.     IV and Dr. de Lara take issue with my proposed claim construction, e.g., criticizing a dictionary definition that I offered for "network address." IV Brief at pp. 14-16, de Lara Decl. ¶¶ 74-76. Further, I was questioned about this definition and the reliability of its source, ComputerDictionaryOnline.org, at my deposition. My Depo., 158:12-159:17, 165:19-167:10. However, even setting aside this disputed dictionary definition, the following definition from a highly cited technical dictionary[5] would, in my opinion, based on my education and experience, be considered accurate to a POSITA as of the priority date of the '785 Patent:

---

[5] According to Google Scholar, this technical dictionary has been cited over 900 times in the peer-reviewed literature. See, e.g., https://scholar.google.com/scholar?hl=en&as_sdt=0%2C5&q=newton%27s+telecom+dictionary&oq=newton%27s+tel.

**network address** Every node—computer, PDA, iPhone—on an Ethernet network has at least two addresses associated with it. One is called a MAC (Media Access Control) address. It's a fixed hardware address such as "ae-34-2c-1d-69-f1" and it's assigned by the device's manufacturer. It's the unique number assigned to the network adapter inside your computer or gadget. No one else can have your number. Additionally, on all Ethernet networks, there's an IP (Internet Protocol) address. That address is typically assigned to your device on the fly by a router connected to the Internet. Think of this address which looks like this—192.168.10.108—as your postal address. It enables the postal service (i.e. the Internet) to find you. Without your IP address you wouldn't be able to receive email or surf the Internet. There are two ways you acquire an IP address when you attempt to log into the Internet. Your ISP (Internet Service Provider) can assign you one. This is called dynamic assignment. There is also a static IP address. Essentially you choose the IP Address you want. You organize this thus. You have a router at your home or office. It connects to the Internet. Your router gets its IP address from your ISP. But then it has software inside which translates that IP Address to the addresses demanded by the computers attached to it. Choosing between dynamic and static is done in the software in your computer. It's easier to select dynamic—let the Internet do all the work. That's called DHCP—Dynamic Host Configuration Protocol. See HOW TO SET UP A HOME OR SMALL OFFICE NETWORK in the Introduction and Internet address.

Newton's Telecom Dictionary, 25th Anniversary Edition, 2009.

20.    Further, I note that this technical dictionary lists on its cover that it is a "#1 Best Seller", with a 5-star rating and over 770,000 sold, and that it was identified by PC Magazine as "An essential resource."

21.    In summary, a POSITA would understand the above technical dictionary definition to be teaching that a "network address" is a "MAC address" or an "IP address," depending on whether one is operating at the link layer on a LAN or network layer on the Internet, respectively, in the TCP/IP Reference Model. See, e.g., '785 Patent at 3:1-46. My Depo., 155:5-22. Given that a POSITA would understand the invention of the '785 Patent to be operating at the network layer on the Internet rather than confined to a LAN on the data link layer, this definition provides additional evidence that the proper construction for "network address" in the '785 Patent is "IP address." See also, e.g., '785 Patent at 1:38-47, 4:47-5:10.

10

22.     Further, I note that Dr. de Lara admits that embodiments in the '785 Patent "may use network address interchangeably with an IP address," while disputing whether there is lexicography for this in the '785 Patent. Further, Dr. de Lara cites to references to "public network addresses," "private network addresses," and "virtual network addresses," e.g., as recited in claim 30, as other types of "network addresses." However, my proposed claim construction is for the recited "a network address," not for the recited "public network address," "private network address," and "virtual network address." Indeed, I confirmed this at my deposition, which neither IV nor Dr. de Lara cite. My Depo., 154:8-17. Further, Dr. de Lara points to no reference from the '785 Patent where "network address" is disclosed to be anything other than an "IP address." Accordingly, having reviewed Dr. de Lara's declaration, my conclusion remains that the proper construction for "network address" in the context of the '785 Patent is an "IP address."

23.     For example, I stand by my opinions from My Opening Declaration that I understand that a patentee can serve as their own lexicographer, and in the case of the term "network address," a POSITA would have understood that the patentee defined "network address" in the specification as an "IP address." *See, e.g.*, '785 Patent at Fig. 7, 8:16-17, 14:32-34. Likewise, I continue to conclude that the '785 Patent relies on IP addresses as network addresses to be a core aspect of the described invention, and at many points uses the term "IP address" interchangeably and/or synonymously with "network address." *See, e.g.,* '785 Patent at 1:44-45, 1:48-50, 9:15-17, 10:17-39, 10:34-50, 12:48-53, 13:33-40, 27:1-5, 28:30-33, 31:24-33. Further, I stand by my conclusion that the patent holder noted that "the response from the DNS server includes a numeric IP address" and explained that "a DNS request is responsible for resolving a domain name, such as www.example.com, into its corresponding IP address (e.g., 93.184.216.34) so that devices can locate and communicate with the server hosting the desired

11

resource." Applicant Arguments/Remarks Made in an Amendment in response to Ex Parte Reexamination Non-Final Action, dated Jan. 8, 2025, at pg. 12-13. These representations show that the "network address" described in the claims corresponds to an IP address returned by a DNS server.

24.    Therefore, based on the above analysis, I continue to conclude that "network address" in claim 30 would have been understood by a POSITA when reading the claims in view of the specification and prosecution history as "IP address."

### ii.    "network route director"

25.    Claim 30 of the '785 Patent requires "return[ing] a network address associated with a network route director[.]" As I explain in My Opening Declaration, in my opinion, a POSITA would have understood "network route director" to mean "a publicly addressable device configured to route encapsulated packets to and from entities located in a private network portion of a virtual network." I include by reference my discussion regarding this claim term from My Opening Declaration.

