**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| INTELLECTUAL VENTURES I LLC and<br>INTELLECTUAL VENTURES II LLC,<br><br>        *Plaintiffs*,<br><br>v.<br><br>AMERICAN AIRLINES, INC.<br><br>        *Defendant*. | )<br>)<br>)<br>) **C.A. No. 4:24-cv-00980-ALM**<br>)<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>) |

**PLAINTIFFS INTELLECTUAL VENTURES I LLC AND
INTELLECTUAL VENTURES II LLC'S REPLY TO
<u>DEFENDANT'S RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

## **TABLE OF CONTENTS**

|     |     |     | Page |
| --- | --- | --- | ---: |
| I.   | '844 PATENT | | 1 |
|      | A. | '844 Patent: "root image" (Claims 7, 11) | 1 |
| II.  | '722 PATENT | | 2 |
|      | A. | '722 Patent: "input source" (Claim 14) | 2 |
|      | B. | '722 Patent: "identify a category of the update message based on the input source" (Claim 14) | 3 |
| III. | '785 PATENT | | 4 |
|      | A. | '785 Patent: "network address" (Claims 30, 37) | 4 |
|      | B. | '785 Patent: "network route director" (Claim 30) | 5 |
| IV.  | '469 PATENT | | 6 |
|      | A. | '469 Patent: "a remote location" (Claim 24) | 6 |
|      | B. | '469 Patent: "a relatively high volume of transient traffic" (Claim 24) | 7 |
| V.   | '582 PATENT | | 8 |
|      | A. | '582 Patent: "partition" (Claim 1) | 8 |
|      | B. | '582 Patent: "description of all said partitions" (Claim 1) | 9 |
|      | C. | '582 Patent: simultaneously executing at least a respective one of the sub tasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions" (Claim 1) | 9 |
|      | D. | '582 Patent: "on a first-come/first-served basis" (Claim 1) | 10 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Braintree Lab'ys, Inc. v. Novel Lab'ys, Inc.*,
    749 F.3d 1349 (Fed. Cir. 2014) ..................................................................................... 7

*Chef America, Inc. v. Lamb-Weston, Inc.*,
    358 F.3d 1371 (Fed. Cir. 2004) ..................................................................................... 3

*Cypress Lake Software, Inc. v. Samsung Electronics America, Inc.*,
    382 F. Supp. 3d 586 (E.D. Tex. 2019) .......................................................................... 8

*Edwards Lifesciences LLC v. Cook Inc.*,
    582 F.3d 1322 (Fed. Cir. 2009) ..................................................................................... 4

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) ....................................................................................... 6

*Niazi Licensing Corporation v. St. Jude Medical S.C., Inc.*,
    30 F.4th 1339 (Fed. Cir. 2022) ..................................................................................... 7

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ..................................................................................... 8

*SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*,
    983 F.3d 1367 (Fed. Cir. 2021) ................................................................................... 10

*Thorner v. Sony Computer Ent. Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ............................................................................ 1, 2, 4

*U.S. Well Servs., Inc. v. Halliburton Co.*,
    No. 21-367, 2022 WL 819548 (W.D. Tex. Jan. 17, 2022) ............................................ 7

*US Well Services, LLC, et al. v. Liberty Energy, Inc.*,
    No. 24-839, Dkt. 111 (S.D. Tex. May 30, 2025) ........................................................... 7

Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively, "IV") submit this reply in support of their constructions for the Asserted Patents' disputed terms and in reply to Defendant American Airlines, Inc.'s ("AA") responsive brief ("Resp. Br.") (Dkt. 80).[1][2][3]

## I. '844 PATENT

### A. '844 Patent: "root image" (Claims 7, 11)

| Plaintiffs' Position | American's Proposed Construction |
|---|---|
| Plain and ordinary meaning. | a read-only base set of data blocks, operating beneath the file system, that provide the common portion of the application environment |

