# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| **INTELLECTUAL VENTURES I LLC AND INTELLECTUAL VENUTRES II, LLC,** | |
| **Plaintiff,** | **Civil Action No. 4:24-cv-00980** |
| **vs.** | |
| **AMERICAN AIRLINES, INC.,** | **JURY TRIAL** |
| **Defendant.** | |

**DEFENDANT AMERICAN AIRLINES, INC.'S MOTION TO DISMISS PLAINTIFFS, INTELLECTUAL VENTURES I, LLC AND INTELLECTUAL VENTURES II, LLC'S <u>FIRST AMENDED COMPLAINT UNDER RULE 12(B)(6) AND 12(B)(1)</u>**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   ARGUMENT .........................................................................................................2

    A.    Invalidity Under 35 U.S.C § 101 and *Alice* ..............................................2

        1.    Outsourcing Part 1: the '584 Patent ...............................................3

            a.    Claim 1 Is Directed to a Business Idea. ...............................4

            b.    Claim 1 Lacks an Inventive Concept. ...................................6

        2.    Outsourcing Part 2: the '841 Patent ...............................................7

            a.    Claim 1 Is Directed to a Business Idea. ...............................9

            b.    Claim 1 Lacks an Inventive Concept. .................................12

        3.    Organizing and Storing: the '282 Patent.......................................14

            a.    Claim 1 is Directed to Organizing and
                 Storing Information.............................................................15

            b.    Claim 1 Lacks an Inventive Concept. .................................16

    B.    No Infringing Uses Are Alleged ................................................................18

    C.    Plaintiff Provides No Basis for its Speculation of
        Unlicensed Use ..........................................................................................19

    D.    Plaintiffs Do Not Have Standing to Assert the '080 Patent......................20

III.  CONCLUSION......................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Addiction & Detox. Inst. L.L.C. v. Carpenter*,
 620 F. App'x 934 (Fed. Cir. 2015) ...............................................................18, 19

*Affinity Labs of Tex., LLC v. DIRECTV, LLC*,
 838 F.3d 1253 (Fed. Cir. 2016)........................................................................2

*Alice Corp. v. CLS Bank Int'l*,
 573 U.S. 208 (2014)............................................................................... passim

*Artrip v. Ball Corp.*,
 735 F. App'x 708 (Fed. Cir. 2018) ......................................................................19

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)...............................................................................1

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
 827 F.3d 1341 (Fed. Cir. 2016).........................................................................6

*Bell Atl. v. Twombly*,
 550 U.S. 544 (2007)................................................................................1, 19

*Berkheimer v. HP Inc.*,
 881 F.3d 1360 (Fed. Cir. 2018)........................................................................2

*Bot M8 LLC v. Sony Corp. of Am.*,
 4 F.4th 1342 (Fed. Cir. 2021) ........................................................................18

*Bridge and Post, Inc. v. Verizon Commc'ns, Inc.*,
 778 F. App'x 882 (Fed. Cir. 2019) .................................................................5, 9

*BSG Tech. L.L.C. v. Buyseasons, Inc.*,
 899 F.3d 1281 (Fed. Cir. 2018)...............................................................2, 12, 17

*BuySafe, Inc. v. Google, Inc.*,
 765 F.3d 1350 (Fed. Cir. 2014).........................................................................5, 9

*CardioNet, LLC v. InfoBionic, Inc.*,
 955 F.3d 1358 (Fed. Cir. 2020).........................................................................2

*Cedars-Sinai Med. Ctr. v. Watkins*,
 11 F.3d 1573 (Fed. Cir. 1993).........................................................................20

*Celgard, LLC v. Shenzhen Senior Tech. Material Co.*,
 2020 WL 7392909 (W.D.N.C. Dec. 17, 2020).......................................................19

*ChargePoint, Inc. v. SemaConnect, Inc.*,
 920 F.3d 759 (Fed. Cir. 2019) ................................................................................. 10, 13, 16

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
 776 F.3d 1343 (Fed. Cir. 2014) ..................................................................................... 15, 17

*Customedia Techs., LLC v. Dish Network Corp.*,
 951 F.3d 1359 (Fed. Cir. 2020) ....................................................................................... 2, 12

*Elec. Power Grp., LLC v. Alstom S.A.*,
 830 F.3d 1350 (Fed. Cir. 2016) ............................................................................. 6, 7, 11, 13

*FluorDx LLC v. Quidel Corp.*,
 2019 WL 4599842 (S.D. Cal. Sept. 23, 2019) .................................................................... 20

*Gibbs v. Buck*,
 307 U.S. 66 (1939) .............................................................................................................. 20

*In re TLI Commc'ns LLC Patent Litig.*,
 823 F.3d 607 (Fed. Cir. 2016) ............................................................................................. 15

*Intell. Ventures I LLC v. Erie Indem. Co.*,
 850 F.3d 1315 (Fed. Cir. 2017) ........................................................................................... 15

*Intell. Ventures I LLC v. Symantec Corp.*,
 838 F.3d 1307 (Fed. Cir. 2016) ............................................................................... 12, 13, 17

*JVC Kenwood Corp. v. Nero, Inc.*,
 797 F.3d 1039 (Fed. Cir. 2015) ........................................................................................... 19

