UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| INTELLECTUAL VENTURES I LLC, ET AL. | DOCKET 4:24-CV-980 |
| | JANUARY 22, 2026 |
| VS. | 9:03 A.M. |
| AMERICAN AIRLINES, INC. | SHERMAN, TEXAS |

---

VOLUME 1 OF 1, PAGES 1 THROUGH 96

REPORTER'S TRANSCRIPT OF CLAIM CONSTRUCTION HEARING

BEFORE CHIEF JUDGE AMOS L. MAZZANT, III,
UNITED STATES DISTRICT JUDGE

---

FOR THE PLAINTIFFS: ALLEN FRANKLIN GARDNER
ALLEN GARDNER LAW, PLLC
609 SOUTH FANNIN
TYLER, TX 75701

JONATHAN K. WALDROP
MARCUS A. BARBER
JOHN W. DOWNING
HEATHER S. KIM
JONATHAN HICKS
KASOWITZ LLP
101 CALIFORNIA STREET, SUITE 3950
SAN FRANCISCO, CA 94111

PAULA Y. AJUMOBI
KASOWITZ LLP
1633 BROADWAY
NEW YORK, NY 10019

COURT REPORTER: CHRISTINA L. BICKHAM, CRR, RDR
FEDERAL OFFICIAL REPORTER
101 EAST PECAN
SHERMAN, TX 75090

PROCEEDINGS RECORDED USING MECHANICAL STENOGRAPHY;
TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.

FOR THE DEFENDANT: JOHN B. CAMPBELL
KENNETH M. SCOTT
MCKOOL SMITH, P.C.
303 COLORADO STREET, SUITE 2100
AUSTIN, TX 78701

EMILY TANNENBAUM
MCKOOL SMITH, P.C.
1301 AVENUE OF THE AMERICAS
32ND FLOOR
NEW YORK, NY 10019

CASEY L. SHOMAKER
MCKOOL SMITH, P.C.
300 CRESCENT COURT, SUITE 1200
DALLAS, TX 75201

ALAN P. BLOCK
MCKOOL SMITH, P.C.
300 SOUTH GRAND AVENUE, SUITE 2900
LOS ANGELES, CA 90071

# INDEX OF TERMS


| | PAGE |
|---|---|
| "ROOT IMAGE" | 5 |
| "INPUT SOURCE" AND "IDENTIFY A CATEGORY OF UPDATE MESSAGE BASED ON THE INPUT SOURCE" | 20 |
| "NETWORK ADDRESS" AND "NETWORK ROUTE DIRECTOR" | 33 |
| "A REMOTE LOCATION EXPERIENCING A RELATIVELY HIGH VOLUME OF TRANSIENT TRAFFIC" | 53 |
| "RELATIVELY HIGH VOLUME OF TRANSIENT TRAFFIC" | 61 |
| "PARTITION" | 77 |
| "DESCRIPTION OF ALL SAID PARTITIONS" | 84 |
| "SIMULTANEOUSLY EXECUTING AT LEAST A RESPECTIVE ONE OF THE SUBTASKS OF THE COMPUTER-EXECUTABLE PROCESS IN EACH OF AT LEAST SOME OF SAID PROCESSORS ON A RESPECTIVE ONE OF THE PARTITIONS" | 91 |
| "ON A FIRST-COME/FIRST-SERVED BASIS" | 92 |
| COURT REPORTER'S CERTIFICATION | 96 |

(Open court, all parties present via Zoom.)

(REPORTER'S NOTE: During the following proceedings, there were disruptions in the audio as a result of it being held by videoconferencing. These are noted in the transcript.)

THE COURT: Good morning, everyone. This is Judge Mazzant, and we're here in 4:24-cv-980. You've already made your appearances. Just if you will identify yourself every time you speak just so -- because we are in the courtroom taking this down, with my court reporter.

Just a couple things. I think you received my preliminary constructions yesterday. Hopefully that will help aid this process. So you have my thoughts on all but the one term, and, of course, you're welcome to point out why I'm wrong if you disagree.

And one other thing, just for full disclosure, I don't think I've said anything in this case. I've had another American Airlines case years ago. My daughter is a flight attendant with American. Not that it impacts anything, but I just wanted to make sure everyone was aware of that just for full transparency.

And then Scott Woloson, my technical advisor, is also here on this call as well.

So if we're ready to proceed -- I don't know if -- based on my preliminary constructions if that changed what

we're going to argue today or -- I'll hear from the parties to let me know what you think about that, I guess first from the plaintiff.

MR. HICKS: Good morning, your Honor. This is Jonathan Hicks with plaintiff.

We had planned on three of us arguing the five patents in total, and I was tasked with the responsibility for the '844 and the '722 patent. I'm happy to take up argument for those terms if the Court would like to start with those, or if the Court has a preference to start with a particular patent, we'd be happy to oblige.

THE COURT: Yeah. I don't have a preference, so I just -- if you want to go ahead and tell me where you're going and we can begin.

MR. HICKS: Great. Thank you, your Honor.

So, if I may, I'd like to start with the '844 patent which just has the one term in dispute. That's the "root image" disputed claim term.

And so we've had a chance to review the Court's preliminary construction. And taking a step back, I.V. believes that its proposed construction of plain and ordinary meaning without further interpretation of that plain and ordinary meaning is correct, partly because the nature of the dispute between I.V. and American is whether there is an exception to the rule that the plain and

ordinary meaning applies here as opposed to a dispute over the plain and ordinary meaning itself and that the Court need not construe this term to be anything other than its plain and ordinary meaning.

That said, I.V. believes the Court's preliminary construction is not inconsistent with the plain and ordinary meaning and the language of Claim 7, but it's I.V.'s position that the preliminary construction adds an unnecessary limitation.

Specifically, for the portion of the Court's preliminary construction that reads "unchanged by the plurality of compute nodes," I.V. believes Claim 7 of the '844 patent recites language and a limitation including that the, quote, root images of the plurality of compute nodes do not include blocks of the root image that are unchanged by the compute nodes. And this is provided, for example, at Column 11, lines 35 to 38.

I.V. believes this language from the Court's preliminary construction is unnecessary in view of the claim language. (Audio distortion) -- limitations that inform the meaning of the root image and leaf image and, in I.V.'s view, adds language that's not necessary.

As to the preliminary construction, that's all the argument that I.V. had intended to present for this term subject to rebuttal to any arguments that American may

present for its proposed construction. Thank you.

THE COURT: No, thank you.

For American?

MR. SHOMAKER: Good morning, your Honor. This is John Campbell for American Airlines.

Ms. Tannenbaum will be handling this term for the '844, and so I'll turn it over to her.

I just wanted to briefly make the remark that I think Mr. Hicks pointed it out and the Court probably saw it, but for the most part, what we're arguing here today is about lexicography and disclaimer. We actually aren't arguing over the plain meaning. So we're generally arguing about the lexicography and disclaimer of these being captured in the claim construction, and I think you'll see that as we proceed today.

So with that, I'll let Ms. Tannenbaum handle the '844 patent and the term "root image."

THE COURT: Okay. Thank you.

MS. TANNENBAUM: Thank you. I'm going to share my screen.

Good morning, your Honor. My name is Emily Tannenbaum, and I am here on behalf of Defendant American Airlines.

This claim construction presentation addresses construction of the term "root image" in the '844 patent

and explains why the intrinsic record supports American's construction.

On Slide 2 is the cover page of the '844 patent which is titled Root Image Caching and Indexing for Block-Level Distributed Application Management.

As I previously mentioned, the disputed term in the '844 patent is "root image."

As seen on Slide 4, the term "root image" is included in the two claims, Claims 7 and 11 of the '844 patent, that plaintiffs have asserted against American.

American proposes "root image" to be construed as "a read-only base set of data blocks, operating beneath the file system, that provide the common portion of the application environment," while plaintiffs propose plain and ordinary meaning.

Because the patentees acted as lexicographers and used the term consistently throughout the specification, construction is required to reflect that intrinsic meaning. American's construction follows the claim's block-level description; whereas, plaintiffs, by contrast, offer no affirmative meaning and object that American imports limitations. But the patent text itself provides these defining elements, and the Federal Circuit guidance recognizes lexicography where patentees clearly define a term, and that principle governs here.

So on Slide 6, I've included a brief portion of the Background of the Invention which recognizes systems with read-only common layers and a writable layer caption changes or an -- (Audio distortion) -- as the patent describes existed before the '844 patent, reinforcing the ordinary technical understanding that a common base image and a change layer are distinct roles.

However, problems existed with prior approaches that stored data at the file system level and required operating system-specific versions and repeated indexing of common data. So the purported invention of the '844 patent addressed these problems by consolidating common content into a root image and capturing per-change deltas in images at the block level. This system accelerates the plan that reduces redundant indexing and simplifies cluster updates. The alleged block-level solution operating below the file system is central to achieving operating system and file system independence in the disclosed deficiencies.

Slide 8 includes relevant case law and demonstrates when patentees act as lexicographers, that definition controls claim meaning. The governing principles, as summarized in the claim construction briefing, cite *AstraZeneca* for the proposition that "The specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it

would otherwise possess. In such cases, the inventor's lexicography governs."

Additionally, as explained in *Sinorgchem*, "The term ... is set out by quotation marks - often a strong indication that what follows is a definition."

Slide 9 shows the specification expressly defines "a read-only base image (or 'root' image) of the application environment," which a POSITA would understand as lexicography. Not only is "root" in quotation marks, but the intrinsic record further exploits the read-only nature to avoid reindexing and to share results across nodes, reflecting commonality in the root images context. This definition --

THE COURT: Let me ask you, you know, as to this issue of read-only, Claim 27 shows that when they want to claim read-only, they can do so. So how does that affect your argument that you want to now include that limitation in the construction when 27 shows that if they want it to be read-only, they know how to do so?

MS. TANNENBAUM: Thank you, your Honor.

Later on in this presentation, I have planned to discuss that the embodiments where the storage -- first storage unit is read-only is a part of the specification that the plaintiffs have pointed out. However, there is a distinction between the storage unit and the root image

being read-only. And I believe the definition that the Court has proposed captures part of it being read-only with the unchanged blocks.

So I think the specification in the -- the definition where "root" is in quotation marks, as I've shown on the prior slide, is identifying that a root image is defined as a read-only base image.

THE COURT: And, you know, it just appears to the Court that you're trying to impose certain limitations into the construction, but I don't -- based on my preliminary construction, too, I just didn't see that this was enough to show that this was -- they defined what this was exactly, so -- but go ahead. You saw my construction. I'm looking for you to tell me why I'm wrong.

MS. TANNENBAUM: Okay. Thank you.

So on Slide 10 I have included a portion of Intellectual Ventures' opening claim construction brief where Intellectual Ventures acknowledges that if lexicography applies, "root image" would include a read-only base set of data blocks of the application environment, aligning with the specification's definitional language. This concession confirms that the patent's definitional phrasing governs the term's meaning.

Although acknowledging lexicography, Intellectual Ventures argues read-only construction would exclude

embodiments. However, I.V. incorrectly interprets the specification's disclosure relying on passages about read-only storage units which are distinct from root images that are read-only.

