**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC, | ) ) ) | |
| *Plaintiffs*, | ) ) | **C.A. No. 4:24-cv-00980-ALM** |
| v. | ) ) ) | **JURY TRIAL DEMANDED** |
| AMERICAN AIRLINES, INC. | ) ) | |
| *Defendant*. | ) | |

**PLAINTIFFS' SUPPLEMENTAL OPENING CLAIM CONSTRUCTION BRIEF**

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................ 1

II.   '841 PATENT .................................................................................................. 1

    A.    '841 PATENT BACKGROUND ................................................................. 1

    B.    DISPUTED CLAIM TERMS ..................................................................... 2

        1.    "operational and connectivity problems" (Claim 1) .................................. 2

        2.    "hardware and software problems" (Claim 1) ............................................ 3

        3.    "wherein the first configuration differs from the second configuration" (Claim 1) ....................................................................................................... 4

        4.    "communications within the first and second clusters are isolated" (Claim 8) ......................................................................................................... 5

        5.    "high performance computing cluster" (Claim 9) ..................................... 6

III.  '584 PATENT ................................................................................................. 7

    A.    '584 PATENT BACKGROUND ................................................................. 7

    B.    DISPUTED CLAIM TERMS ..................................................................... 8

        1.    "high performance cluster" / high performance computing cluster" (Claims 1 and 10) ................................................................................................ 8

        2.    "communications between the first [HPC] cluster and the second [HPC] cluster are isolated" (Claims 1 and 10) ........................................... 8

        3.    "wherein the first configuration differs from the second configuration" (Claims 1 and 10) .............................................................. 9

        4.    "operational or connectivity problems" (Claims 5 and 6) ......................... 9

        5.    "hardware or software problems" (Claim 6) ............................................... 9

        6.    "means ... to limit access ..." (Claim 8) ..................................................... 10

IV.   '282 PATENT ................................................................................................. 11

    A.    '282 PATENT BACKGROUND ................................................................. 11

    B.    DISPUTED CLAIM TERMS ..................................................................... 11

        1.    "root image" (Claims 1, 4, 5, 15, 17, 20, and 21) ..................................... 11

        2.    "new data blocks" (Claims 1 and 15) ......................................................... 12

        3.    "appropriate persistent mapping" (Claims 1 and 15) ................................. 13

        4.    "sector" (Claims 1, 10, 15) ......................................................................... 14

        5.    "low-level driver" (Claim 1) ....................................................................... 15

i

6.      "the modifying" (Claim 15) ........................................................ 16

7.      "at an operational level" (Claim 26) ....................................... 17

V.    '080 PATENT ............................................................................................. 18

A.    '080 PATENT BACKGROUND ................................................................. 18

B.    DISPUTED CLAIM TERMS ..................................................................... 18

1.    "distributed parallel computing program" (Claims 1, 4, 5, 6, 9, 17, and 18) ................................................................................ 18

2.    "distributed sequential computing program" (Claims 1 and 9) ............... 19

3.    "parallel processing and/or operations" (Claims 1 and 9) ....................... 20

4.    "multiple nodes" (Claim 6) ................................................................ 21

5.    "distributed shared memory system" (Claims 17 and 18) ........................ 22

VI.    '000 PATENT ............................................................................................. 22

A.    '000 PATENT BACKGROUND ................................................................. 22

B.    DISPUTED CLAIM TERMS ..................................................................... 23

1.    "time interval" / "time intervals" (Claims 1, 6 and 13) ............................ 23

2.    "a processor" / "the processor" (Claims 1, 2 and 4) ................................. 26

3.    "a receiver" / "the receiver" (Claims 1, 2 and 4) .................................... 27

4.    "a transmitter" / "the transmitter" (Claim 1).......................................... 27

5.    "in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval" (Claim 1) ........................................................................ 28

6.    "a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel" (Claim 13) .................................................... 29

VII.    CONCLUSION ............................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BASF Corp. v. Johnson Matthey Inc.*,
  875 F.3d 1360 (Fed. Cir. 2017)......................................................................................2, 3

*Bayer Pharma AG v. Watson Lab'ys, Inc.*,
  No. CV 12-1726-LPS-CJB, 2014 WL 4954617 (D. Del. Sept. 30, 2014)..............................29

*Biosonix, LLC v. Hydrowave, LLC*,
  230 F.Supp.3d 598 (E.D. Tex. 2017)......................................................................................15

*BTL Indus. Inc. v. Rejuva Fresh LLC*,
  No. 1:23-CV-00032-SDN, 2025 WL 2452505 (D. Me. Aug. 26, 2025)...............................27

*Cheetah Omni LLC v. Alcatel-Lucent Inc.*,
  939 F.Supp.2d 649 (E.D. Tex. 2013)......................................................................................16

*Dow Chem. Co. v. Sumitomo Chem. Co., Ltd.*,
  257 F.3d 1364 (Fed. Cir. 2001)........................................................................................6, 13

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
  435 F.3d 1366 (Fed. Cir. 2006)..............................................................................................17

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
  64 F.3d 1553 (Fed. Cir. 1995)................................................................................................23

*IPXL Holdings, LLC v. Amazon.com, Inc.*,
  430 F.3d 1377 (Fed. Cir. 2005)........................................................................................28, 29

*KIPB LLC v. Samsung Elecs. Co. Ltd.*,
  No. 2:19-cv-00056-JRG-RSP, 2020 WL 1495231 (E.D. Tex. Mar. 27, 2020) ......................29

*In re McFadden*,
  No. 2024-2107, 2025 WL 2553720 (Fed. Cir. 2025) ............................................................29

*Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*,
  194 F.3d 1250 (Fed. Cir. 1999)..............................................................................................10

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
  520 F.3d 1367 (Fed. Cir. 2008)..............................................................................................30

*Oatey Co. v. IPS Corp*,
  514 F.3d 1271 (Fed. Cir. 2008).........................................................................................6, 13

iii

*Optimum Imaging Techs. LLC v. Canon Inc.*,
No. 2:19-cv-00246-JRG, 2020 WL 3104290 (E.D. Tex. June 11, 2020) ....................28, 29, 30

*Profectus Tech. LLC v. Huawei Techs. Co., Ltd.*,
No. 6:11–cv–474, 2014 WL 1575719 (E.D. Tex. Apr. 17, 2014) ...........................................13

*Ricoh Co., Ltd. v. Katun Corp.*,
486 F.Supp.2d 395 (D.N.J. 2007) .......................................................................................29

*Salazar v. AT&T Mobility LLC*,
64 F.4th 1311 (Fed. Cir. 2023) ...........................................................................................27

*Samsung Elecs. Co., Ltd. v. Power2B, Inc.*,
No. 2023-1629, 2025 WL 2538863 (Fed. Cir. Sep. 4, 2025) ..................................................26

*SIPCO, LLC v. Emerson Electric Co.*,
794 F. App'x 946 (Fed. Cir. 2019) ......................................................................................23

*Synqor, Inc. v. Artesyn Techs., Inc.*,
No. 2:07–CV–497–TJW–CE, 2010 WL 2991037 (E.D.Tex. July 26, 2010) .........................29

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002).............................................................................................24

**Statutes**

35 U.S.C. § 112.....................................................................................................................6

iv

## I.    **INTRODUCTION**

Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively, "IV" or "Plaintiffs") submit this supplemental brief in support of its constructions for the disputed claim terms of the Asserted Patents, including U.S. Patent Nos. 7,822,841 ("'841 Patent"); 8,352,584 ("'584 Patent"); 7,721,282 ("'282 Patent"); 7,712,080 ("'080 Patent"); and 11,032,000 ("'000 Patent") (collectively, "Asserted Patents"). For the reasons below, the Court should adopt each of IV's constructions, which are properly grounded in the intrinsic record and, where appropriate, provide helpful clarity to a person of ordinary skill in the art ("POSITA"). In contrast, Defendant American Airlines, Inc. ("American" or "Defendant") propounds constructions that improperly read limitations into the claims from the specification, are based on misinterpreting the patent's prosecution histories, or are otherwise unsupported by evidence.

