# **<u>Exhibit 2</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC, | ) ) ) | |
| | ) | Case No. 4:24-cv-980 |
| Plaintiffs | ) ) | |
| v. | ) ) | |
| AMERICAN AIRLINES, INC. | ) ) | |
| Defendant. | ) | |

_____

**DECLARATION OF MAHDI ESLAMIMEHR, Ph.D.
IN SUPPORT OF CLAIM CONSTRUCTION**

Date: 02/12/2026

_____

Mahdi Eslamimehr, Ph.D.

## Table of Contents

I.    INTRODUCTION ................................................................4

    A.    Professional Experience and Qualifications.............................4

    B.    Compensation ....................................................................6

II.    UNDERSTANDING OF THE LAW ....................................7

III.    MATERIALS CONSIDERED ..............................................9

IV.    PERSON OF ORDINARY SKILL IN THE ART .................10

V.    OVERVIEW OF THE PATENTS-IN-SUIT..........................11

    A.    The '841 Patent ..................................................................11

    B.    The '584 Patent ..................................................................12

    C.    The '282 Patent ..................................................................13

    D.    The '080 Patent ..................................................................14

VI.    CLAIM CONSTRUCTIONS ..............................................15

    A.    The '841 Patent ..................................................................15

        a.    "operational and connectivity problems" (Claim 1)................17

        b.    "hardware and software problems" (Claim 1) .........................24

        c.    "wherein the first configuration differs from the second configuration" (Claim 1) ..........................................................26

        d.    "communications within the first and second clusters are isolated" (Claim 8) ........................................................31

        e.    "high performance cluster" (Claim 9) ....................................35

B.    The '584 Patent ..................................................................................38

    a.    "high performance cluster" / "high performance computing cluster" (Claims 1 and 10) ......................................42

    b.    "communications between the first [HPC] cluster and the second [HPC] cluster are isolated" (Claims 1 and 10) .............46

    c.    "wherein the first configuration differs from the second configuration" (Claims 1 and 10) ..............................................49

    d.    "operational or connectivity problems" (Claims 5 and 6) .........54

    e.    "hardware or software problems" (Claim 6)............................58

    f.    "means … to limit access …" (Claim 8) ..................................60

C.    The '282 Patent ..................................................................................65

    a.    "root image" (Claims 1, 4, 5, 15, 17, 20, and 21).....................67

    b.    "new data blocks" (Claims 1 and 15) ......................................70

    c.    "appropriate persistent mapping" (Claims 1 and 15)...............73

    d.    "sector" (Claims 1, 10, and 15)..............................................76

    e.    "low-level driver" (Claim 1)....................................................78

    f.    "the modifying" (Claim 15) .....................................................81

    g.    "at an operational level" (Claim 26) ........................................84

D.    The '080 Patent ..................................................................................88

    a.    "distributed parallel computing program" (Claims 1, 4-6, 9, 17, and 18)....................................................................90

    b.    "distributed sequential computing program" (Claims 1 and 9)...............................................................................97

    c.    "parallel processing and/or operations" (Claims 1 and 9)......102

    d.    "multiple nodes" (Claim 6).....................................................106

2

e.    "distributed shared memory system" (Claims 17 and 18) .......108

I, Mahdi Eslamimehr, hereby declare as follows:

1.      I have been retained by Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC ("IV") as an independent expert consultant in this proceeding. I have been asked to submit this declaration on behalf of IV.

2.      All of my opinions provided in this Declaration are based on my own personal knowledge and professional judgment. I am over 18 years of age and, if I am called upon to do so, I would be competent to testify as to the matters set forth in this declaration.

## I.   INTRODUCTION

### A.   Professional Experience and Qualifications

3.      I received a Master of Science in Computer Science from Linköping University in Sweden and a Doctor of Philosophy in Computer Science from the University of California, Los Angeles ("UCLA"). I also received an MBA from the London School of Economics and Political Science and completed the Harvard Business School Strategy Execution program. I am currently an Adjunct Professor in the Department of Computer Science at the University of Southern California ("USC").

4.      I authored a reference book on software quality metrics, including software scalability. I have conducted years of research in large-scale software systems and distributed computing, and I have delivered numerous technical

presentations concerning complex and scalable containerized solutions. I was the recipient of the Best Paper Award at the IEEE International Symposium on Software Reliability Engineering ("ISSRE"), a conference sponsored and hosted by the National Institute of Standards and Technology ("NIST"). My research publications have been widely cited, including more than 200 citations in peer-reviewed scientific journals and conference proceedings. My Curriculum Vitae, including a list of my publications, is attached as Exhibit A. I teach graduate-level courses at USC in software engineering, software management and economics, and software requirements, including software infrastructure technologies such as Docker, Kubernetes, and Spark.

5.     I have worked as a software engineer for more than 20 years. My experience includes software design, development, deployment, scaling, and operations for a wide range of companies and international organizations. For example, I migrated legacy single-node databases for the United Nations World Food Programme into distributed, multi-node cluster-based databases. I also developed scalable multi-instance software for Ericsson AB's research and development group, cloud infrastructure for Samsung Electronics' infrastructure research and development group, and container-based cloud infrastructure at SAP in connection with SAP HANA.

6.      I also served as Chief Technology Officer ("CTO") and Chief Operating Officer ("COO") at Clarity Global, a software company specializing in development, deployment, and operational support systems for mid- to large-scale telecommunications operators, where I designed and developed Docker- and Kubernetes-based infrastructure software for fixed and mobile telecom operators.

7.      I have been retained as a testifying expert witness and as a non-testifying expert consultant in more than 120 matters, which are identified in Exhibit A.

8.      Based on my education, training, and experience, my areas of expertise include software systems, cloud infrastructure, distributed systems, scalable computing platforms, and container-based infrastructure technologies, including but not limited to Docker and Kubernetes. As an expert witness, I have worked on matters involving scalable software systems and numerous other patent disputes.

**B.      Compensation**

9.      I am being compensated at a rate of $600/hour for my work in this proceeding. My compensation is in no way contingent on the nature of my findings, the presentation of my findings in testimony, or the outcome of this or any other proceeding. I have no other interest in this proceeding.

## II.    UNDERSTANDING OF THE LAW

10.    I am not an attorney. I understand that claim construction is solely a matter for a court to decide and, in general, the ordinary meaning of the claim terms used in the patent to one of ordinary skill in the art is determined in the context of the patent's specification and the file history, which I understand is commonly referred to as "intrinsic evidence."

11.    I understand that a person of ordinary skill in the art is a hypothetical person who is presumed to have known the relevant art at the time of the invention.

12.    I understand that a person of ordinary skill in the art is a person of ordinary creativity, and would have the capability of understanding the scientific principles applicable to the pertinent art.

13.    I understand that claims are construed from the perspective of a person of ordinary skill as of the effective filing date of the patent application.

14.    I understand that a person of ordinary skill in the art is deemed to read the claims in the context of the entire patent, including the specification and prosecution history. In other words, the terms are not considered in a vacuum.

15.    I understand that claim terms should be given their ordinary and customary meaning within the context of the patent in which the terms are used, *i.e.*, the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention in light of what the patent teaches.

7

16. I understand that the plain and ordinary meaning is determined from the language of the claims, the specification, and the prosecution history of the patent at issue.

17. I understand that, in construing a claim term, one looks primarily to the intrinsic patent evidence, which includes the patent abstract, specification, claims, and figures, and its prosecution history.

18. I understand that extrinsic evidence may also be useful in interpreting patent claims when the intrinsic evidence itself is insufficient.

19. I understand that the usual and customary meaning of a claim term can be altered by the patent applicant if they choose to act as their own "lexicographer" and clearly set forth in the patent a different meaning of a claim term.

20. I understand that the meaning of a claim term can also be altered during the patent examination process by a clear and unequivocal disclaimer or disavowal made by the patent applicant regarding the meaning or scope of the term, and that such statements are recorded in the prosecution history of the patent application.

21. I understand that if a claim term is ambiguous or unclear, the term must be construed to determine how a person of ordinary skill in the art would have resolved in light of the rest of the patent specification, patent claims, and the application's prosecution history.

22.     I understand that a claim is not indefinite, as long as it, having been read in light of the intrinsic evidence, informs one of skill in the art at the time of the invention about the scope of the invention with reasonable certainty.

23.     I understand that indefiniteness must be proven by clear and convincing evidence.

24.     I understand that it is improper to import limitations from embodiments in the specification.

25.     I understand that it is improper to import limitations from other parts of the claims and rendering a claim term duplicative.

26.     I understand that it is improper to import additional or different language from other independent claims that would render such claims superfluous.

27.     I understand that the factors to be considered in determining the level of ordinary skill in the art include: (1) the educational level of individuals involved in the field of technology; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; and (5) the sophistication of the technology in the art. I further understand that, in a given case, one or more factors may be given greater weight or may not be present.

## III.     MATERIALS CONSIDERED

28.     My opinions contained in this Declaration are based on the documents I reviewed and my knowledge and professional judgment. My opinions have also

been guided by my appreciation of how a person of ordinary skill in the art would have understood the state of the art, the prior art, and the claims and the specifications of the Asserted Patents at the time of the inventions.

29.     In forming the opinions provided in this declaration, I have reviewed US Patent No. 7,822,841 (the '841 Patent), US Patent No. 8,352,584 (the '584 Patent), US Patent No. 7,721,282 (the '282 Patent), and US Patent 7,712,080 (the '080 Patent) (collectively, "Asserted Patents"), as well as their prosecution histories.

30.     I have also reviewed other materials referred to in this declaration in support of my opinion, including the parties' claim construction disclosures and extrinsic evidence cited in those disclosures.

## IV.    PERSON OF ORDINARY SKILL IN THE ART

31.     Based on my review of the Asserted Patents and my consideration of the factors in determining a person of ordinary skill in the art ("POSITA"), it is my opinion that a POSITA would have a bachelor's degree in electrical engineering, computer science, or a similar area of study, and two or more years of industry experience in networking and distributed computing. Additional experience may make up for a lack of education, and vice versa.

32.     My opinion is based on information available to me as of the date of this declaration. I reserve the right to review and respond to any standard of a

10

POSITA offered by American or to modify my opinion based on information that subsequently becomes available to me.

## V.    OVERVIEW OF THE PATENTS-IN-SUIT

### A.    The '841 Patent

33.    U.S. Patent No. 7,822,841 ("'841 Patent"), entitled "Method and System for Hosting Multiple, Customized Computing Clusters," is directed to systems and methods for hosting and managing multiple computing clusters within a shared infrastructure, where each cluster may be configured differently to perform distinct computing tasks and is logically and operationally isolated from other clusters.

34.    The '841 Patent addresses the technical challenges of deploying, configuring, securing, and monitoring diverse cluster types, such as high performance computing (HPC) clusters, load balancing clusters, and high availability clusters, on a common hosting platform.

35.    The '841 Patent discloses supporting different cluster configurations based on hardware, software, networking, and performance requirements; providing isolation of communications between clusters; limiting client access so that each client may access only its assigned cluster; and including monitoring mechanisms for detecting hardware, software, operational, and connectivity problems at both node and cluster levels.

11

36.     These concepts disclosed in the '841 Patent are described using established terminology in the field of distributed and cluster computing, and the specification discloses multiple alternative embodiments and implementations without limiting the invention to any single architecture or configuration.

**B.     The '584 Patent**

37.     U.S. Patent No. 8,352,584 ("'584 Patent"), entitled "System for Hosting Customized Computing Clusters," is directed to systems and methods for hosting and managing multiple computing clusters within a shared infrastructure, where different clusters may be dynamically configured to provide distinct computing environments for different client tasks. The '584 Patent is a continuation of the '841 Patent.

38.     The '584 Patent addresses technical challenges associated with deploying, customizing, securing, and monitoring clusters, particularly high performance computing (HPC) clusters, while enabling multiple client-specific cluster configurations to coexist on a common hosting platform. The '584 Patent specification discloses systems that include first and second clusters of computing resources that may differ in configuration based on hardware, software, storage, and networking parameters, and use private cluster networks and gateway mechanisms to support communications while maintaining isolation between clusters.

39.     The '584 Patent also describes mechanisms for limiting client access so that each client is restricted to its assigned cluster and for monitoring cluster operation and connectivity. The specification uses established terminology in the field of distributed and cluster computing and describes multiple alternative architectures and implementations, demonstrating that the claims are intended to cover a range of configurations and embodiments rather than being limited to any single structural arrangement or specific implementation detail.

**C.     The '282 Patent**

40.     U.S. Patent No. 7,822,282 ("'282 Patent"), entitled "Block-Level I/O Subsystem for Distributed Application Environment Management," is directed to systems and methods for distributing an application environment to compute nodes using a shared base image architecture combined with node-specific modifications. The '282 Patent describes a system in which a "root image" provides a common base software environment (such as an operating system) accessible to multiple compute nodes, while node-specific changes and newly written data are stored separately in per-node "leaf images."

41.     The '282 Patent discloses a union block device that interfaces between the compute node, the root image storage, and the leaf image storage, and dynamically merges data from the root and leaf images to present a unified application environment to the compute node. The '282 Patent further describes

13

copy-on-write behavior in which write requests cause data to be redirected to the leaf image, including through creation of persistent mappings, thereby allowing modification without altering the root image.

42.    The '282 Patent specification explains these concepts using established terminology from distributed storage and file system technology and describes the claimed mechanisms in functional terms without restricting them to a single implementation, confirming that the claims are intended to cover a range of architectures consistent with the disclosed root/leaf image framework.

