# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| INTELLECTUAL VENTURES I LLC and<br>INTELLECTUAL VENTURES II LLC,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN AIRLINES, INC.,<br><br>Defendant. | )<br>)<br>)  Case No. 4:24-cv-980<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF MICHAEL T. GOODRICH
IN SUPPORT OF CLAIM CONSTUCTION**

I, Michael T. Goodrich, hereby declare as follows:

1.     I have been retained as an expert witness by American Airlines, Inc. ("American Airlines") to provide information to the Court concerning patent claims from the perspective of the "person of ordinary skill in the art" ("POSITA"). The opinions set forth below are true to the best of my knowledge, and if called to testify, I can testify competently to them.

2.     I have reviewed United States Patent No. 7,822,841 ("the '841 Patent"), United States Patent No. 8,352,584 ("the '584 Patent"), and United States Patent No. 7,721,282 ("the '282 Patent") (collectively, "the Patents-in-Suit"), as well as their file histories and other documents cited in this declaration.

3.     A list of other recent cases in which I have signed a Protective Order or have testified as an expert either at a trial, hearing, or deposition, or have submitted statements/opinions, is attached in Appendix A of this declaration.

4.     My time is being billed at a rate of $800 per hour plus any direct expenses incurred. My compensation is based solely on the amount of time that I devote to activity related to this case and is in no way affected by any opinions that I render. I receive no other compensation from work on this action. My compensation is not dependent on the outcome of this matter.

## I. QUALIFICATIONS

5.     I summarize some of the relevant information regarding my CV (Appendix A) as follows. I received a Bachelor of Arts degree in Mathematics and Computer Science from Calvin University, in Grand Rapids, Michigan, in 1983, a Master of Science (M.S.) degree in Computer Science from Purdue University, in West Lafayette, Indiana, in 1985, and a Ph.D. in Computer Science from Purdue University in 1987.

6.     I am a Distinguished Professor in the Department of Computer Science at the University of California, Irvine, where I have been a faculty member since 2001. The

1

Distinguished Professor title is a campus-level distinction and is reserved for faculty who have achieved the highest levels of scholarship over the course of their careers. Prior to this, I was a professor in the Department of Computer Science at Johns Hopkins University from 1987-2001.

7.    I have authored or coauthored over 400 publications, including several widely adopted books, such as *Data Structures and Algorithms in Java*, *Data Structures and Algorithms in C++*, *Data Structures and Algorithms in Python*, *Introduction to Computer Security*, and *Algorithm Design and Applications*. Altogether, my publications have, according to Google Scholar, been cited over 19,000 times. My publications include contributions to data structures and algorithms, information visualization, networking, graph algorithms, computational geometry, distributed and parallel algorithms, cloud security, information security and privacy, and algorithm engineering. For example, using the indexing of publications listed in my CV, I have publications on networking and parallel and distributed computing, including publications Ch-1, Ch-3, Ch-6, Ch-10, J-1, J-5, J-7, J-10, J-16, J-19, J-24, J-30, J-38, J-56, J-61, J-69, J-96, C-1, C-2, C-7, C-25, C-26, C-39, C-106, C-112, C-127, C-137, C-228, C-230. Also, several of my textbooks include entire chapters on software engineering, and several of my publications, including Ch-8, Ch-12, J-45, C-53, C-62, C-63, C-64, are on algorithm engineering. In addition, I have many publications on topics specifically relevant to the subjects of the Patents-in-Suit, as I explain below.

8.    The '841 and '584 Patents are directed to distributed computing using clusters of processors in a network, including monitoring clusters for operational problems. '841 Patent at Abstract; '584 Patent at Abstract. Publications of mine that are relevant to this subject include my coauthored publication C-228, where my coauthors and I describe parallel network mapping algorithms, which discover the topological connections between hosts in a computer network using distributed queries. Our methods use a high-probability parametric parallelization of a

2

network clustering technique based on organizing clusters according to the distances between hosts in the network, so that the hosts in a given cluster are closer to the leader for that cluster than to any other cluster leader. In addition, in my publication C-202, my coauthors and I describe an algorithm for clustering nodes in a grid network that is also based on clustering hosts according to their network distance to a cluster leader, but now with capacity constraints, so that each cluster has an upper bound on how large it can be. Further, I have coauthored several publications on methods for visualizing clustered networks, which is a component of network monitoring systems. Such publications of mine include J-48, J-52, J-92, C-61, C-70, C-110, and C-281.

9.      The '282 Patent is directed to technology for caching and indexing for block-level distributed application management. "The system includes a first storage unit for storing blocks of a root image of the compute node and a second storage unit for storing a leaf image comprising new data blocks and changes to the blocks of the root image." '282 Patent at Abstract. Further, the '282 Patent discloses that it operates at the block level, below the file system, and is therefore file system and operating system independent. '282 Patent at 4:48-51. Publications of mine that are relevant to this subject include my publication C-126, in which my coauthors and I studied the problem of authenticated storage, where one can outsource a file system to an untrusted server and yet ensure the file-system's integrity. We introduced "Athos," a platform-independent and user-transparent architecture for authenticated outsourced storage. Using light-weight cryptographic primitives and efficient data-structuring techniques, we designed authentication schemes that allow a client to efficiently verify that a file system is fully consistent with the exact history of updates and queries requested by the client, and which supports this authentication at the block level. In my publication C-203, my coauthors and I introduced "Accountable Storage," which is a framework enabling a client to outsource data blocks to a server while being able (any time after outsourcing) to provably compute how many bits in these blocks were discarded or

3

corrupted by the server. With our accountable storage scheme, a client can be compensated with a dollar amount proportional to the number of corrupted bits (which the client can now provably compute). We integrated our protocol with Bitcoin, supporting automatic compensations. In addition, I have several additional publications on external-memory data structures and algorithms, which operate on memory blocks at a level below the file system, including my publications J-26, C-31, C-33, C-41, C-127, C-156, C-161, C-163, C-166, C-167, C-177, C-208, C-211, C-257.

10.    My research has been supported by grants from the Defense Advanced Research Projects Agency ("DARPA"), the National Security Agency ("NSA"), the Office of Naval Research ("ONR"), the Army Research Office ("ARO"), and the National Science Foundation ("NSF").

11.    In addition, I have consulting experience in matters involving algorithms, cryptography, machine learning, digital rights management, computer security, mobile devices (including power management), networking, software, video streaming, and storage technologies.

12.    I am a Fellow of the American Association for the Advancement of Science ("AAAS"), a Fellow of the Institute of Electrical and Electronics Engineers ("IEEE"), and a Fellow of the Association for Computing Machinery ("ACM"), as well as being named as a Foreign Member of the Royal Danish Academy of Sciences and Letters. I am also a recipient of a Fulbright Scholarship (for senior specialist service to University of Aarhus, Denmark). In addition, I am a recipient of the IEEE Computer Society's Edward J. McCluskey Technical Achievement Award ("for outstanding contributions to the design of parallel and distributed algorithms for fundamental combinatorial and geometric problems") and the Pond Award for Excellence in Undergraduate Teaching. Also, I am an ACM Distinguished Scientist.

4

13. My study of computer and network security topics began as an undergraduate student and continued in graduate school, where my Ph.D. research involved the study of computer system components operating in parallel. My study and interest in computer security continued after my Ph.D., as detailed above and in my CV. In addition, I have reviewed and evaluated research papers on computer security, including cryptography, beginning with work as an associate editor for Journal of Computer & System Sciences, as well as my service on program committees of peer-reviewed Computer Science conferences, including the Conference on Electronic Publishing and the Information Superhighway and the ACM Symposium on Theory of Computing (STOC), the latter for which I chaired and edited the conference proceedings.

14. I am a co-inventor on several U.S. patents, including U.S. Patent No. 7,257,711, "Efficient Authenticated Dictionaries with Skip Lists and Commutative Hashing," which discloses secure distributed data authentication schemes. I am also co-inventor of U.S. Patent No. 7,299,219, "High Refresh-Rate Retrieval of Freshly Published Content using Distributed Crawling," which discloses a technology for quickly retrieving website data that can change frequently, so as to be stored in a search engine. I am also co-inventor of U.S. No. Patent 8,681,145, "Attribute Transfer Between Computer Models Including Identifying Isomorphic Regions in Polygonal Meshes," which teaches how to map one mesh-based computer model to another. In addition, I am co-inventor of U.S. Patent No. 9,152,716, "Techniques for Verifying Search Results Over a Distributed Collection," which discloses a system for searching the Internet so as to produce verifiable search results that can be produced by a search engine.

