# Exhibit 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC and<br>INTELLECTUAL VENTURES II LLC<br><br>　　Plaintiffs,<br><br>v.<br><br>AMERICAN AIRLINES, INC.<br><br>　　Defendant. | § § § § § § § § § § § § | Civil Action 4:24-cv-00980-ALM<br>Judge Mazzant |

**MAKRMAN DECLARATION OF MICHAEL SHAMOS, PH.D.**

i

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................1

II.  PROFESSIONAL BACKGROUND & QUALIFICATIONS ........................2

    A.   Education and Industry Experience .......................................................2

    B.   Compensation ........................................................................................4

III. MATERIALS CONSIDERED ...........................................................................4

IV.  LEGAL PRINCIPLES .........................................................................................5

    A.   Claim Construction Principles ..............................................................5

    B.   Priority Date ..........................................................................................8

V.   LEVEL OF ORDINARY SKILL IN THE ART................................................8

VI.  OVERVIEW OF THE '080 PATENT .............................................................10

VII. CLAIM CONSTRUCTION OPINIONs .........................................................13

    A.   "distributed parallel computing program" ..........................................13

    B.   "distributed sequential computing program" ......................................16

    C.   "distributed shared memory system" ...................................................17

    D.   "multiple nodes"..................................................................................18

    E.   "parallel processing and/or operations" ..............................................19

VIII. JURAT ................................................................................................................22

ii

I, Michael Shamos, hereby declare and state as follows:

## I.    INTRODUCTION

1.    I hold the title of Distinguished Career Professor in the School of Computer Science at Carnegie Mellon University in Pittsburgh, Pennsylvania.  I have been retained as an expert witness McKool Smith P.C. on behalf of American Airlines, Inc. ("AA" or "Defendant").  I understand that Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC (collectively, "IV" or "Plaintiffs") are asserting multiple U.S. Patents (collectively, the "Patents") against AA in this proceeding.

2.    In this declaration, I provide my opinions regarding certain claim terms used in U.S. Patent 7,712,080 (the "'080 Patent" or the "Patent").  I also provide technical bases for my opinions.  I reserve the right to amend or supplement my opinions in light of further documents, depositions, or discovery disclosures of which I become aware.

3.    I have been asked by counsel to provide opinions in this declaration on the meanings of several terms in the '080 Patent as they would have been understood by a person of ordinary skill in the art ("POSITA").  I offer no opinions on claim construction other than those expressed herein.

4.    I am also providing expert opinion on behalf of Petitioners in IPR2025-01511, which challenges the claims of the '080 Patent.

1

## II.    PROFESSIONAL BACKGROUND & QUALIFICATIONS

### A.    Education and Industry Experience

5.    This section summarizes my educational background, career history, publications, and other relevant qualifications.  My full curriculum vitae is attached hereto as Exhibit 1.

6.    I have an A.B. degree from Princeton University in Physics, an M.A. degree from Vassar College in Physics, an M.S. degree from American University in Technology of Management, an M.S. degree from Yale University in Computer Science, an M. Phil. from Yale University in Computer Science, a Ph.D. from Yale University in Computer Science, and a J.D. degree from Duquesne University.

7.    I am a member of two departments in the School of Computer Science at Carnegie Mellon, the Software and Societal Systems Department and the Language Technologies Institute.  I founded and was a Co-Director of the Institute for eCommerce at Carnegie Mellon from 1998-2004 and from 2004-2018 was Director of the eBusiness Technology graduate program in the Carnegie Mellon University School of Computer Science.  Since 2018, I have been Director of the M.S. in Artificial Intelligence and Innovation degree program at Carnegie Mellon.

8.    I have taught graduate courses at Carnegie Mellon in Electronic Commerce, including eCommerce Technology, Electronic Payment Systems, Electronic Voting, Internet of Things, Ubiquitous Computing, Electronic Payment

2

Systems and eCommerce Law and Regulation, as well as Analysis of Algorithms. Since 2007, I have taught an annual course in Law of Computer Technology.

9. I was the author and lecturer in a 24-hour video course on Internet protocols and have taught computer networking, wireless communication, and Internet architecture since 1999.

10. From 2001-2021, I was a Visiting Professor at the University of Hong Kong, where I taught an annual course in Electronic Payment Systems. This course is one of only a handful of graduate courses taught on this subject in the world. The course includes components on RFID and NFC.