26.    IV and Dr. de Lara dispute my proposed claim construction, e.g., by citing to claim 39, which derives from independent claim 38. However, my proposed claim construction is for claim 30, not claims 38 or 39. Moreover, the term in claim 38 is "route director," not "network route director." Moreover, a POSITA would understand that claim 39 supports my conclusion rather than contradicting it, since claim 39 (which neither IV nor Dr. de Lara cite in full) is further restricting "route director" from claim 38 and it recites in full, "The system of claim 38 wherein the route director is a public network route director *that includes a public network interface and the network address is a public network address by which the first and second virtual network agents communicate with the public network route director*." (Emphasis added.) Thus, a

POSITA would understand claim 39 to be adding further limitations to the (public) network route director, not that it is limiting a potentially non-public network route director to be public.

27.    Further, the only dispute IV and Dr. De Lara have with the language "configured to route encapsulated packets to and from entities located in a private network portion of a virtual" is that Dr. de Lara did not find this limitation in claim 30 itself. Of course, this opinion ignores what I understand to be the reason for claim construction. *See, e.g.*, My Depo., 158:6-11. Moreover, Dr. de Lara does not rebut the substance of my opinions regarding this language. For example, Dr. de Lara does not dispute my analysis that, during reexamination, the patent owner stated that "the problem of the current invention [] is how to route through a route director to the virtual address." Applicant Arguments/Remarks Made in an Amendment in response to Ex Parte Reexamination Non-Final Action, dated Jan. 8, 2025, at pg. 19. As I explain in My Opening Declaration, a POSITA would understand this explanation, by emphasizing its reliance on "the current invention," to definitively narrow the understanding of the "network route director" so that it must route packets to a virtual address. Given the patent owner's contention that the invention seeks to resolve the challenge of directing traffic through a network route director, the network route director recited in the claims must necessarily perform the step of routing data to a virtual address. Further, neither IV nor Dr. de Lara dispute my analysis that the specification and claims of the '785 Patent describe a communication flow between a private source or "first" device and a private destination or "second" device; hence, I stand by my conclusion that such routing must encompass the transmission of communications from the private first/source device to the private second/destination device. *See, e.g.*, '785 Patent at 13:6-7, 13:51-59, 27:13-15, 28:26-27, 32:53-59.

28.    Therefore, my conclusion remains that a "network route director" in claim 30 would have been understood by a POSITA as "a publicly addressable device configured to route

encapsulated packets to and from entities located in a private network portion of a virtual network."

### B. The '844 Patent

29.    Claim 7 recites:

7. A method for providing data to a plurality of compute nodes, comprising:

storing blocks of a <u>root image</u> of said compute nodes on a first storage unit;

storing leaf images for respective compute nodes on respective second storage units,

> said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image,

> wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and

caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory.

### i.  "root image"

30.    Claim 7 of the '844 Patent requires "storing blocks of a root image of said compute nodes." As I explain in My Opening Declaration, in my opinion, a POSITA would have understood "root image" to mean "a read-only base set of data blocks, operating beneath the file system, that provide the common portion of the application environment." I include by reference my discussion regarding this claim term from My Opening Declaration.

31.    Dr. de Lara disputes my proposed claim construction, but he apparently agrees that lexicography could apply here, in which case he proposes the meaning of "root image" would be "a read-only base set of data blocks of the application environment." de Lara Decl., ¶ 91. For example, I understand that a patentee can serve as their own lexicographer, and in the case of the term "root image," a person of ordinary skill in the art would have understood that the patentee defined "root image" in the specification of the '844 Patent as "a read-only base image (or 'root'

14

image) of the application environment …." '844 Patent at 2:13-14. Thus, on this point, Dr. de Lara and I apparently agree.

32.    Regarding the phrase "read-only," I note that, in spite of his admission regarding lexicography in the '844 Patent, Dr. de Lara confusingly disputes that a root image would be "read-only." To support this conclusion, Dr. de Lara incorrectly interprets disclosures regarding embodiments where the first storage unit 240 is read-only (which, in turn imply the root image would not have to be re-indexed). de Lara Decl., ¶ 89. *See, e.g.*, '844 Patent 7:34-37, 9:60-67. Contrary to Dr. de Lara's interpretation here, a POSITA would understand that even though a root image is always "read-only," meaning that its contents do not change, it would be possible to store a root image on a storage unit that itself is read only (like a CD-ROM) or it could be stored on a storage unit that is not read only (like a disk drive). A POSITA would be aware that in storage units that are not read only, the blocks of a root image on such a storage unit may be moved (e.g., to reduce disk fragmentation).[6] In the case of moving disk blocks (whose contents are themselves read only), the locations, i.e., the indices, of those blocks would necessarily change; hence, other parts of a system that use those indices would need to be re-indexed. This would be understood to a POSITA, for instance, from the '844 Patent, based on the following:

> Step 520 involves the compute node indexing the root image portion of its file system. In such a case, the compute node is to some extent agnostic to the fact that its file system is divided between a root image portion and a leaf image portion. At step 540, the compute node provides the indexing results of the root image portion to another compute node. It is appreciated that this may be achieved a number of ways. For example, the first compute node may simply provide the indexing results to the second compute node directly. Alternatively, the first compute node may store the indexing results on a shared storage unit that is accessible by the second compute node (step 530).
>
> Thereafter, the compute node may complete its indexing of its file system by indexing the leaf image portion of the file system (step 550). Further down the road, the benefits of indexing the root image separately from the leaf image are

---

[6] *See, e.g.*, "Defragmenting really speeds up Windows NT machines," by Drew Robb, *IEEE Spectrum*, 74-77, 2000.

realized when the compute node requires that its file system be re-indexed. At step 560, the compute node re-indexes its file system by re-indexing its corresponding leaf image portion with the previous indexing results of the root portion.

'844 Patent at 9:48-67.

33.    Thus, I conclude that the lexicography for "root image" offered by the patentee regarding the phrase "read-only" is not contradicted by embodiments disclosed in the '844 Patent regarding storage units that are read only.

34.    The only real dispute, therefore, is the other language that, in my opinion, should be added to the definition for "root image" to avoid potentially circular language involving the term "image," based on the specification of the '844 Patent. *See, e.g.*, My Depo., 35:1-37:16. As an initial matter, I note that neither IV nor Dr. de Lara cite to my deposition testimony.