The parties agree that a root image includes "blocks" as recited in claim 7. *See* Dkt. 77-2 at 11:29 ("storing blocks of a root image of said compute nodes on a first storage unit."). AA's proposed construction based on lexicography goes much further than this, and fails because there is no single definition anywhere in the '844 Patent. Dkt. 77-14 at ¶¶ 88-89; Ex. N. at ¶¶ 38-41. This is confirmed by AA's reliance on multiple disclosures throughout the '844 Patent, including claim 7 and specification. *See Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("A patentee may not 'simply disclose a single embodiment or use a word in the same manner in all embodiments' but rather 'must clearly express an intent to redefine the term.'"). By AA's own admission, to the extent lexicography applies (which it does not), the only possible construction is "a read-only base image (or 'root' image) of the application environment." Dkt. 77-2 at 2:13-14. AA's proposed language, "operating beneath the file system," is found nowhere

---

[1] Submitted herewith is the September 16, 2025 Declaration of Jonathan K. Waldrop with exhibits thereto ("Ex. __").

[2] Footnote 1 of AA's brief violates the local rules, as it presents substantive argument in the Table of Exhibits, and its brief would otherwise exceed its 30-page limit. L.R. CV-7(a)(1). In that footnote, AA alleges that "IV also fails to cite any opinion of its expert in its brief, waiving any reliance on them." Resp. Br. at fn. 1. P.L.R. 4-5 allows a party to cite "any evidence directly rebutting the supporting evidence contained in an opposing party's response."

[3] In its brief, AA cites to a new reply declaration from its expert and extrinsic evidence not previously disclosed in the parties' P.L.R. 4-2 and 4-3 disclosures. IV accordingly requests that the Court respectfully reject consideration of any of this previously undisclosed evidence.

in the claims, and AA's discussion of how blocks are "stor[ed]" (Resp. Br. at 4) is not germane to the construction of the term at issue, "root image." AA's lexicography argument is further belied by its use of "example[s]" from the specification (Resp. Br. at 4), which is not a definition. Quite simply, AA is attempting to import a limitation from one disclosed embodiment and provides no good reason to do so. Even then, AA's reliance on the embodiment disclosed at 7:58-62 is wrong because that disclosure describes that "embodiments *are able to operate* beneath the file system," not that they must in fact operate below the file system. Ex. N. at ¶¶ 38-41.

## II.   '722 PATENT

### A.   '722 Patent: "input source" (Claim 14)

| Plaintiffs' Position | American's Proposed Construction |
|---|---|
| Plain and ordinary meaning. | information provider and/or dynamic content provider |

The parties agree that an information provider and/or a dynamic content provider can be an input source. However, AA's proposed construction attempts to improperly limit an "input source" to these provider types, while IV's construction reflects the plain and ordinary meaning. Dkt. 77-14 at ¶¶ 99-100; Ex. N. at ¶¶ 42-46. Indeed, AA's lexicography argument (that relies almost entirely on the disclosure at 3:15-16) fails because, at most, that disclosure defines "information provider" and "dynamic content provider," *not* input source. That those provider types are "generically referred to" as an "input source" does not mean that the inverse is true, *i.e.*, that "input source" is limited to those provider types. AA's reliance on the disclosure at 13:26-28 is of no help because that disclosure describes a specific embodiment, where input source (element 210) is an information provider (element 108) "and/or" a dynamic content provider (element 116), and does not define the term for the entire patent. *See supra*, *Thorner*. AA's case authorities are distinguishable because they follow a clear form: [term x] is [definition]. *See, e.g.*, 511 F.3d at

1136. In contrast, as described above, the provider types (at most) are defined, not "input source," and nothing otherwise excludes an "input source" from including other sources of input.

### B.     '722 Patent: "identify a category of the update message based on the input source" (Claim 14)

| Plaintiffs' Position | American's Proposed Construction |
|---|---|
| Plain and ordinary meaning. | identify a category of the update message based on the information provider or dynamic content provider but not on the category/topic of the message content |

The parties do not dispute that identifying a category of the update message must be based on the input source (which "input source" should be construed consistent with the arguments above). Rather, the only dispute is whether the category identification of the update message can **_also_** be based on other information, such as the category/topic of the message content (or other techniques for identifying a category of the update message). It can. Dkt. 77-14 at ¶¶ 101-103; Ex. N at ¶¶ 47-51. AA's proposed construction is wrong because it would re-write this term to require that the category identification can be based **_only_** on the input source. *See id.*; *see also Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("[W]e construe the claim as written"). AA's argument rests entirely on an incorrect interpretation of the '722 Patent file history. During prosecution, the Applicant distinguished prior art by noting that the prior art did not disclose the limitation "identify a category of the update message based on the input source," but instead disclosed "identifying categories **_based on category/topic of the message content_**." Dkt. 77-9 at 12 (emphasis in original). AA cites no authority that "based on" should mean "based only on" because no such authority exists.