*KVOS, Inc. v. Associated Press*,
 299 U.S. 269 (1936) ............................................................................................................ 20

*MyMail, Ltd. v. ooVoo, LLC*,
 No. 2020-1825, 2021 WL 3671364 (Fed. Cir. Aug. 19, 2021) ............................................ 13

*Panavise Prods., Inc., v. Nat'l Prods., Inc.*,
 306 F. App'x 570 (Fed. Cir. 2009) ...................................................................................... 20

*Radar Indus., Inc. v. Cleveland Die & Mfg. Co.*,
 424 F. App'x 931 (Fed. Cir. 2011) ...................................................................................... 19

*SAP Am., Inc. v. InvestPic, LLC*,
 898 F.3d 1161 (Fed. Cir. 2018) ....................................................................................... 2, 11

*Synopsys, Inc. v. Mentor Graphics Corp.*,
 839 F.3d 1138 (Fed. Cir. 2016) ........................................................................................... 15

*WirelessWerx IP LLC v. OnStar, LLC,*
    2024 WL 1607018 (E.D. Mich. Apr. 12, 2024)......................................................................18

**STATUTES**

35 U.S.C. § 101................................................................................................................ passim

**TABLE OF EXHIBITS**

| Ex. | Description |
|---|---|
| A | '841 Patent Original Claims |
| B | '841 Patent – Feb. 25, 2010 Non-Final Office Action |
| C | '282 Patent – July 8, 2009 Non-Final Office Action |
| D | '282 Patent – Claim Amendments in Response to July 8, 2009 Non-Final Office Action |

## I.    INTRODUCTION

Plaintiffs' First Amended Complaint (Dkt. 84) ("FAC") fails to state a claim for relief and should be dismissed under Rule 12(b)(6) for three independent reasons:

*First*, Plaintiffs assert several patents issued pre-*Alice* that claim abstract ideas—such as applying longstanding scheduling techniques to process routine tasks, outsourcing the hosting and monitoring of computer clusters, and organizing and storing information—implemented using generic, conventional computer and networking technology. The patents fail to disclose any technological innovations that improve upon the prior art in a concrete, non-abstract way. Under 35 U.S.C. § 101 and *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208 (2014), the patent claims in Counts VIII, IX, and XII are ineligible as a matter of law and should be dismissed.

*Second*, the FAC fails to identify any specific American products or services alleged to infringe the asserted patents. For example, it broadly references various third-party software tools—such as Docker, Kubernetes, and Spark—and asserts that any American "system or service" using these tools infringes. Yet the FAC itself acknowledges that many providers of these software tools (as well as upstream equipment manufacturers for in-flight Wi-Fi systems) are licensed under the asserted patents, and Plaintiffs are aware that American uses licensed vendors. By sweeping broadly while disregarding these licenses, Plaintiffs fail to plausibly allege any unlicensed or unauthorized use, and the FAC's vague and conclusory allegations do not provide American with the fair notice required by *Bell Atl. v. Twombly*, 550 U.S. 544, 556 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 685 (2009).

*Third*, the FAC fails to allege any facts that establish Plaintiffs, alone, have standing to assert U.S. Patent No. 7,712,080 in Count VII.

For these reasons, the Court should dismiss Plaintiffs' claims.

## II.    ARGUMENT

### A.    Invalidity Under 35 U.S.C § 101 and *Alice*

Under the two-step test in *Alice*, a patent claim is ineligible under § 101 if (1) it is "directed to" a patent-ineligible concept, such as an abstract idea, and (2) it lacks any "inventive concept" sufficient to transform the abstract idea into a patent-eligible application. 573 U.S. at 217–18; *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166–67 (Fed. Cir. 2018). Although patent eligibility can turn on underlying facts, it remains a question of law and may be resolved on a Rule 12(b)(6) motion. *InvestPic*, 898 F.3d at 1166; *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).

At step one of the *Alice* analysis, courts examine the claims in view of their language, the specification, and, if relevant, the prosecution history. *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372, 1374 (Fed. Cir. 2020). The focus is on the "claimed advance over the prior art." *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016). To be patent eligible, the claims must improve "the functionality of the computer or network platform itself." *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1364 (Fed. Cir. 2020). Simply invoking a computer as a tool to implement an abstract idea is not sufficient. *See BSG Tech. L.L.C. v. Buyseasons, Inc.*, 899 F.3d 1281, 1287–88 (Fed. Cir. 2018).

The claims at issue here apply abstract ideas using generic computing hardware and software. These claims recite broad, functional results implemented on standard systems—without providing specific, inventive technological solutions, such as improved hardware, data structures, algorithms, or other technical advancements. The patents themselves admit the underlying technologies used to implement the abstract ideas were well-understood, routine, and conventional by the time of the purported inventions.

1.    **Outsourcing Part 1: the '584 Patent**

U.S. Patent No. 8,352,584 ("'584 patent") claims a system for hosting computing clusters for use by clients. The purported problem is a logistical challenge, not a technological one: while "multiple cluster systems" were already known and conventional, they were "typically limited" because "clients are required to host and manage the clusters that are located on their site or in their facilities." Dkt. 84-17 (hereinafter, "'584 patent") at 4:60–5:2, 5:19–21.