American's expert, Dr. Goodrich, explains that Intellectual Ventures misreads the disclosure. "Read-only" describes the root image's contents, not the properties of the physical storage medium. So "root image" can be read-only in content even if stored on a writable device. Therefore, the specification's description of embodiments where the first storage unit is read-only does not contradict the content of a root image being read-only.

Additionally, Dr. Goodrich further opines that a POSITA would understand "root image" to be read-only in this design with per-node modifications captured in leaf images rather than altering the root image's content.

Turning to part 2 of the construction and looking to *Phillips* for the proposition that claim construction starts with the claim language itself, the claims describe "root image" in block terms, "blocks of a root image," "blocks of said root image," not -- (Audio distortion) -- semantic indicating a set of blocks as the second part of the constructions.

The claims also separate unchanged root image blocks from leaf images which include only additional or

changed blocks, reinforcing a base set versus incremental changes structure. This claim framing squarely supports American's "base set of data blocks" language.

The specification is consistent with the claims and illustrates that a file consists of multiple blocks. When a node modifies some file blocks, only those modified blocks are stored in the leaf image while unmodified blocks remain in the root image. This passage supports that "root image" is a block-level base set distinct from -- (Audio distortion) -- level constructs, and leaf images capture differences at block granularity.

Turning the part 3 of the proposed construction on Slide 15. The '844 patent teaches that by storing data at the block level, embodiments are able to operate beneath the file system and the file system and operating system independent, branding how the root and leaf mechanisms function.

The architect description places union block devices which merges the root and leaf blocks to present the application environment to the file system as low-level interfaces, merging blocks beneath the file system to present a cohesive environment consistent with "beneath the file system."

THE COURT: But isn't this just one embodiment that you're trying to incorporate into the construction?

MS. TANNENBAUM: So I can explain as I continue through the slides. I believe I'll answer your question.

So Intellectual Ventures acknowledges that the '844 patent discloses embodiments beneath the file system. However, they emphasize the term "able" to operate beneath the file system, not that it must do so.

However, "able" is not permissive in this context. Rather, it signifies the embodiment's technical capability, not a discretionary permission, so it does not support treating the embodiment as merely optional. In other words, it is the mechanism the patent teaches to achieve the stated operating system and file system independence and rapid deployment benefits, and the specification presents it in the way the invention works, not as an optional flourish.

Additionally, the passage I.V. cites to for the proposition that the '844 patent describes embodiments that operate at the file system layer is incorrect.

So Slide 17 shows the portion of the specification that Intellectual Ventures cites to to allege that the '844 patent describes embodiments that operate at the file system level. So this disclosure still pertains to the block level as the file system comprises data blocks, just at a different level.

For instance, the specification here explains that

the file system actually seen by the compute node is a product of merging the root image portion and the leaf portion together at the block level. Absence of alternative teachings supports the inclusion of "beneath the file system" in the construction to capture the patent-defined context.

Dr. Goodrich explains that operating beneath the file system is not a mere feature of a specific embodiment but a fundamental aspect of the purported invention that enables rapid deployment and operating system independence, advantages the '844 patent repeatedly ties to block-level operation. And Dr. Goodrich, further, ties this to how a POSITA would understand the architecture's function and benefits in practice.

As to the last part of the proposed construction, "that provide the common portion of the application environment," the specification explicitly states that "the data stored in the root image is by definition common to all the compute nodes," capturing "the common portion of the application environment" included in American's construction.

Intellectual Ventures offers no substantive objection to "common portion" language beyond asserting that the exact words are not used. But the specification's "initially common" and "by definition common" descriptions

reflect that concept directly. This lack of substantive dispute further supports adopting American's construction as best aligned with the intrinsic record.

So, ultimately, American's construction aligns with the claim language identifying a set of data blocks for the root image. The specification's definitional "read-only base image" statement, the consistent "block-level" disclosures that operate beneath the file system, and the teaching that the root image comprises data common to the compute nodes is precisely how a POSITA would read the term "root image" in the '844 patent.

For the reasons shown in the claim specification definitions, operating layer disclosures, and expert analysis, the Court should adopt American's construction of "root image," a read-only base set of data blocks, operating beneath the file system, that provide the common portion of the application environment.

This is all we have on "root image" unless the Court has any additional questions.

THE COURT: No. Thank you.

And does plaintiff have any response?

MR. HICKS: Yes. Thank you, your Honor. Again Jonathan Hicks with Kasowitz.

Just a few comments in consideration of the Court's time and considering we have four more patents to

discuss here.

As to the "read-only" portion, I think not only the Court's recognition of Claim 27 but the disclosure at Column 7, lines 34 to 37, pretty clearly suggest that the input -- the storage unit which holds the root image does not need to be read-only, which means that memory is -- that storage unit is not read-only, including the root image, the software, the operating system, whatever application the root image might comprise. It's not read-only, meaning it can be modified.

That said, I.V. acknowledges that the claim -- (Audio distortion) -- to the '844 patent involves distributing this base image through multiple nodes, so there's reasons why you want to limit the number of edits you might make to a root image, for example, but certainly nothing -- there is nothing in the claim language, there is nothing in the spec that says you can't edit this root image.

So I think that's all we need to say on that point.

On Slide 10, American seemed to infer that we acknowledge there is lexicography. I just -- to be clear, we dispute that lexicography applies. Our point on Slide 10 of American's is that if there is lexicography, then -- which we dispute -- then that's -- (Audio

distortion). The lexicography should be limited to what is actually stated in the specification as opposed to providing color and interpretation and adding a modifying language to the alleged lexicography, right? It's what the -- lexicography should be limited to what's said, not to characterizations of what was said.

Slide 12 -- (Audio distortion) -- expert testimony. It's I.V.'s view that it's unnecessary here, particularly in view of American's argument that lexicography applies here, in part because the nature of lexicography and disclaimer aren't such that it should be clear and it's an exact standard.

So my understanding of the general rule of extrinsic evidence and when to consider extrinsic evidence of -- (Audio distortion) -- testimony is when there is ambiguity as to what a term means. (Audio distortion) -- it's sort of a -- (Audio distortion) -- there between saying it's clear from the specification and the claims but we need to go to expert testimony to fill those holes.

And taking a step back, it's just important to acknowledge the claims. They don't say "read-only." They don't say "operating beneath the file system." In fact, the citations included in American's slides -- for example, Slide 15 and 16 -- you know, the way I heard American argue it is "able" means something other than "able."

So, right, the language said "embodiments" -- so we're talking about embodiments here of the specification -- "are able to operate beneath the file system and thus are designed to be file system and operating system independent." That means that they can, but do not necessarily need to, operate at a particular layer, whether it be the file layer or the block layer. I think that's the most reasonable interpretation of that specification passage, and "able" does not mean it must, based on the plain language and understanding of how we understand the word "able" to mean.

With that, your Honor, unless your Honor has any further questions -- (Audio distortion.)

THE COURT: No. Thank you.

We can go on to the next term.

MR. HICKS: So, your Honor, I believe the next -- at least in terms of the preliminary constructions, the next patent is the '722 patent, which again I'll be doing argument for that on behalf of I.V. so -- if that makes sense, if I may start with the '722 patent.

(Off-the-record discussion between the Court and court reporter.)

THE COURT: My court reporter -- yeah. So I guess if you can speak closer to the mic or something. My court reporter is having a little trouble, so -- okay. Go ahead.

MR. HICKS: Yes, your Honor. I'll keep that in mind.

For the '722 patent, there were two terms, "input source" and "identify a category of update message based on the input source."

For the "input source" term, I.V. agrees with the Court's preliminary construction and does not intend to offer specific argument. So my question is would the Court prefer to address the input source term first or both terms at the same time?

THE COURT: Well, let's just do one at a time. So we can go ahead and hear American's response on "input source," and when we go there -- let me just ask -- I'll ask the question to start off with. You know, when you look at Figure 7, it provides as an example information provider, dynamic content provider, but then you have additional blank ones showing that there are others. So I guess I'm -- it seems like these are embodiments that you're trying to restrict to the definition. When you look at the figure in the patent, it definitely shows that there are other options. It's not the only ones.

So whoever is going to argue, if you want to start off there if you can.

MR. CAMPBELL: Sure, your Honor. This is John California for American Airlines.

Can you see my slides?

THE COURT: Yes, I can. And I have the slides on my iPad, too, just so you know.

MR. CAMPBELL: Okay, great. Okay, great. So, look, I'll jump into this given the Court's question.

You know, the figure is one thing and the figure suggests that maybe there would be other embodiments, but here you've got straight-up lexicography. I mean, this is -- this is a pretty straight-up one. This is straight-up lexicography.

Three different times in the specification the patent defines "input source." And the Federal Circuit in individual cases has taken one of the hallmarks that appears here and determined that there was lexicography and the inventor must be bound by that definition. Here we've got three of them. Usually the Federal Circuit is only looking at one thing. Here they've got three different things.

So the specification at Column 3, line 15 through 16, says, "the information provider or a dynamic content provider (generically referred to as an 'input source')." And then it says it similarly again at Column 11, line 21 through 24, but specifically related to the figure that the Court refers to, that "information provider 108/dynamic content provider 116" again generically referred to as an

"input source 210."

So even with the figure, when you look at the specification's description of the figure, it's defining "input source" as information provider or dynamic content provider.

And, again, the Federal Circuit in *Sinorgchem* said, hey, if you've got something set off by quotes, that's a strong indication that what you've got is a definition and the patentee's got to be bound by that. We have that here. It's set off by quotes.

In a separate case, in *Alnylam Pharmaceuticals*, the Court said when you say generally conveys -- that generally -- when you use the term "refer to," that conveys an intent for the sentence to be definitional.

We also have that in those two specifications. We've got "refers to" and quotations. That should be doubly enough. But in case it's not, the patent then at Column 13, line 26 through 28, says that "the input source 210, i.e., the information provider 108 and/or dynamic content provider 116." So, "i.e.," that is, right? "I.e." we all know means that is.

And the Federal Circuit in a different case looked at i.e. in the *Edwards Lifesciences* case and says, well, "the specification's use of 'i.e.' signals an intent to define the word to which it refers."

So here, you know, the Federal Circuit has said over and over that if you have the specification providing a special definition, in that case the inventor's lexicography governs, and they've looked and found various hallmarks individually in individual cases. Here we not only have one of those three hallmarks, we have three of those hallmarks.

So short of a "this is this," which we do have in other terms later in this case, which is clearly definitional, here you've got three different hallmarks that gets you pretty close to "this is this" definition.

So despite what you would maybe see with that -- (Audio distortion) -- in isolation, when you read the specification's description of that figure, you read the specification three different times telling you what the definition of "input source" is with quotations, "refers to," "i.e.," this is -- this is a case of inventor lexicography.

THE COURT: Okay. Thank you.

And would the plaintiff like to respond to that?

MR. HICKS: Yes. Thank you, your Honor. Very briefly.

So I note that there wasn't any real rebuttal of the disclosure of Figure 7. Instead, what American relied on was -- (Audio distortion) -- three passages, which two

of them on their face are discussions of embodiments of the invention, which respectfully is not necessarily -- (Audio distortion).