## II.    **'841 PATENT**

### A.    **'841 PATENT BACKGROUND**

U.S. Patent No. 7,822,841 ("'841 Patent") is titled "Method and System for Hosting Multiple, Customized Computing Clusters" and was filed as Application No. 11/927,921 on October 30, 2007. The '841 Patent relates to the configuration, access control, and monitoring of multi-cluster systems that are hosted for remote client(s). Ex. 1 at 2:57-63. In multi-cluster systems, each cluster may include a set of computing resources, such as processing nodes, data storage, and a private communications network that is arranged in a particular configuration, such as High Performance Computing ("HPC"), load balancing, and high availability clusters. *Id*. at 3:4-15. These systems also include a monitoring system that monitors the clusters for connectivity and operational problems on a cluster level and hardware and/or software problems on a per-node basis, and issues alerts based on identified issues. *Id*. at 3:26-31.

### B.    DISPUTED CLAIM TERMS

#### 1.  "operational and connectivity problems" (Claim 1)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, not indefinite | Indefinite |

Claim 1 recites in part a "system for hosting computing clusters" including "a monitoring system" configured for "identifying *operational and connectivity problems*." American alleges that this term is indefinite—it is not. *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017) (A "patent claim is indefinite if, when read in light of the specification delineating the patent, and the prosecution history, the claim fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention"). Rather, this term refers to well-understood categories of failures in cluster and network monitoring that would have been readily understood by a POSITA. *See* Ex. 1 at 3:26-29, 3:64-67, 5:12-26, 7:43-528:27-45, 8:58-9:6; *see also* Ex. 2 at ¶¶ 47-62.

The patent describes "operational" as relating to the operations of a cluster, for example "running jobs or cluster maintenance." Ex. 1 at 8:23-26; *see also id*. at 3:26-29, 3:64-67; Ex. 2 at ¶¶ 48, 51-52. Further, a POSITA would have understood that operational "problems" are issues affecting cluster operations, for example execution failures and performance degradation. Ex. 1 at 3:26-29; Ex. 2 at ¶ 48. Similarly, the patent describes "connectivity" as relating to the ability of clusters to communicate using connections over a network. Ex. 1 at 1:19-23; *see also id*. at 5:12-26; Ex. 2 at ¶¶ 48, 55-56. A POSITA would have thus understood that connectivity "problems" relate to issues affecting cluster network communications, for example loss of network availability, communication failures, and network connectivity interruptions. Ex. 1 at 5:12-26, 7:43-52; Ex. 2 at ¶¶ 48. This term is further narrowed by the scope of the claims, which are limited to computer systems for hosting computer clusters that include the specific components recited in claim 1, and

more specifically problems arising at the cluster level. Ex. 1 at 10:66-11:31. In other words, "problems" as recited in the specification and in the claims relate to operational and connectivity problems arising from operation of a multi-cluster system that is described and captured in claim 1. Thus, American's argument that the scope of a type of "problem" cannot be reasonably determined by a POSITA (and rendering this term indefinite) is contradicted by the specification and knowledge and expertise of a POSITA. Ex. 2 at ¶¶ 47-62. Because American has not (and cannot) meet its burden, this term is definite. *See BASF Corp.*, 875 F.3d at 1365 (A defendant carries "the burden of proving indefiniteness by clear and convincing evidence.").

### 2. "hardware and software problems" (Claim 1)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning, not indefinite | Indefinite |

Claim 1 recites in part a "monitoring system" that includes "monitors for each node of the first and second clusters operating to check for *hardware and software problems* within a particular node and to report *the hardware and software problems* to the main monitor." There is no dispute that "hardware" and "software" are definite. *See* Ex. 3 at 50:10-17. Rather, American alleges that these categories of "problems" are indefinite. They are not. Ex. 2 at ¶¶ 63-70.

A POSITA would have understood that hardware "problems" refer to problems arising from malfunction or failure of physical components of a computing node, such as processor faults, memory errors, storage device failures, and other similar problems. Ex. 1 at 7:43-50; Ex. 2 at ¶ 64. Similarly, a POSITA would have understood that software "problems" refer to problems arising from malfunction or failure of software executing on a node, such as software crashes, execution errors, misconfiguration, or other failures in software operation. Ex. 1 at 7:43-50; Ex. 2 at ¶ 65. The scope of "hardware and software problems" is further limited by the scope of the claims, which are limited to computer systems for hosting computer clusters that include the specific

3

components recited in claim 1, and more specifically problems arising at the node level. Ex. 1 at 10:66-11:31. American alleges that the "problems" language of this term renders it indefinite, but it does not (and cannot) because there is no dispute that "hardware" and "software" are definite and would have been understood by a POSITA and a POSITA would have been readily able to determine whether "problems" with hardware and/or software exist within a node.

### 3. "wherein the first configuration differs from the second configuration" (Claim 1)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning, not indefinite | Indefinite |

Claim 1 recites in part "a first cluster … in a first configuration [and] a second cluster … in a second configuration … wherein the first configuration differs from the second configuration." The plain language of this claim requires simply that the first cluster configuration differ from the second cluster configuration. Because its scope is reasonably certain, it is definite. Ex. 2 at ¶¶ 71-82.

The '841 Patent describes different cluster configurations, such as load balancing clusters, high availability clusters, and High Performance Computing ("HPC") clusters. Ex. 1 at 1:51-2:18. These are specific examples of different cluster configurations where a first cluster is different from a second cluster. The specification further states that "first and second configurations may differ due to configuration of the processing nodes in the clusters, based on configuration of the data storage, based on the private communications network or its connections, or based on software modules provided on the nodes, or based on other hardware or software components and/or configurations." Ex. 1 at 3:20-25. A POSITA would have thus understood that the configuration of two clusters may differ based on the configuration of hardware and/or software. *See* Ex. 2 at ¶ 71. This description is consistent with other parts of the specification that describe potential

4

configurations of a cluster. *See, e.g.*, Ex. 1 at 2:13-18, 2:57-60, 3:8-25, 5:61-6:13, 6:48-57, 10:37-49. Thus, this term has reasonably certain scope.

American appears to allege that the specification describes "configurations" "so broadly that there is no discernable limit for a POSITA to understand the metes and bounds" for determining how first and second configurations may differ. *See* Ex. 4 at ¶ 49. In other words, American alleges that a given physical component and a given copy of software in one cluster will always be different from other physical components and copies of software of another cluster, and thus they will always differ. This is an unreasonable interpretation of the specification and ignores the specification citations above that describe that two clusters can be configured the same or may be configured differently, and a POSITA would have been able to well understand when such configurations differ. Ex. 2 at ¶¶ 71-82.