**D.    The '080 Patent**

43.    U.S. Patent No. 7,712,080 ("'080 Patent"), entitled "Systems and Methods for Parallel Distributed Programming," is directed to methods and systems for developing and executing distributed parallel computing programs in which parallelism is dynamically introduced into distributed sequential programs during execution. The '080 Patent addresses challenges in distributed computing environments by enabling a computing program to begin as a distributed sequential program and then transform into a distributed parallel computing program by spawning "child" distributed sequential programs when certain intermediate conditions are met.

44.    These parent and child programs concurrently operate to perform parallel processing using distributed shared variables that may be physically

14

distributed across multiple memories, processors, or nodes. The '080 Patent specification describes these concepts using established terminology from the fields of parallel and distributed computing, including threads, nodes, shared memory, and distributed execution, and explains that the disclosed techniques may be implemented across multiple processors, multiple threads, multiple nodes, or distributed shared memory systems.

45.    The '080 Patent presents these mechanisms at a functional level and discloses them as adaptable to a variety of computing architectures, demonstrating that the claims are intended to encompass a range of distributed parallel computing implementations rather than being limited to any specific execution model or system architecture.

## VI.    CLAIM CONSTRUCTIONS

### A.    The '841 Patent

46.    Claim 1 recites:

1. A computer system for hosting computing clusters for clients, comprising:

a private communications network linked to a public communications network;

a first cluster comprising a set of computing resources, including at least one hardware processor, in a first

15

configuration, wherein the first cluster is communicatively linked to the private communications network;

a second cluster comprising a set of computing resources, including at least one hardware processor, in a second configuration, wherein the second cluster is communicatively linked to the private communications network; and

a monitoring system monitoring operations of the first and second clusters, identifying <u>operational and connectivity problems</u>, and issuing an alert in response to the identified problems indicating a corresponding one of the first and second clusters associated with the identified problems;

<u>wherein the first configuration differs from the second configuration</u> and wherein the first configuration provides a first computing environment for performing a first client task and the second configuration provides a second computing environment for performing a second client task;

wherein the monitoring system comprises a main monitor that operates to monitor the first and second clusters to identify the <u>operation and connectivity problems</u> and further comprises monitors for each node of the first and second clusters operating to check for <u>hardware and software problems</u> within a particular node and to report the hardware and software problems to the main monitor.

### a. "operational and connectivity problems" (Claim 1)

47.     It is my opinion that a POSITA would understand the term "operational and connectivity problems" according to its plain and ordinary meaning in the context of clustered and networked computing systems because "operational and connectivity problems" are commonly used technical concepts that describe categories of system failures. It is also my opinion that this term is not indefinite because its scope can be determined with reasonable certainty.

48.     "Operational problems" refer to issues affecting the operation of a cluster or node, such as failures in execution, availability issues, performance degradation, or malfunctioning system components. "Connectivity problems" refer to issues affecting the ability of nodes or clusters to communicate over a network, such as loss of network availability, inability to connect, communication failures, or interruptions in network connectivity. A POSITA would readily understand these terms as describing recognizable classes of failures in distributed computing environments and would not require an exhaustive list of all possible problems in order to understand their meaning with reasonable certainty.

49.     The patent specification confirms that "operational and connectivity problems" are used in their ordinary technical sense. For example, the specification explains that the system may include a monitoring system that "monitors the clusters

17

for connectivity and availability or other operational problems on a cluster level and, typically, on a per-node basis."

> 3:26-29 "The system may further include a monitoring system that monitors the clusters for connectivity and availability or other operational problems on a cluster level and, typically, on a per-node basis"

50.     This disclosure demonstrates that the inventors used "operational problems" to refer to problems affecting cluster operation, and further provides examples such as "availability," which a POSITA would recognize as an operational characteristic of a computing system.

51.     The specification further reinforces this understanding by describing a monitoring process directed to the "operation of multiple, customized clusters."

> 3:64-67 "FIG. 5 is a flow diagram representing a monitoring process implemented in a hosted cluster system in one embodiment of the invention for monitoring operation of multiple, customized clusters."

52.     This disclosure confirms that "operational" is used to describe whether the clusters are functioning properly as intended.

53.     The specification also provides evidence regarding "connectivity problems" by describing the networked architecture of the claimed hosted cluster system. In one preferred embodiment, the system includes a public network

18

connected to a firewall/authentication system, which connects to a private company network containing a monitoring system and gateways that connect to private cluster networks.

> 5:12-26 "In FIG. 2, one preferred embodiment of a hosted cluster system 200 is illustrated such as it may be provided at a hosting facility typically remote from users or clients (i.e., from their accessing nodes or systems 208). The system 200 has, or is connected to, a public network 204 (e.g., a wired and/or wireless digital communications network including the Internet, a LAN, a WAN, or the like), which in turn is connected to a firewall and authentication system 210. The authentication system 210 connects to the company network 230, which has a monitoring system 220 for all the customized clusters 250, 251, 252. The company network 230 also has gateways 240, 241, 242, such as routers, to each unique cluster 250, 251, 252. On the other side of each gateway 240, 241, 242 is a private network 300, 301, 302 for the individual clusters 250, 251, 252.

54.    A POSITA would understand from this architecture that connectivity between nodes, clusters, and monitoring components is essential to system function, and that failures in such communications would constitute "connectivity problems."

19

55. Furthermore, the '841 Patent specification explicitly describes the monitoring system as monitoring "network connectivity" and verifying that per-node monitoring systems are functioning:

> 7:43-52 "The monitoring system described has two main components: a per-node monitoring system (not shown), such as the Intelligent Platform Management Interface (IPMI), that monitors the hardware and software components on each cluster node and a central monitoring system 220 and 330 that monitors the network connectivity of each node along with verifying that each nodes' per-node monitoring system is functioning. Each node reports its status back to the main monitoring system 220, 330 through a common mechanism, such as the Simple Network Management Protocol (SNMP)."

56. A POSITA would recognize from this disclosure that "connectivity problems" refers to failures in network connectivity that prevent communication among system components, including inability of nodes to report status or inability of the central system to monitor availability.

57. The '841 Patent specification further describes the monitoring process in operational terms, explaining that the monitoring system may include a per-node monitoring system that monitors node hardware and software and a main monitoring

20

system that monitors network availability and verifies that per-node monitoring systems are functioning:

> 8:27-45 "The monitoring system 220 may be implemented with hardware and/or software to perform the monitoring method 500 shown in FIG. 5. Functionally the system 220 may be thought of as comprising two primary systems: a per-node monitoring system, such as IPMI, that monitors the hardware and software of the node in which it is provided (i.e., in a step 502 of method 500) and a main monitoring system 220 that monitors the network availability of each node and verifies that their per-node monitoring systems are functioning (i.e., as shown with step 505 of method 500). When the per-node monitoring system detects a problem with the node hardware or software at 510 or the main monitoring system 220 (or dedicated system 330) detects a problem with node availability or the nodes per-node monitoring system at 515, they operate to notify the central monitoring system 220 via a mechanism, such as SNMP, of the problem at 520. When the central monitoring system 220 acknowledges the problem, the per-node or main monitoring system 220 (or 330) resumes monitoring their components at 530."

58. This disclosure provides clear examples of both categories: hardware/software failures are operational problems, and network availability failures are connectivity problems.

59. The monitoring process described in the specification is also reflected in Figure 5, which shows that the per-node monitoring system checks for problems with the node (hardware, software, etc.) and the main monitoring system checks for problems relating to the cluster and cluster node, including network connectivity and verification of per-node monitoring functionality.

60. These disclosures confirm that the term "operational and connectivity problems" is not subjective or ambiguous but rather refers to well-understood categories of failures in cluster and network monitoring.

61. Finally, the specification explains that monitoring may be expanded and configured to include additional components as requested by the client, and that various mechanisms may be used to collect monitoring data:

> 8:58-9:6 "A cluster 250, 251, 252 may be configured to have a per-cluster monitoring system 330, in which case, that system 330 is responsible for monitoring the operations of only that cluster but still sends the information to the central monitoring system 220. The monitoring data is collected from the systems 330 such as via a specific request by the monitoring system 220 for the status of each component or the components periodically send the monitoring system 220

22

their status. Either mechanism along with many other methods result in an effective monitoring system and process for a hosted cluster system 200. The clients have the option of having additional monitoring components on each node to monitor additional components as requested by the client. Since SNMP is very expandable and configurable, the additionally monitored components easily integrate into the existing system 200." – this more or less says that anything related to the operation of the components can be monitored, and on top of that, additional things for monitoring can be added (thus using the term "operational" as a broad term that covers everything around the operation of the node/cluster/etc.

62.    Accordingly, when read in view of the claim language and the specification, a POSITA would understand with reasonable certainty what constitutes "operational and connectivity problems" in the context of the claimed hosted cluster system. The term describes recognizable classes of system failures that are commonly understood in distributed computing and networking, and the specification provides sufficient context and examples to confirm that meaning. Therefore, the term "operational and connectivity problems" is not indefinite.

### b. "hardware and software problems" (Claim 1)

63.    A POSITA would understand the term "hardware and software problems" according to its plain and ordinary meaning in the context of clustered computing systems. It is further my opinion that this term is not indefinite.

64.    "Hardware problems" refer to problems arising from malfunction or failure of physical components of a computing node, such as processor faults, memory errors, storage device failures, or other physical component malfunctions.

65.    "Software problems" refers to problems arising from malfunction of software executing on a node, such as software crashes, execution errors, misconfiguration, or other failures in software operation.

66.    These are well-known technical concepts in computer engineering and systems administration, and a POSITA would readily understand what constitutes a hardware problem versus a software problem without requiring additional detail.

67.    The '841 Patent specification confirms this meaning by describing a monitoring system architecture in which node-level monitoring is responsible for monitoring hardware and software components on each cluster node. Specifically, the specification states:

> 7:43-50: "The monitoring system described has two main components: a per-node monitoring system (not shown), such as the Intelligent Platform Management Interface (IPMI), that monitors the hardware and software components

24

on each cluster node and a central monitoring system 220 and 330 that monitors the network connectivity of each node along with verifying that each nodes' per-node monitoring system is functioning."

68.    This disclosure makes clear that "hardware and software problems" refer to faults local to a particular cluster node, detected by the per-node monitoring system. A POSITA would understand from this disclosure that the per-node monitoring system monitors node hardware and software components specifically to identify failures or malfunctions in those components, which is consistent with the ordinary technical meaning of "hardware problems" and "software problems."

69.    The specification further distinguishes this node-level monitoring from the central monitoring system, which monitors network connectivity and verifies node availability. This division between per-node monitoring of hardware/software faults and centralized monitoring of connectivity and availability issues reflects a well-understood monitoring architecture in distributed cluster environments.

70.    Accordingly, a POSITA would understand with reasonable certainty what constitutes "hardware and software problems" in the context of the claimed invention, and the term is not indefinite.

25

### c. "wherein the first configuration differs from the second configuration" (Claim 1)

71.    A POSITA would understand the phrase "wherein the first configuration differs from the second configuration" according to its plain and ordinary meaning in the context of clustered computing systems. In this field, a "configuration" refers to the arrangement, setup, and parameters of a cluster or computing system, including hardware resources, software environment, network topology, access controls, and operational settings used to perform assigned tasks. The phrase "differs from" simply requires that the two configurations are not identical - i.e., that at least one aspect of the first configuration is different from the second configuration. No particular degree or quantitative measure of difference is required. A POSITA would readily understand that the limitation is satisfied whenever the two clusters are configured differently in any meaningful way, and therefore the term is not indefinite.

72.    The patent specification repeatedly uses the term "configuration" in a manner consistent with this ordinary technical understanding. For example, the specification explains that different types of clusters are defined by their configurations:

> 2:13-18 "A load balancing cluster is a configuration in which a server sends small individual tasks to a cluster of additional servers when it is overloaded. The high availability cluster is

26

a configuration in which a first server watches a second server and if the second server fails, then the first server takes over the function of the second server."

73.    This disclosure demonstrates that "configuration" refers to how a cluster is arranged and operated to perform a particular task, and that different configurations correspond to different functional roles.

74.    The specification further explains that the invention is directed to hosting multiple clusters that are each configured for particular tasks or applications:

> 2:57-60: "To address the above and other problems, the present invention provides methods and systems for hosting a plurality of clusters that are each configured for a particular task or computing application presented by a user or client."

75.    The specification then expressly describes first and second clusters having different configurations and explains what it means for those configurations to differ:

> 3:8-25 "The system includes a first cluster including a set of computing resources such as processing nodes, data storage, and a private communications network that is arranged or implemented in a first configuration. The system also includes a second cluster having a set of computing resources in a second configuration, which differs from the first configuration (e.g., both may be HPC clusters but be configured to handle a different client-assigned or defined

27

task). The first configuration provides a first computing environment for performing a first client task while the second configuration provides a second computing environment for performing a second client task (which typically will differ from the first client task). The first and second configurations may differ due to configuration of the processing nodes in the clusters, based on configuration of the data storage, based on the private communications network or its connections, or based on software modules provided on the nodes, or based on other hardware or software components and/or configurations."

76. This citation directly addresses the claim language and provides multiple concrete examples of how configurations may differ, including differences in hardware, software, networking, and task assignment. A POSITA would therefore have no difficulty understanding what it means for one configuration to differ from another.

77. The specification further illustrates that "configuration" includes network connectivity and access arrangements, as well as authentication mechanisms applied to clusters:

5:61-6:13 "One useful configuration of the system 200 and mechanism 210 is to give each cluster 250, 251, 252 its own public address… Another configuration of the system 200 and mechanism 210 is to have each client 210 connect to a

different service on the firewall 210… Another configuration for system 200 and mechanism 210 is for client system 208 to connect to a common service on the firewall 210, and have the firewall 210 authenticate the user."