15. I have taught courses at Johns Hopkins University, Brown University, and University of California, Irvine, at both the undergraduate and graduate levels. Topics of my courses have included computer security, algorithms, data structures, information visualization, computer graphics, networking, algorithm engineering, computational geometry, and parallel

5

processing. In addition, I have mentored 29 PhD students over the years, who have written their PhD theses on topics in algorithms, data structures, information visualizations, networking, parallel processing, and computer security and privacy.

16.    I have served as an editor on several technical journals, including Computational Geometry: Theory and Applications, Journal of Computer & System Sciences, Journal of Graph Algorithms and Applications, Int. Journal of Computational Geometry & Applications, and Information Processing Letters. I have also served on many program committees (PCs) for top conferences and workshops in Computer Science, including serving as PC chair in several instances. Examples include ACM Symposium on Computational Geometry ("SoCG"), ACM Symposium on Theory of Computing ("STOC"), Workshop/Symposium on Algorithms and Data Structures ("WADS"), Algorithm Engineering and Experimentation ("ALENEX"), which I cofounded with Dr. Catherine McGeoch in 1999), IEEE Symposium on Foundations of Computer Science ("FOCS"), ACM-SIAM Symposium on Discrete Algorithms (SODA), International Symposium on Graph Drawing ("GD"), International Colloquium on Automata, Languages, and Programming ("ICALP"), ACM Conference on Computer and Communications Security ("CCS"), European Symposium on Algorithms ("ESA"), IEEE International Parallel and Distributed Processing Symposium ("IPDPS"), ACM Symposium on Parallel Algorithms and Architectures ("SPAA"), ACM Symposium on Advances in Geographic Information Systems ("GIS"), IEEE Symposium on Security and Privacy ("S&P"), IEEE International Conference on Big Data, IEEE International Conference on Data Engineering ("ICDE"), and International Symposium on Algorithms and Computation ("ISAAC"), and DAGS Conference on Electronic Publishing and the Information Superhighway.

6

## II. PERSON OF ORDINARY SKILL IN THE ART

17.    I understand that the factors to be considered in determining the level of ordinary skill in the art to be: (1) the educational level of active workers in the field, including the named inventors of the patent; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; and (5) the sophistication of the technology in the art. I further understand that in a given case, every factor may not be present, and one or more factors may predominate.

18.    Based on my review of the Patents-in-Suit and my consideration of the abovementioned factors, it is my opinion that a person of ordinary skill in the art ("POSITA") as of the respective priority dates for the Patents-in-Suit would have had a Bachelor's degree in electrical engineering, computer science, or the like, and/or two or more years of industry experience in networking and distributed computing. Additional experience may make up for a lack of education and vice versa. For example, each of the Patents-in-Suit discloses inventions involving computational devices and networking.

19.    Based on my training and experience, I believe that I am a person of greater-than-ordinary skill in the relevant art, and I have been since at least the priority dates of the Patents-in-Suit, which I understand permits me to give an opinion about the qualifications of one of ordinary skill at the time of the invention. In addition, I have taught Computer Science topics, including distributed computing and networking, since before the priority dates of the Patents-in-Suit, which provides me with additional experience regarding the knowledge of a person of ordinary skill in the art.

7

### III.  LEGAL UNDERSTANDINGS

20.    I understand that claim construction is the process by which a court determines, as a matter of law, the scope and meaning of terms used in the claims of a patent. I further understand that the goal of this process is to give claim terms the ordinary and customary meaning they would have had to a person of ordinary skill in the art (POSITA) as of the effective filing date, after reading the entire patent and prosecution history.

21.    I understand that the prosecution history of a patent can inform the meaning of some claim language and must be taken into account in construing the claims.

22.    I further understand that it is possible that the specification or prosecution history may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise have to a POSITA. In such cases, I understand that the patentee's definition usually controls.

23.    I understand that the patentee may also disavow the full scope of a claim term through clear and unmistakable statements in the specification or prosecution history.

24.    I understand that, in some cases, the court may consider extrinsic evidence, such as technical dictionaries, treatises, and expert opinions, to understand the underlying technology and the way in which claim terms would be understood by a POSITA at the relevant time. However, such extrinsic evidence should not be used to vary, contradict, expand, or limit the claim language from how it is defined in the specification or prosecution history.

25.    I understand that a patent claim may be held invalid for indefiniteness if the claim, viewed in light of the specification and prosecution history, fails to inform with reasonable certainty those skilled in the art about the scope of the invention. I further understand that definiteness is to be evaluated from the perspective of someone with skill in the relevant art at the time the invention was made (pre-AIA) or at the time the patent was filed (post-AIA).

8

## IV.  OVERVIEW OF PATENTS-IN-SUIT

### A.  The '841 Patent

26.  U.S. Patent No. 7,822,841 (the "'841 Patent"), "Method and System for Hosting Multiple Customized Computing Clusters," to Jeffrey B. Franklin, was filed October 30, 2007, and issued October 26, 2010. The '841 Patent is directed to a computer system for hosting computing clusters for clients, where the system includes compute clusters, each implemented in custom or differing configurations. Each of the configurations provides a customized computing environment for performing particular client tasks. The '841 Patent discloses that configurations may differ due to configuration of the processing nodes, the data storage, or the private cluster network or its connections. In addition, the system includes a monitoring system that monitors the clusters for operational problems on a cluster level and also on a per-node basis. The system controls client access to the clusters by only allowing clients to access their assigned cluster or the cluster configured per their specifications and performing their computing task. Gateway mechanisms isolate each cluster such that communications within a cluster or on a private cluster communications network are maintained separate.'841 Patent at Abstract. For example, the '841 provides a functional block diagram illustrating a hosted cluster system of one embodiment in its Figure 2 (*see also*, '841 Patent at 5:12-7:26):



FIG.2

'841 Patent at Fig. 2.

### B. The '584 Patent

27.    U.S. Patent No. 8,352,584 (the "'584 Patent"), "System and Method for Hosting Customized Computing Clusters," to Jeffrey B. Franklin, was filed September 30, 2010, and issued January 8, 2013. The '584 Patent is a continuation of U.S. Patent Application No. 11/927,921, now the '841 Patent, which is incorporated by reference. '584 Patent at 1:7-10. Thus, the '584 Patent shares the specification of the '841 Patent.

### C. The '282 Patent

28.    U.S. Patent No. 7,721,282 (the "'282 Patent"), "Block-Level I/O Subsystem for Distributed Application Environment Management," to Pradip Kukarni et al., was filed March 30, 3006, and issued May 18, 2010. The '282 Patent is directed to technology for caching and indexing for block-level distributed application management. "The system includes a first storage

10

unit for storing blocks of a root image of the compute node and a second storage unit for storing a leaf image comprising new data blocks and changes to the blocks of the root image. The system further includes a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node. The union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the leaf image stored on the second storage unit." '282 Patent at Abstract. Further, the '282 Patent discloses that it operates at the block level, below the file system, and is therefore file system and operating system independent. '282 Patent at 4:48-51. The '282 Patent illustrates its system for root image caching and indexing in a block-level distributed application environment in Figure 1:



Figure 1

'282 Patent at Fig. 1.

29.    Further, the '282 Patent shows an embodiment of its tree structure for its storage system, showing an exemplary root image and leaf images in Figure 2:

11



Figure 2

'282 Patent at Fig. 2.

## V.  CLAIM CONSTRUCTIONS

### A.  The '841 Patent

30.    Claim 1 recites:

1. A computer system for hosting computing clusters for clients, comprising:

a private communications network linked to a public communications network;

a first cluster comprising a set of computing resources, including at least one hardware processor, in a first configuration, wherein the first cluster is communicatively linked to the private communications network;

a second cluster comprising a set of computing resources, including at least one hardware processor, in a second configuration, wherein the second cluster is communicatively linked to the private communications network; and

a monitoring system monitoring operations of the first and second clusters, identifying operational and connectivity problems, and issuing an alert in response to the identified problems indicating a corresponding one of the first and second clusters associated with the identified problems;

12

wherein the first configuration differs from the second configuration and wherein the first configuration provides a first computing environment for performing a first client task and the second configuration provides a second computing environment for performing a second client task;

wherein the monitoring system comprises a main monitor that operates to monitor the first and second clusters to identify the operation and connectivity problems and further comprises monitors for each node of the first and second clusters operating to check for hardware and software problems within a particular node and to report the hardware and software problems to the main monitor.