11. I am also a faculty member in the Privacy Engineering degree program at Carnegie Mellon. My course on Law of Computer Technology is required for all students in that program, the Master of Science in Artificial Intelligence and Innovation, and the Ph.D. Program in Societal Systems.

12. I am a named inventor on the following six issued patents relating to electronic commerce: U.S. Patent Nos. 7,330,839; 7,421,278; 7,747,465; 8,195,197; 8,280,773; and 9,465,299.

13. From 1979-1987 I was the founder and president of two computer software development companies in Pittsburgh, Pennsylvania: Unilogic, Ltd. and Lexeme Corporation.

3

14. I am an attorney admitted to practice in Pennsylvania and have been admitted to the Bar of the U.S. Patent and Trademark Office since 1981. I have been asked to render opinions in this Declaration as a technical expert. I have not been asked to offer any opinions on the law in this proceeding, and I do not do so.

15. I have previously served as an expert in over 400 cases concerning computer technology. I have been involved in multiple cases involving parallel computing..

16. In this declaration, all emphasis has been added except as noted.

**B. Compensation**

17. I am being compensated at the rate of $625 per hour for my work on this matter and will be reimbursed for all reasonable expenses that I incur during the course of this case. No part of my compensation is affected by the results of this litigation. I have no financial interest in any of the parties to this litigation or in the Patents.

## III. MATERIALS CONSIDERED

18. The opinions in this report are based on my background and experience, along with my review of the documents cited herein, the '080 Patent, its prosecution history, and the materials listed in Exhibit 2 hereto.

## IV.    LEGAL PRINCIPLES

### A.    Claim Construction Principles

19.    I have been provided the following legal standards by counsel and I have applied these standards in arriving at the conclusions in this report.

20.    The claims of a patent define the limits of the patentee's exclusive rights.  In order to determine the scope of the claimed invention, courts may construe (or define) claim terms whose meanings are disputed by the parties.

21.    I understand that claim construction is a matter of law for the Court to decide.

22.    Claim terms should be given their ordinary and customary meaning within the context of the patent in which the terms are used, i.e., the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention in light of what the patent teaches, and statements made in its prosecution history.

23.    I understand that, under the doctrine of claim differentiation, two claims of a patent are presumed to differ in scope.  I understand that a patent may have two types of claims: an independent claim, and a dependent claim.  I understand that a dependent claim must further define and narrow the subject matter of the claim from which it depends, while that claim may itself be an independent claim or another dependent claim.   In addition, I understand that, under the doctrine of claim

5

differentiation, limitations stated in a dependent claim are not to be read into the claim from which the dependent claim depends.

24.    I understand that words or terms should be given their ordinary meaning unless it appears that the inventors were using them to mean something else.  In making this determination, the claims, the patent specification, and the prosecution history are of paramount importance.  Additionally, the specification and prosecution history must be consulted to determine whether the patentee has acted as its own lexicographer (i.e., provided its own special meaning to any disputed terms), or intentionally disclaimed, disavowed, or surrendered any claim scope.

25.    I understand that a patentee may act as his own lexicographer and may provide in the specification definitions for terms used in the claims, and such definitions are to be applied.

26.    I understand that, if no definition of a claim term is provided, then to determine how a person of ordinary skill would understand a claim term, one should look to those sources available that show what a person of skill in the art would have understood the disputed claim language to mean.  Such sources include the words of the claims themselves, the remainder of the patent's specification, the prosecution history of the patent and the references cited in the patent (all considered "intrinsic" evidence), and may include "extrinsic" evidence, such as dictionary definitions,

learned treatises and the opinions of qualified experts concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

27.    I understand that, in construing a claim term, one looks primarily to the intrinsic patent evidence, including the words of the claims themselves, the remainder of the patent specification, and the prosecution history. The prosecution history can inform the meaning of the claim language by demonstrating how the patentee and the PTO understood the invention.

28.    I understand that extrinsic evidence, which is evidence external to the patent and the prosecution history, may also be useful in interpreting patent claims.

29.    I understand that a person of ordinary skill in the art is deemed to read a claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification. For this reason, the words of the claim must be interpreted in view of the entire specification. The specification is the primary basis for construing the claims and provides a safeguard such that correct constructions closely align with the specification. Ultimately, the interpretation given to a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim as set forth in the patent itself.