35.    For instance, regarding the phrase "operating beneath the file system," Dr. de Lara admits that embodiments disclosed in the '844 Patent operate beneath the file system. de Lara Decl., ¶ 90, citing the '844 Patent at 5:51-58, 7:58-62 ("Step 310 involves storing blocks of a root image of the compute node on a first storage unit. By storing data at the block level, embodiments are able to operate beneath the file system and thus are designed to be file system and operating system independent.") Dr. de Lara opines that these disclosures are just for embodiments in the '844 Patent, but he offers no evidence for alternative embodiments where the invention is not operating beneath the file system. Moreover, he incorrectly interprets the disclosure in the '844 Patent at 5:51-58. Rather than disclosing that a root image is not necessarily read only, a POSITA would understand this disclosure to be about the changes to a root image that are reflected in a leaf image. Tellingly, Dr. de Lara omits the previous sentence that makes this context clear. A more complete citation is as follows:

Thus, when a compute node (e.g., node 220a) makes changes involving the root image, modifications are made to that compute node's leaf image (e.g., leaf image stored on second storage device 250a). With respect to changes to the root image,

16

only the specific blocks that are changed are stored in the leaf image. For example, a particular file on the root image may comprise twenty blocks of data (e.g., blocks 1-20). One compute node (e.g., compute node 220a) desires to make a change to this file which involves a modification of only a few specific blocks of the file (e.g., blocks 4-9). In this example, only the modified blocks (e.g., blocks 4-9) will be stored in the compute node's leaf image (e.g., leaf image stored on second storage device 250a) plus some small overhead.

'844 Patent at 5:45-58.

36.    In my opinion, a POSITA would understand that the '844 Patent is disclosing the general benefits (not restricted to specific embodiments) of operating beneath the file system to include, e.g., the following (which Dr. de Lara does not cite):

Thus, by operating at the block level, embodiments of the present disclosure provide file system and operating system independent systems and methods for distributing an application environment to a compute node.

'844 Patent at 10:1-4.

37.    Further, a POSITA would understand block storage to operate at a layer beneath a file system and that operating at that layer can provide efficiency benefits, as I explain above in my technology background section.[7]

38.    Regarding the phrase "that provide the common portion of the application environment," Dr. de Lara offers no real objection to this other than his opinion that this exact language is not recited in the claims or specification. de Lara Decl., ¶ 91. I disagree that language equivalent to this is not found in the specification of the '844 Patent. For example, such language can be found in the '844 Patent at 5:27-30 ("System 200 has a first storage unit 240 for storing blocks of a root image of an application environment. The root image contains data initially common to the compute nodes 220a-n."). Moreover, a POSITA would find that such language is offered in the specification of the '844 Patent using lexicography, e.g., at 7:26-31 ("As an added benefit of the architecture 200 depicted in FIG. 2, because the data stored in the root image is **by**

---

[7] *See also, e.g.,* https://aws.amazon.com/what-is/block-storage/.

*definition* common to all the compute nodes 220a-in, one compute node (e.g., compute node 220a) can index the contents of the root image and then provide the indexing results to the other compute nodes (e.g., compute nodes 220b-n)." [emphasis added]). *See also, e.g.*, '844 Patent at 9:17-19.

39.    Thus, I remain convinced that a POSITA would have understood a "root image" to be "a read-only base set of data blocks, operating beneath the file system, that provide the common portion of the application environment."

**C. The '582 Patent**

40.    Claim 1 recites:

1. A method of effecting on a preexisting input file a computer-executable process comprised of a plurality of subtasks, the method comprising the steps of:

(a) automatically determining file allocation and logically subdividing records of said input file into a plurality of <u>partitions</u>;

(b) distributing <u>descriptions of all of said partitions</u> to each of a plurality of subtask processors

c) <u>simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions</u> with each subtask reading and processing the respective partition so as to process the respective partition and produce respective subtask output and;

d) thereafter repeating step (c) in at least some of the subtask processors each with another unprocessed partition on a <u>first-come/first-served basis</u>; and

(e) generating at least one output combining all of the subtask outputs and reflecting the processing of all of said subtasks.

**i. "partition"**

41.    Claim 1 of the '582 Patent requires "logically subdividing records of said input file into a plurality of partitions." '582 Patent at 6:47-49. Claim 1 further requires "distributing descriptions of all of said partitions to each of a plurality of subtask processor" '582 Patent at

6:50-51. As I explain in My Opening Declaration, in my opinion, a POSITA would have understood that the patentee defined "partition" in the specification as "a well-defined part of the input or output." I include by reference my discussion regarding this claim term from My Opening Declaration.

42.    I understand that a patentee can serve as their own lexicographer, and in the case of the term "partition," a person of ordinary skill in the art would have understood that the patentee defined "partition" in the specification of the '582 Patent as "a well-defined part of the input or output." For example, the '582 Patent has the following disclosure:

> A logical partition in this context is a well-defined part of the input or output. A very simple way to define a partition, which in many cases is the most efficient, would be to define the partitions as consecutive ranges on the input or output, ranging from one relative byte address to another relative byte address or from one relative track address to another.

'582 Patent at 3:36-41.

43.    In spite of the above explicit language using the word "is," Dr. de Lara disputes this disclosure as being lexicography. de Lara Decl., ¶¶ 50-53. He notes, for instance, that later in the specification the '582 Patent states, "Other partition definitions can be used with no impact on the rest of the embodiment." '582 Patent at 3:46-47. Tellingly, Dr. de Lara omits the portion of the specification at 3:42-46, which make clear that this paragraph is discussing specific types of partitions that are determined by address ranges that take record boundaries into account (e.g., to avoid defining partition ranges that end inside a record). *See, e.g.,* '582 Patent at 3:42-47. Thus, a POSITA would understand that the sentence at 3:36-37, "A logical partition in this context is a well-defined part of the input or output," to be lexicography, where the phrase "in this context" refers to the context of the '582 Patent itself. A POSITA would therefore understand the latter passage, e.g., at 3:36-47, to be disclosing embodiments using partitions all of which are "a well-defined part of the input or output."