AA does not dispute that the '722 Patent discloses various techniques to identify message categories. *See* Resp. Br. at 8-10. Thus, there is nothing in the claims, specification, and prosecution that limits this term to AA's wrong proposed construction, in particular the language "but not on the category/topic of the message content."

### III. '785 PATENT

#### A. '785 Patent: "network address" (Claims 30, 37)

| Plaintiffs' Position | American's Proposed Construction |
|---|---|
| Plain and ordinary meaning. | Internet protocol or IP address |

AA's attempt to construe a "network address" as an "Internet protocol or IP address" necessarily fails because a POSITA would readily understand that the terms are different in scope. Dkt. 77-14 at ¶¶ 74-76; Ex. N at ¶¶ 26-31. Indeed, even AA's own extrinsic evidence confirms that they are different in scope. *See* Op. Br. at 15-16.[4] AA's argument that network address and IP address are used interchangeable (Resp. Br. at 12) is unavailing because a cursory review of the citations show that only the language IP address is used for those disclosures—there is no interchangeable use between network address and IP address. The cases that AA cites to support its argument that two terms that are used interchangeably can be definitional are distinguishable because they do not involve lexicography and those cases involved patents where, in fact, terms were interchangeably used. *See, e.g., Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009) ("The interchangeable use of ["graft" and "intraluminal graft"] is akin to a definition equating the two."). Here, there is no interchangeable use of "network address" and "IP address." AA's other arguments rely on a single embodiment ('785 Patent at Figure 7) to argue that a "network address" is necessarily limited to an IP address. There is no lexicography where an embodiment uses a term in a specific way. *See supra*, *Thorner*. Further, AA's proposed construction is problematic because it construes "network address" in one context to have a certain meaning, but does not extend to types of "network address[es]" recited elsewhere in claim 30. Rather than address this inconsistency, AA ignores it. *See Resp. Br.* at 13.

---

[4] AA's argument that there is no "contradiction" in the computer-dictionary.org definition (Resp. Br. at 12) fails to address the fact that the definition is a "***portion***" of an IP address and not the IP address itself. AA's arguments fail to address this inconsistency.

B.     '785 Patent: "network route director" (Claim 30)

| Plaintiffs' Position | American's Proposed Construction |
|---|---|
| Plain and ordinary meaning. | a publicly addressable device configured to route encapsulated packets to and from entities located in a private network portion of a virtual network |

AA's proposed construction based on lexicography and disclaimer is wrong for multiple reasons, including because its proposed construction is not tied to the alleged lexicographical disclosures. For example, for the portion of its proposed construction that reads "publicly addressable device," AA ignores the fact that other '785 Patent claims, such as claim 39, recite a "network route director" that is "public," as opposed to private. Dkt. 77-4 at 37:50-51 ("wherein the route director is a ***public network route director***"). AA does not address this in its brief. *See* Resp. Br. at 13-15. Further, while the parties agree that the network route director is involved in routing packets, the '785 Patent specification does not require that the route director actually route packets (which AA's construction implies). Dkt. 77-14 at ¶¶ 77-80; Ex. N at ¶¶ 32-37. Indeed, the specification expressly states that the "Network Route Director" "***enable[es]*** Member Agents and Group Agents … to be reached inside one or more private networks from the public networks." Dkt. 77-4 at 11:10-14. In other words, enabling communication is distinct from routing communication. This is confirmed by the specification's description that the network route director "facilitat[es]" routing traffic. Dkt. 77-4 at 13:51-54. AA's reliance on an *ex parte* proceeding where the Applicant stated that the "problem of the current invention [ ] is how to route through a route director to the virtual address" (Resp. Br. at 29) is not particularly relevant because this statement does not conflict with the specification's disclosures, nor does it define the term "network route director." To the extent AA is correct that lexicography applies (which it is not), then this term should be construed as a "device configured to facilitate routing traffic into and out

of private address domains." *See* Dkt. 77-4 at 13:51-59. AA does not cite case authority to allow it to drift from the actual lexicographical disclosure.