As its proposed solution, the patent describes outsourcing cluster management by providing a "hosted cluster system" located remotely from the client. *Id.* at 5:22–25. Clients can "access their hosted cluster from a remote location via … the Internet or other network," allowing them to offload the burden of on-site infrastructure. *Id.* at 4:25–27. The patent frames the invention as solving common problems associated with managing computer clusters by hosting computer clusters for clients using "a network for communications with a corresponding client and monitoring equipment and/or software modules." *Id.* at 4:53–58. The system purportedly provides clients with the "computational assets or power" they need "while not presenting an unacceptable burden on the clients' resources." *Id.* at 2:52–56.

The "present invention" is described as "hosting a plurality of clusters that are each configured for a particular task … and optionally providing for configuration, access control, and monitoring." *Id.* at 2:64–3:3. The only distinction claimed over conventional clusters is location: the "cluster systems of the invention … are physically provided at one or more locations that are remote from the processing user or client's facilities." *Id.* at 4:19–23.

Claim 1, the only claim referenced or charted in the Complaint, recites a generic system architecture implementing this outsourcing:

1.    A computer system, comprising:
a private communications network linked to a public communications network;

a first cluster … in a first configuration … linked to the private communications network;

a second cluster … in a second configuration … linked to the private communications network;

a monitoring system …;

with additional limitations i) requiring communications isolation, ii) defining clusters as "high performance," and iii) linking each cluster through respective gateways.

The terms in claim 1 are defined broadly and generically. The specification teaches that the invention extends to "any particular type of cluster or to particular hardware and/or software components." *Id.* at 10:22–25. The term "configuration" encompasses virtually every conventional aspect of cluster design, including "the physical components," "the topology of the cluster," and "any clustering software utilized to manage the cluster." *Id.* at 10:50–58.

Similarly, the "monitoring system" is described as relying on off-the-shelf tools such as the Intelligent Platform Management Interface (IPMI) and Simple Network Management Protocol (SNMP). *Id.* at 7:53–62. The '584 patent does not disclose or claim any improvement to the clusters themselves, the computing resources, the network, or the monitoring systems; it merely assembles known components in a conventional arrangement.

### a.    Claim 1 Is Directed to a Business Idea.

Claim 1 of the '584 patent is directed to the abstract idea of outsourcing computing tasks to remote clusters and monitoring them—a logistical or business goal, not a technological improvement. The supposed advance of hosting clusters remotely is framed in the patent as a solution to reduce clients' infrastructure costs, not a technical enhancement. '584 patent at 1:39–43. Claim 1 recites only a system that receives a client task over a public network and executes it using remote clusters linked by conventional networking components.

The Federal Circuit has consistently held that "communicating requests to a remote server and receiving communications from that server" is an abstract idea. *Bridge and Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 892 (Fed. Cir. 2019) (quoting *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766–67 (Fed. Cir. 2019)); *see also BuySafe, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends information over a network … is not even arguably inventive."). Just like in *ChargePoint*, where adding network communications to known systems did not render the claims eligible, claim 1's functional recitation of "performing a client task," "monitoring operations," and "reporting the state of the cluster" merely describes abstract outcomes without concrete technological solutions.

Similarly, in *Two-Way Media*, the Federal Circuit held claims invalid where they recited functional results—"converting," "routing," and "monitoring"—without any technological implementation, because the claims simply relied on a generic network architecture performing routine tasks. 874 F.3d at 1337–38. The '584 patent's claim 1 is no different: it describes using standard hardware to execute client tasks over a network without any improvement to the functionality of the clusters or networks themselves.

The generic monitoring elements of the claim likewise fail to impart eligibility. Claim 1's monitoring system simply checks for problems and reports them using known tools like SNMP and IPMI—off-the-shelf technologies that the '584 patent admits are standard. '584 patent at 7:53–62. This is akin to *InvestPic*, where the Federal Circuit found that claims focused on collecting, analyzing, and reporting information using standard computers were abstract and lacked any technological improvement. 898 F.3d at 1167–68. Because claim 1 does not improve how computers or networks function but instead recites a generic use of existing systems to carry out an abstract hosting and monitoring scheme, it fails *Alice* step 1.

5

**b.    Claim 1 Lacks an Inventive Concept.**

Claim 1 of the '584 patent also fails *Alice* step 2 because it uses only generic computer components to perform conventional functions. The specification confirms that all components of claim 1 are standard. The system includes a "public communications network," a "private communications network," two computing clusters, and a monitoring system. But none of these elements are novel or unconventional. The "public communications network" is the Internet. '584 patent at 3:8–10, 4:23–27. The "private communications network" is a typical intranet using established protocols such as "Gigabit Ethernet," "10 Gigabit Ethernet," "Infiniband™," or "Myrinet™." *Id*. at 7:41–52. The "clusters" are conventional computing clusters made up of processing nodes, shared storage, and standard networking. *Id.* at 3:1-19. The "monitoring system" consists of two main components implemented using existing, off-the-shelf technologies: the IPMI and SNMP—both longstanding, conventional tools for monitoring system health. *Id*. at 7:53–62. The use of such "off-the-shelf, conventional computer, network, and display technology" cannot confer patent eligibility. *Elec. Power Grp.*, 830 F.3d at 1355; *see also Two-Way Media*, 874 F.3d at 1339 (invalidating claims relying on "conventional computer and network components operating according to their ordinary functions."). Claim 1 fails *Alice* step 2 because it merely uses standard elements to perform ordinary hosting and monitoring tasks.