And, in particular, the matter here is important because I.V. didn't dispute that an information provider or a dynamic content provider can be an input source. That's clear from the passages. But the way that -- the order and how these are stated is that this is saying input -- it's saying precisely that. These -- information provider and dynamic content provider are input sources. They're not saying input sources are precisely this. That's not what these passages are saying.

And, further, they are just specific embodiments and not definitional, and there is certainly evidence in the specification that contradicts that an input source must be one of these types -- two types of information.

So with that, your Honor, nothing further.

THE COURT: Okay. Thank you.

If you want to go on to the next term, and we'll start again with the plaintiff. And tell me why, you know, you disagree with my construction, if you do. And that -- my construction is just basically taking it from the prosecution history, but -- tell me, Mr. Hicks. Why am I wrong?

MR. HICKS: Yes, your Honor. And for this one, I

prepared slides that might be helpful if you're able to review those as I present argument here.

So on Slide 3 -- and I'll share my screen for the gallery here.

So on Slide 3 is the language in issue, and it's on -- it's "identify a category of the update message based on the input source."

And so turning to the next slide, this is from the prosecution history, which I believe is a portion that the Court is relying on for its preliminary construction, in particular the "data content" language and limitation that is in the preliminary construction.

So on Slide 4, the first paragraph provides context of what's being discussed, which is the prior art reference which I'll refer to as "Chandra." And the block quote there is directly from Chandra, and what is shown in the highlight that we've got is that Chandra discusses -- discloses "In publish/subscribe systems, publishers post messages and subscribers independently specify categories of events in which they are interested."

And below that, the applicant's argument that this disclosure in Chandra, which is "relied upon by the examiner, discloses -- (Audio distortion) -- subscribers can identify categories of events in which they are interested." That is not the same as "identify a category

of the update message based on the input source."

So next helpful context and I think the meat of the argument is on the next slide here.

So turning to Slide 5, this is the same office action in the '722 patent file history. As shown in the excerpt, we have the applicant's characterization of Chandra and its discussion of its content-based subscription system, where "one or more of the clients can specify a subscription. Each subscription provides a set of conditions indicating the types of messages that those clients are interested in receiving."

And focusing on that language that's highlighted in this slide -- I'll read it for the record. "If the data content of the messages matches the specified values of the subscription, then the message is delivered to the one or more subscribers (or clients) of that subscription."

So the applicant argued in this context, as shown on the next slide, that "Chandra, as asserted by the examiner, disclosed that if the data content of a message matches the specified values of the subscription" -- keep in mind Chandra's system which is a publisher/subscriber model -- "then the message is delivered to the one or more subscribers (or clients) of that subscription."

So, importantly, what's being analyzed and compared in the data content of the message is not relating

to the input source, right? It's specified value of a subscription that are provided by the clients in Chandra's -- in the Chandra reference.

When you look at what the applicant was arguing, it's that they were saying this disclosure in Chandra does not meet the limitation of "identifying a category of the update message based on the input source" because the specified value for the subscription -- (Audio distortion) -- by the client are not the input source.

And so why is this important? Well, the claim doesn't specify how you identify the input source. There's nothing in Claim 14 that says the limitation of that identification of the message must be based on the input source. There is nothing that limits how that input source can be identified for purposes of satisfying that claim limitation.

And it's Intellectual Ventures, or I.V.'s, view that there are different ways for the patent -- (Audio distortion) -- disclosed in different ways of identifying the input source, and one of those could be contents of the messages itself, that nothing precludes identification of the category of the update message based on the message contents when the message contents include information related to the input source.

And so that's -- we feel strongly that's an

important distinction because the Court's preliminary construction would preclude a scenario where the input source is included in the content of the message, which, in our view, the prosecution disclaimer is not that broad. It doesn't exclude or preclude how the input source is identified. It only requires the identification of a category of the update message be based on the input source.

So, your Honor, that's all I have for the slides. I think it's just an important clarification on what was being argued during the prosecution history of the '722 patent and its distinct arguments that the applicant was saying and, specifically, information that was being -- the contents of the message being analyzed was not input source information; it was this specified values of subscription provided by the client. And that is an important distinction, your Honor.

Do you have any questions?

THE COURT: No. Thank you.

Let me go ahead and hear a response.

MR. CAMPBELL: Yeah. If I could share my slides.

Mr. Hicks, if you could stop sharing.

Your Honor, John Campbell for American Airlines.

Just to make sure I answered the Court's question on "input source," Figure 7 shows that there can be

additional input sources. It doesn't contradict the definition of "input source" as being an information provider and dynamic content provider.

But turning to this claim term -- and I think the Court has recognized there is a disclaimer here, right? So we have to -- we can't -- we've got to capture the disclaimer here. And there is clearly a disclaimer within the prosecution history, and that disclaimer shows up in two different passages of the prosecution history, right?

And the Court captured -- I think the Court captured this first one, right, where the -- where I.V. said that, look, the section of Chandra, the prior art reference, discloses that the data content of the message is different from identifying a category of the update message based on the input source.

And you note here, right, the emphasis is in the prosecution history, right? I.V. bolded "data content of the message," underlined "based on the input source," right, telling anybody that looks at the prosecution history, telling the examiner these are two different things. The input source does not include data content of the message, right? And so we've got to capture that disclaimer.

They went on, right, to tell the examiner that -- and again their emphasis -- that not only that but Chandra

is teaching "identifying the categories based on category/topic of the message content." That's what Chandra does. That's not us. We do it based on the input source. Two different things, right?

And so that disclaimer has to be captured in the claim construction, right? Both of those disclaimers -- bold, underlined disclaimers -- that are in the prosecution history.

And, you know, we didn't get a chance to depose I.V.'s experts because the declarations came in after the close of discovery for experts and after the deadline for those declarations. But their expert, in a declaration, even agreed, right? The expert pointed to this part of the prosecution history about Chandra being based on the category/topic of the message content, the patent being based on the input source. It said that "In reviewing this passage, a POSITA would appreciate that the applicant was arguing that Chandra did not disclose identifying a category 'based on the input source.'"

So that distinction, that disclaimer of Chandra's "category/topic of the message content" does not mean "based on the input source," he recognizes that part of the disclaimer is there. It's in the prosecution history. And so, you know, again -- and he reiterate that, that the text shows two different methods, input source, category/topic

of the content message, and that those are materially different. "I agree with this reading."

Those are materially different. That was the claim scope that I.V. disclosed in the prosecution. And as the Court well knows -- I won't read into the record the case cites here -- but that prosecution disclaimer has to be related to the claim construction.

So unless the Court has any questions, I don't have anything further on that.

THE COURT: No, thank you.

And, Mr. Hicks, any reply before we move on to the next term?

MR. HICKS: Thank you, your Honor. Jonathan Hicks again for I.V.

So, you know, what was not raised in there was the discussion that was brought up in my slides, because what applicant was actually distinguishing, which is Chandra's publishers/subscribers, where the information that was used for identifying the category of the message was information -- subscriber information or information that is identified by the clients and its subscribers.

Again, taking a step back and looking at claim language, identification -- (Audio distortion) -- based upon the input source. And what -- (Audio distortion) -- are arguing is -- (Audio distortion) -- disclosure there is

not -- (Audio distortion).

It didn't preclude including an input source in the contents of the message. And there might be -- (Audio distortion) -- the specification discloses different ways of identifying an input source, so our concern there is that if there is disclaimer, which the Court is inclined to find, it's the issue of ensuring that the disclaimer is going to what was actually disclaimed.

In this case, there was no disclaimer that the possibility that the input source could be included in the content of the message in Chandra's system, which is -- (Audio distortion) -- didn't satisfy -- what applicant argued does not satisfy the claim language, identifying the category of the update messages based on input source.

And in terms of expert testimony, your Honor, I don't think this term needs it. I don't think it particularly helpful in American's argument that this is a disclaimer which -- (Audio distortion) -- it's claiming -- (Audio distortion).

Unless any questions, I have nothing further to add.

THE COURT: Okay. Thank you.

Let's go ahead and move on to the next one, the next --

MR. DOWNING: Your Honor, this is John Downing

from Kasowitz. I just wanted to address a quick issue that Mr. Campbell raised related to the timing of a deposition of our expert. I believe Mr. Campbell said that he was not able to take the deposition of our expert because it didn't occur within the expert time limits, but we just wanted to make clear for the record that our expert was provided. His availability for a deposition was provided, and American declined to take his deposition. I just wanted to make sure that that was clear for the record, your Honor.

MR. CAMPBELL: That's -- your Honor, that's not correct. He was provided after the close of expert discovery. So to take his deposition would be violating the Court's order, which American declined to violate the Court's order.

THE COURT: Okay. Let's go ahead and proceed. Thank you for that.

Are we going on to the '785 next?

MR. CAMPBELL: Happy to.

MR. DOWNING: Yes, your Honor.

THE COURT: Okay.

MR. DOWNING: Your Honor, again this is John Downing from Kasowitz. I'll be handling the '785.

The first term, your Honor, is the "network address." We reviewed your Honor's preliminary construction and we're okay with it and, you know, unless

your Honor has any specific questions, you know, I'll reserve for rebuttal.

I would like to note, just real quickly, that Column 34, line 23, specifically says that other protocols should be -- can and should be used. And so this kind of goes directly contrary to their position that this particular term should be limited to IP protocols.

But unless your Honor has any questions, I'll save mine for rebuttal.

THE COURT: That's fine.

Then who is arguing for American?

MR. CAMPBELL: Your Honor, John Campbell on behalf of American for the '785 patent. I'll try to make this fairly brief and skip over some slides.

The '785 patent expired last year. And so the term here is "network address." I think, as the briefing showed, the "network address" that's being disputed here is the "network address associated with a network route director."

And you see that "network address" show up in what we've labeled Claim 30, part [c]. It's somewhat long. But it's return and then we added --

THE COURT: Can I stop you, Mr. Campbell --

MR. CAMPBELL: Yes, please.

THE COURT: -- and ask a question?

Why is it that you're only going -- I mean, "network address" is used throughout the claim. Why is it that you are only pairing that the way you're doing that, to only that one instance? Because the term is used throughout the claim.

MR. CAMPBELL: Well, there is a "private network address." There is a "virtual network address." The construction we've offered is for a "network address associated with a network route director." So that's the term that we are looking for a construction for, and that term should be an Internet protocol or IP address, right?

So if you look at just generically "network address" and then try to apply it to "private network address" or "virtual network address," it doesn't fit. Okay? The term we were looking to construe is a "network address associated with a network route director." That term must be, under the specification, an Internet protocol or IP address.

THE COURT: Okay. Go ahead and continue. Thank you.

MR. CAMPBELL: Okay. So focusing on that term, a network address that's associated with a network route director, when we look here, the invention here -- and, you know, it's important, of course, to look at the patent and see what the invention is, right?

In the '844, it's all about not using the file system, getting at the block level, we need to operate at block level to overcome the limitations of the file system.

Here, what the '785 patent is, we've got this problem that we've got public IP addresses for things that are connected to the Internet and are public and then we've got these private networks, and how do we cross the boundaries? How do we get from the public Internet to the private network?

And what the patent teaches is we're going to cross those boundaries by using, in some embodiments -- and this is the embodiment claimed here -- a network route director. And that network route director is this stand-alone unit -- it shows up as 520 in Figure 22. It's highlighted in blue here -- that's connected to the Internet.