### 4.  "communications within the first and second clusters are isolated" (Claim 8)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | network traffic within each cluster is maintained separate from other clusters by a gateway positioned between the private cluster network and the private company network that manages traffic destined for its corresponding cluster |

Dependent claim 8 recites in part "wherein the first and second clusters each comprise a private cluster network for communications among the computing resources of a particular cluster and a gateway mechanism positioned between the private cluster network and the private communications network, *whereby the communications within the first and second clusters are isolated*." IV's plain and ordinary meaning construction captures the proper meaning of this term in view of the express claim language, in sharp contrast to American's proposed construction that adds unnecessary, redundant, and ambiguous language, and unnecessarily limits the scope of the claim to specific embodiments.

IV's plain and ordinary meaning is consistent with the express language of the claims, which describes structure that enable communications "within" a cluster to be isolated. This claim language is consistent with embodiments from the specification. *See, e.g.*, Ex. 1 at 9:7-29, 10:41-49. In contrast, American's proposed construction is wrong for a plethora of reasons. <u>First</u>, the claim language does not recite any specific structure that isolates communications "within the first and second clusters." Indeed, the specification recites other potential components that may be involved with isolating communications within clusters. Ex. 1 at 1:51-2:18. <u>Second</u>, claim 8 recites a "gateway mechanism" that has a different and broader meaning than the language found in American's proposed construction, *i.e.*, a "gateway." <u>Third</u>, claim 8 does not recite a "private company network," which is an improper attempt by American to limit the claim scope to a particular embodiment. *See Oatey Co. v. IPS Corp*, 514 F.3d 1271, 1276 (Fed. Cir. 2008); *see also Dow Chem. Co. v. Sumitomo Chem. Co., Ltd.*, 257 F.3d 1364, 1378 (Fed. Cir. 2001) ("[C]laims, not the specification embodiments, define the scope of protection."). For at least these reasons, American's proposed construction should be rejected.

### 5. "high performance computing cluster" (Claim 9)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, not indefinite | Indefinite |

Claim 9 recites in part "wherein the first configuration configures the first cluster as *a high performance computing cluster*." Because a "high performance computing cluster" has a reasonably certain scope to a POSITA, it is definite under 35 U.S.C. § 112.

The specification expressly describes different cluster configurations, including High Performance Computing ("HPC") clusters: "[w]hen utilized, *HPC systems allow a set of computers to work together to solve a single problem. The large problem is broken down into smaller independent tasks that are assigned to individual computers in the cluster allowing the*

6

*large problem to be solved faster*." Ex. 1 at 1:51-55 (emphasis added). The specification contrasts HPC clusters with descriptions of load balancing clusters and high availability clusters—neither of which American alleges is indefinite. *See id*. at 2:13-18. Further, the specification's subsequent recitations of HPC clusters are consistent with the description at column 1 lines 51 to 55. *See*, *e.g.*, Ex. 1 at 2:19-44, 3:4-25, 4:51-5:11, 10:3-12. Thus, this term is reasonably definite in scope. Ex. 2 at ¶¶ 93-100. American appears to allege that this term is indefinite because the specification fails to provide guidance regarding how a POSITA would determine whether a cluster is an HPC cluster, as opposed to a load balancing cluster, high availability cluster, or another cluster type. *See* Ex. 4 at ¶ 62. This is inconsistent with the specification's express disclosures describing the different types of clusters, which a POSITA would have been able to determine whether a given cluster is an HPC cluster. Ex. 2 at ¶¶ 96. Further, American's reliance on the specification of the '841 Patent (Ex. 1 at 3:20-25, 7:27-42, 10:13-15, and 10:15-64) is not availing. Those disclosures describe that a cluster can be configured in a customized manner, not that a POSITA would not be readily able to determine whether a given cluster is an HPC cluster.

## III.    '584 PATENT

### A.    '584 PATENT BACKGROUND

U.S. Patent No. 8,352,584 ("'584 Patent") is titled "System for Hosting Customized Computing Clusters," was filed as Application No. 12/894,664 on September 30, 2010, and is a continuation of the '841 Patent. The '584 Patent specification is similar in scope to the '841 Patent and describes a multi-cluster HPC system that includes a monitoring system for monitoring communication problems. Ex. 5 at 3:12-33.

B.        **DISPUTED CLAIM TERMS**

1.  **"high performance cluster" / high performance computing cluster"**
    **(Claims 1 and 10)**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, not indefinite | Indefinite |

Claim 1 recites in part a "high performance cluster" and claim 10 recites in part a "high performance computing (HPC) cluster." For at least the same reasons described in Section II.B.5, these terms are reasonably certain in scope. *See* Ex. 2 at ¶¶ 103-111.

2.  **"communications between the first [HPC] cluster and the second [HPC]**
    **cluster are isolated" (Claims 1 and 10)**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | network traffic within each cluster is maintained separate from other clusters by a gateway positioned between the private cluster network and the private company network that manages traffic destined for its corresponding cluster |

Claim 1 recites in part "wherein communications between the first cluster and the second cluster are isolated," and claim 10 recites a similar limitation, except that the first and second clusters are "HPC" clusters. For at least the same reasons described in Section II.B.4, these terms are reasonably certain in scope. *See* Ex. 2 at ¶¶ 112-122. Further, this disputed term recites communications "between" the recited first and second clusters, whereas the similar term recited in claim 1 of the '841 Patent recites communications "within" the recited clusters of that claim. Thus, claims 1 and 10 of the '584 Patent refers to communications "between" clusters, while claim 1 of the '841 Patent refers to communications "within" each cluster. These terms are different in scope, yet American proposes the exact same, erroneous, construction for both terms. This is yet another reason why American's proposed construction should be rejected. *Id.*

8

### 3. "wherein the first configuration differs from the second configuration" (Claims 1 and 10)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, not indefinite | Indefinite |

Claim 1 recites in part "a first cluster … in a first configuration" and "a second cluster … in a second configuration," "wherein the first configuration differs from the second configuration." For at least the same reasons described in Section II.B.3, these terms are reasonably certain in scope. *See* Ex. 2 at ¶¶ 123-135.

### 4. "operational or connectivity problems" (Claims 5 and 6)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, not indefinite | Indefinite |

Claim 5 recites in part "the monitoring system" "identifies operational or connectivity problems." For at least the same reasons described in Section II.B.1, these terms are reasonably certain in scope. *See* Ex. 2 at ¶¶ 136-147.

### 5. "hardware or software problems" (Claim 6)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, not indefinite | Indefinite |

Claim 6 recites in part "the monitoring system" "monitors for each node of the first cluster and for each node of the second cluster to check for hardware or software problems within a particular node." For at least the same reasons described in Section II.B.2, these terms are reasonably certain in scope. *See* Ex. 2 at ¶¶ 148-153.