78.    This disclosure confirms that "configuration" encompasses networking, access control, and authentication arrangements, further demonstrating that the term has a well-understood technical meaning.

79.    The specification also explains that cluster configurations may differ dynamically in response to user needs, depending on performance or communication requirements:

6:48-57 "In contrast, the system 200 is adapted such that each of the clusters 250, 251, 252 may have a differing configuration with such configuration being dynamically established in response to a user or customer's request so as to be better suited to perform their task. For example, the task may be handled better with a cluster configuration designed to provide enhanced processing or enhanced data storage. In other cases, the task may best be served with a cluster configured for very low latency or a cluster with increased bandwidth for communications between nodes and/or accessing storage."

80.    Finally, the specification explicitly explains what the inventors intended by the term "configuration" in the context of clusters:

10:37-49 "Clustering software is often implemented on top of an operating system, and such clustering software controls operation of the nodes on the various assigned tasks in a particular manner (e.g., based on the configuration of the hardware and software). The use of the term 'configuration' with regard to a cluster is intended to encompass not only the physical components selected for a cluster and their interconnections with each other in the cluster and the topology of the cluster, but, at least in some cases, configuration also includes configuration of the software running on the computing resources of the cluster which may include any clustering software utilized to manage the cluster."

81.    This express statement leaves no ambiguity as to what the inventors meant by "configuration."

82.    Accordingly, when read in view of the claims and the specification, a POSITA would understand with reasonable certainty what is meant by "wherein the first configuration differs from the second configuration." The term requires only that the two clusters are configured differently in at least one respect, and the specification provides ample guidance as to the types of differences contemplated. Therefore, the claim limitation is not indefinite.

30

### d. "communications within the first and second clusters are isolated" (Claim 8)

83.    Claim 8 recites:

8.    The system of claim 1, wherein the public communications network is accessible by clients accessing the first and second clusters and wherein the system further comprises a monitoring system linked to the private communications network for monitoring operation of the first and second clusters, wherein the first and second clusters each comprise a private cluster network for communications among the computing resources of a particular cluster and a gateway mechanism positioned between the private cluster network and the private communications network, whereby the communications within the first and second clusters are isolated.

84.    A POSITA would understand the phrase "communications within the first and second clusters are isolated" according to its plain and ordinary meaning, which is simply that communications occurring within each cluster are kept separate from communications occurring outside that cluster, including communications within the other cluster.

85.    The claim language itself provides the structural basis for this isolation by expressly requiring that each cluster includes its own private cluster network for internal communications and a gateway mechanism positioned between the private

31

cluster network and the private communications network. In view of this claim language, the phrase "communications … are isolated" means what it says and would be readily understood by a POSITA with reasonable certainty.

86.    I understand the Defendant proposed the following construction for the term: "Network traffic within each cluster is maintained separate from other clusters by a gateway positioned between the private cluster network and the private company network that manages traffic destined for its corresponding cluster."

87.    Defendant's proposed construction is unnecessary because it largely restates limitations that already appear explicitly in the claim, including the existence of a gateway mechanism positioned between the private cluster network and the private communications network, which provides the structural basis for isolation of the communications within each of the first and second clusters.

88.    Moreover, Defendant's construction adds additional functional language such as the gateway "manag[ing] traffic destined for its corresponding cluster" that is not required by the claim language. Since the claim already recites the relevant networking structure and expressly states the resulting isolation, there is no need to import additional requirements into the term beyond its plain and ordinary meaning.

32

89.    Furthermore, the specification describes example embodiments in which communications within clusters are isolated using private cluster networks and one or more gateway mechanisms.

> For example, the specification explains that "numerous cluster arrangements and embodiments are possible," and describes an embodiment in which a firewall and authentication system may be provided on a per-cluster basis, with gateways positioned between the private company network and the clusters.

90.    In that embodiment, a gateway is used to connect the private cluster network to the private company network, while the firewall and authentication system connects the public network to the private cluster network. This disclosure is expressly and clearly presented as one possible configuration, not as a definition of "isolated" or a limitation on the claim scope:

> 9:7-29 "Numerous cluster arrangements and embodiments are possible given these components. The system design shown in FIG. 2 has a central authentication and firewall system 210; however, the authentication and firewall system 210 may be provided on a per-cluster basis, giving each cluster 250, 251, 252 its own firewall and authentication system. Such a system 400 may be configured as shown in FIG. 4. The system 400 includes clusters 250, 251, 252, gateways 240, 241, 242 between a private company network

33

230 and monitoring system 220 and the clusters, and private cluster networks 300, 301, 302. In the system 400, a firewall and authentication system 410, 411, 412 is provided for each cluster 250, 251, 252. Each firewall and authentication system 410, 411, 412 is configured to only allow a particular client (or clients if more than one client were provided access to a particular customized cluster) to access the corresponding cluster 250, 251, 252. In such a configuration, the firewall and authentication system 410, 411, 412 connects the public network 200 to the private cluster network 300, 301, 302. In this situation, the gateway 240, 241, 242 is used to connect the private cluster network 300, 301, 302 to the private company network 230, which has the monitoring system 220."

91. A POSITA would therefore understand that the claim language itself governs, and that the term "communications within the first and second clusters are isolated" has a plain and ordinary meaning, namely, that internal communications within each cluster occur on a private cluster network that is segregated from other clusters and from broader networks, with access mediated through the claimed gateway mechanism.

92. The specification's discussion of alternative architectures confirms that the patent contemplates multiple ways of implementing such isolation, and does not

34

require importing additional limitations such as a specific gateway traffic-management function into the claim term beyond what is expressly recited.

### e. "high performance cluster" (Claim 9)

93.    Claim 9 recites:

9. The system of claim 1, wherein the first configuration configures the first cluster as a high performance computing cluster and wherein the second configuration configures the second cluster as a load balancing cluster or a high availability cluster.

94.    A POSITA would understand the term "high performance computing cluster" according to its plain and ordinary meaning. Further, it is my opinion that this term is not indefinite.

95.    Each of the words in this phrase has a well-established ordinary meaning, both in common usage and in the field of computer systems. In the computing context in particular, those ordinary meanings are applied in a straightforward manner: "high performance" refers to computing systems designed or configured to achieve high throughput, speed, and/or computational capability as compared to conventional systems, "computing" refers to the execution of computational tasks and "cluster" refers to a group of interconnected computers or computing nodes that operate together as a system. Read together, the phrase "high performance computing cluster" would be understood by a POSITA to mean a

35

cluster of interconnected computing resources configured to perform computationally intensive tasks, typically using parallel or distributed processing.

96. The claim further reinforces this understanding by contrasting a "high performance computing cluster" with other well-known cluster configurations such as "load balancing" and "high availability" clusters, confirming that the term is used in its ordinary technical sense and is not indefinite. This is also confirmed by the patent specification:

> 1:32-55 "As one example, High Performance Computing (HPC) clusters are difficult to setup, configure, and manage. An HPC cluster also requires numerous resources for ongoing maintenance that increases the cost and manpower associated with cluster ownership. Despite these issues, a company may require or at least demand HPC clusters (or other cluster types) to solve large problems that would take an inordinate amount of time to solve with a single computer. The need for HPC and other cluster types is in part due to the fact that processor speeds have stagnated over the past few years. As a result, many companies and other organizations now turn to HPC clusters because their problems cannot be solved more rapidly by simply purchasing a faster processor. These computer users are placed in the difficult position of weighing the benefits of HPC clusters against the resources consumed by owning such clusters. Decision makers often solve this dilemma by not purchasing clusters, and clusters

36

have remained out of reach of some clients as the resource issues appear insurmountable.

When utilized, HPC systems allow a set of computers to work together to solve a single problem. The large problem is broken down into smaller independent tasks that are assigned to individual computers in the cluster allowing the large problem to be solved faster."

97.    The specification further confirms that "high performance computing (HPC) clusters" are a well-known class of cluster computing systems and distinguishes them from other well-known cluster configurations such as "load balancing" and "high availability" clusters.

98.    For example, the specification explains that "tasks and computing situations that would benefit from HPC clusters continues to rapidly grow," and contrasts HPC clusters with "load balancing cluster" and "high availability cluster" configurations. The specification's discussion reflects that these are established categories of cluster architectures recognized by a POSITA, and the claim language uses them in precisely that ordinary technical sense.

2:5-18 "Unfortunately, while the number of tasks and computing situations that would benefit from HPC clusters continues to rapidly grow, HPC clusters are not being widely adopted. In part, this is because HPC clusters require the most computers of any cluster type and, thus, cause the most

37

problems with maintenance and management. Other types of clusters that have been more widely adopted include the "load balancing cluster" and the "high availability cluster," but resources are also an issue with these clusters. A load balancing cluster is a configuration in which a server sends small individual tasks to a cluster of additional servers when it is overloaded. The high availability cluster is a configuration in which a first server watches a second server and if the second server fails, then the first server takes over the function of the second server."

99.     The fact that the specification provides brief background descriptions of load balancing and high availability clusters does not suggest that the term "HPC cluster" is unclear; rather, it confirms that the patent is using these terms as conventional classifications of cluster computing systems, and a POSITA would readily understand "high performance computing cluster" to refer to a cluster configured for high computational performance and throughput.

100.    Furthermore, A POSITA would not interpret the absence of an explicit definition of "HPC cluster" as creating ambiguity, because the term was widely used in the field and is used consistently in the patent as a contrast to other conventional cluster types.

**B.     The '584 Patent**

101.    Claim 1 recites:

1. A computer system, comprising:

a private communications network linked to a public communications network;

a first cluster comprising a set of computing resources, including at least one hardware processor, in a first configuration, wherein the first cluster is communicatively linked to the private communications network;

a second cluster comprising a set of computing resources, including at least one hardware processor, in a second configuration, wherein the second cluster is communicatively linked to the private communications network; and

a monitoring system to monitor operations of the first cluster and the second cluster for communications problems;

wherein the first configuration differs from the second configuration;

wherein the first configuration provides a first computing environment to perform a first client task and the second configuration provides a second computing environment to perform a second client task; and

wherein the computing resources comprise processing nodes, data storage shared by the processing nodes, and at least one

39

communications network to link the processing nodes to each other and to the data storage;

wherein the first cluster establishes communications between the set of computing resources of the first cluster and a first gateway communicatively linked between the first cluster and the private communications network;

wherein the second cluster establishes communications among the set of computing resources of the second cluster and a second gateway communicatively linked between the second cluster and the private communications network;

wherein communications between the first cluster and the second cluster are isolated;

wherein the first cluster is a high performance cluster; and

wherein the second cluster is a high performance cluster.

102. Claim 10 recites:

10. A computer system, comprising:

a firewall communicatively linked to a public network and a private network;

a first private cluster network comprising:

a <u>first high performance computing (HPC) cluster</u> comprising a set of computing resources comprising at least one processing device in a first configuration; and

a first gateway communicatively linked between the first HPC cluster and the private network;

a second private cluster network comprising:

a <u>second HPC cluster</u> comprising a set of computing resources in a second configuration; and

a second gateway communicatively linked between the second HPC cluster and the private network; and

a monitoring system to monitor operation of the first private cluster network and the second private cluster network;

<u>wherein the first configuration differs from the second configuration</u>;

wherein the first configuration provides a first computing environment to perform a first client task;

wherein the second configuration provides a second computing environment to perform a second client task;

wherein the firewall limits communications from a first client associated with the first client task to connections with the first cluster;

41

wherein the firewall limits communications from a second client associated with the second client task to connections with the second cluster; and

wherein communications between the first HPC cluster and the second HPC cluster are isolated.

### a. "high performance cluster" / "high performance computing cluster" (Claims 1 and 10)

103. A POSITA would understand the term "high performance cluster" / "high performance computing cluster" according to its plain and ordinary meaning. It is further my opinion that this term is not indefinite.

104. Each word in the phrase has a well-established ordinary meaning, both in common usage and in the field of computer systems.

105. In the computing context, "high performance" refers to systems designed or configured to provide high computational throughput, speed, and/or processing capability as compared to conventional computing systems; "computing" refers to the execution of computational tasks; and "cluster" refers to a group of interconnected computers or computing nodes that operate together as a unified system. Read together, a POSITA would understand "high performance cluster" / "high performance computing cluster" to mean a cluster of interconnected computing resources configured to perform computationally intensive tasks, typically through parallel or distributed processing.

42

106. The claims of the '584 patent reinforce this understanding by expressly identifying "high performance computing clusters" as one type of cluster configuration and contrasting them with other well-known cluster configurations.

107. For example, independent claims 1 and 10 recite clusters that may be configured as high performance computing clusters, while other claims refer to load balancing and high availability cluster configurations. This contrast confirms that "high performance computing cluster" is used in its ordinary technical sense, not as a term requiring special definition.

108. The patent specification confirms that "high performance computing (HPC) clusters" are a well-known class of computing systems. The specification explains that HPC clusters are designed to allow multiple computers to work together to solve large computational problems by dividing those problems into smaller tasks that can be processed in parallel:

> 1:39-62 "As one example, High Performance Computing (HPC) clusters are difficult to setup, configure, and manage. An HPC cluster also requires numerous resources for ongoing maintenance that increases the cost and manpower associated with cluster ownership. Despite these issues, a company may require or at least demand HPC clusters (or other cluster types) to solve large problems that would take an inordinate amount of time to solve with a single computer. The need for HPC and other cluster types is in part due to the

fact that processor speeds have stagnated over the past few years. As a result, many companies and other organizations now turn to HPC clusters because their problems cannot be solved more rapidly by simply purchasing a faster processor. These computer users are placed in the difficult position of weighing the benefits of HPC clusters against the resources consumed by owning such clusters. Decision makers often solve this dilemma by not purchasing clusters, and clusters have remained out of reach of some clients as the resource issues appear insurmountable.