### i. "operational and connectivity problems"

31.    Claim 1 of the '841 Patent requires "a monitoring system monitoring operations of the first and second clusters, identifying ***operational and connectivity problems***, and issuing an alert in response to the identified problems indicating a corresponding one of the first and second clusters associated with the identified problems[.]" '841 Patent at claim 1 [emphasis added]. In my opinion, a POSITA could not have ascertained the meaning of the phrase "operational and connectivity problems" with reasonable certainty from the patent's specification and prosecution history, as I explain below.

32.    As an initial matter, the specification of the '841 Patent uses the term "problem[s]" 24 times, but eight of these refer to problems that the '841 Patent proports to solve or computational problems that its system's clusters proport to solve. *See, e.g.,* '841 Patent at 1:32-2:4, 2:57-60, 4:4-9, 4:27-29. The text of the '841 Patent specification discloses operational and connectivity problems at one place:

> The system may further include a monitoring system that monitors the clusters for ***connectivity and availability or other operational problems*** on a cluster level and, typically, on a per-node basis (such as with monitors provided for each node) and issues alerts to operations and/or maintenance personnel based on identified issues.

> '841 Patent at 3:26-31 [emphasis added].

33.    Additionally, the '841 Patent discloses the following flowchart, which includes a box 505 and decision diamond 515 that mention "problem" and "connectivity":



FIG.5

'841 Patent at Fig. 5.

34.    These disclosures teach actions to perform after "operational and connectivity" problems occur, but a POSITA would recognize that the '841 Patent never provides examples or definitions for the metes and bounds of what "operational and connectivity problems" actually are. Moreover, based on my experience, "operational and connectivity problems" is not a term of art that would provide a technical definition that would inform the understanding of a POSITA.

14

35.     For example, a POSITA has no guidance from the specification of the '841 Patent to determine whether the following are "operational and connectivity problems" or normal operational occurrences:

- The bandwidth to a computer in a cluster that is available to the cluster for processing client tasks is reduced by 10% because someone on that computer is streaming a movie over the network.

- A client has forgotten their password and is repeatedly trying to login to a computer host in a cluster. *See, e.g.,* '841 Patent at 5:61-6:23, which discloses user authentication. What if the client is an attacker trying to break into a computer cluster? This would look the same from the perspective of the network. Further, what if the firewall mechanism disclosed in the '841 Patent successfully is blocking this attacker? Is this an operational problem or normal functionality? *See, e.g.,* '841 Patent at 3:40-43, 5:47-60, 6:11-18.

- A client task has been running for 2 hours/2 days/2 weeks, which could either indicate a computationally intensive task or a runaway task that is running in an infinite loop. The '841 Patent provides no guidance on determining if this is an operational problem or a normal occurrence. Indeed, the '841 Patent discloses "companies or organizations may face differing computing challenges and have different needs for a cluster." '841 Patent at 6:26-27.

- The firewalls in a cluster are detecting and stopping malicious packets, but the network and clusters are otherwise functioning normally. Is this a problem or normal occurrence for which the firewalls were put in place to stop? *See, e.g.*, '841 Patent at 3:40-43.

- A client's payment for access to a computer cluster has been denied. *See also, e.g.,* '841 Patent at 2:1-4, 6:26-47 (which discloses "leasing use of a cluster"), 9:59-10:2.

36.     Further, a POSITA would understand that for most network applications, a packet loss of 3% would still be considered good, 15% would be considered medium, and 25% loss would be considered poor. *See, e.g.,* TIPHON,[1] p. 26. The '841 Patent provides no guidance to a POSITA as to the level of packet loss that would be considered a "connectivity problem." For example, is "medium" packet loss a problem or not? What about what would otherwise be considered a "good" level of packet loss? The '841 Patent provides no guidance to answer this

---

[1] "Telecommunications and Internet Protocol Harmonization Over Networks (TIPHON); General aspects of Quality of Service (QoS)," ETSI, TR 101 329, V2.1.1, 1999-06, https://www.etsi.org/deliver/etsi_tr/101300_101399/101329/02.01.01_60/tr_101329v020101p.pdf.

15

question nor the questions listed above. Further, the '841 Patent does not provide any lexicography for "operational and connectivity problems."

37.    Accordingly, in my opinion, the term "operational and connectivity problems" in claim 1 of the '841 Patent is indefinite.

### ii.  "hardware and software problems"

38.    Claim 1 of the '841 Patent requires "and further comprises monitors for each node of the first and second clusters operating to check for hardware and software problems within a particular node and to report the hardware and software problems to the main monitor." In my opinion, a POSITA could not have ascertained the meaning of the phrase "hardware and software problems" with reasonable certainty from the patent's specification and prosecution history.

39.    The text of the specification of the '841 Patent only mentions "hardware or software" problems at one place:

> The monitoring system 220 may be implemented with hardware and/or software to perform the monitoring method 500 shown in FIG. 5. Functionally the system 220 may be thought of as comprising two primary systems: a per-node monitoring system, such as IPMI, that monitors the hardware and software of the node in which it is provided (i.e., in a step 502 of method 500) and a main monitoring system 220 that monitors the network availability of each node and verifies that their per-node monitoring systems are functioning (i.e., as shown with step 505 of method 500). When the per-node monitoring system detects ***a problem with the node hardware or software*** at 510 or the main monitoring system 220 (or dedicated system 330) detects a problem with node availability or the nodes per-node monitoring system at 515, they operate to notify the central monitoring system 220 via a mechanism, such as SNMP, of the problem at 520. When the central monitoring system 220 acknowledges the problem, the per-node or main monitoring system 220 (or 330) resumes monitoring their components at 530. She [sic] monitoring process 500 typically would be operated on an ongoing manner for a cluster system such as system 200 (e.g., 24 hours a day and 7 days a week).
>
> Once the central monitoring system 220 has acknowledged the problem, the staff of the hosting facility (e.g., where the system 200 is located, operated, and maintained) is then notified of the problem such as via wired or wireless communication (e.g., via e-mail, paging, or other notification methods). The notification may indicate where the problem is physically or functionally located (e.g., which cluster, which node within that cluster, and the like). The staff or operator is then responsible for solving the problem and clearing the problem

16

from the central monitoring system at 540. A cluster 250, 251, 252 may be configured to have a per-cluster monitoring system 330, in which case, that system 330 is responsible for monitoring the operations of only that cluster but still sends the information to the central monitoring system 220. The monitoring data is collected from the systems 330 such as via a specific request by the monitoring system 220 for the status of each component or the components periodically send the monitoring system 220 their status. Either mechanism along with many other methods result in an effective monitoring system and process for a hosted cluster system 200. The clients have the option of having additional monitoring components on each node to monitor additional components as requested by the client. Since SNMP is very expandable and configurable, the additionally monitored components easily integrate into the existing system 200.

'841 Patent at 8:27-9:6 [emphasis added].

40.    Additionally, the '841 Patent discloses the following flowchart, which includes a box 502 and decision diamond 510 that mention "problem with node (hardware, software, etc.)":

17



FIG.5

'841 Patent at Fig. 5.

41.    These disclosures teach actions to perform after "hardware and software" problems occur, but a POSITA would recognize that the '841 Patent never provides examples or definitions for the metes and bounds of what "hardware and software problems" actually are. Moreover, based on my experience, "hardware and software problems" is not a term of art that would provide a technical definition that would inform the understanding of a POSITA.

18

42.    For example, a POSITA has no guidance from the specification of the '841 Patent to determine whether the following are "hardware and software problems" or normal operational occurrences:

- There is an upgrade available for the operating system or other software on a computer in a cluster, but the computer and cluster are otherwise functioning normally.

- A computer in a cluster is restarted to upgrade its operating system but is otherwise functional and the cluster can still process client tasks.