7

**B.      Priority Date**

30.      I understand that the "priority date" of a patent is generally the date on which the patent application is filed.  However, a patent may be entitled to a priority date that corresponds to the filing date of an earlier-filed patent application if (i) the patent expressly claims priority to the earlier-filed patent application and (ii) the earlier-filed patent or application provides adequate written description and enablement support.

31.      The '080 Patent was filed on May 21, 2004 but claims priority to U.S. provisional patent application 60/472,612, filed May 21, 2003.  The term of the Patent was extended by 1013 days, so it will expire on February 28, 2027.  I offer no opinion for claim construction purposes as to whether the '080 Patent is entitled to the claimed priority date.  For purposes of claim construction only, I have been asked to assume that the earliest possible priority date of the '080 Patent is May 21, 2003.

## V.      LEVEL OF ORDINARY SKILL IN THE ART

32.      I understand that there are multiple factors relevant to determining the level of ordinary skill in the pertinent art, including (i) the educational level of active workers in the field, (ii) the type of problems encountered in the art, (iii) the prior art solutions to those problems, the rapidity with which innovations are made, and (v) the sophistication of the technology in the art.

33.     The '080 Patent defines its field of invention as follows:

*The present invention relates generally to computer programming, and more particularly to systems and methods for parallel distributed programming.*

'080 Patent, 1:13-15

34.     The specification of the Patent ("Specification") discloses methods of distributing parallel processing across multiple memories and multiple processors using self-migrating threads.  EX1001, 2:8-18.  The Specification states:

*Generally, a parallel distributed program is configured to operate across multiple processors/nodes and multiple memories. In one aspect of the invention, a parallel distributed program includes at least one distributed shared variable located across the multiple memories and one or more distributed programs configured to operate across multiple processors.*

'080 Patent, 2:9-16

That is, the field of the invention is parallel computing.

35.     The claims are drawn to parallelizing sequential computer programs by spawning child sequential computer programs and establishing a distributed shared variable located across the multiple memories and one or more distributed programs configured to operate across multiple processors.

36.     In my opinion, in order to understand the Specification and make and use the claimed invention without undue experimentation as of May 2003, one of ordinary skill in the art of the '080 Patent would have had a bachelor's degree in computer science, computer engineering, electrical engineering, or related field, and

at least two years of experience in computer networking and parallel computing, or a person with a master's degree in one of the foregoing and at least one year of experience in the aforementioned fields. Additional education could substitute for professional experience, and vice-versa.

37. I had at least the background of such a POSITA at least as early as May 21, 2003.

## VI.    OVERVIEW OF THE '080 PATENT

38. The '080 Patent deals with construction of software programs that distribute processing over multiple processors and multiple memories, as opposed to the use of a multiple processors and a single memory. The Patent refers to such programs as "parallel distributed programs." '080 Patent, 1:25-30. As a result of the inventors' prior art publication[1], "parallel distributed programs" were well known long before the Patent was filed. As I explain later, the prior art resulted in a disclaimer by Patentee during prosecution of the '080 Patent.

39. The Patent also uses the phrase "navigational programming," which "includes the programming and use of self-migrating threads or tasks, which are threads or tasks that can migrate from one processor to another." '080 Patent, 3:15-

---

[1] See Fukuda et al., "Messengers: Distributed Programming Using Mobile Agents," Transactions of the SDPS, Dec. 2001, Vol. 5, No. 4, pp. 95-112, cited on the face page of the Patent.

18. "Navigation" in this context refers to execution threads moving to the processor at which they are needed.

40. The Patent discloses that one feature of "navigational programming" is what it calls "distributed parallel computing," or "DPC," which is computing using multiple concurrent distributed sequential computing "DSC" programs. '080 Patent, 5:57-59.

41. The Patent explains that a DSC program "injects" or "spawns" a separate DSC program that performs "fetching" of data. *Id.*, 6:43-47. "Fetch" was long a common term in the art for retrieving data from a memory.