44.    In addition, in a related IPR proceedings, IV apparently agrees with me regarding claim construction for the term "partition":

> The specification explains that, in the content of the '582 Patent, a logical partition is a *well-defined* part of the input file:
>
>> A logical partition in this context is *a well-defined part of the input* or output. A very simple way to define a partition, which in many cases is the most efficient, would be to define the partitions as consecutive ranges on the input or output, *ranging from one relative byte address to another relative byte address or from one relative track address to another*. ...
>>
>> Note that the *logical partition does not rely on actual reading of the file. The actual reading of the file is reserved to the subtasks which read the partitions allocated to them*. A splitting function may be allocating offset 0 to offset 100000 to a first partition, offset 100001 to 200000 to the second partition, offset 200001 to 300000 to the third partition and 300001 to the end of the file to a fourth partition. *Id.*, 3:36-59 (emphasis added).
>
> Thus, in the parlance of the '582 Patent, the logical partitions correspond to well-defined portions of an input file, and the logical partitions are *different* from the sub tasks which, *inter alia*, read and process the logical partitions.

Patent Owner's Preliminary Response, IPR2025-00785, August 11, 2025, at 4-5 [emphasis added].

45.    Thus, I remain convinced that a POSITA would have understood a "partition" in the context of the '582 Patent is "a well-defined part of the input." Indeed, if the Court adopts Dr. de Lara's interpretation that "the patent does not place restrictions on the nature of the partition," then, in my opinion, the term "partition" is indefinite, because a POSITA would have no reasonable way of determining the metes and bounds of the term "partition" in the claim. *See, e.g.*, de Lara Decl., ¶ 53.

### ii.  "descriptions of all of said partitions"

46.    Claim 1 of the '582 Patent requires "distributing descriptions of all of said partitions to each of a plurality of subtask processors." As I explain in My Opening Declaration, in my opinion, "descriptions of all of said partitions" would have been understood by a POSITA when reading the claims in view of the specification and the prosecution history as "statements giving a characteristic(s) of all of the well-defined parts of the input file for use in distributing the load without a special load process, wherein such statements are distinct from the input file itself." I include by reference my discussion regarding this claim term from My Opening Declaration.

47.    As I explain in My Opening Declaration, a POSITA would have understood that the '582 Patent distinguishes descriptions of partitions from the partitions themselves, that is, the bytes of data for a partition and this is further reflected in amendments that patentee made to the claims during the prosecution history. Indeed, Dr. de Lara apparently does not dispute the part of my proposed construction, "statements giving a characteristic(s) of all of the well-defined parts of the input file … wherein such statements are distinct from the input file itself." de Lara Decl., ¶¶ 54-57.

48.    Thus, the dispute apparently involves the language, "for use in distributing the load without a special load process." As I explain in My Opening Declaration, this language follows from disavowal of claim scope that occurred during prosecution of the '582 Patent. Namely, during prosecution of the '582 Patent, the applicant responded to the examiner's rejection of the pending claims by distinguishing prior art and stating that "The amended claims, refer to a distribution of a description of the work to be done. The sharing process can use such a description to distribute the load without a special load process." First Amendment, March 2, 2007, at 7. It is my understanding that a patent applicant's statements during prosecution to distinguish the claims over the prior art may show that the applicant disavowed claim scope. Dr.

de Lara places special emphasis on the word "can" in the above patentee response to imply that this was not intended as disavowal. de Lara Decl., ¶¶ 55-57. However, Dr. de Lara is apparently ignoring his own citation that explicitly states, "With the instant invention as defined in the claims there is no such special process." Indeed, the full quotation provided by Dr. de Lara supports my conclusion that a POSITA would understand the patentee to be providing a clear and unambiguous disavowal that the descriptions of said partitions are for use in distributing the load without a special load process:

> 56.    The text surrounding this cited quote in the '582 Patent file history says:
>
> The primary difference between the instant invention and the processes disclosed in US 5,603,028 of Kitsuregawa and 5,357,632 of Pian is that these systems rely on a special control process that uses load information to distribute the load between processors that share the load. With the instant invention as defined in the claims there is no such special process. The prior art's load information is not created with the process of the instant invention. Instead, the load sharing is done as a byproduct of the fact that the load-sharing process take parts of the load on a first-come/first-served basis.
>
> A comparison would be to a road intersection where, according to the prior art, there is a traffic light that determines who can go when. The instant invention is more like such an intersection with a four-way stop so that the individual drivers determine who can go and when.
>
> This is a major improvement since in addition to eliminating the control process it also eliminates the need to collect and maintain load information, which it is very difficult to do and almost impossible to define so as to anticipate all possible processors that might execute the subtasks.
>
> The amended claims, refer to a distribution of a description of the work to be done. The sharing process can use such a description to distribute the load without a special load process.

de Lara Decl., ¶ 56.

49.    Therefore, based on above analysis, I continue to conclude that "descriptions of all of said partitions" would have been understood by a POSITA when reading the claims in view of the specification and the prosecution history as "statements giving a characteristic(s) of all of

the well-defined parts of the input file for use in distributing the load without a special load process, wherein such statements are distinct from the input file itself."

### iii. "first-come/first-served basis"

50.    Claim 1(d) of the '582 Patent requires "repeating step (c) in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis." As I explain in My Opening Declaration, in my opinion, a POSITA would have understood "first-come/first-served basis" to mean "selecting the earliest unprocessed partition for execution without the use of a control process that uses load information for such selection." A POSITA would have also understood that whether a partition is the "earliest" unprocessed partition would have been determined by the ordering of the partitions determined in step (a) of claim 1. I include by reference my discussion regarding this claim term from My Opening Declaration.