## IV. '469 PATENT

### A. '469 Patent: "a remote location" (Claim 24)

| Plaintiffs' Position | American's Proposed Construction |
|---|---|
| Plain and ordinary meaning. | a fixed remote location experiencing a relatively high volume of transient traffic |

AA's attempt to re-write "remote location" to mean a "fixed" location is improper because it improperly limits this term to disclosed embodiments. Indeed, the plain and ordinary meaning of a "remote location" does not require a fixed or non-fixed location, only that it must be a remote location as recited in claim 24, and a POSITA would understand that a remote location need not be "fixed." Dkt. 77-13 at ¶¶ 43-49; Ex. O at ¶¶ 16-19. IV's construction, *i.e.*, the remote location is not "fixed," is correct because the '469 Patent expressly describes the only limiting factor when considering placement of equipment at a remote location: "***The 'Hotspots' can be located anywhere*** there is 120 volt electricity available or access to the sun for a solar panel and enough space to house the transceiver and mount a satellite dish." Dkt. 77-5 at 1:38-41 (emphasis added). These are the ***only*** conditions that limit the location of a Hotspot, and this disclosure does not limit a "Hotspot" to a fixed location (and AA does not argue otherwise). AA's only rebuttal is to point to an exemplary list of locations where Hotspots ***could*** be located and argue that the exemplary list necessarily limits Hotspots to fixed locations. This attempt to improperly limit the types of "remote locations" is improper and should be rejected. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("As we explained above, it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."). Further, AA's reliance on 3:55-59 is misplaced, as that disclosure describes an

"exemplary embodiment," *see* Dkt. 77-5 at 3:55-59; AA does not cite, nor does the '469 Patent anywhere contain language limiting all embodiments to this one embodiment.

### B.     '469 Patent: "a relatively high volume of transient traffic" (Claim 24)

| Plaintiffs' Position | American's Proposed Construction |
|---|---|
| Not indefinite. | Indefinite as to "relatively high" and "transient" |

Claim 24 recites that the recited "satellite dish," "router," and "subscriber access unit" are "located in a remote location [ ] experiencing a relatively high volume of transient traffic." The specification describes specific examples of locations that are remote and which "experience high volume transient traffic, such as rest areas, restaurants, truck stops, rural hotels, conference centers, motels, and state park lodges." Dkt. 77-5 at 1:41-46; *see also id*. at 3:52-55. A POSITA would readily be able to use the examples provided in the patent as benchmarks. *See* Dkt. 77-13 at ¶¶ 50-58; Ex. O at ¶¶ 20-23. Contrary to AA's assertions, mathematical precision is not necessary. *See Niazi Licensing Corporation v. St. Jude Medical S.C., Inc.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022) ("While there must be objective boundaries, we have explained that 'a patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement.'") (citations omitted); *see* also *Braintree Lab'ys, Inc. v. Novel Lab'ys, Inc.*, 749 F.3d 1349, 1360 (Fed. Cir. 2014) ("patentees often use '[d]escriptive words … to 'avoid [ ] a strict numerical boundary to the specified parameter.") This is particularly accurate for terms that are not technically complex. AA does not cite a **_single_** authority finding the use of the language "transient" in a claim is indefinite, let alone that it is a term of degree. *See* Resp. Br. at 17-21. This is unsurprising because it is not a term of degree. Instead, AA cites authorities that focus on the use of the term "relatively."[5] AA's argument fundamentally fails because it improperly focuses on specific

---

[5] *US Well Services, LLC, et al. v. Liberty Energy, Inc.*, No. 24-839, Dkt. 111 at 14 (S.D. Tex. May 30, 2025); *U.S. Well Servs., Inc. v. Halliburton Co.*, No. 21-367, 2022 WL 819548, at *9 (W.D. Tex. Jan. 17, 2022); ParkerVision, Inc. v. MediaTek, Inc., No. 22-1163, Dkt. 70 at 43-44 (W.D.