The '584 patent does not identify any non-conventional arrangement of these elements. It claims a routine setup in which two generic clusters are linked to an intranet, receive tasks from a public network, and use standard monitoring tools. That configuration reflects a typical managed data center architecture—not an inventive concept.

In addition, claim 1 does not recite any inventive combination of elements. Although an inventive concept can sometimes arise from a "non-conventional and non-generic arrangement of known, conventional pieces," *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d

6

1341, 1350 (Fed. Cir. 2016), the ordered combination here is conventional: computing clusters communicating over standard networks, monitored using known tools. This mirrors the type of generic implementation the Federal Circuit repeatedly finds ineligible.

As in *Elec. Power*, the claims "do not require any non-conventional and non-generic arrangement of known, conventional pieces," and merely perform generic functions on standard computer components. 830 F.3d at 1355. *ChargePoint* confirms the same principle: adding generic networking to existing systems does not impart inventiveness. 920 F.3d at 774–75. Claim 1 does not improve how clusters, networks, or monitoring systems function; it simply applies conventional tools in their ordinary roles to achieve abstract results without any "improvement to the functioning of the computer itself." *Alice*, 573 U.S. at 225.

Because claim 1 lacks any inventive concept, it fails both steps of the Alice inquiry and is not directed to patent-eligible subject matter. Count IX should therefore be dismissed.

### 2.      Outsourcing Part 2: the '841 Patent

U.S. Patent No. 7,822,841 ("'841 patent") claims a system for hosting computer clusters for use by clients. Dkt. 40-16 (hereinafter, "'841 patent"). The alleged problem that the patent identifies, however, is a logistical problem, not a technological problem. "Before the invention," "multiple cluster systems" were already known and conventional, but such systems were "typically limited." *Id.* at 4:51–60. The "fundamental difficulties associated with prior cluster systems" is "*clients* are required to host and manage the clusters that are located on their site or in their facilities." *Id.* at 5:7–11.

The '841 patent's proposed solution is to *outsource* that burden. It describes a "hosted cluster system" that "may be provided at a *hosting* facility typically remote from users or clients." *Id.* at 5:12–15. Clients can "access their hosted cluster from a remote location *via . . . the Internet* or other network." *Id.* at 4:16–18. The purported invention is a business model that offers "hosted"

clusters that use "a network for communications with a corresponding client and monitoring equipment and/or software modules." *Id.* at 4:44–48. The '841 patent characterizes the system as providing "the computational assets or power that the clients demand while not presenting an unacceptable burden on the clients' resources." *Id.* at 2:45–49.

The "present invention" is described as "hosting a plurality of clusters that are each configured for a particular task . . . and optionally providing for configuration, access control, and monitoring." *Id.* at 2:57–63. The only claimed difference from conventional cluster systems is location: the "cluster systems of the invention . . . are physically provided at one or more locations that are remote from the processing user or client's facilities." *Id.* at 4:10–14.

Claim 1—the sole independent claim and the only claim referenced or charted with the Complaint—recites a generic system architecture for implementing this outsourcing model:

1. A computer system for hosting computing clusters for clients, comprising:

a private communications network linked to a public communications network;

a first cluster . . . in a first configuration . . . linked to the private communications network;

a second cluster . . . in a second configuration . . . linked to the private communications network; and

a monitoring system . . . ;

wherein the first configuration differs from the second configuration . . . ;

wherein the monitoring system comprises a main monitor . . . and further comprises monitors for each node . . . operating to check for hardware and software problems . . . and to report . . . problems to the main monitor.

Though the claim refers to clusters in different "configurations" and a "monitoring system," these elements are defined broadly and generically. The '841 patent extends "to a[ny] particular type of cluster or to particular hardware and/or software components." *Id.* at 10:13–15.

8

And the term "configuration" includes "the physical components," "the topology of the cluster," "the software running on the computing resources of the cluster," and "any clustering software utilized to manage the cluster." *Id.* at 10:41–49. The "monitoring system," meanwhile, "has two main components," which may consist of off-the-shelf tools such as "the Intelligent Platform Management Interface (IPMI)" and "Simple Network Management Protocol (SNMP)." *Id.* at 7:43–52. The patent does not disclose or claim any improvement to the "clusters," "computing resources," or "monitoring system."

The file history confirms the abstract nature of the claim. As originally filed, Claim 1 lacked any hardware limitations at all. Ex. A at 1. The Examiner rejected original claims 1–8 under § 101, explaining that the system "does not contain components that are limited to hardware." Ex. B at 2–3. The applicant responded by adding references to "private and public networks" and requiring each cluster to include at least one "hardware processor." *Id.* While the Examiner accepted that was enough to overcome the rejection under then-prevailing legal standards, under current § 101 precedent, generic hardware references cannot transform an abstract idea into a patent-eligible invention and show that the claim is directed to an abstract idea.