And because it's connected to the Internet, it has to have an IP address. And the specification repeatedly uses network "address associated with the network route director" -- interchangeably uses the term "IP address" because, of course, it has to. There's no other option for it because it's connected to the Internet.

And so when we look here, there's basically three different addresses. There's the public network address associated with a network route director, then the private

network address that's associated with a device, and a virtual network address that's associated with a device, and we're focused on that network address provided by the network route director. And each of those matches up to Figure 22 in a different place, and it's important that we look at those and look at the one that we're talking about here, right?

And so, again, when we talk about the interchangeability here, Figure 7 is a flowchart that describes the overall process. And when we look at Figure 7 that's describing the overall process, the invention, it refers to that network address in block 656 as a -- it has typo here. It says "publid." I don't think anybody disputes that it's "public." But it says the VCN manager returns the public IP address for the route director. It's an IP address. It says it's an IP address, right? And that's -- it's using that interchangeably here with the network route address that it's referring to in Claim 30.

That's not by mistake. That's what it has to be, right? It's not an isolated incident. It shows up in the specification talking about Figure 7 as well and, again, it shows that it's interchangeable, right? The specification at Column 14, line 34 to 46, talks about the "VCN manager 510 returns the public address of the route director for

the destination," right? Now, it doesn't say IP there, right?

But you go down and then interchangeably it says, "If the destination machine is in a private network that uses a network route director" -- right? Network route director, capital N, capital R, capital D. So we know we're talking about that embodiment and that is what Claim 30 is, a network route director -- "(e.g., NRD 520), then step 656 will return the public IP address for the network route director."

So, again, when we're talking about the network route director, public address, IP address, network address, all these are used interchangeably, right?

Now, let's think about that. Does that make -- that's lexicography, so we know that definition has to apply because even when we don't have those hallmarks that we had in the '722 patent, the Federal Circuit will find lexicography from interchangeable use.

But does this make sense? Well, it's consistent, right? It shows up then in the flowchart in Figure 24, global IP address for the route director, right? So it was in Figure 7. Now it's in Figure 24. So we're consistent throughout, right?

But it also makes sense, right? The patent recognizes, okay, what we're doing here is trying to

connect the public Internet and private devices. And when we're using the public Internet to transmit data from a source to a destination, we're not Column 1, right, the very beginning, line 44 to line 50, "the Internet protocol uses an IP address." That's not some embodiment. That's just what the Internet does, right? It uses an IP address. "The Internet converts a Domain Name System (DNS) to convert a domain name to an IP address."

And we know it's part of the claim, it's part of the figures. This is -- in that -- we have reinforced that this is the public Internet by -- it's also part of the claim and part of the figures that we're talking about a DNS request to the VCN manager. That's showing up in block 654. This is a DNS request to the VCN manager for the domain name of the destination. That's going to get converted to an IP address. That's also in the claim.

The specification makes no doubt, right, that this system -- we're trying to use the public Internet and cross the public Internet boundaries, right? And the patent says, "There is a need for a system that provides for local and remote entities to communicate and collaborate using the Internet," right?

And then it goes on to say, to make the system -- "to increase the ability of the system to be accepted," we have to, it's desirable, we need to do this, "communicate

directly across the Internet and not require any changes to existing protocols," right?

What are those protocols? That protocol is I'm going to send a DNS request. I'm going to get back an IP address when I'm connected to the Internet, just like the NRD is. So we need a system that "allows local and remote entities to communicate and collaborate from any location via a standard Internet connection."

So I won't go through all of these, but it's consistent throughout that when you are talking about devices connected to the Internet, they have public IP addresses and then when you have the network route director, as shown at the bottom of this slide at Column 14, 34 through 46, that ends up being the public IP address for the network route director.

And so, like I said, you know, the Court has these slides. It shows up over and over that we refer to the public IP address when we're talking about the route director or, for that matter, any device that's connected to the Internet. It has to be the public IP address for the route director.

This slide talks about Column 32, line 23 through 31. It's a long patent, and it's consistent throughout.

I.V.'s expert explained this. It's used interchangeably. Interchangeable use, as I mentioned, is a

definition. It's lexicography.

I'm going to skip over the prosecution history and leave it there unless the Court has any questions.

THE COURT: I just have one other question. You know, you provided some extrinsic evidence and a definition of "network." And I was just curious because when you look at the definition that you provided, it says, "a network portion of an IP address." It doesn't mean that's the IP address itself, so even your extrinsic evidence seems to cast doubt on that these are being used interchangeably. I'm just curious what your thoughts on that are.

MR. CAMPBELL: Yeah. I don't -- the network -- it's saying the IP address has to have the network address, right? And here, again, you know, as your Court pointed out, it's extrinsic evidence.

When we look at the patent, which has got to control here, and it's interchangeable use and it says when you have -- when you are using the Internet you have to have the IP address, it must include the IP address.

So, you know, look, if the Court wants to look at that and say, well, it can have a little bit more, I think that's fair. Okay? That's okay. But it's got to have the IP address. There just can't be any doubt, based on the specification and its teachings and that the NRD is connected to the Internet, that it has to include the IP

address. That's got to be part of it.

THE COURT: Okay. Thank you.

Response?

MR. DOWNING: Your Honor, yeah. If I may, your Honor, I think what Mr. Campbell has kind of set forth is what the Federal Circuit has instructed, you know, how not to construe the claims.

And I wrote down some notes. He said, you know, "it must be this," "it has to be this," "it makes sense." You know, he pointed to the figures and said, well, this is what the figures show. But, of course, unless there is, a you know, clear and unmistakable disclaimer or unless there is some sort of lexicography -- and even Mr. Campbell admitted that this one is not as -- you know, it doesn't have the same hallmarks as the one he argued before. And so none of that is in this patent. None of those indications are something where you would take and try to define it or serve as some sort of disclaimer.

And, you know, Mr. Campbell didn't address, you know, the actual opposite, which is what this patent teaches with, you know, even assuming that everything is true, you know, and this patent is only a single embodiment and it's consistent, the patent -- you know, Column 34, line 23, clearly says, "Additionally, while the above description provided an example using the protocols and

addressing currently used on the Internet, the present invention can be used with other protocols and addressing schemes." And so that's a clear statement to the opposite, that the patentee in this case was not trying to limit it, you know, to this specific IP and IP protocol and that that term should be construed broader.

And so unless your Honor has any other questions, I'll rest.

THE COURT: No. That's fine.

And, Mr. Campbell, did you want to add anything before we go on to the next term?

MR. CAMPBELL: No -- well, your Honor, I'll just again reiterate the Federal Circuit, even without those hallmarks, has found interchangeable use to be lexicography.

And we can see with respect to -- again, we're not talking about a bunch of different protocols, a bunch of different -- we're talking about the "network address associated with a network route director that's connected to the Internet." It clearly is defined here to be the IP protocol. It has to include the IP protocol.

THE COURT: Okay. Thank you.

Okay. If we want to go on to the next term in patent, a "network route director."

MR. DOWNING: Yes, your Honor. The next term is

"network route director." Again this is John Downing from Kasowitz. I'll be addressing this term.

Your Honor, we received your preliminary construction. I think we would like to propose some tweaks to that to address some specific concerns. You know, just -- I would like to read into the record our proposed tweaks, if it pleases your Honor.

THE COURT: Go ahead.

MR. DOWNING: And so your Honor construed -- had a preliminary construction "a unit that runs on the public side of the Internet that allows communication to a device that is in a private network."

And so we would suggest "one or more components that interface with the public side of the Internet that allow communication to a device that is in a private network."

And so the two tweaks that we're focused on is, one, there is a suggestion in the construction that it has to be a single thing or a single unit and we don't think that the patent, you know, kind of defines it in that way. And the second thing is that, you know, there may be a dispute for infringement, you know, about where specifically these components or software are located and so we're using the word "interface" instead of, you know, having -- it has to be completely outside this

configuration so -- and I'll stop there and then kind of move into why we think that this is appropriate.

It looks to us like your Honor was -- you know, was indicating that there is some sort of disclaimer or disavowal here, and the argument from American was that there was lexicography here. And I think that the relevant passage -- that where a lot of this language is located is 11, 9 to 13, where it says, "the network route director 520 is a stand-alone unit that runs on a public side of the Internet enabling Member Agents and Group Agents to be reached inside one or more private networks from the public network."

And, you know, from our perspective, that has to be read in context because if your Honor goes to Column 10, starting at line 8, the patent itself makes it very clear that it's discussing one embodiment in the specification, and it actually uses the term "one embodiment." It says -- and I'll just read this for the record, your Honor -- "A more detailed overview of, quote, one embodiment of the present invention is depicted in Figures 5A and 5B." And then it goes on to describe the figures.

And so if you start here, it's clear from the specification that, you know, when it's discussing these figures, it isn't, you know, disclaiming it or having a lexicography. It's describing how this is configured in

this particular embodiment.

And so our proposed construction is -- you know, tries to get the spirit of your Honor's construction but also makes sure that it doesn't, you know, kind of limit it, you know, to a point that kind of includes, you know, things that -- like these figures which are embodiments and shouldn't be, you know -- and shouldn't be limited in this way.

And I'll just give your Honor one more cite, which is -- you know, which is a similar cite that I raised for the last term, starting at Column 34:14. The patent explains that "Any combination of NRDs and PRDs may be used to improve network efficiency." And so, you know, the patent and the patentee is explaining that, you know, it doesn't even have to be one NRD, right? It can be multiple.

And so, you know, I guess our proposal is that, you know, some of that language is -- you know, is softened so that it encompasses the spirit and not that specific embodiment.

Unless your Honor has any questions, I'll pass to Mr. Campbell.

THE COURT: Well, and I know that, you know, this being a coined term, that in the Court's view it needed construction because there is not an ordinary and plain

meaning that you asked for.

But would you do me a favor and read me what you are proposing now as a construction and go a little slower so I can write it all down.

MR. DOWNING: Yes, your Honor.

THE COURT: I'm sure my technical advisor --

MR. DOWNING: I apologize.

THE COURT: -- got it, but I just -- I want to make sure I have it down myself.

MR. DOWNING: Yes.

It's "one or more components that interface with the public side of the Internet that allow communication to a device that is in a private network."

THE COURT: Okay. Response?

MR. CAMPBELL: Yes, your Honor. John Campbell for American Airlines.

Can you still see my screen?

THE COURT: Yes. And I have all your slides here with me, too, so --

MR. CAMPBELL: I -- okay. I understand. Just want to make sure.

So, your Honor, response -- let me start with we had a proposal for "network route director," and I.V. criticized that proposal because they said, well, if there's lexicography, your proposal doesn't just adopt the

lexicography.

Well, you know, that was fair, right? That was fair. There is lexicography here, and the Court should and needs to adopt the lexicography.

And here, unlike the '722 where we had quotes and "i.e." and "refer to," we had to go to different cases for these hallmarks and we had the interchangeability with the -- with -- in some instances earlier, this is definitional. "The network route director is." That is the definition of "network route director" provided by the inventor, and that's the definition that the Federal Circuit has said needs to be adopted when the inventor provides lexicography like this. When you define what something is, that's what it goes with.