### 6. "means ... to limit access ..." (Claim 8)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| *Function:* limit access to the first cluster to communication access from a first client associated with the first client task and limit access to the second cluster to communication access from a second client associated with the second client task. <br> *Structure:* Firewall and authentication system/mechanism (e.g., 210), including implementations such as per-cluster firewall/authentication systems/mechanisms (e.g., 410/411/412), and associated software/hardware configured to (1) direct incoming connections to the correct cluster and (2) authenticate the user/client to ensure access only to the authorized cluster, and equivalents thereof. | *Function*: limit access to the first cluster to communication access from a first client associated with the first client task and limit access to the second cluster to communication access from a second client associated with the second client task <br> *Structure*: firewall and authentication mechanism 210 |

The parties agree on the function of the "means" limitation of dependent claim 8, *i.e.*, "limit access to the first cluster to communication access from a first client associated with the first client task and limit access to the second cluster to communication access from a second client associated with the second client task," but disagree as to the structure. Because IV's structure reflects the full disclosures of the specification, it should be adopted. The specification describes in the embodiment shown in Figure 2 "firewall and authentication system 210," which "govern[s]" "[a]ccess control." Ex. 5 at 5:22-6:3. This structure "may be implemented with several configurations to achieve the goal of ensuring that clients have access to their cluster, and only to their cluster," where "[e]ach of these configurations performs two primary steps: (1) ensuring that an incoming connection goes to the correct cluster and (2) ensuring that the incoming user has access to that cluster." Ex. 5 at 5:60-6:3. The specification describes different, alternative configurations of firewall and authentication system 210. *See id*. at 6:4-33. The specification also describes another embodiment, shown in Figure 4, which shows firewall and authentication systems 410, 411, and 412. *Id*. at 9:17-38. This disclosure alone confirms that American's proposed structure is inaccurate, as it improperly limits the structure. *Micro Chem., Inc. v. Great*

10

*Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258-59 (Fed. Cir. 1999) (finding when multiple embodiments in the specification correspond to the claimed function, proper application of § 112, ¶ 6 generally reads the claim element to embrace each of those embodiments).

## IV.    '282 Patent

### A.    '282 PATENT BACKGROUND

U.S. Patent No. 7,721,282 ("'282 Patent") is titled "Block-Level I/O Subsystem for Distributed Application Environment Management" and was filed as Application No. 11/395,816 on March 30, 2006.[1] The '282 Patent describes distributed application environments to a compute node, where the system includes a first storage unit for storing a root image including blocks and a second storage unit for storing a leaf image including new data blocks and changes to the root image blocks. Ex. 6 at 2:19-23. The system also includes an interface between the compute node and the first and second storage units, where the application environment is created by merging the blocks of the root image stored on the first storage unit with the leaf image stored on the second storage unit. *Id.* at 2:23-31.

### B.    DISPUTED CLAIM TERMS

#### 1.  "root image" (Claims 1, 4, 5, 15, 17, 20, and 21)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | a read-only base set of data blocks, operating beneath the file system, that provide the common portion of the application environment |

This Court previously construed "root image" as recited in certain claims of a related patent as "a common set of data blocks unchanged by the plurality of compute nodes." Dkt. 127 at 18. For similar reasons, the Court should reject American's attempt to limit the base image to a "read-

---

[1] U.S. Patent No. 8,332,844 ("'844 Patent") is a continuation-in-part of the '282 Patent.

only" set of data blocks that "operat[es] beneath the file system, that provide[s] the common portion of the application environment." *See id*. at 14-17.

The independent claims generally recite a first storage unit for storing blocks of a root image of a compute node, where the blocks include "sections of data," and where "a file of the root image" includes "at least one block." *See, e.g.*, Ex. 6 at 7:14-19. In other words, a block can correspond to a file. The claims also generally recite that changes to the blocks of the root image are stored in a leaf image, and that the application environment is created by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit. *See, e.g., id*. at 7:21-32. Thus, the claims do not recite any requirement that the root image is read-only, that it operates beneath the file system, or that it provides the common portion of the application environment. In the background section, the specification describes the root image as "a read-only base image (or 'root' image) of the application environment" that is "accessible by all compute nodes in the cluster," and that when changes are made to data in the root image, those changes are stored in a 'leaf' image unique to that compute node." *Id*. at 1:58-2:3. The specification also describes embodiments where the root image is modified, for example during reconciliation where a root image and a leaf image are combined "to form a new root image." *Id.* at 6:31-37. Thus, there is no support in the specification requiring the root image to operate beneath the file layer, nor is there support for the "read-only" language included in American's proposed construction.

### 2. "new data blocks" (Claims 1 and 15)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | data blocks that are not present in the root image |

Claims 1 and 15 recites in part storing a leaf image on a second storage unit "comprising *new data blocks* and changes to the blocks of the root image." IV's plain and ordinary meaning is

12

consistent with the express claim language and specification, which contrasts "new data blocks" with "changes to the blocks of the root image." *See* Ex. 2 at ¶¶ 173-175. American's proposed construction, however, is wrong for at least the reason that it improperly excludes disclosed embodiments. *See supra, Oatey*, 514 F.3d at 1276; *see also supra, Dow Chemical*, 257 F.3d at 1378. For example, in the embodiment shown in Figure 3 at step 360, the patent describes a process of "reconciling" a root image and a leaf image "to form a new root image," which may be "desirable" for example if a leaf image exceeds a space quota or there is substantial commonality between leaf images. Ex. 6 at 6:31-37. In this embodiment, the root image includes data blocks that were present in the leaf image, *i.e.*, "data blocks that are not present in the root image." For this reason alone, American's proposed construction should be rejected. American's proposed construction is further wrong because there is no language in the specification that supports American's narrow proposal, *see id.* at 2:19-23, 2:34-37, 6:4-6, and it unnecessarily adds a negative limitation without a basis to do so. *See Profectus Tech. LLC v. Huawei Techs. Co., Ltd.*, No. 6:11–cv–474, 2014 WL 1575719, at *8 (E.D. Tex. Apr. 17, 2014) ("Absent a specific disavowal, negative limitations are generally disfavored") (citation omitted).

### 3. "appropriate persistent mapping" (Claims 1 and 15)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning, not indefinite | Indefinite |

Claims 1 and 15 recite creating "an appropriate persistent mapping for sector X" "upon receiving a write request from the compute node for a sector X." In the context of claims 1 and 15, a "mapping" refers to an association between the sector specified by the write request and a particular storage location, such that read and write operations for that sector are directed to the appropriate storage unit, and a "persistent" mapping refers to one that is maintained so that subsequent accesses to the same sector continue to be directed to the same storage location. *See*

13

Ex. 2 at ¶¶ 180-181. This understanding is confirmed by the specification, which describes in one embodiment that "upon receiving a write request from their respective compute nodes for a sector X, the UBDs 130 a-n will create an appropriate persistent mapping for sector X and then write sector X onto their respective second storage units 150 a-n, where sector X can then be modified." Ex. 6 at 5:3-7. In that embodiment, if "the data block being modified … already exist[s] in the leaf image," "it does not need to be mapped and copied from the root image before modification" because a persistent mapping already exists. *Id*. at 5:7-11. Further, the language "appropriate" does not render this claim indefinite because it reflects that the mapping created depends on the state of the system, and specifically whether the sector is already stored in the leaf image or must be newly mapped from the root image before modification. *See* Ex. 2 at ¶¶ 184-186. This understanding is confirmed by the claims and the specification, which provides objective guidance as to when a mapping is created, what it applies to, and how it is used. Ex. 6, 5:1-11. Accordingly, the scope of this term can be determined with reasonable certainty and is definite. *See* Ex. 2 at ¶¶ 179-187.