When utilized, HPC systems allow a set of computers to work together to solve a single problem. The large problem is broken down into smaller independent tasks that are assigned to individual computers in the cluster allowing the large problem to be solved faster."

109.    The specification further confirms that HPC clusters are an established category of cluster computing systems by expressly distinguishing them from other well-known cluster configurations, such as load balancing clusters and high availability clusters:

2:12-25 "Unfortunately, while the number of tasks and computing situations that would benefit from HPC clusters continues to rapidly grow, HPC clusters are not being widely adopted. In part, this is because HPC clusters require the most computers of any cluster type and, thus, cause the most

44

problems with maintenance and management. Other types of clusters that have been more widely adopted include the "load balancing cluster" and the "high availability cluster," but resources are also an issue with these clusters. A load balancing cluster is a configuration in which a server sends small individual tasks to a cluster of additional servers when it is overloaded. The high availability cluster is a configuration in which a first server watches a second server and if the second server fails, then the first server takes over the function of the second server."

110. This discussion demonstrates that the patent uses "high performance computing cluster," "load balancing cluster," and "high availability cluster" as conventional classifications of cluster architectures that would be readily recognized by a POSITA. The fact that the specification provides brief explanatory descriptions of load balancing and high availability clusters does not imply that the term "HPC cluster" is unclear. Instead, it reflects that these are well-understood categories in the art and that the patent relies on their ordinary technical meanings.

111. Accordingly, a POSITA would not interpret the absence of an explicit definition of "high performance computing cluster" as creating ambiguity. To the contrary, the term was widely used and well understood in the field at the time of the invention, and the '584 patent uses it consistently with that established

45

understanding. Therefore, "high performance computing cluster" has a plain and ordinary meaning and is not indefinite.

### b. "communications between the first [HPC] cluster and the second [HPC] cluster are isolated" (Claims 1 and 10)

112. A POSITA would understand the limitation "communications between the first [HPC] cluster and the second [HPC] cluster are isolated" according to its plain and ordinary meaning.

113. In the context of clustered computing systems, "communications … are isolated" means that communications associated with one cluster are kept separate from communications associated with the other cluster, such that the two clusters do not directly exchange communications with one another or can only do so in a controlled and segregated manner. In other words, inter-cluster communications are separated so that the clusters operate independently and do not interfere with one another.

114. The claim language itself provides structural context for this isolation. Claims 1 and 10 recite separate private cluster networks and separate gateways communicatively linked between each cluster and the private communications network. Read in that context, the "isolated" limitation describes the resulting separation of communications between the clusters.

46

115.    A POSITA would understand that this limitation expresses the intended outcome of the claimed networking arrangement, rather than requiring that a particular device perform a specific traffic-management function beyond what is already recited.

116.    Defendant's proposed construction "Network traffic within each cluster is maintained separate from other clusters by a gateway positioned between the private cluster network and the private company network that manages traffic destined for its corresponding cluster" is unnecessary and improper because it alters the claim language and adds requirements that are not recited.

117.    First, Defendant's construction substitutes "within" for "between," even though the claim expressly requires that communications **between** the first and second clusters are isolated. This distinction is significant. "Between" refers to inter-cluster communications, whereas "within" refers to intra-cluster communications. The claim limitation does not require defining or restricting communications internal to each cluster; instead, it requires that communications between the two clusters be isolated from each other.

118.    Second, Defendant's proposed construction adds additional functional language such as requiring that the gateway "manage traffic destined for its corresponding cluster" that is not required by the claim language. While the claims

47

recite gateways and their connectivity, they do not require any additional specific traffic-handling implementation beyond what is recited.

119. A POSITA would therefore understand that Defendant's proposed construction improperly imports additional functional limitations into the term "isolated."

120. Furthermore, because claims 1 and 10 already expressly require distinct gateways connected between each cluster and the private communications network, there is no basis in the claim language to import additional gateway functionality into the meaning of the term "isolated."

121. Accordingly, the limitation should be given its plain and ordinary meaning in view of the surrounding claim language and the specification.

> 9:17-38: "Numerous cluster arrangements and embodiments are possible given these components. The system design shown in FIG. 2 has a central authentication and firewall system 210; however, the authentication and firewall system 210 may be provided on a per-cluster basis, giving each cluster 250, 251, 252 its own firewall and authentication system. Such a system 400 may be configured as shown in FIG. 4. The system 400 includes clusters 250, 251, 252, gateways 240, 241, 242 between a private company network 230 and monitoring system 220 and the clusters, and private cluster networks 300, 301, 302. In the system 400, a firewall and authentication system 410, 411, 412 is provided for each

48

cluster 250, 251, 252. Each firewall and authentication system 410, 411, 412 is configured to only allow a particular client (or clients if more than one client were provided access to a particular customized cluster) to access the corresponding cluster 250, 251, 252. In such a configuration, the firewall and authentication system 410, 411, 412 connects the public network 200 to the private cluster network 300, 301, 302. In this situation, the gateway 240, 241, 242 is used to connect the private cluster network 300, 301, 302 to the private company network 230, which has the monitoring system 220."

122.    This disclosure confirms that gateways and private cluster networks are described as part of example embodiments that achieve separation between clusters. A POSITA would understand that such structures support isolation of communications between clusters but would not interpret this embodiment as redefining the claim language to require a specific gateway implementation or the additional "traffic management" functionality proposed by Defendant.

### c. "wherein the first configuration differs from the second configuration" (Claims 1 and 10)

123.    A POSITA would understand the phrase "wherein the first configuration differs from the second configuration" according to its plain and ordinary meaning in the context of clustered computing systems. In this field, a "configuration" refers to the arrangement, setup, and operational parameters of a

49

cluster, including its hardware resources, software environment, networking architecture, access controls, and other settings used to perform assigned computing tasks. It is further my opinion that this term is not indefinite.

124.   The phrase "differs from" simply requires that the two configurations are not identical, i.e., that at least one aspect of the first configuration is different from the second configuration. No particular degree or quantitative measure of difference is required. A POSITA would readily understand that this limitation is satisfied whenever the two clusters are configured differently in any meaningful respect, and therefore the phrase is not indefinite.

125.   The patent specification consistently uses the term "configuration" in a manner that aligns with this ordinary technical understanding. For example, the specification explains that different types of clusters are defined by their configurations:

> 2:20-25 "A load balancing cluster is a configuration in which a server sends small individual tasks to a cluster of additional servers when it is overloaded. The high availability cluster is a configuration in which a first server watches a second server and if the second server fails, then the first server takes over the function of the second server.

50

126. This disclosure demonstrates that "configuration" refers to how a cluster is arranged and operated to perform a particular function, and that different configurations correspond to different operational roles.

127. The specification further explains that the invention is directed to hosting multiple clusters that are each configured for particular tasks or applications:

> 2:64-67 "To address the above and other problems, the present invention provides methods and systems for hosting a plurality of clusters that are each configured for a particular task or computing application presented by a user or client."

128. The specification then expressly describes first and second clusters having different configurations and explains what it means for those configurations to differ:

> 3:15-33 "The system includes a first cluster including a set of computing resources such as processing nodes, data storage, and a private communications network that is arranged or implemented in a first configuration. The system also includes a second cluster having a set of computing resources in a second configuration, which differs from the first configuration (e.g., both may be HPC clusters but be configured to handle a different client-assigned or defined task). The first configuration provides a first computing environment for performing a first client task while the second configuration provides a second computing

51

environment for performing a second client task (which typically will differ from the first client task). The first and second configurations may differ due to configuration of the processing nodes in the clusters, based on configuration of the data storage, based on the private communications network or its connections, or based on software modules provided on the nodes, or based on other hardware or software components and/or configurations."

129. This passage directly addresses the claim language and provides multiple concrete examples of how configurations may differ, including differences in hardware, software, networking, and task assignment. A POSITA would therefore have no difficulty understanding what it means for one configuration to differ from another.

130. The specification further illustrates that "configuration" includes network connectivity and access arrangements, as well as authentication mechanisms applied to clusters:

6:4-23 "One useful configuration of the system 200 and mechanism 210 is to give each cluster 250, 251, 252 its own public address… Another configuration of the system 200 and mechanism 210 is to have each client 210 connect to a different service on the firewall 210… Another configuration for system 200 and mechanism 210 is for client system 208

52

> to connect to a common service on the firewall 210, and have
> the firewall 210 authenticate the user."

131.  This disclosure confirms that "configuration" encompasses networking, access control, and authentication arrangements, further demonstrating that the term has a well-understood technical meaning.

132.  The specification also explains that cluster configurations may differ dynamically in response to user needs, depending on performance or communication requirements:

> 6:58-67 "In contrast, the system 200 is adapted such that each of the clusters 250, 251, 252 may have a differing configuration with such configuration being dynamically established in response to a user or customer's request so as to be better suited to perform their task. For example, the task may be handled better with a cluster configuration designed to provide enhanced processing or enhanced data storage. In other cases, the task may best be served with a cluster configured for very low latency or a cluster with increased bandwidth for communications between nodes and/or accessing storage."

133.  Finally, the specification expressly explains what the inventors intended by the term "configuration" in the context of clusters:

> 10:46-58 "Clustering software is often implemented on top of an operating system, and such clustering software controls

53

operation of the nodes on the various assigned tasks in a particular manner (e.g., based on the configuration of the hardware and software). The use of the term "configuration" with regard to a cluster is intended to encompass not only the physical components selected for a cluster and their interconnections with each other in the cluster and the topology of the cluster, but, at least in some cases, configuration also includes configuration of the software running on the computing resources of the cluster which may include any clustering software utilized to manager[sic] the cluster."

134.   This express statement leaves no ambiguity as to what the inventors meant by "configuration."

135.   Accordingly, when read in view of the claims and the specification, a POSITA would understand with reasonable certainty what is meant by "wherein the first configuration differs from the second configuration." The limitation requires only that the two clusters are configured differently in at least one respect, and the specification provides ample guidance as to the types of differences contemplated. Therefore, the claim limitation is not indefinite.

### d.  "operational or connectivity problems" (Claims 5 and 6)

136.   Claim 5 recites:

5. The system of claim 1, wherein the monitoring system:

54

identifies <u>operational or connectivity problems</u> based on the monitoring; and

issues an alert in response to the identified operational or connectivity problems indicating a corresponding one of the first cluster or the second cluster or a combination thereof associated with the identified <u>operational or connectivity problems</u>.

137.   Claim 6 recites:

6. The system of claim 5, wherein the monitoring system:

monitors the first and second clusters to identify the <u>operational and connectivity problems</u>; and

monitors for each node of the first cluster and for each node of the second cluster to check for hardware or software problems within a particular node and to report the <u>hardware or software problems</u> to the main monitor.

138.   It is my opinion that a POSITA would understand the term "operational and connectivity problems" according to its plain and ordinary meaning in the context of clustered and networked computing systems. These terms describe well-known categories of system failures and are routinely used by engineers and system administrators in distributed computing environments. It is further my opinion that this term is not indefinite.

55

139.   In this context, "operational problems" refer to failures or issues affecting the functioning of a cluster or node, such as execution failures, availability issues, performance degradation, or malfunctioning hardware or software components. "Connectivity problems" refer to failures affecting the ability of nodes or clusters to communicate over a network, such as loss of network availability, inability to connect, or communication interruptions.

140.   A POSITA would readily understand these terms as describing recognizable classes of failures and would not require an exhaustive list of specific problems to understand their meaning with reasonable certainty.

141.   The patent specification confirms that the inventors used these terms in their ordinary technical sense. For example, the specification explains that the system may include a monitoring system that "monitors the clusters for connectivity and availability or other operational problems on a cluster level and, typically, on a per-node basis."

> 3:35-38 "The system may further include a monitoring system that monitors the clusters for connectivity and availability or other operational problems on a cluster level and, typically, on a per-node basis"

142.   This disclosure demonstrates that the inventors used "operational problems" broadly to refer to problems affecting cluster operation and identified

56

"connectivity" and "availability" as examples of conditions monitored by the system.

143. The specification further explains that the monitoring system distinguishes between node-level problems and network-level problems. In particular, it describes a per-node monitoring system that monitors hardware and software components, and a central monitoring system that monitors network connectivity and node availability.

> 7:53-62 "The monitoring system described has two main components: a per-node monitoring system (not shown), such as the Intelligent Platform Management Interface (IPMI), that monitors the hardware and software components on each cluster node and a central monitoring system 220 and 330 that monitors the network connectivity of each node along with verifying that each nodes' per-node monitoring system is functioning. Each node reports its status back to the main monitoring system 220, 330 through a common mechanism, such as the Simple Network Management Protocol (SNMP)."

144. A POSITA would understand from this disclosure that hardware and software failures are operational problems, while failures in network availability or communication are connectivity problems.

145.    Finally, the specification describes a monitoring process that detects and reports these categories of problems during system operation.

> 8:34-55 "The monitoring system 220 may be implemented with hardware and/or software to perform the monitoring method 500 shown in FIG. 5… [including] monitoring the hardware and software of the node… and monitoring the network availability of each node…"

146.    These disclosures confirm that the term "operational and connectivity problems" refers to well-understood categories of failures in distributed computing systems and is used consistently throughout the specification to describe system conditions monitored during normal operation.

147.    Accordingly, when read in view of the claims and the specification, a POSITA would understand with reasonable certainty what constitutes "operational and connectivity problems." The term is neither subjective nor ambiguous and does not render the claims indefinite.

### e.  "hardware or software problems" (Claim 6)

148.    It is my opinion that a POSITA would understand the term "hardware or software problems" according to its plain and ordinary meaning in the context of clustered computing systems. These are well-established technical concepts that describe common categories of failures encountered in computer systems. It is further my opinion that this term is not indefinite.