- A client task has been running for 2 hours/2 days/2 weeks, which could either indicate a computationally intensive task or a runaway task that is running in an infinite loop. The '841 Patent provides no guidance on determining if this is an operational problem or a normal occurrence. Indeed, the '841 Patent discloses "companies or organizations may face differing computing challenges and have different needs for a cluster." '841 Patent at 6:26-27.

- A storage disk on a computer in a cluster has failed, but the RAID (Redundant Array of Inexpensive Disks) system has reconstructed the data that was on this disk, and the system is still functioning. A POSITA would understand that such disk failures are considered a normal occurrence, which is why RAID was invented and widely deployed. *See, e.g.,* '841 Patent at 10:50-64.

43.    For instance, the '841 Patent provides no guidance to a POSITA whether the above scenarios would be "hardware and software problems," nor does it provide guidance regarding threshold conditions for, e.g., how long to let a client task run, how many disk drives can fail before these failures would trigger a hardware problem, or what would be the metes and bounds of software problems. Further, the '841 Patent does not provide any lexicography for "hardware and software problems."

44.    Accordingly, in my opinion, the term "hardware and software problems" in claim 1 of the '841 Patent is indefinite.

### iii.    "wherein the first configuration differs from the second configuration"

45.    Claim 1 of the '841 Patent requires "wherein the first configuration differs from the second configuration." In my opinion, a POSITA could not have ascertained the meaning of the

19

phrase "wherein the first configuration differs from the second configuration" with reasonable certainty from the patent's specification and prosecution history.

46.    For example, the '841 Patent discloses "configurations" for computing clusters so broadly that there is no discernable limit for a POSITA to understand the metes and bounds for how a first configuration would ***not*** differ from a second configuration. For instance, the '841 Patent discloses the following regarding differing configurations, which a POSITA would understand is a circular definition without any bounds:

> The system includes a first cluster including a set of computing resources such as processing nodes, data storage, and a private communications network that is arranged or implemented in a first configuration. The system also includes a second cluster having a set of computing resources in a second configuration, which differs from the first configuration (e.g., both may be HPC clusters but be configured to handle a different client-assigned or defined task). The first configuration provides a first computing environment for performing a first client task while the second configuration provides a second computing environment for performing a second client task (which typically will differ from the first client task). The ***first and second configurations may differ*** due to ***configuration*** of the processing nodes in the clusters, based on ***configuration*** of the data storage, based on the private communications network or its connections, or based on software modules provided on the nodes, or based on other hardware or software components and/or ***configurations***.

'841 Patent at 3:8-25 [emphasis added]

47.    That is, a POSITA would understand that this disclosure is essentially saying that the first and second configurations may differ due to the first and second configurations being different. Such a circular definition is not limiting. Moreover, the types of "configurations" enumerated here would be understood by a POSITA to include every aspect of a distributed computing system, including its processors, storage, and networking, as well as including other hardware or software components. Finally, the "and/or configurations" at the end of this passage adds even more confusion, since it is another circular definition, whose scope is all of "hardware and software," which a POSITA would understand to be the full breadth of any computer system.

20

48.    Further, the '841 Patent additionally discloses that its exemplary configurations are merely provided as examples and that many other configurations exist. '841 Patent at 6:20-23. Indeed, the '841 Patent expressly teaches that it encompasses all "configurations" including hardware and software "configurations" in a disclosure a POSITA would understand to be a circular "definition" that in the context of a computing system is completely unbounded:

> The use of the term "*configuration*" with regard to a cluster is intended to encompass not only the physical components selected for a cluster and their interconnections with each other in the cluster and the topology of the cluster, but, at least in some cases, *configuration* also includes *configuration* of the software running on the computing resources of the cluster which may include any clustering software utilized to manager [sic] the cluster.

'841 Patent at 10:41-49 [emphasis added].

49.    Put another way, a POSITA would understand that the scope of the limitation "wherein the first configuration differs from the second configuration" is so broad that there would be no cluster computing system that would not satisfy the element "wherein the first configuration differs from the second configuration," since, for instance, the first configuration is for a "first cluster" that includes at least one hardware processor and the second configuration is for a "second cluster" that includes at least one hardware processor. Thus, because these two clusters have different hardware processors, a POSITA would understand that the '841 Patent's teachings imply that they necessarily have different "configurations;" hence, this limitation has no discernable meaning to a POSITA with reasonable certainty in light of the specification of the '841 Patent.

50.    Accordingly, in my opinion, the term "wherein the first configuration differs from the second configuration" in claim 1 of the '841 Patent is indefinite.

### iv.    "communications within the first and second clusters are isolated"

51.    Claim 8 of the '841 Patent requires "whereby the communications within the first and second clusters are isolated." In my opinion, a POSITA would have understood

21

"communications within the first and second clusters are isolated" to mean "network traffic within each cluster is maintained separate from other clusters by a gateway positioned between the private cluster network and the private company network that manages traffic destined for its corresponding cluster."

52.    For example, the '841 Patent discloses, "Gateway mechanisms isolate each cluster such that communications within a cluster or on a private cluster communications network are maintained separate." '841 Patent at Abstract. Additionally, the '841 Patent discloses, "The gateway mechanisms operate, in part, to isolate each cluster such that communications within a cluster such as on the private cluster communications network are separated (e.g., do not have to share bandwidth of a single system network)." '841 Patent at 3:43-47. Also, additional disclosures regarding cluster isolation are consistent with these disclosures. *See, e.g.,* '841 Patent at 4:44-50, 7:53-60.

53.    Further, the '841 Patent illustrates embodiments with a first and second cluster in Figures 2 and 4:



FIG.2

'841 Patent at Fig. 2.



FIG.4

'841 Patent at Fig. 4.

54.    As is shown in each figure, the '841 Patent explains that the network traffic for each cluster is maintained separate from other clusters by a gateway positioned between the private cluster network and the private company network that manages traffic destined for its corresponding cluster. For example, with respect to Fig. 2, the '841 Patent explains, "The company network 230 also has gateways 240, 241, 242, such as routers, to each unique cluster 250, 251, 252. On the other side of each gateway 240, 241, 242 is a private network 300, 301, 302 for the individual clusters 250, 251, 252." '841 Patent at 5:22-26. Further, with respect to

24

Fig. 4, the '841 Patent explains, "Each firewall and authentication system 410, 411, 412 is configured to only allow a particular client (or clients if more than one client were provided access to a particular customized cluster) to access the corresponding cluster 250, 251, 252. In such a configuration, the firewall and authentication system 410, 411, 412 connects the public network 200 to the private cluster network 300, 301, 302. In this situation, the gateway 240, 241, 242 is used to connect the private cluster network 300, 301, 302 to the private company network 230, which has the monitoring system 220." '841 Patent at 9:19-29.

55.    Accordingly, a POSITA would understand that the term "whereby the communications within the first and second clusters are isolated" should **not** be understood to mean that the clusters cannot communicate with each other under any circumstances, such as in the way that source code computers in patent litigations are routinely isolated from the Internet by completely disconnecting all network connections.[2] Thus, I conclude that the use of the term "isolated" in the '841 Patent is different from its plain-and-ordinary meaning, which would prevent any inter-cluster communication. For instance, such a plain-and-ordinary meaning of "isolated" would contradict the rest of the limitations of claim 8, since clients and a monitoring system can communicate with both the first and second cluster:

> **8**. The system of claim 1, wherein the public communications network is accessible by clients accessing the first and second clusters and wherein the system further comprises a monitoring system linked to the private communications network for monitoring operation of the first and second clusters, wherein the first and second clusters each comprise a private cluster network for communications among the computing resources of a particular cluster and a gateway mechanism positioned between the private cluster network and the private communications network, whereby the communications within the first

---

[2] For example, the Protective Order in this case states, "Source Code Material shall be provided using two secure review computers (where the Source Code production applicable is accessible from the review computers) that are 'stand-alone' computers (that is, the computer may not be linked to any network, including a local area network ('LAN'), an intranet or the Internet)." 2025-07-30 Protective Order at 9.

and second clusters are isolated.