42. A DPC program is a combination of a DSC program and a fetching DSC program:

> *The computing DSC program and the fetching DSC program together make a DPC program. The two DSC threads of the DPC program run concurrently to perform parallel or pipelined computing. In this particular example, the computations and the fetching are pipelined.*

*Id.*, 6:61-65

43. The Patent defines "strong mobility" as follows:

> *Navigational programming may be facilitated by mobile agent systems. Self-migrating threads may be in the form of mobile agents. Such a mobile agent has the ability to halt its execution, encapsulate the values of its variables, move to another node, restore the state, and continue executing. This ability is often referred to as strong mobility.*

*Id.*, 8:20-26

11

44.     The Patent then points to the inventors' prior art MESSENGERS system as exhibiting strong mobility, and describe "two types of variables in MESSENGERS: agent variables and node variables." *Id.,* 8:20-25; 9:1-2. Messengers take data with them when they migrate, by means of a "hop":

> *A Messenger's programmer may tell it to migrate using the navigational statements, such as hop(). A destination node's logical address or a logical link between the source and the destination nodes can be used as the argument for the statements. When a Messenger hops, it takes the data in its agent variables with it to wherever it migrates.*

*Id.,* 9:10-15

45.     Spawning (generating a new messenger) occurs in the Patent by executing an "Inject()" statement.  Further, "Messengers may be injected by a program, which is part of the MESSENGERS system, or by another Messenger into any of the daemon nodes, and they may start creating new logical nodes and links on the current or any other daemons." *Id*., 8:39-43. Injecting new Messengers is performed by a daemon:

> *"There are four tasks for a daemon. First, to accept signals, such as UNIX signals, to inject Messengers. These signals are sent by the program minject or another messenger. In addition, a daemon also provides a function, the calling of which would result in the autonomous caller Messenger being sent to a destination daemon."*

*Id*., 8:50-58.

12

## VII.   CLAIM CONSTRUCTION OPINIONS

46.   Below are my opinions on the proper construction of certain terms in the Patents, in alphabetical order.

47.   Defendant proposed five terms for construction.  Plaintiffs contend that each proposed term should take its plain and ordinary meaning, but decline to be pinned down as to what the plain and ordinary meanings are.  This is a signal to me that Plaintiffs intended to present to the jury at trial previously undisclosed explanations of what the plain and ordinary meanings are.

48.   Plaintiffs ignore the fact that the plain and ordinary meaning of a term to a POSITA is not necessarily the way a lay juror would understand the term. And the lay juror may not even ascribe any meaning to a technical term at all.  If a term really has a plain and ordinary meaning, the it should be an easy exercise for the parties to write down that meaning, agree to it, and relieve the Court from having to construe it.  However, Plaintiffs decline to do so.

49.   In the constructions below I offer constructions for what a POSITA reading the Patent and its prosecution history would consider the plain and ordinary of each term to be.  In each case the construction is based on the Patent's own lexicography and/or the prosecution history.

A.   **"distributed parallel computing program"**

| **"distributed parallel computing program"** **'080 Patent Claims 1, 4-6, 9, 17, 18** |
|---|

13

| Plaintiffs' Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning | program that computes using multiple concurrent distributed sequential computing programs configured to operate across multiple processors/nodes and multiple memories |

50.    Even though the individual words in this term are meaningful to a POSITA, the term itself is not a term of art.  A Google search for "distributed parallel computing program" on January 17, 2026 produced only 12 hits, of which six relate to litigation over the '080 Patent. The remainder are subsequent to the filing date of the Patent.  Therefore, we must look to the Patent itself to determine the meaning of the term.

51.    The Patent contains definitions of the terms "distributed parallel computing" and "parallel distributed computing program."  "Distributed parallel computing is defined as follows at 5:57-59:

> *Another aspect of navigational programming is distributed parallel computing ("DPC"), which is computing using multiple concurrent DSC programs.*

'080 Patent, 5:57-59

52.    The term "parallel distributed computing program" is defined as follows:

14

> *Generally, a parallel distributed program is configured to operate across multiple processors/nodes and multiple memories.*

'080 Patent, 2:10-12

53.    The Patent does not distinguish between "parallel distributed computing program," which is used only in the specification, and "distributed parallel computing program," which is used only in the claims, and I have taken them to be synonymous.

54.    Combining the definitions, a "distributed parallel computing program" uses multiple concurrent DSC programs, which are configured to operate across multiple processors/nodes and multiple memories.  Therefore, using Patentee's own language, "distributed parallel computing program" means "program that computes using multiple concurrent distributed sequential computing programs configured to operate across multiple processors/nodes and multiple memories."