51.    Dr. de Lara disputes my proposed claim construction for this term. de Lara Decl., ¶¶ 59-62. Regarding Dr. de Lara's opinions for this term, in my opinion, a POSITA would understand that in the context of the '582 Patent, "on a first-come/first-served basis" requires an ordering of the partitions so that unprocessed partitions can be processed according to a "first-come/first-served basis." Further, as I explain in My Opening Declaration, a POSTA would understand that the ordering of partitions in the claim is the ordering that is inherent in step 1.a of the claim, and that this is the ordering for the phrase "selecting the earliest unprocessed partition for execution" in my proposed construction.

52.    Both IV and Dr. de Lara misunderstand and/or misconstrue my opinions with respect to my proposed construction for "first-come/first-served basis" to imply that my construction would read out preferred embodiments in the specification and/or file history of the '582 Patent, e.g., regarding the "four-way stop" analogy and/or the use of a job scheduler or control process. *See, e.g.*, IV Brief at 28-30, de Lara Decl., ¶¶ 59-62. To be clear, my proposed

claim construction would not read out either the four-way stop method for assigning partitions to subtasks nor the use of a job scheduler or control process, e.g., as taught in the '582 Patent. *See, e.g.*, My Depo., 138:5-140:10, which neither IV nor Dr. de Lara cite to. For example, a POSITA would understand the four-way stop approach to be disclosed, e.g., in the '582 Patent at 4:1-3 ("Each such Sub Task then repeatedly tries to allocate for itself and then process, an input partition that has not been allocated yet."). Likewise, use of a job scheduler or control process is disclosed, e.g., in the '582 Patent at 3:13-21. *See also, e.g.*, My Depo., 140:11-141:5. In both embodiments, the earliest unprocessed partition is repeatedly selected for execution, either organically as determined by which subtask chooses the next unprocessed partition for execution (as in the four-way stop analogy method) or as dictated by a job scheduler or control process.

53.    Thus, the only real dispute is apparently over the language, "without the use of a control process that uses load information for such selection." That is, in my opinion, if a control process is used to select the next unprocessed task for execution, then that control process cannot use load information for that selection, due to disavowal by the patentee during prosecution. Interestingly, neither IV nor Dr. de Lara provide argument or opinion disputing this language in my proposed claim construction. de Lara Decl., ¶¶ 59-62. IV Brief at pp. 28-30. *See also, e.g.*, My Depo., 140:11-141:4.

54.    As mentioned above, my proposed claim construction does not read out the possibility of using a control process to assign partitions to subtasks. As I explain in My Opening Declaration, during prosecution, the applicant distinguished prior art, stating that "[the prior art] systems rely on a special control process that uses load information to distribute the load between processors that share the load. With the instant invention as defined in the claims there is no such special process. . . Instead, the load sharing is done as a byproduct of the fact that the load-sharing

process take parts of the load on a first-come/first-served basis." First Amendment, March 2, 2007, at 6. From the applicant's distinction of the claims over the prior art, a POSITA would have understood that this selection is done without the use of a control process that uses load information for such a selection and instead is done according to an ordering of the partitions determined in step (a) of claim 1 ("automatically determining file allocation and logically subdividing records of said input file into a plurality of partitions"). Importantly, as mentioned above, neither IV nor Dr. de Lara dispute this analysis.

55.     Based on the above analysis, I therefore continue to conclude that in the context of claim 1, a POSITA would have understood "first-come/first-served basis" to mean "selecting the earliest unprocessed partition for execution without the use of a control process that uses load information for such selection." A POSITA would have also understood that whether a partition is the "earliest" unprocessed partition would have been determined by the ordering of the partitions determined in step (a) of claim 1 ("automatically determining file allocation and logically subdividing records of said input file into a plurality of partitions").

### iv. "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions"

56.     Claim 1 of the '582 Patent requires "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions." In my opinion, a POSITA could not have ascertained the meaning of the phrase "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions" with "reasonable certainty" from the patent's specification and prosecution history. I include by reference my discussion regarding this claim term from My Opening Declaration.

25

57.    Dr. de Lara misunderstands and/or misconstrues my analysis regarding this claim term. de Lara Decl., ¶¶ 63-66. For example, I am not disputing that the claim recites "a plurality of subtasks" and "a plurality of subtask processors," nor am I disputing that a POSITA would understand that a "plurality" means "two or more." *See, e.g.*, My Depo., 136:11-20, 138:5-10, which neither IV nor Dr. de Lara cite. Indeed, these phrases are not what makes this claim term indefinite.

58.    What makes claim 1 indefinite to a POSITA is the step (c) "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions with each subtask reading and processing the respective partition so as to process the respective partition and produce respective subtask output," together with step (d) "thereafter repeating step (c) in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis." A POSITA would understand that each iteration of the loop recited by steps (c) and (d) requires "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors," but that this makes no sense in the case (which is claimed) of there being only one subtask to be executing during some iteration of this loop.

59.    For example, as I explain in My Opening Declaration, a POSITA would have understood that the '582 Patent is directed to parallel processing, where multiple processors execute processes simultaneously to perform a task, such as a sorting task, statistical analysis task, reporting task, or database querying task. See, e.g., '582 Patent at 1:28-57, 2:28-38. This understanding is further supported by the word "simultaneous" in the specification of the '582 Patent to refer to parallel actions of at least *two* subtasks that are executing at the same time. See, e.g., '582 Patent at 5:54-6:3. This is also confirmed to a POSITA in the extended example

illustrated in Fig. 4 and explained in the specification of the '582 Patent at 6:14-42. Accordingly, I stand by my opinion that a POSITA would have understood that simultaneously executing subtasks can only occur when there are at least two subtasks executing at the same time, by the plain and ordinary meaning of "simultaneously." In contrast, claim 1 recites "simultaneously executing at least a respective ***one*** of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions." [Emphasis added.] Given the knowledge of the POSITA regarding parallel processing and the express requirements for a plurality of subtask processors in the claim, a POSITA would be unable to reasonably determine what it means to simultaneously execute one subtask by itself during some iteration of the loop recited in steps (c) and (d), as is encompassed by limitation (c).