language for this term, rather than understanding and interpreting this term as a whole. *Phillips v. AWH Corp.*, 415 F.3d 1303, (Fed. Cir. 2005) ("[A] person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."). The term in dispute is "a relatively high volume of transient traffic," which is further modified by surrounding claim language, including "remote location," and it must be interpreted in this way. It is not "relatively high," nor is it "transient"—this is why AA's case authorities do not apply. Each of AA's authorities are further distinguishable because the '469 Patent provides specific examples that can be used as guidance in determining whether a location is remote and whether a remote location is experiencing a relatively high volume of transient traffic. *See supra*. The '469 Patent is thus in line with case authorities cited in IV's opening brief. *See* Op. Br. at 20-22.

## V.    '582 PATENT

### A.    '582 Patent: "partition" (Claim 1)

| Plaintiffs' Position | American's Proposed Construction |
|---|---|
| Plain and ordinary meaning. | well-defined part of the input file |

The '582 Patent specification provides examples of what a partition could be: "[a] logical partition ***in this context*** is a well-defined part of the input or output." Dkt. 77-6 at 3:36-37 (emphasis added). The specification further discloses that "***other partition definitions*** can be used with no impact on the rest of the embodiment." *Id*. at 3:46-47. These confirm AA's proposed construction is not the plain and ordinary meaning of this term. Dkt. 77-14 at ¶¶ 50-53; Ex. N at ¶¶ 12-14. AA ignores these disclosures, and instead limits this term to a particular embodiment. AA's argument that IV defined "partition" as a "well-defined part of the input file" in a PTAB

---

Tex. Apr. 29, 2024); *Cypress Lake Software, Inc. v. Samsung Electronics America, Inc.*, 382 F. Supp. 3d 586, 609-10 (E.D. Tex. 2019).

document (Resp. Br. at 22) is wrong. Indeed, IV merely recites the disclosure at 3:36-37. AA also ignores the portion of the PTAB document that discusses how "in the parlance of the '582 Patent, the logical partitions correspond to well-defined portions of an input file," contradicting AA's argument that "partition" was defined in front of the PTAB. Resp. Br., Exhibit 12 at 5.

B.  '582 Patent: "description of all said partitions" (Claim 1)

| Plaintiffs' Position | American's Proposed Construction |
|---|---|
| Plain and ordinary meaning. | statements giving a characteristic(s) of all of the well-defined parts of the input file for use in distributing the load without a special load process, wherein such statements are distinct from the input file itself |

AA's proposed construction of "description of all said partitions" is unsupported and unnecessarily confusing to a jury. It is also not the plain and ordinary meaning. Dkt. 77-14 at ¶¶ 54-58; Ex. N at ¶¶ 15-17. For this term, AA relies on a single layman dictionary definition for "description," yet does not justify how this definition applies to the technical nature of this patent and term. AA also does not illustrate why using the phrase "for use in distributing the load without a special load process" to construe "description of all said partitions" characterizes the invention in a way to overcome the prior art. Further, AA's argument that the "intrinsic record distinguishes descriptions of partitions from the partitions themselves because the claim amendment, which changed the claim from stating 'distributing said partitions' to 'distributing ***descriptions*** of all said partitions,'" is unavailing because it does not place restrictions on the plain and ordinary meaning.

C.  '582 Patent: simultaneously executing at least a respective one of the sub tasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions" (Claim 1)

| Plaintiffs' Position | American's Proposed Construction |
|---|---|
| Not indefinite. | Indefinite |

Contrary to AA's argument, this disputed term is not indefinite. Dkt. 77-14 at ¶¶ 63-66; Ex. N at ¶¶ 21-25. This term requires executing, ***on "each" of the subtask processors***, at least one subtask. AA ignores that claim 1 recites both a plurality of subtasks and a plurality of subtask

-9-

processors. A plurality requires two or more, and therefore claim 1 requires at least two subtasks and at least two subtask processors. *See SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.,* 983 F.3d 1367, 1377 (Fed. Cir. 2021) ("'[A] plurality of' requires two or more."). Claim 1 thus allows for multiple subtasks to run on multiple subtask processors simultaneously. AA's own expert does not dispute this structure that is unambiguously definite. *See* Resp. Br., Exhibit 11 at 143:2-13, 143:15-146:7, 146:16-18, 146:20-147:1. AA points to nothing in the intrinsic record that otherwise shows this term is somehow indefinite.