### a.      Claim 1 Is Directed to a Business Idea.

Claim 1 of the '841 patent is directed to the abstract idea of outsourcing computing tasks to remote clusters and monitoring them—a logistical or business goal, not a technological improvement. The supposed advance—offloading computing tasks to remote clusters and monitoring them—is itself an abstract business goal, not a technical improvement. The Federal Circuit has repeatedly held that "communicating requests to a remote server and receiving communications from that server, i.e. communication over a network," is an abstract idea. *Bridge and Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 892 (Fed. Cir. 2019) (quoting *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766–67 (Fed. Cir. 2019)); *see also BuySafe,*

*Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("[T]hat a computer receives and sends information over a network—with no further specification—is not even arguably inventive.").

In *ChargePoint*, the claim involved a "control device" configured to "communicate requests . . . with a remote server and receive communications from the remote server" to enable the device to "turn electric supply on and off." 920 F.3d at 766. The Federal Circuit found this "nothing more than the abstract idea of communication over a network for interacting with a device." *Id.* at 768. Here, claim 1 likewise recites a "system for hosting computing clusters for clients," which receives a "client task" over a "public communications network" and performs it using remote computing resources. '841 patent at Claim 1, 2:57–3:3, 6:64–7:8. And like *ChargePoint*, the patent itself frames the problem in business—not technical—terms: hosting clusters on site is expensive. *Id.* at 1:32–36. The abstract focus is further underscored by the functional language used throughout the claim: "perform[ing] a client task," "monitor[ing] for hardware and software problems," and "report[ing] the problems." *Id.* at 7:29–40.

Similarly, in *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, the Federal Circuit held ineligible claims directed to "streaming audio/visual data over a communication system like the internet." 874 F.3d 1329, 1333 (Fed. Cir. 2017). The claims described transmitting "streams of audio and/or visual information" to users "in response to selection signals," *id.* at 1334–35, but recited only functional results—"converting," "routing," and "monitoring"—with no "concrete technological implementation." *Id.* at 1337–38. The claims were abstract because they merely recited a generic network architecture performing routine tasks.

Like the above ineligible ideas, the '841 patent describes a generic system that executes client-requested tasks using "computing resources" over a network. '841 patent at claim 1, 2:57–3:3, 6:64–7:8. It contains no inventive architecture, no particularized implementation, and no

improvement to computer functionality. Like the claims in *Two-Way Media*, it relies entirely on abstract functional language to describe desired outcomes without specifying how those outcomes are achieved.

The '841 patent's "monitoring system" does not confer eligibility. As in *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161 (Fed. Cir. 2018), the Federal Circuit has consistently held that "collecting information, analyzing it, and displaying certain results" is abstract when not tied to a technological improvement. *Id.* at 1167. In *InvestPic*, the court rejected claims that merely used "a plurality of processors" to perform "statistical analysis of investment information," where the patent described "off-the-shelf computer technology" and lacked any specific technological innovation. *Id.* at 1165, 1168. Here, claim 1 describes two "clusters" configured to "perform a client task," monitored by a system that checks for "hardware and software problems" and "reports" them. '841 patent at claim 1. The '841 patent admits that standard tools such as SNMP and IPMI may be used to implement the monitoring. *Id.* at 7:43–52. As in *InvestPic*, this system merely uses conventional computers to perform abstract functions—monitoring and reporting— and is "not even arguably inventive." 898 F.3d at 1168.

Similarly, in *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016), the claims were directed to a method for "receiving a plurality of data streams," "detecting and analyzing events," and "displaying the event analysis results"—a classic example of abstract data processing. *Id.* at 1352, 1354. The court emphasized that the claimed advance was "a process of gathering and analyzing information . . . not any particular assertedly inventive technology." *Id.* at 1354. Like the monitoring system in *Elec. Power*, the '841 patent recites a "cluster" system that receives "task[s]" from a "client," executes them using computing clusters, monitors their performance, and reports results to facility staff. '841 patent at claim 1, 7:29–40, 8:49–54. It does

not recite new data structures, new control mechanisms, or novel protocols—just an abstract process carried out using conventional computing tools.

Because the claims are not "directed to an improvement in the functionality of the computer or network platform itself," but instead invoke computers to carry out abstract outsourcing through hosting and monitoring functions, they fail *Alice* step one. *Customedia*, 951 F.3d at 1364.

### b. Claim 1 Lacks an Inventive Concept.

The '841 patent also fails *Alice* step two because it "use[s] generic computers to perform generic computer functions." *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016). To transform an abstract idea into patent-eligible subject matter, a claim must recite an "inventive concept"—something "significantly more" than the ineligible concept itself. *Alice*, 573 U.S. at 217–18. "[C]onventional and well-understood techniques" do not qualify. *BSG Tech*, 899 F.3d at 1290–91. Nor does "computer implementation" supply an inventive concept if the process can be "carried out in existing computers long in use." *Alice*, 573 U.S. at 222.