And so, you know, your Honor, I think, with the preliminary construction, picked up on that. Your Honor, I think, fell into where IP would criticize but didn't adopt exactly what it says, right? It does say "a stand-alone unit." When the inventor defines it as "a stand-alone unit," that definition needs to apply.

And so I think that -- you know, that is the definition. That definition is not inconsistent with anything in the spec. We see in Figure 22 that it is a stand-alone unit that is part of this system.

And so, again, it's not even -- you know,

sometimes we've got these hallmarks where, well, maybe this is, maybe -- the Federal Circuit has said when the specification reveals a special definition, that lexicography governs and "is" signifies that the patentee is serving as his own lexicographer. And so that's what we have here. We have that lexicographical definition that must be adopted.

Again, you know, we've got this dispute about the experts, but I.V.'s expert, if you even look at the -- consider that declaration, just ignores the definition, doesn't even mention it. I think that's telling. The silence there is telling.

The last point I want to make will just pick up on what your Honor said, is not only do we have "is" here, right, we don't have, you know, a common word saying, you know, black is something here, you know, white is something here, you know, some common term. We've got a coined term. We've got a -- it shows up 24 times as "network route director," capital N, capital R, capital D.

This is not an ordinary meaning term. This is not a, well, you're importing things term. This is a coined term which the Federal Circuit says then, well, then we've got to figure out does the intrinsic record provide objective boundaries to the scope of the term. And here it does. It provides more than objective boundaries; it

provides a definition. And that definition needs to be adopted.

I.V.'s brief argued about claim differentiation and additional descriptions of "network route director." I don't hear them arguing about those today, so I'll skip over those slides.

But now they're proposing different words after criticizing not just adopting the lexicography definition. So if the Court determines there is lexicography -- and it's hard to see how there can be anything else -- that definition needs to be adopted straight from the specification.

THE COURT: Thank you.

Mr. Downing, do you want to go ahead and respond? And --

MR. DOWNING: Yes.

THE COURT: -- you know, the Court's proposed construction seems to follow exactly what is in Column 11, 9 through 18, so why is that not -- why is the Court not right, but why is American not right also?

MR. DOWNING: Thank you, your Honor.

I touched on this a little bit, you know, in my opening, and it's because this isn't a lexicography issue. I mean, I know Mr. Campbell believes that this is very clear and it's clear on its face. But if you actually

read -- if you read the section in context, it's very clear that they're not defining every instance of what a network route director can be, where it's located and whether it needs to be a single unit or not, because the portion that I referenced above, starting at Column 10, line 8, makes it very clear that they're talking about a single embodiment.

So they're describing that single embodiment and using those figures, you know, to describe in that specific embodiment what's going on. And, you know, it's clear from the pictures. There is a box. There is a single box, and it's describing that embodiment.

And there is no, you know, federal case law that says when you are describing an embodiment and you are explaining what the embodiment is, which, you know, the patentees need to do, that that is a lexicography definition or that's a clear and unmistakable disclaimer.

And so what's happening here is there is no lexicography. It's just being taken out of context. And so -- and, again, at 10:8 and then I mentioned 34:14. Again --

I'm sorry. Did you say something, your Honor?

THE COURT: No.

MR. DOWNING: Okay. Sorry. There was a noise.

And then I mentioned 34:14 again, which is -- which are, you know, express statements from the patentee

explaining that it -- you know, exactly what American is arguing is not what was intended. There could be other ways. There could be multiple network route directors.

And so, you know, if it's -- I think it's fair to say that there's a dispute, you know, on whether -- you know, the main dispute here is whether there is lexicography or not. And, you know, under the Federal Circuit standard, there is not -- it's not clear. It's not clear on its face.

And if all you're doing is describing a particular embodiment, that can't be used to define the invention. All you're doing then is reading embodiments into the claim terms.

And if the -- you know, if the patentee wanted to say "a single unit," he could use "a single unit." And your Honor said it best earlier in the case. You questioned isn't this, you know, just one embodiment? And that's exactly what's happening here. This is actually just one embodiment. This is a description of a single embodiment, and that's being used to kind of define what are broader claims -- what a person of skill in the art would understand as the language that provides us with a broader scope.

And unless your Honor has any more questions, I'll rest there.

THE COURT: Okay. Thank you.

Okay. If you want to go on to -- I think we're moving on to the '469.

MR. DOWNING: Yes, your Honor. This is John Downing again from Kasowitz. I'll be addressing the '469 patent.

And so, your Honor, you know, for the first term, we received your Honor's preliminary construction of "a remote location experiencing a relatively high volume of transient traffic," and that term was construed by the Court. You know, there's two different issues. I'll just start with the first one that comes first.

Your Honor agreed with our construction of "plain and ordinary meaning, no construction necessary." And so unless your Honor has any specific questions for me, I'm happy to pass to Mr. Campbell or whoever else on American. But we agree with your Honor's construction and propose that.

THE COURT: Yes, that's fine.

And then as -- we'll deal with this first term, and then when we go to the next term, which I know that American is -- I did not offer construction and they argue it is indefinite. I'll have American go first on the next term.

But if you want to respond or discuss. I know you

disagree with "plain and ordinary meaning," but I'll hear -- go ahead and explain to me why.

MR. CAMPBELL: Yeah. And, your Honor, John Campbell for American Airlines. Kenneth Scott will handle the "remote location" term. I'll be handling the "relatively high transient traffic" term, so when we turn to that, I'll take over.

MR. SCOTT: Yes. Good morning, your Honor. This is Kenneth Scott on behalf of American Airlines.

I'm going to share my screen here. Please let me know if it appears for you.

Is that showing up for you, your Honor?

THE COURT: Yes. And I have the slides all on my iPad, too, so I'm using that.

MR. SCOTT: Oh, all right.

Okay. So all throughout in here, this is the '469 patent and I'll be arguing the "remote location" term.

The title of '469 patent is Satellite Distributed High Speed Internet Access. This was filed in September 2004.

And just to situate your Honor's understanding of the claim terms that we seek to construe today, these are located in a limitation of the sole asserted independent claim, and I've drawn a red box around it here. The primary elements of the invention -- a satellite dish, a

router, and a subscriber access unit -- "are located in a remote location experiencing a relatively high volume of transient traffic."

And so American's construction for "a remote location" is simply just "a fixed remote location." Plaintiffs' offering is -- they don't have a construction that they're offering; it's plain and ordinary meaning.

And I just want to highlight one aspect of the Federal Circuit's jurisprudence on this point which is from the *AstraZeneca* case. The first thing I'll highlight is that the Federal Circuit has said that the specification need not reveal a lexicographic definition explicitly.

And the second thing I'll highlight is that the Federal Circuit has said that "when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term by implication." And that's what we're going to assert is occurring here today.

The second thing I'll highlight is that "The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history."

So turning to the specification, here on Slide 8, there is a summary of the invention in the patent specification, and the summary states that, "The present

invention provides rural 'Hotspots' to enable wireless and hard-wired, satellite distributed Internet access for anyone with a PC."

And that same summary says that "These 'Hotspots' would best be located in areas that experience high volume transient traffic, such as rest areas, restaurants, truck stops, rural hotels, conference centers, motels and state park lodges."

And as you can see, your Honor, every example provided in the summary of the invention is a fixed location.

And indeed if you look at the embodiment --

THE COURT: Right, but let me ask you this. I mean, I understand that the examples given are all maybe fixed locations, but where does it limit it to that? I mean, just because those are the -- here are some examples, it doesn't mean that they're saying they all have to be fixed.

MR. SCOTT: Your Honor, I just go back to what the Federal Circuit said, which is that it doesn't have to -- the specification doesn't have to say that it's fixed in order for the term "location" to mean "fixed." If the patentee uses a term in a manner consistent with only one interpretation, then it is so limited.

THE COURT: But "fixed" is not in the claim terms

and it's not in the specification. The word "fixed" is not there.

MR. SCOTT: I can't dispute that, your Honor.

So moving on quickly here, I just want to point out that every embodiment -- in addition to the summary of the invention, every embodiment in the invention is located in a rural location or remote location, and under the Federal Circuit's ruling in *AstraZeneca* this amounts to lexicography by implication.

THE COURT: And so what's the difference between "rural location" and "remote location" in your mind? Because we have -- Claim 1 and Claim 24 use those, both terms. So what does that mean to you? What's a rural location versus what's a remote location?

MR. SCOTT: Well, your Honor, I'm not sure that's in dispute today amongst the parties. But, to my mind, a rural location is something that isn't located in the city and a remote location is something similar to that but not -- maybe not evoking rural locality quite as much. But it's still evoking the same -- the central word is "a location," and in both instances we would assert that the location is fixed.

Moving on here, I just -- I want to examine one claim term -- one claim element that may shed some light on this "location" issue, and that's the satellite dish that's

found in the first limitation of Claim 24 here.

So our expert, Mr. Goodrich, has testified to the notion that a satellite dish, as claimed by Claim 24 -- a POSITA would understand, in light of the patent specification, that this is a fixed satellite dish.

And you can see that here in the embodiment described in the '469 patent. This is -- the satellite dish needs to be physically aimed at a satellite. This can't be used in a mobile application. That's what a POSITA would understand in light of the '469 specification.

And I.V.'s expert, in his declaration, offers an understanding that is consistent with our expert's understanding of this. I want to highlight, I.V.'s expert never says that this system could be used in a mobile application. What I.V.'s expert says is this system could be deployed as needed in different locations. And that's different than the mobile application because a mobile application would raise entirely different technical issues that the patent simply does not address.

And so I'll just close by looking at some testimony that the '469 patent's inventor offered that sheds some light on this satellite dish issue.

(REPORTER'S NOTE: Material read into the record is transcribed verbatim and, therefore, may not reflect an exact quote from documents or exhibits.)

MR. SCOTT: The '469 patent inventor, he described a reduction to practice of the invention. And we asked him about the satellite dish that was used in this reduction to practice, and he testified that this satellite dish was significant in size and that it was installed atop 24 feet of piping that went straight up into the air.

Later on he was asked, "Could you have put the satellite dish on a plane?" And he answered, "No."

And we asked, "Why not?" And he said, "It's too big. We would have needed a different kind of antenna, a flat-panel antenna like the X." And he was referring to the Starlink antenna system.

And he was also asked, "Can you put a satellite dish on something that's moving?" And he answered, "No. It wouldn't work."

And, finally, I'll just leave your Honor with this. The '469 patent's inventor Mr. Wilson, he was also asked if a satellite dish would only work in a fixed location, and his answer was unequivocal. His answer was, "Yes."

And with that, I will end.

THE COURT: Okay. Thank you.

And then would plaintiff like to respond at all to that?

MR. DOWNING: Yeah, just real quick, your Honor.

You know, I think the theme that was kind of presented is that one when you disclose an embodiment and that embodiment is consistent with only one limitation, then you have to -- you know, you have to kind of limit it to that. And that hasn't been established, you know, certainly on the level that it needs to be established.

I think the thing that they point to is, you know, a statement at Column 1 where they provide examples of different places where you could -- you know, you could have this type of, you know, a rural -- you know, these rural locations. And that's certainly not enough, and that's not consistent with what the Federal Circuit has. And what's really going on is they're just reading, you know, examples in the specification into the claims.