### 4. "sector" (Claims 1, 10, 15)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | contiguous portion of the data storage area on a disk |

Claims 1 and 15 recite in part "upon receiving a write request from the compute node for a sector X, creat[ing] an appropriate persistent mapping for sector X." As recited in claims 1, 10, and 15, and as described in the specification, a sector should be construed to have its plain and ordinary meaning, an addressable unit of storage used for read and write operations. *See* Ex. 2 at ¶ 188. This meaning is consistent with the specification's use of the term, which describes that "upon receiving a write request from their respective compute nodes for a *sector* X, the UBDs 130a-n will create an appropriate persistent mapping for *sector* X and then write *sector* X onto their respective second storage units 150a-n, where *sector* X can then be modified." Ex. 6 at 5:3-

14

7. The parties agree that a sector generally refers to a unit of storage, but otherwise disagree. Specifically, American's proposed construction lacks support for a "contiguous portion" of data storage, and unnecessarily adds a "disk" limitation to a claim that does not recite "disk" anywhere. Indeed, dependent claims 9 and 25 refer to a "hard disk" limitation (*id*. at 7:53-56, 8:47-50), and thus American's proposed construction unnecessarily narrows the scope of claims 1, 10, and 15. *See Biosonix, LLC v. Hydrowave, LLC*, 230 F.Supp.3d 598 (E.D. Tex. 2017) (holding that "two claims of a patent are presumptively of different scope"). Further, a POSITA would understand that a sector may correspond to a physical unit of storage, a logical unit of storage, or an abstraction thereof, depending on the implementation. Ex. 2 at ¶ 189.

### 5. "low-level driver" (Claim 1)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | driver that operates below the file system |

Claim 1 recites in part "the union block device comprises *a low-level driver* for interfacing between the first and second storage units and the file system of the compute node." As recited in claim 1, the recited "driver" provides an interface between the storage units and the file system and managing write operations directed to specific storage locations. The claims do not require that the driver reside at any particular architectural layer, and instead define the driver by its role in enabling access to the merged application environment. While the specification describes one embodiment where union block devices ("UBD") are "effectively low-level drivers" that "operate below the file system" (Ex. 6 at 4:41-51), neither the specification nor the claims require that the low-level driver must operate below the file system. Rather, the specification describes the role of the low-level driver as follows: "upon receiving a write request from their respective compute nodes for a sector X, the UBDs 130 a-n will create an appropriate persistent mapping for sector X and then write sector X onto their respective second storage units 150 a-n, where sector X can then

15

be modified." *Id.* at 5:3-7. A POSITA would understand that processing such write requests and creating mappings to redirect writes to the appropriate storage unit is the type of functionality performed by the claimed low-level driver. Ex. 2 at ¶¶ 199, 202. Accordingly, American's proposed construction, which attempts to define not the driver itself, but rather the architectural layer at which the driver operates, should be rejected.

### 6. "the modifying" (Claim 15)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning, not indefinite | Indefinite |

Claim 15 recites in part "the modifying comprises: upon receiving a write request from the compute node for a sector X, creating an appropriate persistent mapping for sector X: and writing sector X on the second storage unit." In other words, upon receiving a write request for a sector X, an appropriate persistent mapping for sector X is created and sector X on the second storage unit *is written to*—the "modifying" thus unambiguously refers to modifying the second storage unit based on the received write request. *See* Ex. 2 at ¶¶ 205-207. This understanding is entirely consistent with the specification, which discloses modifying the leaf image's storage unit by writing to a sector X in response to a write request for sector X:

> UBDs 130a-n may also *modify the leaf image* in response to their respective compute node's access to its instance of the application environment. For example, *upon receiving a write request from their respective compute nodes for a sector X, the UBDs 130a-n will create an appropriate persistent mapping for sector X and then write sector X onto their respective second storage units 150a-n, where sector X can then be modified.* It will be appreciated that the data block being modified may already exist in the leaf image, in which case it does not need to be mapped and copied from the root image before modification.

Ex. 6 at 5:1-11 (emphasis added).

To the extent American alleges that this claim term is indefinite based on a lack of antecedent basis, a claim term with an antecedent basis error is still valid when it provides reasonable certainty to persons of ordinary skill in the art. *See Cheetah Omni LLC v. Alcatel-Lucent*

16

*Inc.*, 939 F.Supp.2d 649 (E.D. Tex. 2013) (finding claims were not indefinite despite lacking explicit antecedent basis because a term had "reasonably ascertainable meaning" and "an antecedent basis may be present by implication."); *see also Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366 (Fed. Cir. 2006). Here, the specification, for example column 1 lines 1 to 11, is entirely consistent with the language in claim 15, and a POSITA would have understood with reasonable certainty the meaning of this limitation. *See* Ex. 2 at ¶ 211.

### 7. "at an operational level" (Claim 26)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning, not indefinite | Indefinite |

Claim 26 depends on claim 15 and recites in part "merging occurs at an operational level between the first and second storage units and file system of the compute node." The "merging" step of claim 15 recites "merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit to create the application environment." In this context, "operational" refers to the system's functioning during normal use, *i.e.*, while the compute node is accessing the application environment through its file system and issuing read and write requests. Ex. 2 at ¶¶ 212-214. The language "at an operational level" is tied to the claim language "merging occurs … between the first and second storage units and [the] file system of the compute node." A POSITA would understand from this language that the merging occurs as part of the system's operation in servicing file system access, rather than as a pre-generated merge performed in advance. *Id*. at ¶¶ 215-216. This understanding is supported by the specification, which describes the "merging" step being performed as part of the system's operation in delivering a unified application environment to the compute node. *See* Ex. 6 at 3:62-4:11; *see also id*. at 4:41-51, 5:1-11.

**V.    '080 PATENT**

    **A.    '080 PATENT BACKGROUND**

U.S. Patent No. 7,712,080 ("'080 Patent") is titled "Systems and Methods for Parallel Distributed Programming" and was filed as Application No. 10/850,842 on May 21, 2004. The '080 Patent generally relates to computer programming and specifically systems and methods for parallel distributed programming, making them more efficient. The '080 Patent makes parallel distributed programming efficient by including at least one distributed shared variable located across multiple memories and one or more distributed programs configured to operate across multiple processors. The parallel distributed programs can also include one or more self-migrating threads configured to migrate from one processor to another. Ex. 7 at 2:8-19.

    **B.    DISPUTED CLAIM TERMS**

    **1.  "distributed parallel computing program" (Claims 1, 4, 5, 6, 9, 17, and 18)**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | program that computes using multiple concurrent distributed sequential computing programs configured to operate across multiple processors/nodes and multiple memories |

The claim term "distributed parallel computing program" does not require construction and should be construed to have its ordinary and customary meaning *i.e.* a program that enables parallel processing through concurrent execution. American's confusing and ambiguous proposed construction is wrong because it attempts to equate descriptive statements in the summary of the invention section and specification to mandatory claim limitations. The specification of the '080 Patent describes "distributed parallel computing ("DPC") as "computing using multiple concurrent DSC programs." This description is consistent with the ordinary technical meaning of distributed parallel computing because it focuses on concurrency and parallel execution through the composition of distributed sequential programs. Ex. 2 at ¶ 224.