58

149.    In this context, "hardware problems" refer to failures or malfunctions of the physical components of a computing node, such as processor faults, memory errors, storage device failures, or other failures of physical hardware. "Software problems" refer to failures or malfunctions of software executing on a node, such as software crashes, execution errors, misconfiguration, or other defects in software operation. A POSITA would readily distinguish between these categories based on ordinary technical usage and experience in system administration and distributed computing.

150.    The patent specification confirms that the inventors used these terms in their ordinary technical sense by describing a monitoring system architecture that separately monitors hardware and software components at the node level. Specifically, the specification explains:

> 7:43–50 "The monitoring system described has two main components: a per-node monitoring system (not shown), such as the Intelligent Platform Management Interface (IPMI), that monitors the hardware and software components on each cluster node and a central monitoring system 220 and 330 that monitors the network connectivity of each node along with verifying that each nodes' per-node monitoring system is functioning."

151. This disclosure makes clear that "hardware or software problems" refer to faults local to an individual cluster node that are detected by the per-node monitoring system, as opposed to network-level or system-wide issues. A POSITA would understand that the purpose of monitoring hardware and software components is to identify failures or malfunctions in those components, which is entirely consistent with the ordinary meaning of these terms.

152. The specification further distinguishes node-level monitoring of hardware and software from centralized monitoring of network connectivity and availability, reflecting a well-known and widely used monitoring architecture in distributed cluster systems.

153. Accordingly, when read in view of the claims and the specification, a POSITA would understand with reasonable certainty what constitutes "hardware or software problems." The term refers to well-understood categories of node-level failures and is not indefinite.

### f.   "means … to limit access …" (Claim 8)

154. Claim 8 recites:

8. The system of claim 1, further comprising means, positioned between the public communications network and the first cluster and the second cluster, to:

limit access to the first cluster to communication access from a first client associated with the first client task; and

limit access to the second cluster to communication access from a second client associated with the second client task.

155. Claim 8 recites a "means … to limit access," which a POSITA would understand as invoking 35 U.S.C. § 112(f). The function recited in the claim is limiting access such that communication access to the first cluster is restricted to a first client associated with a first client task, and communication access to the second cluster is restricted to a second client associated with a second client task. A POSITA would understand this as an access-control function that ensures each client may communicate only with its assigned cluster.

Under 35 U.S.C. §112(f):

Function: Limiting access to the first and second clusters such that only an authorized client associated with a respective client task is permitted communication access to its corresponding cluster.

Structure: Firewall and authentication system/mechanism (e.g., 210), including implementations such as per-cluster firewall/authentication systems/mechanisms (e.g., 410/411/412), and associated software/hardware configured to (1) direct incoming connections to the correct cluster and (2) authenticate the user/client to ensure access only to the authorized cluster, and equivalents thereof.

156.    The patent specification discloses corresponding structure for performing this access-limiting function. In one disclosed embodiment, the structure includes a firewall and authentication system positioned between the public communications network and the clusters. The specification describes this arrangement as follows:

> 5:22–36 "In FIG. 2, one preferred embodiment of a hosted cluster system 200 is illustrated such as it may be provided at a hosting facility typically remote from users or clients (i.e., from their accessing nodes or systems 208). The system 200 has, or is connected to, a public network 204 … which in turn is connected to a firewall and authentication system 210. The authentication system 210 connects to the company network 230, which has a monitoring system 220 for all the customized clusters 250, 251, 252. The company network 230 also has gateways 240, 241, 242 … to each unique cluster 250, 251, 252."

157.    The specification further explains that this firewall and authentication mechanism governs access control and performs two core functions necessary to achieve the claimed access limitation:

> 5:57-6:3 "Access control to the individual clusters 250, 251, 252 is governed by the firewall and authentication mechanism 210. This mechanism 210 may be implemented with several configurations to achieve the goal of ensuring

62

that clients have access to their cluster, and only to their cluster. Each of these configurations performs two primary steps: (1) ensuring that an incoming connection goes to the correct Cluster and (2) ensuring that the incoming user has access to that cluster."

158. Thus, the disclosed structure includes hardware and/or software configured to (1) direct incoming communications to the correct cluster and (2) authenticate the user or client to ensure access only to the authorized cluster.

159. Importantly, the specification makes clear that this access-control structure is not limited to a single implementation. Instead, it discloses multiple alternative configurations for performing the same function, including public-address-based routing, service- or port-based routing, authentication performed at the firewall, and virtual-machine-based isolation:

> 6:4-33 "One useful configuration of the system 200 and mechanism 210 is to give each cluster 250, 251, 252 its own public address … Another configuration … is to have each client connect to a different service on the firewall 210 … Another configuration … is for client system 208 to connect to a common service on the firewall 210 and have the firewall 210 authenticate the user … This is accomplished through common virtual machine technology. All of these possible configurations can co-exist together and are not mutually exclusive. Many other configurations exist that provide per-

63

cluster and per-user authentication, and the above-described configurations … are merely provided as examples."

160. The specification further discloses embodiments in which firewall and authentication functionality is provided on a per-cluster basis, rather than through a single centralized firewall:

> 9:17–38 "Numerous cluster arrangements and embodiments are possible given these components. The system design shown in FIG. 2 has a central authentication and firewall system 210; however, the authentication and firewall system 210 may be provided on a per-cluster basis, giving each cluster 250, 251, 252 its own firewall and authentication system … Each firewall and authentication system 410, 411, 412 is configured to only allow a particular client … to access the corresponding cluster 250, 251, 252."

161. From these disclosures, a POSITA would understand that the corresponding structure for the claimed "means … to limit access" includes firewall and authentication systems or mechanisms, whether centralized or per-cluster, together with associated hardware and/or software configured to direct incoming connections to the appropriate cluster and to authenticate clients so that they may access only their assigned cluster, as well as equivalents thereof.

> Accordingly, the Defendant's apparent attempt to limit the corresponding structure to a single "firewall and

64

authentication mechanism 210" is inconsistent with the specification. The patent expressly teaches that numerous configurations and embodiments are possible, that the disclosed implementations are exemplary rather than limiting, and that multiple alternative structures may be used to perform the same access-limiting function.

162. Accordingly, a POSITA would understand that the claimed "means … to limit access" corresponds to firewall and authentication systems or mechanisms, whether centralized or per-cluster, together with associated hardware and/or software configured to direct incoming communications to the appropriate cluster and authenticate clients so that they may access only their assigned cluster, and equivalents thereof. The function and structure identified above are fully supported by the specification and are not limited to a single embodiment.

**C.    The '282 Patent**

163. Claims 1 recites:

1. A system for distributing an application environment comprising:

a compute node comprising a computer system;

a first storage unit for storing blocks of a <u>root image</u> of the compute node, wherein the first storage unit comprises a first non-volatile memory, wherein the <u>root image</u> comprises a computer program, wherein the blocks comprise sections of

data, and wherein a file of the <u>root image</u> comprises at least one block;

a second storage unit for storing a leaf image, the leaf image comprising <u>new data blocks</u> and changes to the blocks of the <u>root image</u>, wherein the second storage unit comprises a second non-volatile memory; and

a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node, wherein the union block device comprises a driver, wherein the union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit; the union block device comprises a <u>low-level driver</u> for interfacing between the first and second storage units and the file system of the compute node; and the union block device, upon receiving a write request from the compute node for a <u>sector</u> X, creates an <u>appropriate persistent mapping</u> for <u>sector</u> X.

164. Claim 15 recites:

15. A method for distributing an application environment comprising:

storing blocks of a <u>root image</u> of a compute node on a first storage unit, wherein the compute node comprises a

66

computer system, and wherein the first storage unit comprises a first non-volatile memory, wherein the root image comprises a computer program, wherein the blocks comprise sections of data, and wherein a file of the root image comprises at least one block;

storing a leaf image comprising <u>new data blocks</u> and changes to the blocks of the root image on a second storage unit, wherein the second storage unit comprises a second non-volatile memory;

merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit to create the application environment; and

delivering the application environment to the compute node; wherein <u>the modifying</u> comprises: upon receiving a write request from the compute node for a <u>sector</u> X, creating an <u>appropriate persistent mapping</u> for <u>sector</u> X; and writing <u>sector</u> X on the second storage unit.

### a. "root image" (Claims 1, 4, 5, 15, 17, 20, and 21)

165.   A POSITA would understand the term "root image" according to its plain and ordinary meaning. In the field of computer systems and distributed computing, a "root image" is a well-known term referring to a base image of an application environment from which a compute node operates, such as an operating

67

system and associated software components. A POSITA would readily understand that such a root image serves as the foundational environment that may be shared across multiple compute nodes, while node-specific changes may be stored separately.

166.    The specification confirms this understanding by describing the root image as a base image of the application environment that is accessible by compute nodes and provides the common portion of the environment. For example, the specification explains that in a branching store file system, "a read-only base image (or 'root' image) of the application environment is created," and that changes made by a compute node are stored separately in a "leaf" image.

> 1:58-2:3 "A Branching Store File System … In a branching store file system, a read-only base image (or 'root' image) of the application environment is created. The root image is accessible by all compute nodes in the cluster. Changes made by a compute node to the root image are stored in a 'leaf' image unique to that compute node…"

167.    The specification further describes the root image as an application environment (e.g., an operating system) stored in a first storage unit, and contrasts it with a leaf image that stores new data blocks and changes.

> 2:17-31 "An embodiment of the present invention is directed to a system for distributing an application environment to a

68

> compute node … The system includes a first storage unit for storing blocks of a root image (e.g., an operating system) of the compute node and a second storage unit for storing a leaf image comprising new data blocks and changes to the blocks of the root image."

168. The specification also explains that the root image contains data initially common to compute nodes and is not changed by compute nodes, with read-only access described as one embodiment.

> 4:11–16 "System 100 has a first storage unit 140 for storing blocks of a root image of an application environment. The root image contains data initially common to the compute nodes 120 a-n. The root image is not changed by compute nodes 120 a-n. For example, in one embodiment, compute nodes 120 a-n have read-only access to the first storage unit."

169. These disclosures demonstrate that the specification uses the term "root image" in its ordinary technical sense and provides context for how a root image is used within the claimed invention as a shared base application environment.

170. Defendant's proposed construction improperly attempts to incorporate additional limitations into the term "root image," such as requiring that it be "read-only," that it consist of "data blocks," or that it operates "beneath the file system." These limitations are unnecessary and not required by the claim language. The independent claims already recite that the root image is stored as blocks on a first

69

storage unit, and the dependent claims separately recite additional limitations relating to accessibility and read-only storage.

171.  For example, claims 5 and 21 recite that the root image is "concurrently accessible to a plurality of compute nodes," while claims 13 and 29 separately recite that the first storage unit is "read only." A POSITA would understand from this claim structure that read-only storage is not inherent in the meaning of "root image," but rather an additional limitation expressly recited in dependent claims.

172.  Accordingly, the term "root image" should be given its plain and ordinary meaning as understood by a POSITA, namely, a base image of an application environment used by a compute node, and no further construction is necessary.

### b.  "new data blocks" (Claims 1 and 15)

173.  A POSITA would understand the term "new data blocks" according to its plain and ordinary meaning. In the context of storage systems employing a base image and per-node leaf images described in the patent specification, "new data blocks" refers to blocks newly written to the leaf image that store new data generated by or for a compute node, such as data corresponding to newly created files or newly generated content. This term is used in contrast to blocks in the leaf image that store changes to blocks of the root image.

70

4:22-40 "The leaf image may contain blocks of new data, blocks of changed data, or other blocks of data unique to the individual compute node. The leaf image may also contain a block modification log. In other words, a leaf image will describe the changes made by the respective compute node 120 a-n to its instance of the application environment. Thus, when a compute node (e.g., node 120 a) makes changes involving the root image, modifications are made to that compute node's leaf image (e.g., leaf image stored on second storage device 150 a). With respect to changes to the root image, only the specific blocks that are changed are stored in the leaf image. For example, a particular file on the root image may comprise twenty blocks of data (e.g., blocks 1-20). One compute node (e.g., compute node 120 a) desires to make a change to this file which involves a modification of only a few specific blocks of the file (e.g., blocks 4-9). In this example, only the modified blocks (e.g., blocks 4-9) will be stored in the compute node's leaf image (e.g., leaf image stored on second storage device 150 a) plus some small overhead."

174.    The specification confirms this understanding by explaining that the leaf image may contain "blocks of new data" as well as "blocks of changed data," and by describing that the leaf image "includes, but is not limited to, new data blocks for the compute node and blocks of the root image that the compute node has

71

changed." This disclosure demonstrates that the term "new data blocks" distinguishes newly written data from modified root-image data, rather than imposing a requirement that the data content itself must never have existed in the root image.

> 6:3-7 "Step 320 is storing a leaf image on a second storage unit. The leaf image includes, but is not limited to, new data blocks for the compute node and blocks of the root image that the compute node has changed. The leaf image includes a block modification log in one embodiment.

175. Defendant's proposed construction "data blocks that are not present in the root image" is unnecessary and potentially misleading if it is understood to impose a content-identity requirement (i.e., that the same data must never have existed in the root image).

176. A POSITA would instead understand "new data blocks" in the context of the claims as referring to blocks in the leaf image that store data that is new relative to the root image, as distinguished from the other category explicitly recited in the claims: "changes to the blocks of the root image." The specification reinforces this ordinary distinction by explaining that the leaf image may contain "blocks of new data" and "blocks of changed data," and by stating that the leaf image "includes, but is not limited to, new data blocks for the compute node and blocks of the root image that the compute node has changed."