56.    Instead, the '841 Patent teaches that what it means by "isolation" and "separation" is that each gateway is configured with software and hardware to apply a standard set of rules to only permit traffic destined for its corresponding cluster to pass through from the company network while keeping all cluster traffic internal to each cluster. For example, the '841 Patent discloses this understanding and its benefits (e.g., to prevent one cluster from interfering with other clusters) as follows:

> The embodiment shown with system 200 provides efficient separation of the individual cluster network traffic to prevent one cluster from interfering with other clusters. The traffic separation is achieved through the gateway 240, 241, and/or 242 located between each cluster 250, 251, and 252 and the company network 230. Each gateway 240, 241, 242 is configured with software and hardware to apply a standard set of rules to only permit traffic destined for its corresponding cluster to pass through from the company network 230 while keeping all cluster traffic internal to the cluster. With this cluster separation, the internal cluster configuration is abstracted from the primary company network 230 allowing the configuration of each cluster to be selected and maintained independently from the other clusters on the network 230. By keeping all clusters 250, 251, 252 connected to a common network 230 through the gateways 240, 241, 242, it is significantly easier to administer the many individual clusters and it also gives the clusters 240, 241, 242 a common destination for any monitoring information (e.g., to monitoring system 220 via common network 230).

'841 Patent at 5:27-46.

57.    Thus, based on this analysis, I conclude that a POSITA would have understood "communications within the first and second clusters are isolated" to mean "network traffic within each cluster is maintained separate from other clusters by a gateway positioned between the private cluster network and the private company network that manages traffic destined for its corresponding cluster."

### v.  "high performance computing cluster"

58.    Claim 9 of the '841 Patent requires "wherein the first configuration configures the first cluster as a high performance computing cluster." In my opinion, a POSITA could not have

26

ascertained the meaning of the phrase "high performance computing cluster" with reasonable certainty from the patent's specification and prosecution history.

59.    For context, the full text of claim 9 is as follows:

**9**. The system of claim 1, wherein the first configuration configures the first cluster as a high performance computing cluster and wherein the second configuration configures the second cluster as a load balancing cluster or a high availability cluster.

60.    Thus, a POSITA would understand by the principle of claim differentiation that claim 9 is using the term "high performance computing cluster" (HPC) as being different than "a load balancing cluster" or "a high availability cluster." For example, the '841 Patent discloses:

Unfortunately, while the number of tasks and computing situations that would benefit from HPC clusters continues to rapidly grow, HPC clusters are not being widely adopted. In part, this is because HPC clusters require the most computers of any cluster type and, thus, cause the most problems with maintenance and management. Other types of clusters that have been more widely adopted include the "load balancing cluster" and the "high availability cluster," but resources are also an issue with these clusters. A load balancing cluster is a configuration in which a server sends small individual tasks to a cluster of additional servers when it is overloaded. The high availability cluster is a configuration in which a first server watches a second server and if the second server fails, then the first server takes over the function of the second server.

'841 Patent at 2:5-18. *See also, e.g.,* '841 Patent at 5:1-11.

61.    Frustratingly, a POSITA would understand that this passage provides no lexicography for "high performance computing cluster" and only teaches that it requires the most computers of any cluster type. But the '841 Patent doesn't explain what this number of computers is or how a POSITA would discern that a computing cluster is a "high performance computing cluster," e.g., based on how many computing devices are in the cluster.

62.    Further, other disclosures in the '841 Patent repeat the distinction between "load balancing cluster" and "high availability cluster" from "high performance cluster" (HPC), but provide no additional teachings on how a POSITA would determine whether a computing cluster is a "high performance computing cluster," as opposed to a "load balancing cluster," a "high

27

availability cluster," or some other cluster type. *See, e.g.,* '841 Patent at 1:32-2:18, 3:4-25, 5:1-11, 10:3-12.

63. Further, the '841 Patent teaches that its disclosed computing clusters can be set up to differ widely, e.g., based on network latency, network bandwidth, storage, software, hardware, etc. *See, e.g.,* '841 Patent at 3:20-25, 7:27-42, 10:13-15 ("The above description is not considered limited to a particular type of cluster or to particular hardware and/or software components used to form a computing cluster."), 10:15-64. Thus, the '841 Patent does not provide guidance to a POSITA on how to determine whether a computing cluster is a "high performance computing cluster," e.g., based on the cluster is set up in terms of network latency, network bandwidth, storage, software, or hardware.

64. Accordingly, in my opinion, the term "high performance computing cluster" in claim 9 of the '841 Patent is indefinite.

## B. The '584 Patent

65. Claim 1 of the '584 patent recites:

**1.** A computer system, comprising:

> a private communications network linked to a public communications network;

> a first cluster comprising a set of computing resources, including at least one hardware processor, in a first configuration, wherein the first cluster is communicatively linked to the private communications network;

> a second cluster comprising a set of computing resources, including at least one hardware processor, in a second configuration, wherein the second cluster is communicatively linked to the private communications network; and

> a monitoring system to monitor operations of the first cluster and the second cluster for communications problems;

> wherein the first configuration differs from the second configuration;

> wherein the first configuration provides a first computing environment to perform a first client task and the second configuration provides a second computing environment to perform a second client task; and

28

wherein the computing resources comprise processing nodes, data storage shared by the processing nodes, and at least one communications network to link the processing nodes to each other and to the data storage;

wherein the first cluster establishes communications between the set of computing resources of the first cluster and a first gateway communicatively linked between the first cluster and the private communications network;

wherein the second cluster establishes communications among the set of computing resources of the second cluster and a second gateway communicatively linked between the second cluster and the private communications network;

wherein communications between the first cluster and the second cluster are isolated;

wherein the first cluster is a high performance cluster; and

wherein the second cluster is a high performance cluster.

66.    Claim 10 uses similar language, and my opinions below regarding claim 1 also apply to similar claim terms that are recited in claim 10.

### i.   "high performance cluster" / "high performance computing cluster"

67.    Claim 1 of the '584 Patent requires "wherein the first cluster is a high performance cluster." Similarly, Claim 10 of the '584 Patent requires "a first high performance computing (HPC) cluster." In my opinion, a POSITA could not have ascertained the meaning of the phrases "high performance cluster" / "high performance computing cluster" with reasonable certainty from the patent's specification and prosecution history.

68.    Since the '584 Patent shares the specification with the '841 Patent, the reasons for why a POSITA could not have ascertained the meaning of the phrases "high performance cluster" / "high performance computing cluster" in the '584 Patent with reasonable certainty from the patent's specification and prosecution history are the same as those given above for the '841 Patent, which I incorporate by reference here.

69.    Accordingly, in my opinion, the terms "high performance cluster" / "high performance computing cluster" in claim 1 of the '584 Patent is indefinite.

### ii.   "communications between the first [HPC] cluster and the second [HPC] cluster are isolated"

70.   Claim 1 of the '584 Patent requires "wherein communications between the first cluster and the second cluster are isolated," and similar language appears in claim 10. In my opinion, a POSITA would have understood the term "communications between the first [HPC] cluster and the second [HPC] cluster are isolated" to mean "network traffic within each cluster is maintained separate from other clusters by a gateway positioned between the private cluster network and the private company network that manages traffic destined for its corresponding cluster."

71.   Since the '584 Patent shares the specification with the '841 Patent, the reasons for how a POSITA would understand "communications between the first [HPC] cluster and the second [HPC] cluster are isolated" in light of the specification of the '584 Patent are the same as those given above for similar language in the '841 Patent, which I incorporate by reference here.

72.   Thus, based on this analysis, I conclude that a POSITA would have understood the term "communications between the first [HPC] cluster and the second [HPC] cluster are isolated" to mean "network traffic within each cluster is maintained separate from other clusters by a gateway positioned between the private cluster network and the private company network that manages traffic destined for its corresponding cluster."

### iii.   "wherein the first configuration differs from the second configuration"

73.   Claim 1 of the '584 Patent requires "wherein the first configuration differs from the second configuration," and similar language is recited in claim 10. In my opinion, a POSITA could not have ascertained the meaning of the phrase "wherein the first configuration differs from the second configuration" with reasonable certainty from the patent's specification and prosecution history.

74. Since the '584 Patent shares the specification with the '841 Patent, the reasons for why a POSITA could not have ascertained the meaning of the phrases "wherein the first configuration differs from the second configuration" in the '584 Patent with reasonable certainty from the patent's specification and prosecution history are the same as those given above for the '841 Patent, which I incorporate by reference here.

75. Accordingly, in my opinion, the term "wherein the first configuration differs from the second configuration" in claim 1 of the '584 Patent is indefinite.