55.    In the absence of Patentee's lexicography, one might be lured into believing that a "distributed parallel computing program" is simply a parallel computing program that is distributed.  However, that interpretation is ambiguous because it is not clear whether memory is distributed and/or whether processing is distributed.  Further, parallel programs that were distributed in some way were long known in the prior art.    Patentee's definition (and Defendant's proposed construction) is unambiguous.

15

B.    **"distributed sequential computing program"**

| "distributed sequential computing program" '080 Patent Claims 1, 9 | |
|---|---|
| **Plaintiff's Construction** | **Defendants' Construction** |
| Plain and ordinary meaning | program using a single locus of computation over distributed data |

56.    This is also not a term of art.  A Google search for "distributed sequential computing program" on January 17, 2026 produced only nine hits, of which six relate the '080 Patent.  Therefore, we must look to the Patent itself to understand the term.

57.    The term is defined in the Patent as follows:

*Another aspect of navigational programming is distributed sequential computing ("DSC"), which is computing using a single locus of computation over distributed data, possibly stored in a DSV.*

'080 Patent, 3:50-53

58.    "DSV" means "distributed shared variable," but it is not proper to import the phrase "possibly stored in a DSV" into a construction because of the word "possibly."

59.    As with the previous term, a "distributed sequential computing program" is not simply a sequential computing program that is distributed.  Such an interpretation is ambiguous because it is not clear whether data is distributed and/or whether processing is distributed.

16

60.    Therefore, using Patentee's own lexicography, "distributed sequential computing program" means "program using a single locus of computation over distributed data," making it clear that processing is not distributed ("single locus of computation") but data is distributed.

**C.    "distributed shared memory system"**

| "distributed shared memory system" '080 Patent, Claims 17, 18 | |
| --- | --- |
| **Plaintiffs' Construction** | **Defendants' Construction** |
| Plain and ordinary meaning | system that uses a globally accessible memory space built on distributed memories |

61.    Once again, Patentee chose to define this term in the specification:

*Another approach is often referred to as "distributed shared memory" ("DSM"), which is illustrated in FIG. 1b. In this approach, a memory space, Which may span across multiple memories indifferent processors, Processors 1 and 2, is dedicated for multiple threads or tasks to access, i.e., **it is a globally accessible memory space built on distributed memories***.

'080 Patent, 1:53-58

62.    The Patent itself thus defines what a "distributed shared memory" is. A POSITA would understand that a "distributed shared memory system" is a system that uses a "distributed shared memory."   Hence, according to Patentee, a "distributed shared memory system" is a "system that uses a globally accessible memory space built on distributed memories."

17

**D.    "multiple nodes"**

| "multiple nodes" '080 Patent Claim 6 | |
|---|---|
| **Plaintiffs' Construction** | **Defendants' Construction** |
| Plain and ordinary meaning | multiple memory areas associated with separate processors |

63.    The Patent also explains this term:

*Thus, if the data is distributed over a **plurality of nodes, e. g., multiple memory areas associated with separate processors**, wherein the distribution is disproportionate, e.g., a large portion of the data resides in one area and a smaller portion resides in a separate area, the computation will take place on the node with the larger portion of data, i.e., the pivot node, instead of having the larger portion of data moved, which may affect performance.*

'080 Patent, 4:3-10

64.    A POSITA would understand "multiple nodes" and "plurality of nodes" to be synonymous. Therefore, the term "multiple nodes" means "multiple memory areas associated with separate processors."

65.    I note that the passage at 4:3-10 uses "e.g." instead of "i.e.," suggesting that the phrase "multiple memory areas associated with separate processors" is exemplary rather than definitional. However, I have examined all 38 occurrences of "node" in the specification proper[2], and in each case the term is used to refer to a memory having a processor, and no two nodes ever share the same processor.

---

[2] The term "node" is used only once in the claims, namely in claim 6.

18

E.    **"parallel processing and/or operations"**

| "parallel processing and/or operations" '080 Patent Claims 1, 9 | |
|---|---|
| **Plaintiffs' Construction** | **Defendants' Construction** |
| Plain and ordinary meaning | handling multiple threads concurrently without terminating and resuming thread processes. |

66.    I believe a POSITA would understand, purely as a matter of grammar, that "parallel processing and/or operations" should be understood as "parallel processing and/or parallel operations." The term "parallel operations" does not appear anywhere in the specification. The term "operation[s]" is used seven times in the specification, and simply refers to the execution of an instruction by a processor, hence is really synonymous with "processing."