60.     Therefore, I continue to conclude that a POSITA could not have ascertained the meaning of this limitation with "reasonable certainty" from the patent's specification and prosecution history.

### D. The '722 Patent

61.     Claim 14 recites:

14. A method comprising:

providing, using a processing device of an <u>input source</u>, a data representation to a client device, different from the input source, coupled to a routing network,

wherein the data representation includes at least one live object recognizable by the client device, and

causing the client device to respond to the live object of the data representation by determining an object identifier (ID) of the live object and to register for updates of the live object with the routing network, such that registering the client device with the routing network provides client connection information to a node in the routing network; and

sending, using the processing device of the input source, an update message to the routing network, wherein the update message identifies the live object and contains update data that updates a property of the live object,

wherein a gateway device at the routing network is configured to <u>identify a category of the update message based on the input source</u>, to determine a <u>node type</u> to which the identified category maps, and to route the update message to the node, having the node type, at the routing network,

wherein the node is configured to identify the client device as a registered device and to route the update message to the client device, and

wherein the client device processes the update message upon receipt to update the property of the live object at the client device.

### i. "input source"

62.    Claim 14 of the '722 Patent requires "providing, using a processing device of an input source, a data representation to a client device, different from the input source, coupled to a routing network, . . ." '722 Patent at 23:55-57. As I explain in My Opening Declaration, in my opinion, a POSITA would have understood that the patentee defined "input source" in the specification as "information provider and/or dynamic content provider." I include by reference my discussion regarding this claim term from My Opening Declaration.

63.    As I explain in My Opening Declaration, I understand that a patentee can serve as their own lexicographer, and in the case of the term "input source," a POSITA would have understood that the patentee defined "input source" in the specification as "information provider and/or dynamic content provider." '722 Patent at 3:15-18 ("Instead, the information provider or a dynamic content provider (generically referred to as an 'input source') that provided the live object simply sends an update message to the routing network.") and 13:26-27 ("The input source 210, i.e., the information provider 108 and/or dynamic content provider 116 …"). *See also, e.g.*, My Depo., 108:14-111:4.

64. IV and Dr. de Lara dispute this lexicography, despite the use of the words "generally referred to" and "i.e.," in these citations from the '722 Patent. de Lara Decl., ¶¶ 99-100, IV Brief pp. 9-10. They point to Fig. 7, which illustrates "input sources 710", including an information provider 710A, dynamic content provider 710B, and blank boxes 710C and 710D (*see also, e.g.,* '722 Patent at 15:42-50):



'722 Patent, Fig. 7 (top portion).

65. Contrary to the characterization by IV and Dr. de Lara suggesting other types of input sources, a POSITA would understand this figure to be consistent with the express lexicography. For instance, as I explain above, a POSITA would understand "input source" to be an "information provider and/or dynamic content provider." Thus, a POSITA would understand each of the blank boxes in Fig. 7 to illustrate the possibilities that are encompassed by this lexicography from the '722 Patent, i.e., another information provider, another dynamic content provider, or an input source that is both an information provider and a dynamic content provider. Other than this citation to Fig. 7, IV and Dr. de Lara provide no other evidence to support their conclusion contradicting the lexicography regarding "input source" in the 722 Patent. Thus, I conclude that their argument fails.

66. Therefore, I continue to conclude that a POSITA would understand "input source" in the claim to be "information provider and/or dynamic content provider."

29

### ii.  "identify a category of the update message based on the input source"

67.    Claim 14 of the '722 Patent requires "a gateway device at the routing network is configured to identify a category of the update message based on the input source, to determine a node type to which the identified category maps, and to route the update message to the node, having the node type, at the routing network." '722 Patent at 24:3-8. As I explain in My Opening Declaration, in my opinion, a POSITA would have understood "identify a category of the update message based on the input source" to mean "identify a category of the update message based on the information provider or dynamic content provider but not on the category/topic of the message content." I include by reference my discussion regarding this claim term from My Opening Declaration.

68.    As I explain in My Opening Declaration, during prosecution, the applicant distinguished prior art that categorized messages based on the category/topic of the message from the claims, which instead categorized messages based on the input source: "The Examiner, for example, on page 3 of the Office Action, relies on the above sections of Chandra to allegedly show 'identifying each category based on the category/topic of the message content.' By this statement, the Examiner appears to agree that Chandra teaches identifying categories **based on category/topic of the message content**. In contrast, claims 26, 33, 39, 45, 51, and 57 recite, *inter alia*, 'identify a category of the update message <u>based on the input source</u>,' using their respective language." Reply Under 37 C.F.R. § 1.116, February 9, 2012 at 18-19 (emphasis in original); see also Brief on Appeal Under 37 C.F.R. § 41.37, March 30, 2006 at 13-17. Thus, I conclude the patentee provided clear disavowal of claim scope so that "identify a category of the update message based on the input source" would be understood by a POSITA to mean "identify a category of the update message based on the information provider or dynamic content provider but not on the category/topic of the message content."

69.    IV and Dr. de Lara dispute the scope of this disavowal, arguing that it leaves open the possibility of a system that identifies a category of the update message based on the input source **and** a category/topic. IV Brief pp. 11-12, de Lara Decl., 101-103. I disagree. For example, referring back to the disavowal language (which IV cites) and including a more fulsome citation, Applicant states that identifying a category based on a content/topic "is not the same as 'identify a category of the update message based on the input source'":

> This section of Chandra, relied on by the Examiner, discloses that if the ***data content of the message*** matches the specified values of the subscription, then the message is delivered to the one or more subscribers (or clients) of that subscription. This is not the same as "identify a category of the update message <u>based on the input source</u>," as recited in claims 26, 33, 39, 45, 51, and 57, using their respective language.
>
> The Examiner, for example, on page 3 of the Office Action, relies on the above sections of Chandra to allegedly show "identifying each category based on the category/topic of the message content." By this statement, the Examiner appears to agree that Chandra teaches identifying categories **based on category/topic of the message content**. In contrast, claims 26, 33, 39, 45, 51, and 57 recite, *inter* alia,
>
> Atty. Dkt. No. 2222.775000E

'722 Patent Prosecution History, Applicant Response Dated February 9, 2012 at 18.