### D. '582 Patent: "on a first-come/first-served basis" (Claim 1)

| Plaintiffs' Position | American's Proposed Construction |
|---|---|
| Plain and ordinary meaning. | selecting the earliest unprocessed partition for execution without the use of a control process that uses load information for such selection |

AA's arguments regarding its proposed construction for this term contradict intrinsic evidence and would confuse, rather than provide clarity, to the jury. AA relies on an embodiment disclosed at 6:14-37 to support its lexicography/disclaimer-based argument, but its argument that the phrase "selecting the earliest unprocessed partition for execution" is "consistent" with the disclosure above ignores that the disclosure is an example embodiment. AA further fails to identify any sufficient reason to depart from the claim language, as the Applicant expressly described that "load sharing is done as a byproduct of the fact that the load-sharing process take parts of the load on a first-come/first-served basis." Op. Br. at 29-30. In other words, the claims recite a load sharing process that is already distinguishable from prior art because of the limitation at issue. AA's addition of the negative limitation, "without the use of a control process that uses load information for such selection," raises ambiguities and will likely lead to further disputes. What is a "control process"? What is "load information"? This is unnecessary and inconsistent with the plain language of this term and will not assist the jury. Dkt. 77-14 at ¶¶ 59-62; Ex. N at ¶¶ 18-20.

Dated: September 16, 2025           Respectfully submitted,

By: */s/ Jonathan K. Waldrop*
    Jonathan K. Waldrop (CA Bar No. 297903)
    (Admitted in this District)
    jwaldrop@kasowitz.com
    Darcy L. Jones (CA Bar No. 309474)
    (Admitted in this District)
    djones@kasowitz.com
    Marcus A. Barber (CA Bar No. 307361)
    (Admitted in this District)
    mbarber@kasowitz.com
    John W. Downing (CA Bar No. 252850)
    (Admitted in this District)
    jdowning@kasowitz.com
    Heather S. Kim (CA Bar No. 277686)
    (Admitted in this District)
    hkim@kasowitz.com
    ThucMinh Nguyen (CA Bar No. 304382)
    (Admitted in this District)
    tnguyen@kasowitz.com
    Jonathan Hicks (CA Bar No. 274634)
    (Admitted in this District)
    jhicks@kasowitz.com
    **KASOWITZ LLP**
    101 California Street, Suite 3950
    San Francisco, California 94111
    Telephone: (415) 421-6140
    Facsimile: (415) 358-4408

    Jeceaca An (NY Bar No. 5849898)
    (Admitted in this District)
    jan@kasowitz.com
    **KASOWITZ LLP**
    1633 Broadway
    New York, NY 10019
    Telephone: (212) 506-1800
    Facsimile: (212) 506-1700

    Paul G. Williams (GA Bar No. 764925)
    (Admitted in this District)
    pwilliams@kasowitz.com
    **KASOWITZ LLP**
    1230 Peachtree Street N.E., Suite 2445
    Atlanta, Georgia 30309
    Telephone: (404) 260-6080
    Facsimile: (404) 260-6081

        Allen F. Gardner (TX Bar No. 24043679)
        allen@allengardnerlaw.com
        **ALLEN GARDNER LAW, PLLC**
        609 S. Fannin
        Tyler, Texas 75701
        Telephone: (903) 944-7537
        Facsimile: (903) 944-7856

        **Attorneys for Plaintiffs**
        **INTELLECTUAL VENTURES I LLC and**
        **INTELLECTUAL VENTURES II LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument was served or delivered electronically to all counsel of record on this 16th day of September, 2025, via the Court's CM/ECF System.

*/s/ Jonathan K. Waldrop*
Jonathan K. Waldrop