The specification confirms that claim 1's components are standard. It recites a system comprising a "public communications network," a "private communications network," two "clusters" of computing resources, and a "monitoring system." '841 patent, claim 1. But none of these elements are novel. The "public communications network" is the Internet. '841 patent at 3:1–3; 4:16–18; 5:15–19. The "private communications network" is a standard corporate intranet—implemented using known protocols such as "Gigabit Ethernet," "10 Gigabit Ethernet," "Infiniband™," or "Myrinet™." *Id.* at 5:12–25, 8:34–42. The "clusters" are "computing resources such as processing nodes, data storage, and a private communications network." *Id.* at 3:8–11. The "monitoring system" consists of two main components, both of which may be implemented using existing, off-the-shelf technologies: the "Intelligent Platform Management Interface (IPMI)" and

"Simple Network Management Protocol (SNMP)." *Id.* at 7:43–52. These systems are not novel inventions but longstanding standard computing elements in a conventional arrangement.

Federal Circuit precedent forecloses any claim to inventiveness here. In *Two-Way Media*, the court rejected claims involving "conventional computer and network components operating according to their ordinary functions." 874 F.3d at 1339. Likewise, in *Elec. Power Grp.*, the court found no inventive concept in "off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information." 830 F.3d at 1355. *MyMail, Ltd. v. ooVoo, LLC*, No. 2020-1825, 2021 WL 3671364 (Fed. Cir. Aug. 19, 2021), reinforces the point. There, claims involving a "user Internet device" and a "server"—used to transmit version information, receive update data, and install toolbar updates—were held ineligible because they merely involved "routine functions." *Id.* at *7. The same is true here: nothing in claim 1 requires more than generic hardware and routine operations. Claim 1 recites computers that "perform a client task," a monitoring system that "detects" issues, and a reporting function that alerts personnel—generic functionalities, performed in expected ways, with no asserted technological improvement.

Nor does claim 1 recite any inventive combination of elements. The Federal Circuit's reasoning in *ChargePoint* is instructive. There, the court rejected claims that "merely add generic networking capabilities" to a pre-existing system. *ChargePoint*, 920 F.3d at 774–75. So too here: claim 1 does not change how computer clusters, networks, or monitoring systems function. It merely applies conventional tools to achieve abstract results—task execution, fault detection, and reporting—without any "improvement to the functioning of the computer itself." *Alice*, 573 U.S. at 225. Claim 1 "relies on generic computing and networking components arranged in their conventional configuration." *Symantec*, 838 F.3d at 1315. It combines standard systems in

predictable ways to accomplish abstract goals—precisely the kind of claim the Federal Circuit has repeatedly held ineligible under § 101.

Because Claim 1 fails both steps of the *Alice* inquiry, it is not directed to patent-eligible subject matter. Count I should be dismissed.

### 3.    Organizing and Storing: the '282 Patent

U.S. Patent No. 7,721,282 ("'282 patent") describes a system in which read-only "root images" are merged with per-node "leaf images" using a "union block device" to deploy computing environments across multiple nodes and depends on underlying techniques that were admittedly well-understood, routine, and conventional practices. For example, clustered computing and distributed file systems were established technologies. *See* Dkt. 84-20 (hereinafter, "'282 patent") at 1:21–35. Root-leaf organizing and storage methods were commonly used to create boot images "on the fly." '282 patent at 1:62–2:6.

The '282 patent claims a system for organizing and storing information, with claim 1 charted as representative for Count XII (Dkt. 84-26). Claim 1 recites, in relevant part:

> 1. A system for distributing an application environment comprising:
>
> a compute node comprising a computer system;
>
> a first storage unit for storing blocks of **a root image** …;
>
> a second storage unit for storing **a leaf image** …; and
>
> a union block device for interfacing between the compute node and the first and second storage units … wherein **the union block device creates the application environment by merging** the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit ….

The '282 patent relies on generic computer hardware and software implementations, as shown in Figure 1, which depicts general-purpose computing devices with standard storage media. '282 patent at 4:11–40. Components such as "Union Block Devices" (UBDs) are described as low-level drivers without any disclosed novel functionality. *Id.* at 4:41–45. The claims are

drafted in broad functional language—"providing," "distributing," "storing," "interfacing," and "caching"—without specifying any improved algorithms, hardware, or software. The claims reflect the conventional practice of storing one type of data (a "root image") in a first location, storing another type of data (a "leaf image") in a second location, and utilizing standard hardware and routine techniques to merge or cache the data.

The prosecution history of the '282 patent underscores the abstract nature of the claims. The Examiner rejected original claims 1–33 under § 101, explaining the system was "an abstract idea" that failed to disclose how it would "process and carry out its intended results." Ex. C at 5-6. The applicant overcame the rejection by amending the claims to recite generic hardware components, such as the "first storage unit," "second storage unit," and "union block device." Ex. D at 1. While the amendments satisfied the examiner's objection at the time, later § 101 precedent held that merely adding conventional hardware does not transform an abstract idea into a patent-eligible invention. *E.g., Alice*, 573 U.S. at 223–24.

### a.    Claim 1 is Directed to Organizing and Storing Information.

Claim 1 of the '282 patent recites the abstract concept of organizing and storing information in a root-leaf structure: keeping a master "root image" shared across computer nodes and maintaining individualized "leaf images" for per-node changes. These steps mirror basic data collection and organization practices analogous to longstanding human conduct—*e.g.*, keeping a central record and local edits—without any technical innovation. *See Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1146 (Fed. Cir. 2016) (organizing information is an abstract idea); *Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1327 (Fed. Cir. 2017) (same); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016) ("*TLI*") (claim related to creating and storing data images based on "classification" of the data is abstract); *Content Extraction &*

15

*Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("The concept of data collection, recognition, and storage is undisputedly well-known.").