You know, as far as Mr. Wilson's testimony, you know, it's -- one, it's not relevant but, two, it appears to us that Mr. Wilson was speaking about, you know, what he actually did, you know, and kind of what he did at the time, you know, and that doesn't kind of limit it to -- you know, Mr. Wilson may have used a big satellite dish, but that doesn't mean that his invention is, you know, limited to that big satellite dish.

And, in fact, you know, American, you know, explained that Dr. Camp doesn't refute the fact that it has to be fixed, but indeed he does. In paragraph 18 of his

declaration, he talked about parabolic reflectors and how they were deployed in aircraft buses and marine vessels.

And so that is an example of, you know, situations where you would be remote, you would be in rural areas, you know, and you would still be able to access satellite technology. And that's -- you know, that's in addition to, you know, the examples that were provided in the specification. So it's just not true that our expert, you know, sided with them or agreed with them.

And unless your Honor has any other questions, I'll rest.

THE COURT: Yeah. And I understand, I mean, why you would want to talk about what an inventor would say. But based on Federal Circuit law, that's really -- is truly irrelevant really to ultimately what the Court will decide on claim construction.

Okay. I thought we'll go ahead and have American go first on this next term because they're making "indefinite" argument. And I did not give preliminary construction on this, so I look forward to hearing the argument.

MR. CAMPBELL: Yes, your Honor. John Campbell for American Airlines.

So the term is "relatively high volume of transient traffic."

So we just -- here is a phrase that just has multiple problems, right? "Relatively," subjective. "High," subjective. "Transient," somewhat subjective. And what the Federal Circuit says is that, look, when you've got a term of degree, which I don't think there can be any dispute that "relative" and "high" at best are terms of degree, the patent must provide some standard for measuring that degree such that the claim language provides enough certainty to one of skill in the art when read in context of the invention.

In other words, it's got to provide additional information in the form of objective boundaries to be sufficiently definite. And this patent doesn't. At best, right -- not at best. The only thing it does is provide examples of what it thinks are areas which -- places which maybe this satisfies, right?

But what does it mean, relatively high volume versus not relatively high volume? Relative to what? The patent doesn't say. What am I relative to? What am I comparing to?

What is high volume? What is medium volume? What is low volume?

What is "volume" referring to? Is that based on unique visitors, number of people? Is it based on the amount of data, Internet traffic?

What's "transient"? Daily? If I use it daily, am I transient? If I use it weekly, am I transient? If I use it monthly? Seasonally? What does it mean to be transient?

So there's just no objective boundaries here, and when you think about that, this is a real problem. We're not talking about a method claim where you could try to define somebody that qualifies or something that qualifies here. We're talking about a system claim, right?

And so when you talk about, you know, an example that's provided, one of the examples is a rural hotel. Well, setting aside, as your Honor pointed out, I don't -- what is a rural hotel? And can someplace that was rural be no longer rural? As the DFW area expands further into Sherman, was it once rural and is no longer rural? I don't know.

Setting that aside, even if you look at a particular hotel, what if it requires a two-night stay for weekends? Is that the -- you know, is that then transient people? Is that going to qualify in the relatively high volume?

What if you've got a one-week conference versus a one-day conference? Does the system sometimes qualify and sometimes doesn't qualify? I'm not even sure what the qualification is there, but how is that going to work?

You know, I know your Honor doesn't -- you know, pointed out what the inventor testimony means, but the inventor's testimony here is at least relevant for context. He was installing systems in Downtown Cincinnati. How is that -- where do we get the remote, rural, relatively high volume of transient traffic for a system like that?

What if you've got everyday commuters versus occasional?

How long do you take the measurement?

What if it's a subscription service? What if I subscribe on a monthly basis, but I only use it, you know, once a week? Am I now a relatively high volume of transient traffic?

Does it matter if I just check my emails versus download a movie?

There are so many questions here that provide no objective boundaries.

What if it's free Internet?

What if I have no idea how often somebody is a unique user or how much volume that user -- (Audio distortion)?

There is just no boundaries here as to what "relatively high volume" means.

If we look at these vague examples -- again, rural hotels. What's rural? Why only rural? The components of

the system are the same regardless of where that hotel is located. Why only rural hotels?

What if it's an extended stay hotel? Is that high volume of transient traffic?

State park lodges, where are they located? We have a state park here in the middle of Austin, Texas. There are state parks located in faraway places from the cities. Which ones count? Which ones don't?

Are they vacation spots?

Rest areas. Are they used by truckers that go through on a daily basis? The more occasional users? Don't know.

Restaurants. Chains? What if I sign up for -- you know, Starbucks has a subscription service and I can use that anywhere and everywhere. Does that count?

What if it's locals that only show up to the restaurant and they show up and you get a lot of normal -- a lot of people that have a usual order. They show up every day for lunch. Do they count?

Truck stops. Similar questions.

Conference centers. What if they're week-long conferences, day-long conferences?

Motels. What about hotels?

There are so many questions here that just the examples just don't provide any objective boundaries. You

can't say what "relatively high volume of transient traffic" is limited to and know whether the system meets that definition or not.

And so, you know, when you look at that and you consider, you know, the patents are written to a person of ordinary skill in the art, Dr. Goodrich said, you know, "I've looked at this. I would need to know what 'relative' is and what it means. The patent doesn't say. It just gives examples. But then, in my opinion, a person of ordinary skill in the art would have no guidance, absolutely none, on what the boundaries are. What about something else, say, the office I work in? Is that in scope or not? A person of ordinary skill has no way of deciding that or determining it. The patent gives no guidance for that.

"A POSITA would be at a loss of whether the time period to apply is even in minutes, hours, or days, or how this would differ from a location that does not receive transient traffic because its visitors stay for a 'longer' time" -- whatever that may be -- "or because its visitors come back repeatedly."

The case law when you look at "high" -- things like "high," it's routinely considered indefinite unless you provide objective boundaries. And so we cited the *U.S. Well Services* where "high pressure" was considered

indefinite because it doesn't provide an objective boundary to allow a person to differentiate between what is high and non-high. And without those objective boundaries, it was considered indefinite.

Again, when you've got a relative -- a term of degree that is purely subjective and depends on the unpredictable vagaries of one's personal opinions, that's indefinite.

So when you go to "relative," it's even worse. I mean, "high" is bad. But then when you go "relatively high," you've got no boundary, right, between relative and not relevant. And that's where you've got the *ParkerVision* case where the court said, "'Relatively efficient power transfer' is indefinite because the patent doesn't indicate where is the boundary between 'relatively efficient' and 'not relatively efficient'." We're combining multiple terms of degree and just making it worse.

Intellectual Ventures provided some definitions that are circular, not helpful.

"Relatively" means "in a relative manner." I don't think that provides any objective boundary on it.

"Transient." "Not long-lasting, enduring, or permanent; transitory." Again, what does that mean? Is it, you know, hourly? Okay. Daily? Weekly? Monthly? At what point am I transient versus not transient?

And then, look, I'll skip over this briefly, but the inventor -- we asked him what does that mean. For him, it was cost considerations because his system -- did it allow him to make a profit, which is interesting. I don't think it provides an objectively measurable boundary and it's not in the patent, but I think it just goes to show he -- his thought process on what it means is not even in the patent. It can't provide the objective boundaries of it. And, again, he was covering 80 percent of the costs.

When it came to "transient," he thought if you go over a day, you are no longer transient. If you're under a day, transient. Well, that's one person's opinion, but that's not an objective boundary.

And it's not even consistent with what I.V.'s expert put in. I.V.'s expert says, well, the venues, the examples here, they frequently change over the course of a day, a week, or a season.

Okay. Are we measuring a day? Are we measuring a week? Are we measuring a season? I still don't know what "relatively" means. I still don't know what "relatively high" means. I still don't know what comparing it to is. But are we measuring "transient" in terms of a daily, weekly, season? I don't know. It doesn't say.

But he does admit that "transient," when it comes to the -- hard to dispute "high" and -- "relatively" and

"high." But even he admits "transient," well, it's not measured in hours or days but it's a qualitative descriptor. That gets right smack into the middle of there's not objective boundaries when we're talking about qualitative descriptors because we don't know how to measure them.

So if your Honor has any questions, I'm happy to answer them, but it's simply -- there are simply no boundaries to determine when this system meets the claim and when this system doesn't meet the claim.

THE COURT: Okay. Thank you.

Let's hear a response. And I would ask, you know, it seems like the defense makes some good arguments here because when I look at this, I ask that same question. What are the objective benchmarks to give us some boundaries here? And I'm not sure what they are, so if you want to respond and explain that to me.

MR. DOWNING: Sure. Thank you, your Honor.

You know, I'll just start by -- you know, by saying, you know, I think, you know, how the -- you know, what the law is and what the law provides, I think, has been mischaracterized.

You know, you don't have to -- you know, you don't have to say that it has to be a specific amount of days or a specific amount of weeks or you don't have to provide

that level of detail in the claims. And the reason you don't have to do it is because, you know, inventions are different, right? And this is a specific invention related to satellite Hotspots. And I want to talk about that because it seems like in all of these -- (Audio distortion) -- cases that were brought up, you know, we're losing the -- you know, the fact that this is an invention related to, you know, providing Internet in rural areas using satellite technology. And that's straight out of the --

I'm sorry. Did someone say something?

THE COURT: No.

MR. DOWNING: Right. I heard something again.

That's straight out of the very beginning, your Honor, the Background of the Invention. If you go to Column 1, line 21, it says -- you know, it explains how, you know, the Internet -- and this is in 2004. It explains how the Internet was, you know, becoming very, very, very important, but the efficiency and the advantages of the Internet, you know, were not realized, especially when somebody's in transit, such as a salesman, executives, truckers, or private individuals. And it's talking about the fact that these people don't have access to Internet in these particular places because of transit or because of the lack of availability.

And so this patent in that context is designed to solve that issue, right? It's designed to solve the issue about, you know, what do you do if you can't, you know, plug into your work's Internet or your home Internet which you would do. You're actually on the road now or you're in a place that doesn't have it, and so what do you do? So I'd like to start from that perspective.

And then, of course, you know, what the Federal Circuit says is that, you know, providing examples is sufficient. And Mr. Campbell, you know, identified those examples, and we have this issue about, you know, rural hotels, and we have -- right below, we have "rest areas, restaurants, truck stops, rural hotels, conference centers and motels." And it's not saying -- it didn't say "hotel," right? It said a "rural hotel," which is a hotel, you know, out in the boonies that, you know, doesn't have access to these things that you would normally have.

And so these examples, you know, provide that objective boundary and they provide this access to satellite Internet, which you need. You can't plug yourself into a wall and get it, you know, from a landline. And so it's within that context that we're losing -- kind of losing grasp of what's here.

And, you know, I've got a bunch of notes, you know, as far as like, well, is it one week? Is it two

weeks? Is it a year? The patent addresses that in a couple places, you know, and it talks about the idea that you have these people, you know, coming into these Hotspots that are -- you know, that are provided by this satellite functionality and they can sign up for subscriptions.

It talks about it in -- your Honor, just bear with me. It talks about it in the second column where it talks about credit card and being able to do subscriptions and the subscriptions can be, you know, days, weeks, or months.