American proposed construction appears to equate "parallel distributed computing program" and "distributed parallel computing," without explain how the terms are synonymous. Further, American's proposed construction attempts to require that the distributed parallel computing program operate across multiple processor/nodes and multiple memories, when that is not required by the patent. The patent discusses that distributed parallel programs may operate in environments involving multiple processors, nodes, and memories, but does not state that every distributed parallel computing program must operate across each of those resources. *See* Ex. 7 at 2:10-12 ("*Generally* a parallel distributed program includes at least one distributed shared variable located across multiple memories and one or more distributed programs configured to operate across multiple processor"). This specification citation expressly teaches that the execution environment of a DPC application may vary. In particular, it states that "a DPC application targeted to multi-processor environments may be utilized on a uni-processor and operates as a multi-threaded application." Ex. 2 at ¶ 227. This disclosure demonstrates that a distributed parallel computing program is not limited to execution across multiple processors or multiple nodes. Ex. 2 at ¶ 228. Rather, the patent recognizes that the same DPC program may be deployed in different environments (including a single-processor environment) and still operate as a parallel application through multi-threaded execution. Therefore, American's construction is improperly limiting.

**2. "distributed sequential computing program" (Claims 1 and 9)**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | program using a single locus of computation over distributed data |

The Court should reject American's proposal to construe the term as "program using a single locus of computation over distributed data," and adopt its plain and ordinary meaning. Claim 1 states "developing at least one distributed sequential computing program to access the at least one distributed shared variable." Ex. 7 at 11:11-12. A POSITA would understand this term

19

refers to a program that performs computation sequentially while accessing distributed data. This claim language confirms that a distributed sequential computing program is capable of accessing distributed shared data and later serving as the basis for parallel execution. Ex. 2 at ¶ 244. Nothing in the claims requires that the distributed sequential computing program be confined to a single processor or physical location. *Id*.

American argues that "distributed sequential computing program should be construed as "program using a single computation over distributed data," which makes a descriptive of the term *distributed sequential computing* into a rigid definitional limitation. As used in the patent, "distributed sequential computing program" describes the manner of computation, sequential execution, rather than imposing a rigid structural or architectural limitation on how or where computation must occur. Ex. 2 at ¶ 246. American's construction should be rejected.

### 3.  "parallel processing and/or operations" (Claims 1 and 9)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | system that uses a globally accessible memory space built on distributed memories |

The term "parallel processing and/or operations," is a term that needs no further clarification or construction. Construing "parallel processing and/or operations" as a "handling multiple threads concurrently without terminating and resuming thread processes," would add unnecessary confusion to a term that is well understood and straightforward. Further, there is insufficient evidence to justify American's proposed construction.

Claim 1 of the '080 Patent recites "wherein the at least one distributed parallel computing program *concurrently uses* the at least one distributed sequential computing program and the at least one spawned child distributed sequential computing program to perform parallel processing and/or operations." This claim language itself confirms that "parallel processing and/or operations" refers to the use of concurrent execution to carry out work in parallel, without

20

specifying any particular mechanism by which that concurrency must be achieved. American argues that the "Patentee voluntarily disclaimed the scope of the claim to include only parallel processing that enables many calculations to be carried out simultaneously." Ex. 8 at ¶ 71. However, Dr. Shamos acknowledges that the term "parallel processing and/or operations" was not in the patent at the time of this supposed disclaimer. *See* Ex. 9 at 47:2-7 ("Just to make it clear for the record, the term parallel processing was not in the patent at the time? A. Was not in the claims. Q. Was not in the claims at the time, correct? A. That's right. The literal term parallel processing was not there. There are other terms that I just listed that were there."). American does not and cannot justify, how a patent term is disclaimed when the term was not in the patent at the time. Furthermore, American's proposed construction of "parallel processing and/or operations" is not supported by the intrinsic record. The claims do not mention termination, suspension, resumption, or any other aspect of thread lifecycle management, and do not describe parallel processing in terms of excluding those behaviors. American's proposed construction is also inconsistent with the multiple descriptions in the '080 Patent specification that describe concurrent execution of multiple threads or computations, regardless of the specific scheduling behavior of those threads.

### 4. "multiple nodes" (Claim 6)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | multiple memory areas associated with separate processors |

Dependent claim 6 recites "wherein the distributed parallel computing program is configured to operate across multiple nodes." IV's plain and ordinary meaning construction captures the proper meaning of this term in view of the express claim language, in sharp contrast to American's proposed construction that adds unnecessary and redundant language and unnecessarily limits the scope of the claim to specific embodiments. Further, American acknowledges that "the passage at 4:3-10 uses "e.g." instead of "i.e.," suggesting that the phrase

21

'multiple memory areas associated with separate processors' is exemplary rather than definitional." Ex. 8 at ¶ 65. Therefore, this disclosure confirms that "multiple memory areas associated with separate processors" is an exemplary description of nodes in one environment, not a definition of the term. American's proposed construction also is wrong because Claim 4 separately recites operation across "multiple processors," while claim 6 separately recites operation across "multiple nodes." Ex. 7 at 11:38-40, 11:44-46. The use of these distinct terms in separate dependent claims indicates that "nodes" and "processors" are different concepts and that American's proposed construction is redundant.

### 5. "distributed shared memory system" (Claims 17 and 18)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | handling multiple threads concurrently without terminating and resuming thread processes |

IV's plain and ordinary meaning of "distributed shared memory system" is consistent with the express language of the claims. This term describes an execution environment that provides shared access to distributed memory resources and does not impose a particular implementation architecture or memory-management mechanism. Ex. 2 at ¶ 267. American's construction narrows this term by importing a particular architectural description that is not required by the claims or specification. Further, the intrinsic record does not require that the shared memory appear as a single global memory space, nor does it restrict the claims to any specific distributed shared memory implementation. *Id*. at ¶ 274.

## VI.   '000 PATENT

### A.   '000 PATENT BACKGROUND

U.S. Patent No. 11,032,000 ("'000 Patent") is titled "Communications in a Wireless Network" and was filed as Application No. 16/682,854 on November 13, 2019. The '000 Patent generally relates to wireless communications between user equipment ("UEs") and a base station.

22

It addresses challenges associated with efficiently determining channel conditions for multiple UEs while managing uplink and downlink signaling resources. *See* Ex. 10 at 2:20-24. The patent includes both apparatus and method claims directed to this wireless signaling scheme. As described in the patent, UEs transmit uplink physical signals during a defined portion of a frame, *i.e.*, a scheduled uplink interval, which may be organized into time slots distinct from those used for uplink data transmission. *Id*. at 2:32-42. These uplink physical signals enable the base station to determine channel conditions for the UEs. *Id*. Based on those channel conditions, the base station transmits control information to the UEs over a physical control channel in designated portions of a downlink frame, to instruct them how and when to transmit. *Id*. The patent describes these operations as being performed by configured components of the UE, including the receiver, transmitter, and processor. *See id*. at Claim 1.

## B.    DISPUTED CLAIM TERMS

### 1.  "time interval" / "time intervals" (Claims 1, 6 and 13)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "time slot" and "time slots" |

Defendant first attempts to narrow the term "time interval" to mean "timeslot." This position is not supported by the intrinsic record. The patent uses different terminology "time interval" and "time slot," confirming that the patentee understood these as distinct terms with distinct meanings. *Exxon Chem. Patents, Inc. v. Lubrizol Corp*., 64 F.3d 1553, 1557 (Fed. Cir. 1995) (a court "must give meaning to all the words in [the] claims.") Courts presume that different claim terms have different meanings, and Defendant offers no basis to overcome that presumption. *See SIPCO, LLC v. Emerson Electric Co.*, 794 F. App'x 946, 949-50 (Fed. Cir. 2019) (nonprecedential) (finding different terms had different meanings and "we presume that those two terms have different meanings").