72

177.  Thus, a POSITA would understand "new data blocks" to mean blocks added to the leaf image to store data not contained in the root image (e.g., corresponding to newly created files or newly generated content), and not as an abstract requirement that the same data bytes could never have appeared in the root image in some form.

178.  Accordingly, the term is clear and should be given its plain and ordinary meaning.

### c.  "appropriate persistent mapping" (Claims 1 and 15)

179.  A POSITA would understand the phrase "appropriate persistent mapping" according to its plain and ordinary meaning in the context of the claimed system.

180.  A "sector" refers to a particular unit or location of storage that is specified by a write request. When a compute node issues a write request directed to a particular sector (sector X), the system must determine if/where that sector is stored and how subsequent accesses to that sector are handled.

181.  In this context, a "mapping" refers to an association established by the system between the sector specified by the write request and a particular storage location, such that read and write operations for that sector are directed to the appropriate storage unit. A "persistent" mapping is one that is maintained so that

73

subsequent accesses to the same sector continue to be directed to the same storage location.

182. The specification then applies this concept in the context of the claimed union block device. It explains that, upon receiving a write request for sector X, the union block device creates an appropriate persistent mapping for that sector and writes the data to the second storage unit storing the leaf image.

183. The specification further clarifies that if the data block corresponding to sector X already exists in the leaf image, no additional mapping or copying from the root image is required before modification. From this disclosure, a POSITA would understand that the purpose of the mapping is to redirect write operations for a given sector to the leaf image, while maintaining that association so that subsequent accesses to the same sector continue to be directed to the same location, thereby preserving the integrity of the root image.

> 5:1-11 "UBDs 130 a-n may also modify the leaf image in response to their respective compute node's access to its instance of the application environment. For example, upon receiving a write request from their respective compute nodes for a sector X, the UBDs 130 a-n will create an appropriate persistent mapping for sector X and then write sector X onto their respective second storage units 150 a-n, where sector X can then be modified. It will be appreciated that the data block being modified may already exist in the

74

leaf image, in which case it does not need to be mapped and copied from the root image before modification."

184. The term "appropriate" in this context reflects that the mapping created depends on the state of the system - specifically, whether the sector is already stored in the leaf image or must be newly mapped from the root image before modification.

185. The claims and specification therefore provide objective guidance as to when a mapping is created, what it applies to, and how it is used. A POSITA would understand that the "appropriate persistent mapping" is the mapping required under the circumstances to implement the copy-on-write behavior described in the specification, ensuring that write operations modify the leaf image rather than the root image.

186. Accordingly, a POSITA would understand with reasonable certainty what it means for the union block device to "create an appropriate persistent mapping for sector X."

187. I understand Defendant asserts this claim term is indefinite. However, while the patent does not mandate a particular data structure or specific implementation for the mapping, the fact that multiple implementations may exist does not render the term indefinite. Rather, the claims and specification describe the role and effect of the mapping sufficiently for a POSITA to understand and

implement the claimed functionality. Therefore, the term "appropriate persistent mapping" is not indefinite.

### d. "sector" (Claims 1, 10, and 15)

188. A POSITA would understand the term "sector" according to its plain and ordinary meaning in the context of the claimed system and the claimed union block device. In this context, a "sector" refers to an addressable unit of storage used for read and write operations.

189. When the compute node issues a write request for "sector X," it is directing the system to perform an I/O operation with respect to that particular sector. A POSITA would understand that such a sector may correspond to a physical unit of storage, a logical unit of storage, or an abstraction thereof depending on the implementation of the storage device and driver, and the claims do not limit "sector" to any particular physical disk geometry.

190. This understanding is reinforced by the claim language describing that the union block device includes a low-level driver for interfacing between the first and second storage units and the file system of the compute node.

191. A POSITA would understand that a low-level storage driver operates at the level of addressing and servicing read/write requests to identified storage locations (such as "sector X"), regardless of whether the underlying non-volatile memory is implemented as a hard disk, flash memory, or another storage medium.

76

Thus, the "low-level driver" language does not imply a requirement of physical disk contiguity but instead reflects that the claimed union block device operates at a storage access interface where data is addressed in sectors.

192. The specification further confirms this usage. It explains that, upon receiving a write request from the compute node for "sector X," the union block device creates an appropriate persistent mapping for that sector and then writes sector X onto the second storage unit where it can be modified. The specification further clarifies that the data being modified may already exist in the leaf image, in which case it does not need to be mapped and copied from the root image before modification.

193. A POSITA would understand from this disclosure that "sector" refers to the unit of storage addressed by the write request and used by the union block device in implementing the disclosed copy-on-write behavior, and that the persistent mapping associates that sector with the corresponding storage location in the leaf image.

> 5:1-11 "UBDs 130 a-n may also modify the leaf image in response to their respective compute node's access to its instance of the application environment. For example, upon receiving a write request from their respective compute nodes for a sector X, the UBDs 130 a-n will create an appropriate persistent mapping for sector X and then write

77

sector X onto their respective second storage units 150 a-n, where sector X can then be modified. It will be appreciated that the data block being modified may already exist in the leaf image, in which case it does not need to be mapped and copied from the root image before modification."

194. Defendant's proposed construction "a contiguous portion of the data storage area on a disk" improperly narrows the term by limiting it to a physical disk-specific definition. The asserted claims are not limited to disk drives and instead recite storage units comprising non-volatile memory.

195. Moreover, the claims and specification use "sector" in connection with write requests and mapping behavior performed by the union block device, which is consistent with the ordinary usage of "sector" as an addressable unit of storage access rather than a particular contiguous physical region on a disk platter.

196. Accordingly, Defendant's construction improperly imports a disk-geometry limitation not required by the intrinsic evidence, and the term "sector" should be given its plain and ordinary meaning.

### e. "low-level driver" (Claim 1)

197. A POSITA would understand the term "low-level driver" according to its plain and ordinary meaning in the context of the claimed union block device.

198. A "driver" refers to software that interfaces with and controls access to system resources such as storage devices. In the context of the asserted claims, a

78

"low-level driver" refers to driver software that performs storage access and redirection functionality at a level closer to the storage units than higher-level applications, and that enables the compute node to access the merged application environment provided by the union block device.

199.   The claim language recites that the union block device "comprises a low-level driver for interfacing between the first and second storage units and the file system of the compute node." A POSITA would understand this language as describing the functional role of the driver, namely, mediating access between the storage units and the file system and managing write operations directed to specific storage locations (such as sector X), including the creation of mappings and the redirection of write requests to the leaf image as required by the claimed copy-on-write system. The claims do not require that the driver reside at any particular architectural layer but instead define the driver by its role in enabling access to the merged application environment.

200.   Indeed, the specification describes a preferred embodiment in which the union block devices operate below the file system and are concerned with blocks of data rather than the files they form, resulting in file-system and operating-system independence.

> 4:41-51 "A compute node 120 *a-n* mounts its instantiation of
> the application environment via its respective UBD 130 *a-n*.

The UBDs 130 *a-n* are effectively low-level drivers that operate as an interface between the first and second storage devices and the file system of each compute node 120 *a-n*. The file system may reside on the server side of the system 100. The file system may also reside on each of the compute nodes 120 *a-n*. Because UBDs 130 *a-n* operate below the file system, they are concerned merely with the blocks of data themselves, rather than files they form. As a result, system 100 is completely file system, and thus operating system, independent."

201. In that embodiment, the union block devices are described as "effectively low-level drivers" that operate as an interface between the first and second storage devices and the file system of each compute node. While this disclosure explains the advantages of one implementation, it does not limit the claim scope or require that a "low-level driver" must always operate below the file system in all implementations.

202. The specification further confirms the role of the low-level driver by explaining that, upon receiving a write request for a sector X, the union block device creates an appropriate persistent mapping for that sector and writes the data to the second storage unit storing the leaf image.

5:1-11 "UBDs 130 *a-n* may also modify the leaf image in response to their respective compute node's access to its

80

instance of the application environment. For example, upon receiving a write request from their respective compute nodes for a sector X, the UBDs 130 *a-n* will create an appropriate persistent mapping for sector X and then write sector X onto their respective second storage units 150 *a-n*, where sector X can then be modified. It will be appreciated that the data block being modified may already exist in the leaf image, in which case it does not need to be mapped and copied from the root image before modification. "

203.    A POSITA would understand that processing such write requests and creating mappings to redirect writes to the appropriate storage unit is the type of functionality performed by the claimed low-level driver.

204.    Accordingly, Defendant's proposed construction "driver that operates below the file system" improperly imports a specific architectural limitation from a preferred embodiment into the claims. The claims instead use broader language and do not require file-system independence or a particular layering arrangement. Therefore, the term "low-level driver" should be given its plain and ordinary meaning in view of the claims and specification.

### f.  "the modifying" (Claim 15)

205.    It is my opinion that Claim 15 is not indefinite under plain reading of the claim. A POSITA would understand "the modifying" in claim 15 as a method step whose scope and meaning are defined by the claim language itself. Claim 15

81

recites a sequence of steps for distributing an application environment and then introduces an additional step using the clause "wherein the modifying comprises." It is further my opinion that this term is not indefinite.

206.   That clause immediately specifies the actions that constitute the modifying step, namely, upon receiving a write request from the compute node for a sector X, creating an appropriate persistent mapping for sector X and writing sector X on the second storage unit. Thus, the claim expressly defines what "the modifying" entails.

207.   A POSITA would further understand that "the modifying" refers to modification of the leaf image that occurs when the compute node writes to its instance of the application environment. This understanding is consistent with the overall structure of the claim, which recites storing a leaf image comprising new data blocks and changes to the blocks of the root image, and then describes how write operations result in changes being written to the second storage unit.

208.   This interpretation is confirmed by dependent claim 16, which recites: "The method as recited in claim 15 further comprising: modifying the leaf image in response to the compute node's access to the application environment." Claim 16 expressly identifies the object of the modification as the leaf image and addresses the same modification context introduced in claim 15.

209.   A POSITA would understand claim 16 as clarifying and elaborating on the modifying operation recited in claim 15, not as introducing a new or different concept. The presence of dependent claim 16 confirms that a POSITA would understand what "the modifying" refers to in claim 15.

210.   The specification further reinforces this understanding. For example, the specification describes modifying the leaf image in response to the compute node's access to its instance of the application environment, including copying data blocks from the root image to the leaf image when necessary and modifying blocks in the leaf image. This disclosure aligns with the claim language describing creation of a persistent mapping and writing sector X to the second storage unit.

> '282, Fig. 3, Step 350: "Modifying the leaf image in response to the compute node's access to its instance of the application environment."

> 6:23-30 "Step 350 is modifying the leaf image in response to the compute node's access to its instance of the application environment. The modifying of the leaf image may include copying one or more data blocks from the root image to the leaf image, and modifying the data block in the leaf image. It will be appreciated that the data block being modified may already exist in the leaf image, in which case it does not need to be copied from the root image before modification."

211.  Accordingly, when read in context, claim 15 itself defines the scope and content of "the modifying" by expressly stating the actions that constitute that step. The claim language leaves no ambiguity as to what is being modified, how the modification occurs, or when it occurs. A POSITA would therefore understand with reasonable certainty the meaning and scope of "the modifying," and the term is not indefinite.

### g.  "at an operational level" (Claim 26)

212.  Claim 26 recites:

> 26. The method as recited in claim 15 wherein merging occurs at an operational level between the first and second storage units and file system of the compute node.

213.  Claim 26 is not indefinite under plain reading of the claim. A POSITA would understand the phrase "at an operational level" according to its plain and ordinary meaning in the context of the claimed system.

214.  "Operational" refers to the system's functioning during normal use, i.e., while the compute node is accessing the application environment through its file system and issuing read and write requests. In claim 26, the phrase "at an operational level" is not used in isolation but is tied directly to the claim language stating that "merging occurs … between the first and second storage units and [the] file system of the compute node." A POSITA would understand from this language that the

84

merging occurs as part of the system's actual operation in servicing file system access, rather than as a pre-generated merge performed in advance.

215.    This understanding is consistent with the surrounding claim language and the overall structure of the asserted claims. Claim 15 recites merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit to create the application environment and delivering that application environment to the compute node.

216.    Claim 15 further recites that, upon receiving a write request for a sector X, the union block device creates an appropriate persistent mapping and writes sector X on the second storage unit. These limitations describe a system that dynamically provides a merged application environment to the compute node during operation and updates the leaf image in response to write requests. A POSITA would therefore understand that "merging occurs at an operational level" refers to merging that occurs during runtime operation as part of the system's interaction between the storage units and the compute node's file system.

217.    The specification further supports this understanding by describing that the compute node mounts and accesses its instance of the application environment through the union block device, and that the union block device responds to write requests by creating mappings and writing data to the second storage unit. A POSITA would understand that these operations occur while the system is running

and while the compute node is actively using the application environment, rather than being performed as a one-time, offline merge.

218. Thus, the specification confirms that the claimed "merging" is performed as part of the system's operation in delivering a unified application environment to the compute node.

> 3:62-4:10 "Embodiments of the present invention provide methods and systems for distributing an application environment to one or more compute nodes. FIG. 1 is a diagram of a system 100 for distributing an application environment. In a preferred embodiment, system 100 is implemented in a multi-computer system, such as an HPC cluster. In one embodiment, the application environment includes an operating system. In other embodiments, the application environment may contain other applications. System 100 has a number of compute nodes 120 a-n coupled to a first storage unit and a corresponding second storage unit 150 a-n though a corresponding union block device (UBD) 130 a-n. To compute nodes 120 a-n, it appears that they have access to their own version of a distributed application. However, a separate and complete boot image is not created and stored for each compute node 120 a-n."