### iv. "operational or connectivity problems"

76. Claims 5 and 6 of the '584 patent recite:

**5.** The system of claim 1, wherein the monitoring system:

identifies operational or connectivity problems based on the monitoring; and

issues an alert in response to the identified operational or connectivity problems indicating a corresponding one of the first cluster or the second cluster or a combination thereof associated with the identified operational or connectivity problems.

**6.** The system of claim 5, wherein the monitoring system:

monitors the first and second clusters to identify the operational and connectivity problems; and

monitors for each node of the first cluster and for each node of the second cluster to check for hardware or software problems within a particular node and to report the hardware or software problems to the main monitor.

77. Claims 5 and 6 of the '584 Patent require "operational or connectivity problems." In my opinion, a POSITA could not have ascertained the meaning of the phrase "operational or connectivity problems" with reasonable certainty from the patent's specification and prosecution history.

78. Since the '584 Patent shares the specification with the '841 Patent, the reasons for why a POSITA could not have ascertained the meaning of the phrases "operational or connectivity problems" in the '584 Patent with reasonable certainty from the patent's

specification and prosecution history are the same as those given above for the '841 Patent for "operational and connectivity problems," which I incorporate by reference here.

79.    Accordingly, in my opinion, the term "operational or connectivity problems" in claims 5 and 6 of the '584 Patent is indefinite.

### v.  "hardware or software problems"

80.    Claims 5 and 6 of the '584 Patent require "hardware or software problems." In my opinion, a POSITA could not have ascertained the meaning of the phrase "hardware or software problems" with reasonable certainty from the patent's specification and prosecution history.

81.    Since the '584 Patent shares the specification with the '841 Patent, the reasons for why a POSITA could not have ascertained the meaning of the phrases "hardware or software problems" in the '584 Patent with reasonable certainty from the patent's specification and prosecution history are the same as those given above for the '841 Patent for "hardware and software problems," which I incorporate by reference here.

82.    Accordingly, in my opinion, the term "hardware or software problems" in claims 5 and 6 of the '584 Patent is indefinite.

### vi.  "means … to limit access …"

83.    Claim 8 of the '584 patent recites:

**8.** The system of claim 1, further comprising means, positioned between the public communications network and the first cluster and the second cluster, to:

limit access to the first cluster to communication access from a first client associated with the first client task; and

limit access to the second cluster to communication access from a second client associated with the second client task.

84.    Claim 8 of the '584 Patent requires "means … to limit access …," as noted above. In my opinion, a POSITA would have understood the function recited in the claim for the "means . . . to limit access . . ." is "limit access to the first cluster to communication access from a first

client associated with the first client task and limit access to the second cluster to communication access from a second client associated with the second client task" and the structure recited in the specification for performing this function is "firewall and authentication mechanism 210."

85.    As an initial mater, I understand that a claim using language such as "means … for" or "means … to" is presumed to be reciting a means-plus-function limitation. Accordingly, in my opinion, a POSITA would understand claim 8 to recite a means-plus-function limitation through its use of the phrase "means … to".

86.    Further, in my opinion, the recited limitation (excerpted above) for the means of claim 8 is purely functional, since there is, for example, no recited structure in the claim itself for performing this function; hence, I conclude this means-plus-function limitation requires claim construction. Further, I understand that the specification needs to provide a clear linking between the claimed function and structure to perform this function sufficient to inform a POSITA of the structure to perform the claimed function.

87.    The specification of the '584 Patent discloses the following:

> ***Access control to the individual clusters 250, 251, 252 is governed by the firewall and authentication mechanism 210***. This mechanism 210 may be implemented with several configurations to achieve the goal of ***ensuring that clients have access to their cluster, and only to their cluster***. Each of these configurations performs two primary steps: (1) ensuring that an incoming connection goes to the correct cluster and (2) ensuring that the incoming user has access to that cluster (e.g., that a client or customer operating a client node or system 208 attempting a communication or connection with their cluster is directed to the proper one of the clusters 250, 251, or 252 and that the system 208 or, more typically, the user of the system 208 has access to that particular cluster 250, 251, or 252).

'584 Patent at 5:57-6:3 [emphasis added].

88.    Accordingly, a POSITA would understand that access to each cluster is governed by the firewall and authentication mechanism 210 and that this structure ensures that clients have access to their cluster and only to their cluster.

33

89.    Further, the '584 Patent discloses the following:

The task parameters and needs of a user are determined as part of personal interview of the customer and/or via data gathered through a data collection screen/interface (not shown) with the system 200. This user input defines the task characteristics or computing parameters, and these are processed manually or with configuration software to select a cluster configuration that matches or suits the customer's needs. The selected cluster configuration (or configuration data) is then used to customize one or more of the clusters 250, 251, 252 *to have a configuration for performing tasks assigned by the customer* such as by use of node or system 208. *The customer accesses their assigned cluster(s) 250, 251, 252 via the public network 204 and authentication and firewall mechanism 210* through use of a client system 208 as discussed above (or, in some cases, by providing computing requests to an operator of the system 200 in physical form for entry via the monitoring system 220 or the like or by digital communications with such an operator).

'584 Patent at 7:1-18 [emphasis added].

90.    Accordingly, a POSITA would understand that clients in the '584 Patent are associated with tasks that are assigned by the clients and, as disclosed earlier, a customer accesses their assigned cluster via the authentication and firewall mechanism 210.

91.    Thus, based on this analysis, I conclude that a POSITA would have understood the function recited in the claim for the "means . . . to limit access . . ." is "limit access to the first cluster to communication access from a first client associated with the first client task and limit access to the second cluster to communication access from a second client associated with the second client task" and the structure recited in the specification for performing this function is "firewall and authentication mechanism 210."

### C.  The '282 Patent

92.    Claim 1 recites:

**1.** A system for distributing an application environment comprising:

a compute node comprising a computer system;

a first storage unit for storing blocks of a root image of the compute node, wherein the first storage unit comprises a first non-volatile memory, wherein the root image

34

comprises a computer program, wherein the blocks comprise sections of data, and wherein a file of the root image comprises at least one block;

a second storage unit for storing a leaf image, the leaf image comprising new data blocks and changes to the blocks of the root image, wherein the second storage unit comprises a second non-volatile memory; and

a union block device for interfacing between the compute node and the first and second storage units to distribute the application environment to the compute node, wherein the union block device comprises a driver, wherein the union block device creates the application environment by merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit; the union block device comprises a low-level driver for interfacing between the first and second storage units and the file system of the compute node; and the union block device, upon receiving a write request from the compute node for a sector X, creates an appropriate persistent mapping for sector X.

### i.  "root image"

93.    Claim 1 of the '282 Patent requires "storing blocks of a root image of said compute node," and similar language is repeated in claim 15. Additionally, claims 4, 5, 17, 20, and 21 also recite "root image" limitations. In my opinion, a POSITA would have understood "root image" to mean "a read-only base set of data blocks, operating beneath the file system, that provide the common portion of the application environment."

94.    Looking first to the claim language, the claims provide a description of what a "root image" and its "blocks" comprise: "wherein the root image comprises a computer program" ('282 Patent at 7:17-18, 8:8-9) and "wherein the blocks comprise sections of data, and wherein a file of the root image comprises at least one block" ('282 Patent at 7:18-20, 8:9-11). Hence, a person of ordinary skill in the art would have understood that a root image comprises a computer program and that the blocks of a root image comprise sections of data. Further, a POSITA would understand the language of the claim to imply that blocks of the root image operate beneath the file system, since the claims require that "a file of the root image comprises at least one block" and a POSITA would understand from this language that blocks of data operate beneath the file system. For example, a POSITA would understand that a file is a contiguous named unit of data,

35

but blocks are fixed size; hence, a large file would be divided into multiple blocks, which are managed by the storage system at a lower layer of abstraction, as implied by the language of the claim. See, for instance, my discussion regarding "low-level driver" elsewhere herein, which is incorporated here by reference.

95.    Moreover, a POSITA would understand that additional limitations in claim 1 require that the blocks of the root image operate beneath the file system. For example, claim 1 requires the following:

> a union block device for ***interfacing between the compute node and the first and second storage units*** to distribute the application environment to the compute node, wherein the union block device comprises a driver, wherein the union block device creates the application environment by ***merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit***; the union block device comprises ***a low-level driver for interfacing between the first and second storage units and the file system*** of the compute node; and the union block device, upon receiving a write request from the compute node for a sector X, creates an appropriate persistent mapping for sector X.