67.    The term "parallel processing" is literally not used in the specification at all. However, Patentee elucidated the meaning of the term in responding to a prior art rejection during prosecution. By Office Action of July 22, 2008, the Examiner rejected then-pending claim 1 on several grounds, including:

> *Suzuki in the same analogous art of distributed computing, discloses a same parallel distributed approach using self-migrating threads that autonomously navigate over networks and resume their native -mode executions at each destination (see for example, p.1, right column, third paragraph, "These threads can behave as autonomous light-weight agents roaming over and changing their synthetic world") and also discloses coding multi-Agent Applications with Self-migrating Threads (see for example, p.3, section 2.3 Coding Multi-Agent Application with Self-Migrating Threads"). Therefore, it would have been obvious to one having ordinary skill in the art at the time the invention was made*

19

*to combine Pan's sequential computing algorithm with <u>Suzuki's</u> detail programming implementation for multiagent applications with self migrating threads in a parallel distributed system.*

Office Action of 7/22/08, p. 4 (underlining in original)

68.    In a Response dated January 21, 2009, Patentee argued against the rejection as follows:

*Pending independent claims 1 and 15, and there [sic] respective dependent claims, however, are patentably distinguished over the cited references because claims 1 and 15 claim* parallel *distributed operations, which are not disclosed or suggested by Pan, Fukuda, nor Suzuki references either alone or in combination.*

Response of 1/21/09, p. 5 (emphasis of "parallel" in original)

*The Examiner concedes that Pan does not disclose the distributed application is a parallel distributed application. The Examiner then asserts that Suzuki discloses the "same parallel distributed approach using self-migrating threads that autonomously navigate over networks and resume their native-mode executions at each destination" and cites page 1, right column, third paragraph of Pan in support of this contention. The Examiner's assertion makes clear that Suzuki discloses a computing paradigm comprising a set of autonomous self-migrating threads that operates in a sequential sense and not in the parallel sense as claimed by Applicants.* **Notably, in order for a thread to recommence, i.e., resume, it must have been terminated prior to migration. Suzuki simply does not disclose a system that can handle multiple threads concurrently.** *Moreover, Suzuki explicitly discloses that the hop() function used in creating self-migrating threads carries out the following steps in the course of execution: network navigation (via link/node), context switch, and termination. Suzuki, p.3 ("As shown above, ..."). One of ordinary skill in the art would readily recognize this to describes a sequential operation.*

Response of 1/21/09, p. 5 (emphasis in boldface added)

69.    Patentee then drew the following conclusion:

20

*Nothing in Suzuki discloses a parallel system. One of ordinary skill in the art would readily recognize that **parallel processing enables many calculations to be carried out simultaneously, i.e., without terminating and resuming thread processes.** Due to the wholesale absence of an express limitation of independent claim 1, Suzuki is incapable of curing the deficiency of Pan and thus the combination of Pan, Suzuki and Fukuda can not establish a prima facie case of obviousness.*

Response of 1/21/09, p. 6 (emphasis in boldface added)

70.    At the time of the rejection, claim 1 recited as follows:

*1. (Currently Amended) A method of developing a parallel distributed application, comprising the steps of:*

*establishing at least one distributed shared variable; developing at least one distributed sequential computing programs to access at least one distributed shared variables; and*

*transforming the at least one distributed sequential computing program into at least one distributed parallel program by spawning at least one child distributed sequential computing program from the at least one distributed sequential program when at least one intermediate condition occurs within the at least one distributed sequential program.*

71.    In order to overcome the rejection, Patentee voluntarily disclaimed the scope of the claim to include only parallel processing that enables many calculations to be carried out simultaneously, i.e., without terminating and resuming thread processes. Therefore, as used in the Patent, "parallel processing and/or operations" means "handling multiple threads concurrently without terminating and resuming thread processes." Without such a disclaimer, the rejection would not have been overcome.

21

## VIII. JURAT

72.    I declare under penalty of perjury that the foregoing is true and correct.

Signed February 12, 2026 at Pittsburgh, Pennsylvania

_____
Michael Shamos

22