70.    Because of Applicant's use of the language "is not the same as," I continue to conclude that a POSITA would understand this to be a disavowal of claim scope that requires "identify a category of the update message based on the input source" to mean "identify a category of the update message based on the information provider or dynamic content provider but not on the category/topic of the message content."

### E.  The '469 Patent

71.    Claim 24 recites:

24. An Internet Hotspot comprising:

a satellite dish communicating with the Internet via one or more data links with a satellite;

at least one router operatively coupled to the satellite dish;

a subscriber access unit operatively coupled between the satellite dish and the at least one router,

> the subscriber access unit being capable of authenticating a subscription account associated with a user prior to allowing the user access to the Internet; and

a web-ready device operatively coupled to the at least one router,

> the web-read device having a browser application operating thereon for accessing the Internet;

wherein the satellite dish, at least one router and the subscriber access unit are located in a <u>remote location</u> a experiencing a <u>relatively high volume of transient traffic</u>;

wherein the user may authenticate the subscription account and access the Internet at the remote location by establishing a data connection between the web-ready device and the router.

### i. "remote location"

72.    Claim 24 of the '469 Patent requires "at least one router and the subscriber access unit are located in a remote location." As I explain in My Opening Declaration, in my opinion, a POSITA would have understood "remote location" in the context of claim 24 of the '469 Patent to mean "a fixed remote location." I include by reference my discussion regarding this claim term from My Opening Declaration.

73.    As I explain in My Opening Declaration, the '469 Patent specification discloses a system for providing an Internet hotspot to rural locations by using a satellite dish to provide Internet access to travelers at rural locations, such as rest areas, restaurants, truck stops, rural hotels, conference centers, motels, and state park lodges:

The present invention provides rural "Hotspots" (such as Wi-Fi access, for

32

example) to enable wireless and hard wired, satellite distributed Internet access for anyone with a PC or other web-ready device (wireless ready or cabled) and a valid credit card or prepaid coupon. The "Hotspots" can be located anywhere there is 120 volt electricity available, either from an electric utility service or from an on-site power source such as a solar panel with a bridged access point, and enough space to house the transceiver and mount a satellite dish. These "Hotspots" would best be located in areas that experience high volume transient traffic, such as rest area, restaurants, truck stops, rural hotels, conference centers, motels and state park lodges.

'469 Patent at 3:43-55.

74.    Thus, in my opinion, a POSITA would understand that in the invention of the '469 Patent the hotspot is in a fixed location, and the users must move to be in proximity of the hotspot. Indeed, the '469 Patent states, "Since the signal is always 'live,' all a potential wireless user would have to do is to move within the transceiver's field (an approximately radius of 0.2 to 0.4 miles when an amplifier used, in an exemplary embodiment) and turn on his/her wireless ready PC to know the service was available." '469 Patent at 3:55-60. Furthermore, every figure depicting the invention is limited to a fixed "Rural Location." '469 Patent at Figs. 1-4. None of the "exemplary embodiments" in the specification of the '469 Patent discuss a *mobile* remote location. *E.g.,* '469 Patent at 4:17-24, 5:4-7, 5:32-35; 5:60-63; 6:7-10. Alternative embodiments of the invention discuss increased coverage in the context of "large or multi-floor sites." '469 Patent at 3:67.

75.    IV and Dr. Camp dispute my proposed claim construction, observing that the '469 Patent does not use the word "fixed." IV Brief at pp. 18-20, Camp Decl., ¶¶ 43-49. Thus, the main objection to my proposed construction is based on what is *allegedly not disclosed* in the '469 Patent, along with alleged "deployment flexibility" that allegedly allows for "temporary or semi-portable field installations" that use solar power. Camp Decl., ¶ 47. Let me therefore discuss more material that *is disclosed* in the '469 Patent in addition to the disclosures that I cite above.

76.     The specification and claims of the '469 Patent clearly and consistently recite the use of a ***satellite dish*** in the invention of the '469 Patent. *See, e.g.*, '469 Patent at Abstract, Figs. 1-4, 1:21-30, 1:34-63, 2:14-20, 2:34-38, 2:39-3:23, 3:43-67, 4:21-25, 4:39-46, 4:47-53, Claims 1-32. This is shown, for example, as the satellite dish 14 shown in every figure of the '469 Patent. IV excerpts Fig. 3; Dr. Camp excerpts Fig. 1. I show Fig. 4 below:



FIG. 4

'469 Patent at Fig. 4.

77.     A POSITA would understand that the satellite dish 14 is in a ***fixed*** location, because it must be positioned and pointed to have a line-of-sight (LOS) to the satellite 12 providing Internet service to the remote hotspot.[8] A POSITA would know, for example, that if such a satellite dish were turned or moved to no longer have LOS to the satellite, then the signal would be lost. Thus, a POSITA would understand that if the claimed hotspot was not intended to be in a fixed remote location, and instead the hotspot was allowed to be mobile, then the hotspot should

---

[8] *See, e.g.*, my background technology section on satellite dishes and phased array antennas.

use a different type of antenna to communicate with the satellite than a satellite dish, such as a phased array antenna. But, as noted above, every relevant disclosure and all the claims of the '469 Patent regarding how the hotspot communicates with the satellite 12 recite using a satellite dish. *See, e.g.*, '469 Patent at Abstract, Figs. 1-4, 1:21-30, 1:34-63, 2:14-20, 2:34-38, 2:39-3:23, 3:43-67, 4:21-25, 4:39-46, 4:47-53, Claims 1-32. Moreover, the inventor of the '469 Patent was aware of other types of antennas, such as phased array antennas, and chose not to recite using such an antenna for the hotspot to communicate with the satellite 12 and instead always recites the use of a "satellite dish." For instance, the '469 Patent discloses using an outdoor switch 50 with a phased array antenna to allow the hotspot to communicate with user devices accessing the hotspot outdoors, e.g., as shown in Fig. 4 and disclosed as follows:

> Alternatively, as shown in FIG. 4, the wireless Ethernet access point can be replaced with a Vivato® outdoor switch 50 (such as the VP1210 available from Vivato, Inc), which includes an amplifier and antenna. The Vivato® outdoor switch features an electronically controlled phased array antenna that can be used to create high gain beams of Wi-Fi on three channels simultaneously.