Claim 1 recites broad steps—storing root and leaf images and merging them using a generic "union block device"—without any specific algorithm, circuit, or new file-system structure.'282 patent at claim 1; *see also ChargePoint*, 920 F.3d 769 (claims using functional language to describe results without specific technological means are abstract). The '282 patent itself concedes these concepts were conventional: cluster computing and distributed file systems were established technologies; root-leaf boot images were common; and caching algorithms were routine. '282 patent at 1:21–35, 1:62–2:6.

Claim 1 resembles a traditional library system: the central card catalog serves as a shared, primary record (root); individual checkout cards track each book's borrower and status (leaf); and the return cart holds recently returned books awaiting reshelving (cache)—highlighting that these practices are longstanding techniques for organizing and storing information, not inventive technological solutions. Because the claims do not specify any concrete mechanism or technical advancement beyond these conventional organizational methods, they are directed to an abstract idea and fail *Alice* step 1.

### b.    Claim 1 Lacks an Inventive Concept.

Claim 1 also fails *Alice* step 2 because it does not recite any "inventive concept" that could transform the abstract idea of organizing and storing information into a patent-eligible application. *See Alice*, 573 U.S. at 217–18. Instead, claim 1 applies the abstract root-leaf organizing and storage idea using generic, conventional computing components.

The '282 patent itself concedes that the claimed techniques—storing root images and maintaining leaf images for local changes—were well-known, conventional practices at the time of filing.'282 patent at 1:21–35, 1:62–2:6 (cluster computing, distributed file systems, root-leaf

16

boot images all well-known). These admissions confirm that the claims use generic computing hardware and software without any new algorithms, configurations, or technological improvements. *Symantec*, 838 F.3d at 1315 ("claims use generic computers to perform generic computer functions").

The claims themselves underscore their conventional nature, reciting only high-level functional steps—"providing," "distributing," "storing," and "interfacing"—without specifying any inventive implementation for these tasks. *BSG Tech.*, 899 F.3d at 1290–91  Components like the "union block device" are described in the specification as low-level drivers performing routine merging of data blocks, not any technological advance.'282 patent at 4:41–45.

Courts have invalidated similar claims applying conventional computing elements to abstract goals. *E.g.*, *Content Extraction*, 776 F.3d at 1348 (holding claims for data extraction and storage invalid because they relied on routine computing hardware and techniques). Claim 1 falls squarely in this category, merely combining conventional elements to perform abstract data organization and caching without any innovative improvement.

Again, the prosecution history of the '282 patent definitively confirms the absence of a non-abstract inventive concept. The examiner initially rejected the claims as abstract, and the applicant overcame that rejection solely by adding generic hardware references, such as "first storage unit," "second storage unit," and "union block device." Ex. C at 5-6; Ex. D at 1. But under later § 101 precedent, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 223–24.

In the end, the claims merely require storing one type of data (a "root image") in one place, another type of data (a "leaf image") in a second place, and using standard hardware and known

17

techniques to merge them. They provide no inventive concept. Because claim 1 fails both steps of the *Alice* inquiry, Count XII should be dismissed.

### B.    No Infringing Uses Are Alleged

A complaint must "place the alleged infringer 'on notice of what activity … is being accused of infringement.'" *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1352 (Fed. Cir. 2021). "There must be some allegation of specific services or products of the [accused infringer] which are being accused." *Addiction & Detox. Inst. L.L.C. v. Carpenter*, 620 F. App'x 934, 937 (Fed. Cir. 2015).

Here, the FAC alleges that American infringes by offering unspecified "services and technologies" that use the third-party software programs Kubernetes, Docker, and Spark, and third-party in-flight Wi-Fi functionality. *E.g.*, Dkt. 84 at 7. It asserts that these programs practice the '841, '584, '282, '080, and '845 patents but never identifies any specific American product, system, or service accused of infringement. Instead, it defines "Accused Products and Services" broadly as any "products, services, and technologies" American "makes, utilizes, services, tests, distributes, sells, offers, and/or offers for sale …." Dkt. 48 at 7. The FAC then compounds this ambiguity by accusing not only unspecified systems but also "all past, current, and future systems and services" that "operate in the same or substantially similar manner" or "have the same or substantially similar features." *E.g.*, Dkt. 84-26 at 2. Such sweeping allegations fail to give American notice of what conduct is actually accused.

Like the deficient pleadings in *Carpenter* and *WirelessWerx IP LLC v. OnStar, LLC*, 2024 WL 1607018, at *9–10 (E.D. Mich. Apr. 12, 2024), the FAC includes "bare allegations" that American infringes merely because it uses third-party software, without identifying any American-specific implementation or feature alleged to infringe. This is exactly the sort of speculative pleading insufficient under Rule 8. *See Carpenter*, 620 F. App'x at 937; *Artrip v. Ball Corp.*, 735

F. App'x 708, 714–15 (Fed. Cir. 2018) (finding conclusory allegations insufficient where the complaint could encompass virtually all aspects of defendant's operations).