And so there are boundaries to this, but the real focus here is that you have satellite Internet. You know, you have a lot of different scenarios that this could apply to, right? If you're in Alaska, you know, you might not have access to roads at all in Alaska, right? And so, you know, the ability to actually, you know, be at a particular place, you know, would be severely limited. But you can have a Hotspot in Alaska, you know, and it might only be for a couple weeks, you know, for the year.

And so these examples, or these exemplary examples, provide the guidance that the Federal Circuit says that you have to provide with reasonable certainty. And you don't have to go down to the week or the second or the year. That's not necessary under these cases.

You know, and they have their expert who said that he doesn't understand it. We have our expert who says he

does.

And specifically with regards to "transient," our expert explains that this refers to, you know, frequent user churn and short-lived sessions. These are people that are coming into these rural hotels. They're coming into these -- you know, these conference centers that don't have access to Internet. And they're using it with these subscriptions, right, and they're -- you know, they're getting this, you know, access to the Internet that they wouldn't otherwise have.

And so our expert is saying, "I disagree. You know, there are already objective bounds to this."

And then, you know, as far as "relatively high," you know, it just distinguishes -- it just provides a meaningful, you know -- these are locations where -- you know, trains, buses, rural hotels, these are locations where, you know, the Hotspots can be placed and that people will use them in a meaningful way.

So that's also not indefinite, your Honor, and so a POSITA would be able to understand, you know, that it doesn't mean it has to be a maximum or a fixed number and that there is a reasonable bounds to this.

THE COURT: Mr. Downing, I don't mean to interrupt you. We're just -- and you can pick up here in a minute. I'm just going to take a five-minute comfort break and then

we'll continue if that's okay.

MR. DOWNING: Yep.

THE COURT: Thank you. So I didn't mean to interrupt you there.

(Recess, 10:44 a.m. to 10:51 a.m.)

(Open court, all parties present via Zoom.)

THE COURT: Okay. Mr. Downing, if you want to continue. I apologize for that.

MR. DOWNING: It's fine.

Your Honor, I'll just add a couple more points. I think where I left off, I was talking about, you know, the term "relatively high level of traffic." And, you know, there is a discussion about, you know, what that is and what that means, and, you know, what I was trying to explain is that, you know, you're not going to put this system like in a wheat field, right? You're not going to put this in a wheat field where people aren't are (*sic*) and they don't congregate.

And so these examples that are provided, you know, focus on places where, you know, people are likely to be, rest stops. You know, you have these rural locations where there's people. They congregate, and then they can use this system and they can use the system on the go. And that is an objective boundary that's consistent with the Federal Circuit discussion.

And again, just hitting on the point just one more time, you know, there is no requirement to have, you know, 50 percent of the people have to be there, 50 percent of the population has to be, you know, located. You know, in this particular system, you know, in this particular context where you're providing, you know, this type of access outside of, you know, traditional Internet, using satellite Internet, you know, this is what you do to describe the bounds of this particular invention.

And unless your Honor has any questions, I'll stop there.

THE COURT: Okay. Thank you.

Any response to that?

MR. CAMPBELL: Yes, your Honor, just briefly.

I mean, I didn't hear any explanation for what is "high" versus "medium" versus "low," what is "relatively high" versus "not relatively high." The examples just don't provide any objective boundaries for that and I think there is a reason that I.V. is struggling to provide any objective boundaries, because there are none.

In that discussion I heard a discussion of traveling salesmen. Of course, traveling salesmen go to Dallas and Fort Worth. If they're using it there, do they qualify? Do they not qualify? I don't know.

Out in the boonies. I'm pretty sure -- I don't

think anybody would disagree "out in the boonies" is not objectively measurable.

But what we have here, just to refresh your Honor, if you look at Slide 4, right, we've got a system that's a satellite dish; a router; a subscriber access unit, which is a server; and then a web-ready device, which is a laptop. This can be put up anywhere and exists in -- you know, can be put up in the middle of cities, can be put up in wheat fields, can be put up anywhere.

And so the question is which of the systems infringe versus which do not, because apparently, based on the claim language, they don't all infringe. And what are the objective boundaries for how do I know does my system fall within the scope of this claim or does my system not? And given that I don't know what is "relative" versus "not relative," "high" versus "not high," what "volume" refers to in terms of number of visitors, amount of Internet traffic, don't know what "transient" is, daily, weekly, monthly, seasonally, there is just no way that the examples that are not consistent provide objective boundaries for someone to know whether their system meets the language of this claim or not.

THE COURT: Okay. Thank you.

MR. CAMPBELL: And so unless your Honor has any questions, I'll stop there.

THE COURT: Okay. Thank you.

Okay. If we want to go, I guess, to the '582, our, I guess, last patent in this group. And we'll go back to have plaintiffs start with "partition."

MS. AJUMOBI: Good morning, your Honor. This is Paula Ajumobi on behalf of Plaintiff Intellectual Ventures. I will be reviewing the terms for the '582 patent.

So the first term in the Court's preliminary construction is the term "partition," and the Court defined the term "partition" as the "defined part of the input file." I.V. respectfully disagrees with the Court's construction for a few reasons, and I will be brief.

So the first reason is that -- (Audio distortion) -- that there is no lexicography at issue and there -- this definition was most likely taken from, that disclosure was taken out of context.

The disclosure which the defendant's original definition was based off of is, in fact, an example of what a partition is a part of, not the ultimate definition of what a partition is.

Secondly, in the same paragraph of that disclosure, it states that there are other partition definitions that can be used with no impact on the rest of the embodiment. And in that disclosure the phrase "in this context" does not mean the '582 patent as a whole.

In that the specification -- (Audio distortion) -- of a single or multiple files, a POSITA would most likely understand this disclosure to refer to the example provided in Figure 1 and not the '582 patent as a whole.

And, lastly, we would look at this construction to limit the scope of the patent. "Partition" is a key term in this patent, and it's used in many different ways. For example, the patent states that the input file zero is logically partitioned into six partitions.

Another example is that the output partitions are logically allocated to an output file.

Another example is automatically determining file allocation and logically subdividing records of said input file into a plurality of partitions. So for these --

THE COURT: So let me ask you, ma'am, about -- so you disagree with what the Court has -- how the Court has given as a preliminary construction. So what is "partition"?

I know you want "plain and ordinary meaning" for everything, and there are some times we have to construe it. So what would be your definition, then?

MS. AJUMOBI: Would be our definition of the term "partition"?

THE COURT: Correct.

MS. KIM: Your Honor, well, first of all, we would

go back to "plain and ordinary meaning," but --

THE COURT: No. I'm going to --

MS. AJUMOBI: -- to give you --

THE COURT: I'm going to construe it, so tell me -- so I'm giving you an opportunity to give me your construction, then.

MS. AJUMOBI: So, your Honor, I think we would probably move remove the term "defined" and perhaps just state "part of the input file." I think that does not limit the term as much and, I think, still maintains sort of the meaning of "partition" in its multiple contexts.

THE COURT: So in your mind, what does "partition" mean?

MS. AJUMOBI: So "partition" means to divide things into smaller categories, so we are dividing parts of input files. We are logically separating parts of input files. But I believe "partition" as a noun should be more part of the input file itself.

THE COURT: Okay. Thank you. Go ahead.

MS. AJUMOBI: If your Honor has no more questions, I will pass to opposing counsel.

THE COURT: Okay. Well, thank you.

Response?

I think you're on mute.

MR. BLOCK: Oh. Sorry, your Honor. Good morning.

This is Alan Block for Defendant American.

I'm going to share my screen with you and address the '582 patent.

This is another expired patent. So it's a patent that's related to parallel processing in which multiple processors execute or process an application or computational task. It's distinguished from sequential programs or sequential processing where one is done at a time.

So here, the problem being solved was how to allocate unexecuted partitions to the next available processor. So, for instance, in the example where there's six partitions of -- files have been partitioned into six partitions and there are two different processors, those processors might operate at different speeds, which creates a problem. How does one processor that's finished know which partition to take up next?

So we've proposed a construction which is lexicography "well-defined part of the input file." Again, the lexicography governs and the patentee must be bound by that definition.

Here, at Column 3, lines 32 to 41 --

THE COURT: So let me ask a question. What is the difference between "well-defined" and just "defined part of the input file"? What's the difference then?

MR. BLOCK: Those are the words used by the patentee, and so "well-defined" is what the patentee wanted to call it, a "well-defined part of the input file."

THE COURT: But couldn't that just be one --

MR. BLOCK: It has to be --

THE COURT: Couldn't that just be one embodiment in terms of that? I mean, just because -- "well-defined" versus "defined," if they mean the same or different things -- it wouldn't be "well-defined" to just mean a specific -- another embodiment?

MR. BLOCK: No. It's definitional. "A logical partition ... is a well-defined part."

And remember the next step in the method claim is to distribute descriptions of the partition. And so that partition must be well-defined so that a description can be distributed. If it's defined poorly, then that description may not be available to be distributed to the various processors --

THE COURT: So going back to my question, what's the difference between "well-defined part of the input file" versus "defined part of the input file"?

MR. BLOCK: There is no use of the word "defined part" in the patent. It's "well-defined." So I -- through these examples, the patent has consecutive ranges on the input or output. And in later part of the patent, it does

describe defining offset zero to offset 100,000 is the first partition. Offset 100,001 to 200,000, that's the second partition. 200,001 to 300,000, that's the third partition and so on.

That's well-defined. I've defined it by specific numbers dealing with byte addresses as opposed to just saying, well, just some byte addresses could be the first partition, some other byte addresses could be the second partition. It has to be well-defined.

So responding to Counsel's argument regarding "in this context," the term does appear here but it's -- that is definitional. It's saying "in the context of the patent." She referred to Figure 1. Figure 1 is described in the patent at Column 2, line 46, as "a block diagram describing how a system according to the invention works." That is describing the invention.

And this really isn't controversial, shouldn't be controversial. In the IPR, I.V.'s counsel told the Patent Office, or the board, they said, "The specification explains that in the context of the '582 patent, a logical partition is a well-defined part of the file." He even emphasized "well-defined."

They went on to summarize and conclude that "in the parlance of the '582 patent" -- in the meaning of the '582 patent -- "the logical partitions correspond to

well-defined portions of an input file."

And so we should stick to the patentee's terms and use "well-defined" because that's the term the patentee used, as recognized by I.V. itself.

I have nothing further, your Honor.

THE COURT: Okay. Thank you.

And would plaintiff like to respond to any of that?

MS. AJUMOBI: Yes, your Honor.

A few comments. First, on Slide 11 of opposing counsel's point, again, we must point out that, again, "in this context" is not highlighted for the very specific reason that "this context" also means that according to Figure 1, these logical partitions are numbered as numbers 1 to 6. It does not say "a logical partition in this context of the patent."

Another thing is that this -- Figure 1 is an embodiment of the patent.

Then the last comment that I have is opposing counsel discusses the IPR evidence, the IPR petition. But, first, IPRs are extrinsic evidence. That's not relevant here. And the IPR petition was not part of the file history.

Secondly, that document was reciting a part of the patent and was not necessarily espousing a definition for

"partition."

So with that, I rest.

THE COURT: Okay. Thank you.

Are you going to argue the next term?