Nothing in the intrinsic record equates "time interval" with "time slot." The intrinsic evidence described below confirms that the term "time interval" is a defined temporal allocation within the frame during which uplink physical signals are transmitted. Ex. 11 at ¶ 41. By contrast, "time slot" is a specific defined unit of time within the communication standard (*e.g.*, 3GPP) as defined by the standard. Ex. 12 at 43:22-44:1. The patentee used the term "time slot" in other claims, and chose the language "time interval" instead. *See e.g.* Ex. 10 at claims 1, 7, 13, and 19 (claims using "time slot").

The '000 Patent specification discloses multiple embodiments relevant to understanding the term "time interval" that demonstrate flexibility in how uplink transmission opportunities are allocated. In Figure 2, the uplink beacon is transmitted within a single time slot. *See* Fig. 2 (showing the UL-Beacon transmitted within a time slot); Ex. 10 at 6:3-6 ("The uplink frame comprises a UL_Beacon control timeslot 216"); *see also* Ex. 12 at 45:12-47:8, 59:1-9. Defendant's proposed construction appears to focus on this embodiment. However, even if this was the only embodiment, there are no disclaimers or disavowals in the specification that would serve to limit this one embodiment to define the broader term "time interval." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002) (holding absent lexicographic definition or disclaimer "We have 'cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.'"). This is not a single embodiment case. In the second embodiment (Figure 3), the specification describes a "fractionation" approach in which the same UL_Beacon timeslot is reused across different frames with different UEs transmitting in different frames. *See* Fig. 3; 6:7 ("Figure 3 illustrates the case where the fractionation phase is 3" explaining that terminals 1, 2, and 3 occur in different frames); Ex. 12 at 46:4-16. Finally, in the third embodiment, instead of reusing a single slot across frames, the system

provides multiple UL_Beacon slots within the same frame. *See* Ex. 10 at 5:47-49; ("In particular, this may also apply for the case where there are more than one UL_Beacon timeslot per, frame."); Ex. 12 at 46:12-22. Thus, the patent discloses different approaches to allocating uplink beacon resources, including (1) using a single time slot, (2) "fractionating" that slot across multiple frames so different UEs transmit at different times, and (3) providing multiple beacon time slots within a single frame to accommodate additional UEs. These distinct embodiments demonstrate that the claimed "time interval" is not limited to a single time slot in a single frame as Defendant argues is required by the '000 Patent specification. Dr. Camp explains that, when considered together with the Figure 2 and Figure 3 embodiments, this reflects a progression in which the system adapts to resource demands: starting from a single-slot embodiment, then distributing transmissions across frames (fractionation), and then providing multiple slots within a frame when additional capacity is needed. Ex. 12 at 66:22-67:19. In this context, the patent describes a flexible temporal framework, not a rigid one-timeslot-per-transmission structure, and that a "time interval" is therefore broader than a single time slot. Thus, Defendant improperly attempts to import limitations to a single embodiment contrary to established law. The term "time slot" and "time interval" are not interchangeable. Defendant's reference to the *Inter Partes Review* proceedings on another patent is also unavailing. Dr. van de Weide fails to explain how or why the Board construed the term "timeslot" with regards to the IPR proceeding and fails to address the embodiments above. Ex. 13 at ¶¶ 41-43. In any case, as explained above the intrinsic record does not support limiting the term to the Figure 2 embodiment.

### 2. "a processor" / "the processor" (Claims 1, 2 and 4)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | one or more processors, at least one of which is configured to receive resource allocation information ..., send, over the physical uplink shared channel, data ..., send the uplink physical signal ..., and receive, on a physical control channel, control information ... |

Defendant next improperly seeks to construe the term "a processor" to "one or more processors," where at least one of the processors must perform all of the claim functions. Defendant's proposed construction is not about construing the term according to how the term is used and described in the intrinsic record. It is instead intended to generate non-infringement arguments that would allow Defendant to argue that any task completed by another processor or another core in a single processor avoids the proper claim scope.

Under well-established Federal Circuit law, the indefinite article "a" means "one or more" unless the patentee clearly indicates otherwise. *Samsung Elecs. Co., Ltd. v. Power2B, Inc*., No. 2023-1629, 2025 WL 2538863, at *5 (Fed. Cir. Sep. 4, 2025) (nonprecedential). There is no such limiting language here. Likewise, the '000 Patent specification expressly states that the invention can use multiple processors in the context of performing the invention - "that computing system 500 can include one or more processors" and the "processors can be a general or special purpose processing engine." Ex. 10 at 8:4-8. The patent explains that Figure 5 is a "computer system that may be employed to implement embodiments of the invention" (*id*. at 3:24-25) so the patentee makes a clear statement that the invention and tasks including receiving and sending information, is not restricted to a single processor. Moreover, the claim itself does not address the processor alone, it claims "a receiver and a processor are configured." With regards to the receiver, the patent also makes it clear that multiple antennas (receivers and transmitters) are also contemplated. *See id.* at 2:3-7 ("multiple transmit/ and/or receive antennas at the network and/or mobile terminal.");

26

Ex. 11 at ¶¶ 46-47, 56, 63. Thus, defendant's apparent attempt to introduce a requirement that requires at least one of the processors to perform all of the recited functions is not supported by the specification or the claim language itself and is distinguishable from *Salazar v. AT&T Mobility LLC*, 64 F.4th 1311, 1315-17 (Fed. Cir. 2023) because the specification indicates that the invention can be provided by one or multiple processors (and transmitters/receivers). *BTL Indus. Inc. v. Rejuva Fresh LLC*, No. 1:23-CV-00032-SDN, 2025 WL 2452505, at *12 (D. Me. Aug. 26, 2025). There is nothing in the specification that would serve to limit the invention to require a single processor, transmitter, and/or receiver to require all of the limitations be performed by at least one processor. American's construction improperly defines "transmitter" in terms of the specific signals transmitted in claim 1, rather than according to its ordinary structural meaning. A POSITA would understand that a transmitter is a conventional UE component responsible for radio transmission. Ex. 11 at ¶ 64. The patent explains that the invention is not limited to a particular specific form. *See* Ex. 10 at 9:43-45.

### 3. "a receiver" / "the receiver" (Claims 1, 2 and 4)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | one or more receivers, at least one of which is configured to receive resource allocation information..., and receive, on a physical control channel, control information... |

### 4. "a transmitter" / "the transmitter" (Claim 1)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | one or more transmitters, at least one of which is configured to send, over the physical uplink shared channel, data ..., and send the uplink physical signal ... |

As explained above for processor, the terms "receiver" and "transmitter" should be given their plain and ordinary meaning for the same reasons. Ex. 11 at ¶ 55. Nothing in the intrinsic record or claims restricts the claimed receiver or transmitter to a single component and it contemplates at the time that multiple transmitters and antennas could be used. *See, e.g.*, Ex. 10 at

27

1:31-32 ("based upon signals received by the user equipment (UE)"), 2:3-5 ("the use of multiple transmit and/or receive antennas at the network and/or the mobile terminal"), 4:6-7 ("base stations and terminals that transmit and receive …"), 4:9-10 ("base stations are in receive mode when terminals are transmitting"). 2:33-34 ("a terminal to transmit the uplink physical channel control signal"), 2:40 ("the base station to transmit a control signal"), 2:53 ("the UES that are transmitting… signals"), 4:6-7 ("base stations and terminals that transmit and receive"), 4:8-9 ("when the base station is transmitting"), 4:9-10 ("when terminals are transmitting"). Accordingly, "a receiver" and "a transmitter" should be given their plain and ordinary meaning and understood to encompass one or more receivers and one or more transmitters.