> 4:41-51 "A compute node 120 a-n mounts its instantiation of the application environment via its respective UBD 130 a-n. The UBDs 130 a-n are effectively low-level drivers that

86

operate as an interface between the first and second storage devices and the file system of each compute node 120 a-n. The file system may reside on the server side of the system 100. The file system may also reside on each of the compute nodes 120 a-n."

5:1-11 "UBDs 130 a-n may also modify the leaf image in response to their respective compute node's access to its instance of the application environment. For example, upon receiving a write request from their respective compute nodes for a sector X, the UBDs 130 a-n will create an appropriate persistent mapping for sector X and then write sector X onto their respective second storage units 150 a-n, where sector X can then be modified. It will be appreciated that the data block being modified may already exist in the leaf image, in which case it does not need to be mapped and copied from the root image before modification."

219. Accordingly, when read in context, a POSITA would understand with reasonable certainty what it means for "merging [to] occur[] at an operational level between the first and second storage units and file system of the compute node." The claim language makes clear that the merging occurs in the operational data path between the storage units and the compute node's file system as the compute node accesses the application environment.

87

220. The phrase "at an operational level" therefore conveys a clear meaning to a POSITA, namely, that the merging occurs during system operation in connection with file system access, rather than leaving the scope of the claim uncertain. For these reasons, the term is not indefinite.

## D.    The '080 Patent

221. Claim 1 recites:

1. A method of developing a <u>distributed parallel computing program</u>, comprising steps of:

establishing at least one distributed shared variable, wherein the at least one distributed shared variable is a single variable that includes several variables that may be physically distributed across multiple memories;

developing at least one <u>distributed sequential computing program</u> to access the at least one distributed shared variable; and

transforming the at least one distributed sequential computing program into at least one distributed parallel computing program by spawning at least one child distributed sequential computing program from the at least one distributed sequential computing program when at least one intermediate condition occurs within the at least one distributed sequential computing program, wherein the at least one distributed parallel computing program

88

concurrently uses the at least one distributed sequential computing program and the at least one spawned child distributed sequential computing program to perform parallel processing and/or operations, wherein the at least one intermediate condition comprising one intermediate result that will be required by the at least one spawned child distributed sequential computing program to continue computation.

222. Claim 9 recites:

9. A distributed parallel computing system, having at least one memory area and at least one processor, comprising:

at least one distributed shared variable capable of loading into the at least one memory area, wherein the at least one distributed shared variable is a single variable that includes several variables that may be physically loaded into the at least one memory area; and

at least one distributed sequential computing program, configured to operate in the at least one processor, configured to access the at least one distributed shared variable, and configured to transform into at least one distributed parallel computing program by spawning at least one child distributed sequential computing system program when at least one intermediate condition occurs within the at least one distributed sequential program, wherein the at least one

89

distributed parallel computing program concurrently uses the at least one distributed sequential computing program and the at least one spawned child distributed sequential computing program to perform parallel processing and/or operations, wherein the at least one intermediate condition comprising one intermediate result that will be required by the at least one spawned child distributed sequential computing program to continue computation.

### a. "distributed parallel computing program" (Claims 1, 4-6, 9, 17, and 18)

223.    The term "distributed parallel computing program" should be given its plain and ordinary meaning. A person of ordinary skill in the art would understand this term to refer to a program capable of performing parallel computation in a distributed computing context, i.e., a program that enables parallel processing through concurrent execution. The intrinsic record confirms that the patent uses the term in accordance with this ordinary understanding and does not redefine it to require a particular configuration.

224.    The specification describes "distributed parallel computing ('DPC')" as "computing using multiple concurrent DSC programs." This description is consistent with the ordinary technical meaning of distributed parallel computing because it focuses on concurrency and parallel execution through the composition of distributed sequential programs.

90

225.   The specification further explains that, through this approach, original code structure and data structure may be preserved, and that the "intersection" between each composing DSC program and the resulting DPC program may be minimal, consisting of "only local synchronizations."

226.   These disclosures confirm that the patent treats distributed parallel computing primarily as an execution and programming model, achieved through concurrent execution and synchronization, rather than as a program defined by rigid physical requirements such as operating across multiple processors, nodes, and multiple memories:

> 5:57–6:15 "Another aspect of navigational programming is distributed parallel computing ("DPC"), which is computing using multiple concurrent DSC programs. With this aspect, original code structure and data structure may be preserved by virtue of using DSC programs. The 'intersection' between each composing DSC program and the resulting DPC program may be minimal because it may consist of only local synchronizations, which minimizes the code 'pollution' among all the composing DSC programs. The composing DSC programs are said to be 'orthogonal' to the DPC program, and thus parallel distributed programming using DSC self-migrating threads exhibits 'composition orthogonality.' Furthermore, a DPC application targeted to multi-processor environments may be utilized on a uni-

91

processor and operates as a multi-threaded application. Since the memory location information is only used in the hop( ) commands used as annotations in the code to indicate migration, ignoring these commands would result in a multi-threaded program that runs on a uni-processor without further changing its code structure and data structure. In contrast, in a program developed using MP, the memory location information is used not only in the Send( ) and Recv( ) commands, but also in restructuring code structure and data structure, therefore such program would look awkward and become unnecessarily difficult to maintain for uni-processors."

227. Furthermore, the specification citation cited above expressly teaches that the execution environment of a DPC application may vary. In particular, it states that "a DPC application targeted to multi-processor environments may be utilized on a uni-processor and operates as a multi-threaded application."

228. This disclosure is significant because it demonstrates that, as used in the patent, a distributed parallel computing program is not inherently limited to execution across multiple processors or multiple nodes. Instead, the patent recognizes that the same DPC program may be deployed in different environments (including a single-processor environment) and still operate as a parallel application through multi-threaded execution.

229. A POSITA would therefore understand that the defining aspect of a distributed parallel computing program is its concurrent execution model and ability to perform parallel processing, not a mandatory requirement that it must always operate across multiple processors, nodes, and multiple memories.

230. The independent claims are consistent with this understanding and likewise describe the distributed parallel computing program in terms of its formation and operation. Claim 1 recites transforming a distributed sequential computing program into a distributed parallel computing program by spawning at least one child distributed sequential computing program when an intermediate condition occurs, and further recites that the distributed parallel computing program "concurrently uses" the distributed sequential computing program and the spawned child distributed sequential computing program "to perform parallel processing and/or operations."

231. Thus, the claims confirm that the distributed parallel computing program is characterized by concurrent execution and parallel processing, rather than by any requirement that it operate across a particular hardware topology.

232. The specification further reinforces this concept in describing transformations that "convert a DSC application into a DPC application utilizing multiple DSC threads running sequentially or concurrently, thus utilizing parallelization and pipeline opportunities in the sequential computation." This

93

disclosure confirms that the invention is directed to enabling transformation from sequential computation to parallel computation through the use of multiple threads and concurrency opportunities, further supporting that "distributed parallel computing program" refers to a program capable of parallel execution rather than a program limited to a particular hardware arrangement.

> 7:36–52 "In yet another aspect of the invention, transformations are provided to convert a DSC application into a DPC application utilizing multiple DSC threads running sequentially or concurrently, thus utilizing parallelization and pipeline opportunities in the sequential computation. To illustrate different approaches for transformation, FIGS. 3(a), 4(a), and 5(a) depict sequential computations running in a two-dimensional space with spatial s and temporal t dimensions. These computations may be executing in loops, which means they could continue to spread along both dimensions (only two nodes are shown in FIGS. 3(a), 4(a), and 5(a)). Each box in the figures represents a computation. A box marked with R means the computation represented by the box produces intermediate result that will be required by the following computation on the next node, whereas a box marked with NR means the computation on the next node is independent of the computation represented by the box."

94

233. Defendant proposes construing "distributed parallel computing program" as a "program using multiple concurrent distributed sequential computing programs configured to operate across multiple processors/nodes and multiple memories." Defendant appears to rely on the Summary of the Invention section, but that reliance is misplaced. The Summary states only that, "generally," a parallel distributed program is configured to operate across multiple processors/nodes and multiple memories. This statement is descriptive rather than definitional, does not purport to define the claim term, and does not amount to a clear lexicographic definition limiting the scope of the claims.

234. Accordingly, while the specification does describe distributed parallel computing as computing using multiple concurrent DSC programs, Defendant's proposed construction improperly adds additional limitations requiring operation across "multiple processors/nodes and multiple memories." Those added requirements are not supported as definitional limitations by the intrinsic record. To the contrary, as explained earlier, the specification expressly states that a DPC application targeted for multi-processor environments may be utilized on a uni-processor and operate as a multi-threaded application, which is inconsistent with any construction that requires the program to operate across multiple processors or nodes in all cases.

235. Defendant's construction is also improper because it attempts to convert descriptive, exemplary statements in the specification into mandatory claim limitations. The patent discusses that distributed parallel programs may operate in environments involving multiple processors, nodes, and memories, but does not state that every distributed parallel computing program must operate across each of those resources. Instead, the patent emphasizes flexibility of deployment and preservation of code and data structure across different environments. A POSITA would not interpret these disclosures as restricting the scope of the claim term.

236. Moreover, the dependent claims further confirm that specific hardware configurations are not inherent in the term. Dependent claims explicitly recite that the distributed parallel computing program may be configured to operate across multiple processors, across multiple nodes, or using multiple threads, and other dependent claims recite operation across a distributed shared memory system. The presence of these dependent claims demonstrates that such features are additional limitations, not definitional requirements of the independent claim term "distributed parallel computing program." Reading Defendant's proposed hardware and memory requirements into the term would improperly render these dependent claim limitations redundant.

237. Accordingly, the intrinsic evidence demonstrates that "distributed parallel computing program" should be given its plain and ordinary meaning,

96

consistent with the patent's description of DPC as computing using multiple concurrent DSC programs and with the claims' focus on concurrency, spawning, and transformation from sequential to parallel execution. Defendant's attempt to impose additional limitations requiring operation across multiple processors, nodes, and multiple memories is not supported by the intrinsic record and should be rejected.

### b. "distributed sequential computing program" (Claims 1 and 9)

238.  The term "distributed sequential computing program" should be given its plain and ordinary meaning. A person of ordinary skill in the art would understand this term to refer to a program that performs computation sequentially while accessing distributed data.

239.  As used in the patent, "distributed sequential computing program" describes the manner of computation, sequential execution, rather than imposing a rigid structural or architectural limitation on how or where computation must occur.

> 5:50-59 "Another aspect of navigational programming is distributed sequential computing ("DSC"), which is computing using a single locus of computation over distributed data, possibly stored in a DSV. A self-migrating thread may be utilized to perform DSC. For example, for an algorithm that performs computations on a DSV, e.g., A[.], if the algorithm operates on Processor 1 and needs to access data on Processor 2, a single thread, M, can migrate

97

to Processor 2 to   access   the   data   in   the   memory of Processor 2 and then continue the computations."

240.    This description confirms that a distributed sequential computing program involves a "single locus of computation" over distributed data, which a POSITA would understand to refer to a single thread of execution proceeding through the computation, even if that thread migrates between processors to access distributed data. A POSITA would therefore understand that "single locus of computation" describes the logical execution flow of the program, not a requirement that computation be confined to a single processor, node, or memory.

241.    The specification further explains that a self-migrating thread may be utilized to perform distributed sequential computing. In the example provided, a single thread migrates between processors to access distributed data and then continues computation. This disclosure confirms that a distributed sequential computing program may execute across multiple processors or memory locations while remaining sequential in nature.

242.    Thus, even though the computation is "sequential," it is still "distributed" because the data and execution may span multiple processors or memories over time:

> 3:60-4:14 "DSC allows a programmer to develop threads that
> efficiently   access   multiple   memories   spanning   across

multiple processors without having to implement the complicated, tedious, time consuming, and error-prone low-level tasks of message handling in distributed programming. Further, it maintains the original code structure and data structure, i.e., it preserves algorithmic integrity and data structure integrity, in the resulting source code. Moreover, the programmer may follow the principle of pivot-computes, which is defined as the principle under which a computation takes place on the node that owns the large-sized data. Thus, if the data is distributed over a plurality of nodes, e.g., multiple memory areas associated with separate processors, wherein the distribution is disproportionate, e.g., a large portion of the data resides in one area and a smaller portion resides in a separate area, the computation will take place on the node with the larger portion of data, i.e., the pivot node, instead of having the larger portion of data moved, which may affect performance. If the programmer follows the principle of pivot-computes, as an MP programmer usually would, then an application utilizing DSC may be as efficient and scalable as an application utilizing the MP approach."

243. This description confirms that a distributed sequential computing program involves a "single locus of computation," meaning a single location or execution point where the computation proceeds, rather than multiple concurrent execution locations operating in parallel. A POSITA would understand that this

99

describes the sequential nature of the computation, not a requirement that execution remain fixed on a single processor, node, or memory.

244.  The claims are consistent with this understanding. Claim 1 recites "developing at least one distributed sequential computing program to access the at least one distributed shared variable," and further recites that the distributed sequential computing program may be transformed into a distributed parallel computing program by spawning a child distributed sequential computing program when an intermediate condition occurs. This claim language confirms that a distributed sequential computing program is capable of accessing distributed shared data and later serving as the basis for parallel execution. Nothing in the claims requires that the distributed sequential computing program be confined to a single processor or physical location.

245.  Claim 9 similarly recites a distributed sequential computing program "configured to operate in the at least one processor" and configured to access the distributed shared variable and transform into a distributed parallel computing program. The claim language focuses on the program's functional role and execution behavior, not on limiting it to a particular physical or architectural configuration. A POSITA would therefore understand these claims to encompass sequential programs that operate over distributed data and may migrate or execute across different processors as needed.