'282 Patent at 7:24-37 [emphasis added].

96.    Accordingly, because of the requirement that a union block device interfaces between the compute node and the first and second storage units such that this union block device merges the blocks of the root and leaf image and comprises a low-level driver for interfacing between the first and second storage units and the file system, this limitation inherently requires that the blocks of the root image operate beneath the file system. For instance, a POSITA would understand the interface between the storage units and the file system to be operating beneath the file system. Further, as I discuss later in this document, a POSITA would understand that the term "low-level driver" refers to a driver that operates beneath the file system.

97.    Similarly, both claim 1 and claim 15 contain additional limitations that a POSITA would understand to imply that the blocks of the root image operate beneath the file system. For example, claim 1 recites "and the union block device, upon receiving a write request from the

36

compute node for a sector X, creates an appropriate persistent mapping for sector X," and claim 15 recites "upon receiving a write request from the compute node for a sector X, creating an appropriate persistent mapping for sector X; and writing sector X on the second storage unit." For example, a POSITA would understand that a sector is a portion of the data storage area on a disk and that sectors are the smallest physical storage units on a disk and are of fixed size. See, for example, the following technical definition:

**sector** *n.* A portion of the data storage area on a disk. A disk is divided into sides (top and bottom), tracks (rings on each surface), and sectors (sections of each ring). Sectors are the smallest physical storage units on a disk and are of fixed size; typically, they are capable of holding 512 bytes of information apiece. See the illustration.



*Sector.*

*Microsoft Computer Dictionary*, 5/e, 2002, at 470.

98.    Accordingly, a POSITA would understand that the claims require that, because the union block device is the device that merges blocks of the root image and leaf images and that the union block device operates at the level of sectors on the disk, the blocks of the root image necessarily operate beneath the file system. That is, at the most fundamental level, a disk drive ignores the concept of "files" and instead views its entire storage capacity as a massive, collection of fixed-size units of data known as blocks, such as units of 512 bytes, which is the same as 4,096 bits, since there are 8 bits in a byte. *See, e.g.,* '282 Patent at 3:24-27, 7:53-56, 8:47-50. When the

37

storage system stores data in a file in the file system, the storage system acts as a "data middleman," breaking the high-level data in the file into these block-sized chunks and storing these blocks in the sectors on the disk drive. Thus, a POSITA would understand that the components of the storage system that operate on blocks are operating beneath the file system. For example, beneath this logical layer of a file system, a disk controller performs a second level of translation to map blocks to physical locations on the magnetic media of the hard disk, with the controller calculating the exact sector where to store the data.

99. Additionally, I understand that a patentee can serve as their own lexicographer, and in the case of the term "root image," a person of ordinary skill in the art would have understood that the patentee defined "root image" in the specification of the '282 Patent as "a read-only base image (or 'root' image) of the application environment …." '282 Patent at 1:62-64. Further, the specification of the '282 Patent indicates that invention "involves storing blocks of a root image of the compute node on a first storage unit." For example, the '282 Patent has the following disclosure: "Step **310** is storing blocks of a root image of the compute node on a first storage unit. By storing data at the block level, embodiments are able to ***operate beneath the file system*** and thus are designed to be file system and operating system independent." '282 Patent at 5:65-6:2 [emphasis added]. Thus, a POSITA would have understood that a read-only base set of data blocks, operating beneath the file system, that provide the common portion of the application environment, would be a root image. In addition, this understanding is further supported by the title of the '282 Patent, "***Block-Level*** I/O Subsystem for Distributed Application Environment Management." '282 Patent at Cover [emphasis added].

100. Further, a POSITA would have understood that the '282 Patent distinguishes descriptions of root images from the files themselves, that is, the blocks of data for a root image.

101. For example, the '282 Patent has the following disclosure:

38

For example, a particular file on the root image may comprise twenty blocks of data (e.g., blocks **1-20**). One compute node (e.g., compute node **120** *a*) desires to make a change to this file which involves a modification of only a few specific blocks of the file (e.g., blocks **4-9**). In this example, only the modified blocks (e.g., blocks **4-9**) will be stored in the compute node's leaf image (e.g., leaf image stored on second storage device **150** *a*) plus some small overhead.

'282 Patent at 4:33-40.

102. See also my discussion below with respect to "low-level driver," which I incorporate here by reference.

103. Thus, based on this analysis, I conclude that a POSITA would have understood "root image" to mean "a read-only base set of data blocks, operating beneath the file system, that provide the common portion of the application environment."

### ii. "new data blocks"

104. Claim 1 of the '282 Patent requires "storing a leaf image, the leaf image comprising new data blocks," and similar language is found in claim 15. In my opinion, a POSITA would have understood the term "new data blocks" to mean "data blocks that are not present in the root image."

105. For example, the '282 Patent discloses the following:

Moreover, each compute node 120 a-n has a corresponding second storage unit 150 a-n for storing a leaf image. The first storage unit 140 and second storage units 150 a-n may each be contained on separate physical storage devices, on separate logical spaces on the same storage device, or any combination thereof. The leaf image may contain ***blocks of new data***, blocks of changed data, or other blocks of data unique to the individual compute node. The leaf image may also contain a block modification log. ***In other words, a leaf image will describe the changes made by the respective compute node*** 120 a-n to its instance of the application environment. Thus, when a compute node (e.g., node 120 a) makes changes involving the root image, modifications are made to that compute node's leaf image (e.g., leaf image stored on second storage device 150 a). With respect to changes to the root image, ***only the specific blocks that are changed are stored in the leaf image***.

'282 Patent at 4:17-40 [emphasis added].

39

106.    From this passage, a POSITA would understand that only the specific blocks that are different from blocks of the root image are stored in the leaf image. Moreover, a POSITA would understand that these changed blocks comprise two types. The first type are blocks that have a corresponding block in the root node but are changed, i.e., some of the bytes in the changed block are different than corresponding bytes in the root image. The second type of leaf block is a block that has no corresponding block in the root image; hence, such a "new block" would not be described in terms of changes to a block in the root image, but instead would be identified as blocks that are new to the leaf image and have no corresponding block in the root image. For example, a fully expanded leaf image could contain, say, twenty blocks of data that have no corresponding block in the root node and are not defined in terms of changes with blocks in the root node, in which case these blocks would be "new blocks." See, e.g., '282 Patent at 4:30-40, 5:11-17, 6:3-7.

107.    Thus, based on this analysis, I conclude that a POSITA would have understood the term "new data blocks" to mean "data blocks that are not present in the root image."

### iii.    "appropriate persistent mapping"

108.    Claim 1 of the '282 Patent requires "and the union block device, upon receiving a write request from the compute node for a sector X, creates an appropriate persistent mapping for sector X." In my opinion, a POSITA could not have ascertained the meaning of the phrase "appropriate persistent mapping" with reasonable certainty from the patent's specification and prosecution history.

109.    The words "persistent" and "mapping" appear only in one place in the specification: "For example, upon receiving a write request from their respective compute nodes for a sector X, the UBDs **130** *a-n* will create an ***appropriate persistent mapping*** for sector X and then write sector X onto their respective second storage units **150** *a-n*, where sector X can then be

40

modified." '282 Patent at 5:3-8 [emphasis added]. This passage does not inform a POSITA with reasonable certainty as to the meaning of an "appropriate persistent mapping," however.

110. For example, the '282 Patent does not explain what would distinguish an "appropriate" persistent mapping from one that is not "appropriate." The '282 Patent does not discuss inappropriate mappings, for example, and doesn't even give an example what would comprise an "appropriate" mapping.

111. Further, the '282 Patent does not explain what it means by "persistent." Based on my experience, "persistent" has many meanings as a term of art, but a POSITA would not have a reasonable certainty of determining which, if any, of these definitions to apply or whether the '282 Patent is using this term in a peculiar way. For example, based on my experience, a POSITA would understand that "persistence" can refer, among other things, to ghost images that remain on a computer screen after it is turned off, to memory that is not erased if the power to a computer is turned off, to data in a database that is retained between transactions (but which might otherwise be erased after a timeout period, such as 24 hours, has passed), to data that is stored indefinitely in a log file and is never erased, or to data that is stored in an archival revision control system that allows users to retrieve old versions of data that has subsequently been changed. The '282 Patent does not explain which, if any, of these possible meanings for "persistent" are to be understood as applying to the limitation "appropriate persistent mapping."