'469 Patent at 6:7-13.

78.    Accordingly, I continue to conclude that the proper construction for "a remote location" in the context of claim 24 of the '469 Patent is "a fixed remote location."

### ii.  "a relatively high volume of transient traffic"

79.    Claim 24 of the '469 Patent requires a "relatively high volume of transient traffic." As I explain in My Opening Declaration, in my opinion, a POSITA could not have ascertained the meaning of the phrase "relatively high volume of transient traffic" with reasonable certainty from the patent's specification and prosecution history; hence, this phrase is indefinite. I include by reference my discussion regarding this claim term from My Opening Declaration.

80.    For example, as I explain in My Opening Declaration, claim 24 of the '469 Patent recites in part, "a relatively high volume of transient traffic." However, based on my reading of

its specification and file history, the '469 Patent does not define what it means by a "relatively high volume" of transient traffic. Accordingly, a POSITA would be unable to reasonably determine whether a hotspot router and subscriber access unit are located in a remote location experiencing a relatively high volume of transient traffic. For example, the '469 Patent specification does not provide a threshold value, quantile value, or any other reference from which a POSITA could use to determine whether a particular remote location is experiencing a "relatively high" volume of transient traffic. Accordingly, in my opinion, the term "relatively high volume" in claim 24 of the '469 Patent is indefinite.

81.    Also, as I explain in My Opening Declaration, claim 24 of the '469 Patent further recites in part, "transient traffic." However, based on my reading of its specification, the '469 Patent does not define what it means by "transient traffic" other than places such as rest areas, restaurants, truck stops, rural hotels (but apparently not hotels in general), conference centers, motels, and state park lodges. '469 Patent 1:41-44. For instance, a POSITA would have understood that the '469 Patent is using the term "transient" to refer to person who is staying or working in a place for only a short time, but it does not specify a threshold or quantile value for what would constitute enough (or too much) time to qualify as "transient". For example, a POSITA would be at a loss as to whether the time period to apply is even in minutes, hours, or days, or how would this differ from a location that does not receive transient traffic, e.g., because its visitors stay for a "longer" time or because its visitors come back repeatedly. Accordingly, in my opinion, the term "transient traffic" in claim 24 of the '469 Patent is indefinite.

82.    IV and Dr. Camp dispute that these terms are indefinite. IV Brief at pp. 20-22, Camp Decl., ¶¶ 50-58. For example, Dr. Camp opines that engineers often classify sites into categories such as "low," "medium," and "high" traffic. Camp Decl., ¶ 51. However, further supporting my conclusion of indefiniteness, Dr. Camp provides no mechanism or test for a

POSITA to be able to determine whether a remote location is experiencing "low," "medium," or "high" traffic, let alone whether such traffic is "transient." Dr. Camp opines that remote farmhouse serving three residents year-round would not satisfy this term, but this is not helpful for understanding this claim term, since it provides no insight into how to test for a "relatively high volume of transient traffic." Camp Decl., ¶ 52. Indeed, I find Dr. Camp's opinions here to be unhelpful to understanding the meaning of these terms.

83.    IV cites to dictionary definitions for "relatively" that show that this term requires a comparison to *something*, but IV provides no intrinsic or extrinsic evidence for what should be compared to determine whether a remote location is experiencing a *relatively* high volume of transient traffic. IV Brief at pp. 20-21. Thus, I find that these dictionary definitions and IV's arguments are not helpful for understanding this claim term. IV cites case law that supports the conclusion that specific threshold values or quantile values with mathematical precision are supposedly not required for a claim to be definite and that the standard is reasonable certainty. IV Brief at p. 22. However, the '469 Patent provides no guidance at all that would allow a POSITA to determine the metes and bounds of this claim term with reasonable certainty. For instance, besides not providing any thresholds or quantile values, the '469 Patent does not provide any examples of remote locations that are *not* experiencing relatively high volumes of transient traffic. That is, the '469 Patent provides no point of reference to a POSITA to compare against to determine whether a remote location is experiencing a *relatively* high volume of transient traffic. Thus, I find that even Dr. Camp's example of a farmhouse serving three residents is unhelpful. Camp Decl., ¶ 52. '469 Patent at 1:34-46, 3:43-67. Therefore, I continue to conclude that the phrase "relatively high volume" in the claims of the '469 Patent is indefinite.

84.    IV and Dr. Camp also dispute that the term "transient traffic" is indefinite. IV Brief pp. 20-22, Camp Decl., ¶¶ 54-58. For example, IV provides a dictionary definition of "transient"

as "not lasting, enduring, or permanent; transitory" and Dr. Camp opines that the term does not require a fixed numerical time period and that the claimed locations would be "high-turnover" locations "where the user population changes frequently over the course of a day, a week, or a season, in contrast to fixed-population rural environments." Camp Decl., ¶ 55. However, this still does not provide a POSITA with reasonable certainty for determining whether a remote site is experiencing a relatively high volume of "transient traffic." For example, IV opines that "a residential manager of a rural hotel" would not be included in transient traffic, presumably because such a manager lives at the hotel and does not come and go. IV Brief at p. 21. But what about a waitress at a rural restaurant, a maid at a rural hotel, or a park ranger at state park lodge? Do they stay long enough not to be considered transient? IV's arguments provide no evidence or insight that would allow a POSITA to determine who is or is not included in "transient traffic" with reasonable certainty.

85.    Therefore, I continue to conclude that the phrase "a relatively high volume of transient traffic" is indefinite.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _9th__ day of September 2025 at Irvine, California.

_____

Michael T. Goodrich, Ph.D.