### C.    Plaintiff Provides No Basis for its Speculation of Unlicensed Use

The FAC's allegations of infringement are rendered implausible by its own admissions that upstream suppliers of the accused software or cloud services are licensed under the asserted patents—yet the FAC fails to specify which providers are licensed and which are not. *E.g.*, Dkt. 84-26 at 2 (disclosing only exemplary examples). This acknowledgment makes Plaintiffs' infringement theory speculative at best because it relies on the assumption that American's use somehow falls outside of licensed activity without any supporting factual allegations. "The inclusion of [the phrase 'on information and belief'] creates an inference that [Plaintiffs] likely lack[] knowledge of the underlying facts to support the assertion[s], and [are] instead engaging in speculation to an undue degree." *Celgard, LLC v. Shenzhen Senior Tech. Material Co.*, 2020 WL 7392909, at *5 (W.D.N.C. Dec. 17, 2020). Because Plaintiffs admit that third-party providers of the accused technologies are licensed, Plaintiffs' failure to identify which alleged uses by American are unlicensed demonstrates the implausibility of their infringement claims. *See Radar Indus., Inc. v. Cleveland Die & Mfg. Co.*, 424 F. App'x 931, 933 (Fed. Cir. 2011) ("An express or implied license is a defense to infringement."); *JVC Kenwood Corp. v. Nero, Inc.*, 797 F.3d 1039, 1045 (Fed. Cir. 2015) ("without specific allegations and evidence showing use of unlicensed optical discs, Nero has established a complete defense to all of JVC's allegations of infringement under the Patents."). Plaintiffs' statement that they "will provide relevant license agreements . . . in discovery" underscores that they cannot meet their burden to plausibly plead infringement before proceeding to litigation. *See Twombly*, 550 U.S. at 556, 558 ("[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."). Plaintiff's original complaint filed 11 months ago offered to provide

these licenses as well, yet they still have not produced them. Plaintiffs continue to drag their feet producing the licenses to avoid providing definitive proof that—not only do they not have a basis to allege infringement of certain the patents—many of their allegations relate to licensed activity.

### D. Plaintiffs Do Not Have Standing to Assert the '080 Patent

Plaintiffs claim they are "the exclusive licensee of the '080 Patent." FAC, ¶¶4, 37. However, Plaintiffs have failed to allege a single fact to support this bare claim. Accordingly, American disputes that Plaintiffs "hold[] all substantial rights" in or have standing to assert the '080 patent and challenges Plaintiffs' jurisdictional allegations under Rule 12(b)(1). *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993); *KVOS, Inc. v. Associated Press*, 299 U.S. 269, 278 (1936). Under Rule 12(b)(1), the Court need not accept as true all facts plead; instead, the Court need only accept as true uncontroverted facts (of which there are none). *Gibbs v. Buck*, 307 U.S. 66, 72, (1939); *Cedars-Sinai*, 11 F.3d at 1583; *Panavise Prods., Inc., v. Nat'l Prods., Inc.*, 306 F. App'x 570, 572 (Fed. Cir. 2009).

Because the FAC pleads no uncontroverted facts that so much as indicate Plaintiffs have standing to assert the '080 patent, the FAC fails to establish a factual basis for it to exercise jurisdiction. *Cedars-Sinai*, 11 F.3d at 1585. Dismissal of Count VII is therefore appropriate under Rule 12(b)(1). *See FluorDx LLC v. Quidel Corp.*, 2019 WL 4599842, at *2 (S.D. Cal. Sept. 23, 2019) (dismissing complaint for lacking any supporting evidence to show standing).

## III. CONCLUSION

For the foregoing reasons, the FAC is legally deficient. Several asserted patents recite abstract ideas implemented with conventional computer and networking technology. In addition, the FAC does not plausibly identify any specific infringing American product or service, and fails to establish that Plaintiffs have standing to assert the '080 patent. Accordingly, American respectfully requests that the Court dismiss Plaintiffs' FAC under Rules 12(b)(6) and 12(b)(1).

Dated: October 1, 2025

**MCKOOL SMITH, P.C.**

*/s/ John B. Campbell*
John B. Campbell
Texas State Bar No. 24036314
jcampbell@McKoolSmith.com
Kenneth M. Scott
Texas State Bar No. 24137497
kscott@McKoolSmith.com
**MCKOOL SMITH, P.C.**
303 Colorado Street Suite 2100
Austin, TX 78701
Telephone: (512) 692-8700
Telecopier: (512) 692-8744

Emily Tannenbaum
New York State Bar No. 5928130
**MCKOOL SMITH, P.C.**
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 402-9400
Telecopier: (212) 402-9444

Casey L. Shomaker
Texas State Bar No. 24110359
cshomaker@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

Alan P. Block
California State Bar No. 143783
ablock@mckoolsmith.com
**MCKOOL SMITH P.C.**
300 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Telephone: (213) 694-1054
Telecopier: (213) 694-1234

ATTORNEYS FOR AMERICAN
AMERICAN AIRLINES, INC.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document has been

served on all counsel of record via the Court's ECF system on October 1, 2025.

*/s/ John B. Campbell*
John B. Campbell