MS. AJUMOBI: Yes, sir, I am.

MR. BLOCK: Your Honor, I have one more -- one comment in response to the point about the IPR not being part of the file history and, therefore, being irrelevant.

That's not true under --

THE COURT: Go ahead.

MR. BLOCK: -- the *Eye List* (phonetic) -- the *Eye List* case. It's -- they are relevant, and then disclaimers can be made in IPR -- (Audio dropped.)

THE COURT: Okay.

MR. BLOCK: I'm ready to move to the next term. Thank you, your Honor.

THE COURT: Okay. If plaintiff wants to go ahead and go to the next term, "description of all said partitions."

MS. AJUMOBI: Yes, your Honor.

So the term "description of all said partitions," the Court construed this term yesterday as "description of all said partitions for use in distributing the load without a special load process.

This is troubling to us for a few reasons. First,

that by construing "description of all said partitions" this way, the Court is requiring that there always is no special load process. It is unclear to us what "special load process" means and by adding this phrase to this definition, I think also leads to ambiguity.

Secondly, the limitations recited in Claim 1, in fact, themselves enable -- (Audio distortion) -- the load without a special load process. So this additional definition and adding this phrase to this term is also not necessary, in our opinion.

The last thing I want to discuss is that I believe the "without a special load process" phrase comes from -- or defendants purport that it comes from the first amendment. However, the language surrounding that amendment shows that the amendment removed the requirement for a specialized load process. More precisely, the existence of a centralized scheduling process uses load information to make -- (Audio distortion) --

However, this amendment does not preclude -- (Audio distortion) -- coordination for the use of load information to make scheduling decisions.

Does your Honor have any questions for me?

THE COURT: No, thank you. I don't.

MS. AJUMOBI: I pass.

THE COURT: Response?

MR. BLOCK: Yeah. Yes, your Honor. Alan Block again for Defendant American.

So the term "distributing" -- the term appears in step B, "distributing descriptions of all of said partitions to each of a plurality of subtasks." We've given it a construction that includes a meaning for the term "description" and then this -- without using the "special load process, wherein such statements are distinct from the input file itself." So this really breaks down into a few parts.

I'll address the "for use in distributing the load without a special load process" part that Counsel was -- doesn't want included in the claim construction. This is clearly a disclaimer. You can't recapture, through claim interpretation, meanings disclaimed during prosecution.

These are arguments made to convince the Patent Office of patentability, and disclaimer occurs through amendment or argument.

Let's go through what was actually said during prosecution. What I've done here is taken the language that we are focused on and distinguished between statements regarding prior art with red and statements regarding the claimed invention with blue.

So the first discussion has to do with what is in the prior art. It says that "these systems rely on a

special control process that uses load information to distribute the load between processors that share the load." Okay? We've established what the prior art describes.

Now what is in the claimed invention? How is it different? So the patentee said, "With the instant invention as defined in the claims, there is no such special process. The prior art's load information is not created with the process of the instant invention. Instead, the load sharing is done as a byproduct of the fact that the load-sharing process takes parts of the load on a first-come/first-served basis."

They go on to say, "This is a major improvement since in addition to eliminating the control process, it also eliminates the need to collect and maintain load information, which is very difficult to do and almost impossible to define, so as to anticipate all possible processors that might execute the subtasks.

"The amended claims refer to a distribution of a description of the work to be done. The sharing process can use such a description to distribute the load without a special load process."

So there is the disclaimer where they're saying our claim is different than the prior art because we use a description to distribute the load without a special load

process. So that has to then be captured in the meaning of the term because that was the disavowal made during prosecution.

Now, the comment that this is too ambiguous to be -- (Audio distortion) -- is in the construction -- (Audio distortion) -- kind of ridiculous since this was what the argument was made to distinguish over prior art and, therefore, must be taken into account in the meaning of the term.

Let me move on to the second part -- I'm sorry -- the last part of this that the Court did not include, which was "wherein such statements are distinct from the input file itself." This is another example of disavowal. This is due to an amendment to the claim.

So there was an amendment made where the claim originally stated the "distributing said partitions to a plurality of processors." So this is the non-underlined part. That was what the claim originally said.

And then the patentees amended the claim and added the underlying language and said now "distributing descriptions of all of said partitions to each of a plurality of subtask processors."

In other words, they gave up claim scope that said "distributing said partitions" in favor of now limiting, narrowing the claim to "distributing descriptions of all of

said partitions." So that is the construction, obviously, but we propose or we would like to have that language put into the construction, "wherein such statements" -- I would propose that we would say "such description" to account for the Court's construction.

So we would say, "wherein such description is distinct from the input file itself." That's necessary to prevent I.V. from coming in and saying, well, the file itself, or the partition itself, is descriptive of itself and, therefore, it could be what is distributed and meet that limitation.

But then that would go back over what was relinquished. It's a backdoor way to get back what they gave up, and they can't do that. And so we would propose putting in that language to ensure that that doesn't happen.

And unless your Honor has any questions, that's all I have on that term.

THE COURT: No, thank you.

And would the plaintiff like to respond?

MS. AJUMOBI: Yes, your Honor, a couple comments going back to the phrase "use in distributing the load without a special load process."

I would just like to point out that the file history doesn't, in fact, state that it must be done

without a special load process. In fact, I believe the file history says that it can done without a special load process.

And then the last thing I would like to discuss is this last statement which opposing counsel would like to use in its construction. There is no clear disavowal here, and also "wherein such statements are distinct from the file itself" is not put on the slide we're looking at.

The patentee made a change to the patent language, but nowhere on the -- (Audio distortion) -- in the file history it states that statements are distinct from the input file itself. Instead, it now states "distributing the descriptions of all said partitions to each of a plurality of subtask processors."

And with that, I rest.

THE COURT: Okay. Thank you.

MR. BLOCK: Your Honor, may I just address two points very quickly?

THE COURT: Yes, go ahead.

MR. BLOCK: On that last point about the -- there not being, like, a literal -- a word-for-word statement of the description being distinct from the file input, the input file itself, I mean, that is the implication from the amendment. They -- changing from "distributing partitions" to "distributing descriptions of partitions" is

distinguishing and making distinct the description from the file itself.

And, lastly, the point about "the sharing process can use" and that's the language in the file history, that may be true. But the claim itself literally requires using a description to distribute the load without a special load process. So the fact that it "can use" is here used because that's what the claim requires.

THE COURT: Okay. Thank you.

And as we move to the next term, since defense argued it was indefinite, I'll let y'all go first on that.

MR. BLOCK: I'll be very brief on this one.

Let me find where -- so the language here is "simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions."

So our point here is -- look, it says "simultaneously executing at least one -- or at least a respective one." So "at least a respective one" includes one, and "simultaneously" referring to one makes no sense. So how could someone skilled in the art understand the full scope of the claim if what is required is simultaneously executing at least one or one?

It would make sense if it said "simultaneously

executing at least a respective two of the subtasks," but it doesn't say that. That's the point with why that phrase is indefinite.

And I have nothing further on this term.

THE COURT: That's fine.

Response?

MS. AJUMOBI: Just briefly.

For the "simultaneously executing at least a respective one of the subtasks," the limitation recited in steps -- (Audio distortion) -- refers to the plurality subtasks recited in the preamble. And a "plurality" means two or more, and so a POSITA would understand that "simultaneously executing at least one" of those subtasks in fact refers to the plurality of subtasks referenced in the preamble.

That's the only response I have to that argument, your Honor.

THE COURT: Okay. Well, thank you. I've given you what my thoughts are on my preliminary construction, so --

Let's move to the last term. And if plaintiff wants to go first.

MS. AJUMOBI: Your Honor --

MR. BLOCK: Your Honor, we'll submit on our briefing on the last term, so I have nothing further on

that.

THE COURT: Okay. That's fine. Let me just see if --

MR. BLOCK: I assume she's going to --

THE COURT: -- if plaintiff wants to say anything about this last term or not.

MS. AJUMOBI: Sure. Your Honor, I was just going to say that we agree with your construction of the term, and I was only going to rebut if plaintiff -- sorry, excuse me -- defendant had any argument. I will rest as well.

THE COURT: Okay. Well, thank you.

One thing, if I could ask if the plaintiff can go ahead -- on the "network route director," I still -- you were speaking so fast. Would you mind just -- your tweak, the language you've tweaked and want to submit, can you just file it in ECF as a supplemental claim construction? The Clerk's Office may not like that, but -- if there's a problem, you know, let my office know. But if you don't mind just submitting that language so I have it word-for-word so there is not a problem.

MR. DOWNING: Yes, of course, your Honor.

THE COURT: Yes, thank you.

And then thank you for your arguments today. My goal is usually to get a decision within 30 days. Usually it's before that. But I will just say it's hard to believe

January is almost over. We're towards the end of January. I think I'm in trial most of February, so -- but I'll make my goal to try to get it issued as soon as possible.

Let me ask, from the plaintiffs' perspective is there anything else I can do for you today?

MR. DOWNING: Yes, your Honor. We -- go ahead.

MR. WALDROP: Go ahead.

MR. DOWNING: Yes, your Honor. We do have one issue that we'd like to bring to your Honor's attention. My colleague, Heather Kim, is on and would like to address that.

THE COURT: Okay.

MS. KIM: Good morning, your Honor. Heather Kim, on behalf of I.V., from Kasowitz.

Your Honor, we noticed in the latest scheduling order that issued -- and that would be dated September 8th of 2015 *(sic)*. It is Docket Number 81. I can screen share that, your Honor, or if you have it readily available, I can just sort of talk about it in general.

We just wanted to point out that in that scheduling order, we have expert reports due about a month -- I think exactly four weeks or so before the fact discovery deadline. And so we just want to see if the Court would be open to the parties working together to submit a schedule that moves opening expert reports for the

party with the burden of proof to a date after fact discovery. Otherwise, I think we would be in like a supplemental report war.

THE COURT: Yeah, let me ask you. Have you spoken to the defendant about this?

MR. CAMPBELL: No, your Honor, they have not.

THE COURT: Okay. Well, why don't y'all talk to the other side. I'm a big -- I hold a high premium on cooperation of the parties. And so if you all can come up with some agreement, then, you know, I'm usually pretty amenable to that.

The biggest issue comes to later on when we set a trial date. And if we get to that point, I would suggest the parties, you know -- because I don't know if I even -- usually I give a window, but my patent cases are a little bit different, so I will specially set my patent cases when we get to the point we need to do so. Not something we have to worry about today, but I just don't like to put you just on a general docket. I usually specially set it.

But, yeah, just work with the other side and see if you can come up with some solution on that. I have no problem helping out on that effort, so --

MS. KIM: Thank you, your Honor.

THE COURT: Sure. Not a problem, Ms. Kim.

Anything I can do for the defendants today -- or

defendant?

MR. CAMPBELL: No, your Honor. Thank you for your time today. We appreciate it.

THE COURT: Okay, yeah. Thank y'all. We enjoyed it, and we'll be in recess. You have a good day.

(Proceedings concluded, 11:24 a.m.)

COURT REPORTER'S CERTIFICATION

I HEREBY CERTIFY THAT ON THIS DATE, JANUARY 24, 2026, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS.

/s/

CHRISTINA L. BICKHAM, CRR, RDR