### 5. "in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval" (Claim 1)

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning; not indefinite | indefinite under *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005) |

The parties dispute whether the claim term "in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval (Claim 1)" is indefinite. It is not. Determining indefiniteness for hybrid claiming rests on whether the claim provides sufficient notice to ascertain whether infringement occurs when the device is manufactured or occurs when the device is used. *IPXL Holdings L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005). This Court has found that the key issue for hybrid claiming is whether the claims provide sufficient notice to the public to ascertain whether infringement occurs when the device is manufactured or occurs when the device is used. *Optimum Imaging Techs. LLC v. Canon Inc.*, No. 2:19-cv-00246-JRG, 2020 WL 3104290, at *24 (E.D. Tex. June 11, 2020). In *Optimum*, the Court found that the language "selects a specific procedure to optimize the image and corrects the aberrations" can be interpreted as describing functional capabilities of the recited

28

components and therefore the defendant failed to carry its burden. *Id*.; *see also KIPB LLC v. Samsung Elecs. Co. Ltd.*, No. 2:19-cv-00056-JRG-RSP, 2020 WL 1495231, at *6-*7 (E.D. Tex. Mar. 27, 2020). The Federal Circuit has specifically found that the term "configured to" constitutes permissible functional language, as it indicates the capability of using a claimed method but does not require performance of the method steps. *In re McFadden*, No. 2024-2107, 2025 WL 2553720, at *4 (Fed. Cir. 2025). Claim 1 recites a UE in terms of conventional structural components, a "receiver," "transmitter," and "processor," "*configured to*" support uplink physical signaling and downlink control reception. *See* Ex. 10 at Claim 1; Ex. 11 at ¶ 71; Ex. 12 at 106:20-22. The use of the language "configured to" indicates the capabilities of the wireless signaling scheme, not required steps. A POSITA would find this limitation definite because it reasonably advises as to the scope of the claim and does not recite method steps performed by a user.

> **6. "a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel" (Claim 13)**

| Plaintiffs' Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning; not indefinite | indefinite under *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005) |

This disputed term is likewise not indefinite. *See Synqor, Inc. v. Artesyn Techs., Inc.*, No. 2:07–CV–497–TJW–CE, 2010 WL 2991037, at *31 (E.D.Tex. July 26, 2010) ("The [c]ourt agrees with numerous other courts in that the holding in the *IPXL* case is very limited."); *Bayer Pharma AG v. Watson Lab'ys, Inc.*, No. CV 12-1726-LPS-CJB, 2014 WL 4954617, at *6 (D. Del. Sept. 30, 2014) (same); *Ricoh Co., Ltd. v. Katun Corp.,* 486 F.Supp.2d 395, 402 (D.N.J. 2007) (same).

Claim 13 recites method steps that describe steps performed by the "user equipment." *See* Ex. 10 at Claim 1. Defendant's complaint appears to be the wherein clause in Claim 13: wherein physical control channels are transmitted in a same time slot with other physical channels **in a plurality of predetermined time slots in a downlink frame, wherein other time slots of the**

**downlink frame do not include a physical control channel**, ….” The limitation does not create uncertainty about claim scope; rather, it describes the structure of a downlink frames and the conditions under which physical control channels are present or absent – setting forth the environment and context of the method. Ex. 11 at ¶ 78. *See Optimum Imaging Techs. LLC v. Canon Inc.*, No. 2:19-cv-00246-JRG, 2020 WL 3104290, at \*24-\*25 (E.D. Tex. June 11, 2020) (rejecting accused infringer's hybrid claim assertion since the recitation of structure in the method claims was properly “setting forth the environment and context of the method.”); *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008). (“The inclusion of the phrase ‘wherein a set-top box includes two tuners’ provides context and simply limits the claimed method to being practiced in the disclosed environment.”). A POSITA would understand this as a conventional framing of wireless protocol behavior, not an ambiguous or indefinite requirement. *Id.* As recited in claim 13, the UE “receiv[es], on a physical control channel, control information” that is “based on the determined channel conditions,” where “physical control channels” are transmitted in a “same time slot with other physical channels in a plurality of predetermined time slots in a downlink frame,” and where other time slots of the downlink frame “do not include a physical control channel.” This limitation places a condition on the “same time slot,” where physical control channels are received by the UE and where “other time slots” of the downlink frame received by the UE do not include a “physical control channel.”[2] Ex. 11 at ¶ 79.

## VII.  CONCLUSION

For the reasons above, IV's requests that the Court adopt its proposed constructions.

---

[2] Defendant's expert Dr. van der Weide only opines that a person of skill in the art would understand that the claimed downlink frame describes a system element that is independent of the claimed method. However, as described above, the claim describes how the device is used.

Dated: March 30, 2026

Respectfully submitted,

By: */s/ Jonathan K. Waldrop*

Jonathan K. Waldrop (CA Bar No. 297903)
(Admitted in this District)
jwaldrop@kasowitz.com
Marcus A. Barber (CA Bar No. 307361)
(Admitted in this District)
mbarber@kasowitz.com
John W. Downing (CA Bar No. 252850)
(Admitted in this District)
jdowning@kasowitz.com
Heather S. Kim (CA Bar No. 277686)
(Admitted in this District)
hkim@kasowitz.com
ThucMinh Nguyen (CA Bar No. 304382)
(Admitted in this District)
tnguyen@kasowitz.com
Jonathan Hicks (CA Bar No. 274634)
(Admitted *pro hac vice*)
jhicks@kasowitz.com
**KASOWITZ LLP**
101 California Street, Suite 3950
San Francisco, California 94111
Telephone: (415) 421-6140
Facsimile: (415) 358-4408

Paul G. Williams (GA Bar No. 764925)
(Admitted in this District)
pwilliams@kasowitz.com
**KASOWITZ LLP**
1230 Peachtree Street N.E., Suite 2445
Atlanta, Georgia 30309
Telephone: (404) 260-6080
Facsimile: (404) 260-6081

Jeceaca An (NY Bar No. 5849898)
(Admitted *pro hac vice*)
jan@kasowitz.com
Binta A. Watkins (NY Bar No. 5482492)
(Admitted *pro hac vice*)
bwatkins@kasowitz.com
Kristine Abrenica (NY Bar No. 5781489)
(Admitted *pro hac vice*)
kabrenica@kasowitz.com

31

Paula Ajumobi (NY Bar No. 6056097)
(Admitted *pro hac vice*)
pajumobi@kasowitz.com
**KASOWITZ LLP**
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1800
Facsimile: (212) 506-1700

Allen F. Gardner (TX Bar No. 24043679)
allen@allengardnerlaw.com
**ALLEN GARDNER LAW, PLLC**
609 S. Fannin
Tyler, Texas 75701
Telephone: (903) 944-7537
Facsimile: (903) 944-7856

**Attorneys for Plaintiffs**
**INTELLECTUAL VENTURES I LLC and**
**INTELLECTUAL VENTURES II LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served or delivered electronically to all counsel of record on this 30th day of March, 2026, via the Court's CM/ECF system.

/s/ *Jonathan K. Waldrop*
Jonathan K. Waldrop