246.    I understand that Defendant proposes construing "distributed sequential computing program" as a "program using a single locus of computation over distributed data." While the specification indeed uses that phrase in describing distributed sequential computing as cited above, Defendant's proposed construction improperly elevates a descriptive explanation into a rigid definitional limitation. In context, the specification uses "single locus of computation" to contrast sequential execution with parallel execution, not to impose a strict architectural constraint on where computation may occur.

247.    Moreover, adopting Defendant's construction risks importing ambiguity and confusion rather than clarifying the term. A POSITA would understand that a distributed sequential computing program may involve execution across multiple processors through migration while still maintaining a single sequential execution path. Defendant's construction, by contrast, suggests a fixed or singular computational location, which is inconsistent with the specification's express teaching that a single thread may migrate between processors to access distributed data.

248.    Accordingly, the intrinsic evidence demonstrates that "distributed sequential computing program" should be given its plain and ordinary meaning, consistent with the patent's description of sequential computation over distributed data and the claims' focus on program behavior and transformation. Defendant's

101

proposed construction improperly narrows the term by converting an explanatory description into a limiting requirement and should be rejected.

### c.  "parallel processing and/or operations" (Claims 1 and 9)

249.    The term "parallel processing and/or operations" should be given its plain and ordinary meaning. A person of ordinary skill in the art would understand this term to refer to performing multiple computations or operations at the same time, or in overlapping time periods, rather than sequentially one after another.

250.    The phrase "parallel processing and/or operations" describes the functional result of concurrent execution and does not impose any particular requirements on how concurrency is implemented at the operating system, thread-scheduling, or process-management level.

251.    The claims use the term "parallel processing and/or operations" in a straightforward and intuitive manner. Claim 1 recites that the distributed parallel computing program "concurrently uses" the distributed sequential computing program and at least one spawned child distributed sequential computing program "to perform parallel processing and/or operations." This claim language confirms that "parallel processing and/or operations" refers to the use of concurrent execution to carry out work in parallel, without specifying any particular mechanism by which that concurrency must be achieved.

102

252.    The claims do not require any specific threading model, do not describe how threads are scheduled, and do not exclude implementations that involve thread suspension, resumption, or context switching.

253.    The specification is consistent with this understanding. Throughout the disclosure, parallel processing is described in terms of concurrent execution enabled by spawning child programs or threads and allowing those programs to operate simultaneously.

254.    The specification emphasizes that parallelism is achieved by allowing multiple computations to proceed concurrently and by exploiting opportunities for parallelization and pipelining in sequential computation. The focus of the disclosure is on enabling concurrent execution to improve efficiency and flexibility, not on prescribing a particular low-level thread-handling technique.

> 7:36–52 "In yet another aspect of the invention, transformations are provided to convert a DSC application into a DPC application utilizing multiple DSC threads running sequentially or concurrently, thus utilizing parallelization and pipeline opportunities in the sequential computation. To illustrate different approaches for transformation, FIGS. 3(a), 4(a), and 5(a) depict sequential computations running in a two-dimensional space with spatial s and temporal t dimensions. These computations may be executing in loops, which means they could continue to

103

spread along both dimensions (only two nodes are shown in FIGS. 3(a), 4(a), and 5(a)). Each box in the figures represents a computation. A box marked with R means the computation represented by the box produces intermediate result that will be required by the following computation on the next node, whereas a box marked with NR means the computation on the next node is independent of the computation represented by the box."

255.    This disclosure confirms that the patent uses "parallel processing" to describe concurrent execution of multiple threads or computations, regardless of the specific scheduling behavior of those threads. A POSITA would understand that concurrency in practical computing systems may involve a variety of execution models, including time-slicing, context switching, suspension, and resumption, particularly in multi-threaded and distributed environments. Nothing in the specification suggests that parallel processing requires threads to run continuously without termination or resumption.

256.    Defendant proposes construing "parallel processing and/or operations" as "handling multiple threads concurrently without terminating and resuming thread processes." This proposed construction improperly imports limitations that are not supported by the intrinsic record. The claims do not mention termination, suspension, resumption, or any other aspect of thread lifecycle management, and the

104

specification does not describe parallel processing in terms of excluding those behaviors. Therefore, the Defendant's construction attempts to narrow the ordinary meaning of parallel processing by imposing a particular implementation detail that is neither required nor disclosed by the patent.

257.    Furthermore, Defendant's proposed construction would improperly exclude commonplace and well-understood forms of parallel and concurrent execution that a POSITA would consider to fall squarely within the ordinary meaning of "parallel processing." Parallel processing in distributed and multi-threaded systems routinely involves thread scheduling, context switching, and resumption, especially when execution spans multiple processors, nodes, or environments. A POSITA would not interpret the patent's use of "parallel processing and/or operations" to exclude such implementations absent a clear and unmistakable disclaimer, which is not present here.

258.    Accordingly, the intrinsic evidence demonstrates that "parallel processing and/or operations" should be given its plain and ordinary meaning, consistent with the claims' use of concurrent execution and the specification's description of parallelization through spawning and concurrency. Defendant's attempt to limit the term to a specific thread-handling model is unsupported by the intrinsic record and should be rejected.

### d. "multiple nodes" (Claim 6)

259. Claim 6 recites:

> 6. The method of claim 1, wherein the distributed parallel computing program is configured to operate across <u>multiple nodes</u>.

260. The term "multiple nodes" should be given its plain and ordinary meaning. A person of ordinary skill in the art would understand "nodes" in the context of distributed computing to refer to separate computing units or machines participating in a distributed system. Therefore, "multiple nodes" refers to more than one such computing unit capable of participating in distributed execution. The intrinsic record confirms that the patent uses the term "nodes" consistent with this ordinary meaning and does not redefine it to require a particular hardware configuration.

261. The claims confirm that "nodes" are not synonymous with "processors." Claim 4 separately recites operation across "multiple processors," while claim 6 separately recites operation across "multiple nodes." The use of these distinct terms in separate dependent claims indicates that "nodes" and "processors" are different concepts, and that "multiple nodes" should not be construed as merely requiring multiple processors or particular memory arrangements associated with processors.

106

262.   The specification likewise uses "nodes" according to its ordinary meaning. In the Summary of the Invention, the patent states that a parallel distributed program is "generally" configured to operate across "multiple processors/nodes and multiple memories." This statement is descriptive and non-limiting, and it reflects that distributed programs may operate across multiple computing resources. The specification does not define "node" as a "memory area associated with a separate processor," nor does it require that nodes be characterized in terms of memory areas.

263.   Moreover, when the specification discusses nodes in the context of distributed data, it uses "nodes" broadly and provides "multiple memory areas associated with separate processors" only as an example. For instance, the specification explains that "if the data is distributed over a plurality of nodes, e.g., multiple memory areas associated with separate processors," computation may take place on the node owning the larger portion of data (4:3-10). This disclosure confirms that "multiple memory areas associated with separate processors" is merely an exemplary description of nodes in one environment, not a definition limiting the meaning of "nodes" in the claims.

264.   Defendant proposes construing "multiple nodes" as "multiple memory areas associated with separate processors." This construction improperly narrows the term by importing an exemplary description from the specification and treating it as a definitional requirement. The intrinsic record does not redefine "node" in this

107

manner. Rather, the patent uses "nodes" consistent with its plain meaning as separate computing units in a distributed system, and the claims separately recite processors, further confirming that "node" is not limited to a memory-area-plus-processor formulation.

265.    Accordingly, the intrinsic evidence demonstrates that "multiple nodes" should be given its plain and ordinary meaning. Defendant's attempt to limit "nodes" to "multiple memory areas associated with separate processors" is unsupported by the intrinsic record and should be rejected.

### e. "distributed shared memory system" (Claims 17 and 18)

266.    Claims 17 and 18 recite:

17. The method of claim 1, wherein the distributed parallel computing program is configured to operate across a <u>distributed shared memory system</u>.

18. The method of claim 9, wherein the distributed parallel computing program is configured to operate across a <u>distributed shared memory system</u>.

267.    The term "distributed shared memory system" should be given its plain and ordinary meaning. A person of ordinary skill in the art would understand a distributed shared memory system to refer generally to a computing system in which memory is physically distributed across multiple locations or machines but is accessible in a shared manner by programs executing in the system. As used in the

patent, the term describes an execution environment that provides shared access to distributed memory resources and does not impose a particular implementation architecture or memory-management mechanism.

268.    The specification discusses "distributed shared memory" ("DSM") as one known approach to distributed computing and explains that, in this approach, a memory space may span across multiple memories on different processors and may be accessed by multiple threads or tasks. The specification further describes such DSM memory space as "globally accessible" and "built on distributed memories." This discussion appears in the Background of the Invention section and is presented as an illustrative description of a known DSM approach, not as a lexicographic definition of the claim term "distributed shared memory system." The specification uses descriptive language such as "often referred to as" and "may span," indicating that the discussion is explanatory and non-limiting rather than a mandatory definition that restricts claim scope.

> 1:53-2:4 "Another approach is often referred to as "distributed shared memory" ("DSM"), which is illustrated in FIG. 1 b. In this approach, a memory space, which may span across multiple memories indifferent processors, Processors 1 and 2, is dedicated for multiple threads or tasks to access, i.e., it is a globally accessible memory space built on distributed memories. Thus, a thread, X, on one processor, Processor 1, can access data in a memory on another

109

processor, Processor 2, without having to establish another thread. Developing parallel distributed programs using this approach is often easier than using the MP approach, because DSM alleviates the need for major changes in code structure and data structure. However, this approach is generally not as efficient, because it may require a transfer of large amounts of data from the memory on the other processor, Processor 2, to the processor having thread X, Processor 1 and thus may not satisfy the need for high performance parallel computing."

269. A POSITA would understand that describing DSM as "globally accessible" reflects the abstraction provided to the programmer, not a requirement that the system implement a single, unified global address space in a particular architectural manner.

The specification further confirms that DSM is used broadly as an underlying system layer that may be implemented in different environments. For example, the patent explains that a DSM "may be built on top of a physical network of machines," and that higher-level mobile agent systems and navigation protocols may be implemented on top of the DSM. This disclosure reflects that DSM is an infrastructure concept that may be implemented across a network of machines and used as a shared communication medium, further confirming that the term "distributed shared memory

110

system" is not limited to a particular memory architecture beyond its ordinary meaning as shared access to distributed memory resources.

10:17-42 "In another aspect of navigational programming, an explicit-navigation mobile agent system may be built on top of a DSM. A DSM system may be used to serve as communication media for the globally accessible data, or in other words, agent variables. FIG. 7 depicts the functional components of such a system and the dependencies. A DSM 700 may be built on top of a physical network of machines 800. The mobile agent system 600, which may include a compiler and a daemon system, may be built on the DSM 700. An application may be implemented to include explicit agent navigation 500 that uses the mobile agent system 600. The advantages of such a DSM based explicit-navigation system include: 1) It prevents false sharing; 2) Agent migration is faster using DSM; 3) DSM memory consistency protocols can help to reuse the agent variables when the owner agent visits the same node multiple times; 4) Daemon programming on DSM is dramatically simpler than using socket level message passing programming.

In another aspect of navigational programming, an implicit-navigation mobile agent system may be based on a DSM. In this system, a mechanism is included that decides for the agent when and where to migrate, and how the migration is achieved. FIG. 8 depicts a functional design of an implicit-

111

navigation agent system. A DSM 1200 may be built on top of a physical network of machines 1300."

270.  The claims use the term "distributed shared memory system" in a straightforward manner to describe an environment in which the distributed parallel computing program may operate. Claims 17 and 18 recite that the distributed parallel computing program is "configured to operate across a distributed shared memory system." The claims do not describe how such a system must be implemented, do not require a specific memory-coherence model, and do not state that the system must provide a single, globally addressable memory space. Instead, the claims merely require compatibility with a system that provides shared access to distributed memory.

271.  The specification is consistent with this understanding. Throughout the disclosure, the patent describes distributed shared variables that may be physically distributed across multiple memories while remaining accessible to programs executing in a distributed environment.

272.  The specification emphasizes that memory may be physically distributed while being logically shared, enabling programs to access distributed data without requiring explicit message passing or restructuring of code. These disclosures reflect the ordinary understanding of distributed shared memory systems

112

as environments that abstract distributed memory resources into a shared-access model, rather than as systems requiring a particular global-memory architecture.

273.    The specification does not define "distributed shared memory system" using lexicographic language, nor does it limit the term to a specific implementation such as a "globally accessible memory space built on distributed memories." To the contrary, the patent repeatedly emphasizes flexibility of deployment and abstraction of memory location details, allowing programs to operate across different distributed environments without imposing rigid structural requirements. A POSITA would therefore understand the term according to its ordinary meaning, encompassing various forms of distributed shared memory systems rather than a single specific design.

274.    Defendant proposes construing "distributed shared memory system" as a "system that uses a globally accessible memory space built on distributed memories." While such systems may fall within the scope of a distributed shared memory system, Defendant's proposed construction improperly narrows the claim term by importing a particular architectural description that is not required by the claims or specification. The intrinsic record does not require that the shared memory appear as a single global memory space, nor does it restrict the claims to any specific distributed shared memory implementation.

113

275. Also, Defendant's proposed construction risks excluding embodiments and implementations that a POSITA would understand to be distributed shared memory systems, including systems that provide shared access to distributed memory through abstraction, virtualization, or other mechanisms without presenting a single global memory space. Nothing in the claims or specification supports such an exclusion.

276. Accordingly, the intrinsic evidence demonstrates that "distributed shared memory system" should be given its plain and ordinary meaning. Defendant's proposed construction improperly narrows the term by imposing specific architectural requirements that are not supported by the intrinsic record and should be rejected.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

114