112. In addition, the '282 Patent doesn't explain what it means by "mapping" in the limitation "appropriate persistent mapping." For example, based on my experience, a POSITA would understand that a "mapping" to be a function that maps elements from one set to elements of another set. Still, although the specification and claims disclose that the "appropriate persistent mapping" is for sector X, a POSITA would not be able to determine with reasonable certainty what are the sets of elements involved nor the direction of the mapping. For example, a POSITA

41

would not be able to determine whether this is a mapping **from** an identifier "X" for sector X **to** storage unit(s) where X is stored or this is a mapping **from** storage unit(s) where X is stored **to** an identifier "X" for sector X, or whether this is a completely different type of mapping that involves sector X, let alone whether such a mapping is "appropriate" and/or "persistent."

113.  Accordingly, in my opinion, the term "appropriate persistent mapping" in claim 1 of the '282 Patent is indefinite.

### iv.  "sector"

114.  Claim 1 of the '282 Patent requires "and the union block device, upon receiving a write request from the compute node for a sector X, creates an appropriate persistent mapping for sector X," and claim 15 contains similar language. In my opinion, a POSITA would have understood the term "sector" to mean "contiguous portion of the data storage area on a disk."

115.  For example, the '282 Patent does not define the term "sector;" hence, a POSITA would understand that the '282 Patent is using this term according to its definition as a term of art, such as the following:

**sector** *n.* A portion of the data storage area on a disk. A disk is divided into sides (top and bottom), tracks (rings on each surface), and sectors (sections of each ring). Sectors are the smallest physical storage units on a disk and are of fixed size; typically, they are capable of holding 512 bytes of information apiece. See the illustration.



*Sector.*

42

Microsoft Computer Dictionary, 5/e, 2002, at 470.

116.  That is, a sector is a contiguous portion of the data storage on a disk, and the '282 Patent repeatedly discloses how its invention applies to disk storage; hence, a POSITA would understand that the term "sector" should be understood as it is used as a term of art in the context of disk drives. See, e.g., '282 Patent at 1:49-53, 6:30-37, 7:53-57, 8:47-50.

117.  Thus, based on this analysis, I conclude that a POSITA would have understood the term "sector" to mean "contiguous portion of the data storage area on a disk."

### v.  "low-level driver"

118.  Claim 1 of the '282 Patent requires "the union block device comprises a low-level driver for interfacing between the first and second storage units and the file system of the compute node." In my opinion, a POSITA would have understood the term "low-level driver" to mean "driver that operates below the file system."

119.  For example, the '282 Patent discloses the following:

A compute node 120 a-n mounts its instantiation of the application environment via its respective UBD 130 a-n. The ***UBDs 130 a-n are effectively low-level drivers that operate as an interface between the first and second storage devices and the file system*** of each compute node 120 a-n. The file system may reside on the server side of the system 100. The file system may also reside on each of the compute nodes 120 a-n. Because ***UBDs 130 a-n operate below the file system***, they are concerned merely with the blocks of data themselves, rather than files they form. As a result, system 100 is completely file system, and thus operating system, independent.

'282 Patent at 4:41-51 [emphasis added}.

120.  Accordingly, since this part of claim 1 is for limitations for a "union block device" (UBD), a POSITA would understand that this limitation of a "low-level driver" means it is a driver that operates below the file system.

121.  Further, a POSITA would understand that in the architectural hierarchy of the system of the '282 Patent, a low-level driver sits beneath the file system because the

43

responsibilities of the driver and file system are fundamentally different—the file system manages high-level representations of logically contiguous data as files, while the driver manages block storage, which may or may not be contiguous and instead comprises blocks of fixed-length. The file system is designed to provide a user-friendly abstraction, organizing data into named files and directories. Its functionality doesn't deal with how data is stored on a physical disk; it simply knows that it needs to define files in terms of store certain logical blocks of data. By operating below this layer, the low-level driver acts as a "data middleman," in that it receives logical block requests from the file system (e.g., "Read Logical Block 500") and converts them into specific commands for the physical hardware of the disk. See, e.g., '282 Patent at 6:17-22.

122.  Indeed, a POSITA would understand that this separation of concerns is critical for system modularity, where the different components in the system have well-defined functionalities and interfaces (called "application programming interfaces" or "APIs"). A POSITA would understand that if the low-level driver did not operate below the file system, the file system would have to be integrated directly into the block storage system, which would limit system growth and make maintenance difficult, since it would require the file system to "know about" every single brand of hard drive or block storage device available as well as requiring the file system to manage both the logical organization of data into files and also all the details of how blocks are managed. Instead, the "lower" position of the driver allows the file system to remain universal and storage-device-agnostic. The low-level driver handles the messy, physical realities, thereby shielding the file system from these complexities. This layering ensures that as long as the driver handles the low-level storage details, the file system can store data without needing to understand how data blocks are being managed, which in turn allows the block-level storage system to take advantage of the alleged invention of the '282 Patent involving blocks of root images and leaf images. *See, e.g.,* '282 Patent at 5:1-17.

44

123. See also my discussion above with respect to "root image," which I incorporate here by reference.

124. Thus, based on this analysis, I conclude that a POSITA would have understood the term "low-level driver" to mean "driver that operates below the file system."

### vi. "the modifying"

125. Claim 15 recites:

**15.** A method for distributing an application environment comprising:

storing blocks of a root image of a compute node on a first storage unit, wherein the compute node comprises a computer system, and wherein the first storage unit comprises a first non-volatile memory, wherein the root image comprises a computer program, wherein the blocks comprise sections of data, and wherein a file of the root image comprises at least one block;

storing a leaf image comprising new data blocks and changes to the blocks of the root image on a second storage unit, wherein the second storage unit comprises a second non-volatile memory;

merging the blocks of the root image stored on the first storage unit with the blocks of the leaf image stored on the second storage unit to create the application environment; and

delivering the application environment to the compute node; wherein the modifying comprises: upon receiving a write request from the compute node for a sector X, creating an appropriate persistent mapping for sector X; and writing sector X on the second storage unit.

126. Claim 15 of the '282 Patent requires "wherein the modifying comprises: upon receiving a write request from the compute node for a sector X, creating an appropriate persistent mapping for sector X; and writing sector X on the second storage unit." In my opinion, a POSITA could not have ascertained the meaning of the phrase "the modifying" with reasonable certainty from the patent's specification and prosecution history.

127. For example, a POSITA would see from the words of claim 15 itself that there is no antecedent basis for "the modifying" in claim 15. Thus, a POSITA would not be able to determine with reasonable certainty what else is encompassed by "the modifying" in addition to

45

the claimed "upon receiving a write request from the compute node for a sector X, creating an appropriate persistent mapping for sector X; and writing sector X on the second storage unit." For instance, a POSITA would not be able to determine even the component to modify, given the lack of antecedent basis.

128.   Accordingly, in my opinion, the term "the modifying" in claim 15 of the '282 Patent is indefinite.

### vii.   "at an operational level"

129.   Claim 26 recites:

> **26**. The method as recited in claim 15 wherein merging occurs at an operational level between the first and second storage units and file system of the compute node.

130.   Claim 26 of the '282 Patent requires "wherein merging occurs at an operational level between the first and second storage units and file system of the compute node." In my opinion, a POSITA could not have ascertained the meaning of the phrase "at an operational level" with reasonable certainty from the patent's specification and prosecution history.

131.   The specification of the '282 Patent does not contain the word "operational." Claim 26 is the only place that this word appears. In addition, based on my experience, the word "operational" in the phrase "an operational level between the first and second storage units and file system of the compute node" is not being used according to a well-known term of art. That is, the term "operational" does not inform a POSITA of the metes and bounds of what is meant here by "at an operational level." Moreover, the complete lack of disclosures regarding this term in the body of the specification of the '282 Patent does not fill this void in understanding.

132.   Accordingly, in my opinion, the term "at an operational level" in claim 26 of the '282 Patent is indefinite.

46

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 12th day of February, 2026 at Irvine, California.

_____

Michael T. Goodrich, Ph.D.