# Exhibit 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC, | ) ) ) | |
| *Plaintiffs*, | ) ) | **C.A. No. 4:24-cv-00980-ALM** |
| v. | ) ) ) | **JURY TRIAL DEMANDED** |
| AMERICAN AIRLINES, INC. | ) ) | |
| *Defendant*. | ) | |

**DECLARATION OF JOSEPH D. CAMP**

I, Joseph D. Camp, declare as follows:

1.      My name is Dr. Joseph Camp. I am a Professor of Electrical and Computer Engineering and the Director of the Autonomous Drone Teaming Lab at the Southern Methodist University.

2.      I have been retained by Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC ("IV") as an independent expert consultant in this proceeding. I have been asked to submit this declaration on behalf of IV.

3.      I am being compensated at a rate of $1000 per hour for my work in this proceeding. My compensation is in no way contingent on the nature of my findings, the presentation of my findings in testimony, or the outcome of this or any other proceeding. I have no other interest in this proceeding.

4.      All of my opinions provided in this Declaration are based on my own personal knowledge and professional judgment. I am over 18 years of age and, if I am called upon to do so, I would be competent to testify as to the matters set forth in this declaration.

## I.    BACKGROUND AND QUALIFICATIONS

5.    My background and expertise that qualify me as an expert are described in detail in my Curriculum Vitae attached as Attachment A, which further includes an accurate list of all publications authored by me in the previous 20 years and a list of all cases in which I testified as an expert at trial or by deposition during the previous 4 years. Below I have summarized those qualifications, as well as any other background and expertise relevant to the technical issues in this case:

6.    My industry experience includes a range of engineering and research roles across leading organizations. At Intel Corporation in Austin, Texas (Hardware Design Engineer/Co-op, May 2002 – August 2003), I used Perl and MySQL to develop a regression management system database to store and analyze test results for a next-generation gigabit-speed network processor. Earlier at Intel Corporation in Folsom, California (Component Design Engineer/Co-op, January 2000 – August 2000), I used Perl to port and debug 133 full-chip tests for the P64H2 bridge from PCI/PCI-X to Hublink buses, originally developed for the P64H, using the Bus Functional Language on the PCI Bus.

7.    My engineering foundation was shaped by early aerospace- and networking-related work at NASA's Johnson Space Center in Houston, Texas (Pre-Co-op, May 1998 – August 1999), where I programmed in the 4th Dimension database environment to build an operational database for the X-38 Emergency Crew Return Vehicle. I also performed a mathematical correlation of an infrared lamp experiment in a vacuum chamber for the TransHab inflatable habitat module for the International Space Station. Even earlier, as a SHARP Apprentice (May 1997 – August 1997), I created a FORTRAN simulation of antenna reception performance for the Tracking and Data Relay Satellite (TDRS) system intended for the International Space Station.

8.      My educational background includes a B.S. with honors in Electrical and Computer Engineering (ECE) from UT-Austin in 2003, an M.S. in ECE from Rice University in 2006, and a Ph.D. in ECE from Rice University in 2009. My master's thesis focused on a novel multi-tier architecture for deploying a mesh network in which multiple frequency bands were aggregated to provide Internet access to over 4000 users in an underserved community in Houston. My Ph.D. dissertation focused on addressing observed performance problems in the deployed mesh network based on stretching the existing wireless standards to serve a large area in a multihop/mesh topology with multiple frequency bands. The main performance issues identified pertained to HARQ-type signaling that reduced the effective throughput of in-field wireless links. For my Ph.D. dissertation, I was honored to receive the Ralph Budd Award for Best Engineering Thesis at Rice University.

9.      In the summer of 2009, I was hired as an Assistant Professor at SMU in the Electrical and Computer Engineering Department. I received the NSF Faculty Early Career Development Program (CAREER) award in 2012. In 2014, I was additionally honored to receive the Golden Mustang Teaching Award, which is given to one pre-tenured faculty per year. In 2016, I received tenure and promotion to Associate Professor. In 2021, I received promotion to Professor and the Gerald J. Ford Research Fellowship, and was promoted to ECE Department Chair, ad interim, in November of 2022, where I served in that capacity until August of 2024.

10.     Over my career, I have published over 90 peer-reviewed conference and journal papers, most of which are affiliated with IEEE, and received over $6M in federally funded grants.

## II.     <u>MATERIALS REVIEWED</u>

11.     The opinions contained in this declaration are based on documents I reviewed, as well as my professional experience, education, and knowledge.

12.     In forming my opinions expressed in this declaration, I have reviewed United States Patent No. 11,032,000 ("the '000 Patent") and the '000 Patent prosecution history. I have also reviewed other materials referred to in this declaration in support of my opinion, including the parties' claim construction disclosures and extrinsic evidence cited in those disclosures.

13.     My opinions contained in this Declaration are based on the documents I reviewed and my knowledge and professional judgment. My opinions have also been guided by my appreciation of how a person of ordinary skill in the art would have understood the state of the art, the prior art, and the claims and the specification of the '000 Patent at the time of the alleged invention.

## III.     <u>LEGAL STANDARDS</u>

14.     I am not an attorney. I understand that claim construction is solely a matter for a court to decide and, in general, the ordinary meaning of the claim terms used in the patent to one of ordinary skill in the art is determined in the context of the patent's specification and the file history, which I understand is commonly referred to as "intrinsic evidence."

15.     I understand that a person of ordinary skill in the art is a hypothetical person who is presumed to have known the relevant art at the time of the invention.

16.     I understand that a person of ordinary skill in the art is a person of ordinary creativity, and would have the capability of understanding the scientific principles applicable to the pertinent art.

17.     I understand that claims are construed from the perspective of a person of ordinary skill as of the effective filing date of the patent application.

18.     I understand that persons of ordinary skill in the art are deemed to read the claims in the context of the entire patent, including the specification and prosecution history. In other words, the terms are not considered in a vacuum.

19.     I understand that claim terms should be given their ordinary and customary meaning within the context of the patent in which the terms are used, *i.e.*, the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention in light of what the patent teaches.

20.     I understand that the plain and ordinary meaning is determined from the language of the claims, the specification, and the prosecution history of the patent at issue.

21.     I understand that, in construing a claim term, one looks primarily to the intrinsic patent evidence, which includes the patent abstract, specification, claims, and figures, and its prosecution history.

22.     I understand that extrinsic evidence may also be useful in interpreting patent claims when the intrinsic evidence itself is insufficient.

23.     I understand that the usual and customary meaning of a claim term can be altered by the patent applicant if they choose to act as their own "lexicographer" and clearly set forth in the patent a different meaning of a claim term.

24.     I understand that the meaning of a claim term can also be altered during the patent examination process by a clear and unequivocal disclaimer or disavowal made by the patent applicant regarding the meaning or scope of the term, and that such statements are recorded in the prosecution history of the patent application.

25.     I understand that if a claim term is ambiguous or unclear, the term must be construed to determine how a person of ordinary skill in the art would have resolved in light of the rest of the patent specification, patent claims, and the application's prosecution history.

26. I understand that a claim is not indefinite, as long as it, having been read in light of the intrinsic evidence, informs one of skill in the art at the time of the invention about the scope of the invention with reasonable certainty.

27. I understand that a claim which claims both an apparatus and the method steps of using the apparatus is indefinite.

28. I understand that it is improper to import limitations from embodiments in the specification.

29. I understand that it is improper to import limitations from other parts of the claims and rendering a claim term duplicative.

30. I understand that it is improper to import additional or different language from other independent claims that would render such claims superfluous.

31. I understand that the factors to be considered in determining the level of ordinary skill in the art include: (1) the educational level of individuals involved in the field of technology; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; and (5) the sophistication of the technology in the art. I further understand that, in a given case, one or more factors may be given greater weight or may not be present.

## IV.    PERSON OF ORDINARY SKILL IN THE ART

32. Based on my review of the '000 Patent and my consideration of the factors in determining a person of ordinary skill in the art ("POSITA"), it is my opinion that a POSITA would have had a bachelor's degree in electrical engineering, computer science, or a similar area of study, and two or more years of industry experience in networking and distributed computing. Additional experience may make up for a lack of education, and vice versa.

33.     My opinion is based on information available to me as of the date of this declaration. I reserve the right to review and respond to any standard of a POSITA offered by American or to modify my opinion based on information that subsequently becomes available to me.

## V.     THE '000 PATENT

34.     U.S. Patent No. 11,032,000, titled "Communications in a Wireless Network," was filed as Application No. 16/682,854 on November 13, 2019.[1] The '000 Patent claims priority to several earlier-filed applications, including Application No. 14/458,693 filed on August 13, 2014, Application No. 13/176,298, filed on July 5, 2011, and Application No. 11/646,692 filed on December 27, 2006.

35.     The '000 Patent generally relates to communications in a wireless network involving user equipment ("UEs") and a base station. The patent addresses challenges associated with efficiently determining channel conditions for multiple UEs while managing uplink and downlink signaling resources.

36.     The '000 Patent includes both apparatus and method claims directed to this same wireless signaling scheme. Claim 1 recites a user equipment device in terms of conventional structural components (receiver, transmitter, and processor) configured to support uplink physical signaling and downlink control reception, while claim 13 recites corresponding method steps performed by a UE within the same frame and time-slot structure.

37.     As described in the patent, UEs transmit uplink physical signals during a defined portion of the frame (a scheduled uplink interval), which may be organized into time slots that are distinct from those used for uplink data transmission. These uplink physical signals enable the base

---

[1] '000 Patent at cover.

station to determine channel conditions associated with the UEs. Based on those channel conditions, the base station transmits control information to the UEs over a physical control channel in designated time slots within a downlink frame. The patent describes these functions as being carried out by configured components of the UE, including a receiver, transmitter, and processor.

38.    Below is claim 1 from the '000 Patent.

1. A user equipment (UE) comprising:

> a receiver and a processor are configured to receive resource allocation information associated with an uplink physical signal, wherein the uplink physical signal and a physical uplink shared channel have different resources;

> a transmitter and the processor are configured to send, over the physical uplink shared channel, data in assigned time intervals;

> the transmitter and the processor are further configured, in a time interval that it is not sending information over the physical uplink shared channel, to send the uplink physical signal based on the received resource allocation information, wherein the uplink physical signal is used to determine channel conditions by a base station and in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval; and

> the receiver and the processor are further configured to receive, on a physical control channel, control information, wherein the control information is based on the determined channel conditions, wherein physical control channels are transmitted in a same time slot with other physical channels in a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel, wherein a number of bits sent over the physical control channel is based on a number of fields of control information to be sent to the UE.

39.    Below is claim 13 from the '000 Patent.

13. A method performed by user equipment (UE), the method comprising:

8

receiving resource allocation information associated with an uplink physical signal, wherein the uplink physical signal and a physical uplink shared channel have different resources;

sending, over the physical uplink shared channel, data in assigned time intervals;

sending, in a time interval that it is not sending information over the physical uplink shared channel, the uplink physical signal based on the received resource allocation information, wherein the uplink physical signal is used to determine channel conditions by a base station and in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval; and

receiving, on a physical control channel, control information, wherein the control information is based on the determined channel conditions, wherein physical control channels are transmitted in a same time slot with other physical channels in a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel, wherein a number of bits sent over the physical control channel is based on a number of fields of control information to be sent to the UE.

## VI.   DISPUTED CLAIM TERMS FOR THE '000 PATENT

### A.   "time interval" and "time intervals" (claims 1, 6, 13, 18)

40.   I understand that American alleges that the "time interval" and "time intervals" limitations should be construed as "time slot" and "time slots." In my opinion, a POSITA would understand that the '000 Patent uses the term "time interval" to refer to a defined scheduling interval within a frame, and would not understand "time interval" to encompass arbitrary or undefined periods of time. Rather, the patent describes uplink physical signaling as occurring during a structured portion of the frame that may be organized using one or more time slots allocated to different UEs.

41.   The intrinsic evidence shows that the claimed "time interval" is a defined temporal allocation within the frame during which uplink physical signals are transmitted. The specification

9

repeatedly explains that uplink physical signals, including uplink beacon signals, are transmitted during designated beacon transmission opportunities (e.g., time slots) within a defined uplink interval that are distinct from time slots used for uplink data transmission. A POSITA would therefore understand that the claimed "time interval" refers to a specific, predefined interval of scheduled transmission time within a frame, which may include multiple time slots assigned to different UEs, rather than a vague or abstract scheduling window. Nothing in the intrinsic record requires that all UEs transmit uplink physical signals in the same single time slot.

42.    I understand that American has identified extrinsic evidence in support of its construction. Specifically, I understand American has identified various papers for *Toyota Motor Corp. et al. v. Intellectual Ventures II LLC*, IPR2022-01130, including Papers 10, 13, 26, and 41, and U.S. Patent No. 8,811,356 ("'356 Patent"). Consistent with this intrinsic evidence, the Patent Trial and Appeal Board, in a related proceeding involving the '356 Patent in the same family, understood the described "time interval" as a structured beacon transmission interval implemented using time-slot allocations rather than an undefined period of time.

43.    The '000 Patent is a continuation of Application No. 14/458,693, which is a continuation of the application resulting in the '356 Patent. A POSITA would understand that this family describes, including in illustrated embodiments, uplink beacon signaling as occurring within designated beacon intervals in which different UEs may be assigned different time slots, allowing the base station to evaluate channel conditions on a per-UE basis.

**B.      "a processor" / "the processor" (claims 1, 2, 4)**

44.    I understand that American alleges that the "processor" limitation should be construed to mean "one or more processors, at least one of which is configured to receive resource allocation information …, send, over the physical uplink shared channel, data …, send the uplink physical signal …, and receive, on a physical control channel, control information …"

10

45.    I agree that, as a matter of ordinary usage, "a processor" can encompass "one or more processors." I otherwise disagree with American's proposed construction because it is not the plain and ordinary meaning of "processor."

46.    The specification generally describes a processor at column 8 lines 4 to 19, which has been reproduced below.

> Computing system **500** can include one or more processors, such as a processor **504**. Processor **504** can be implemented using a general or special purpose processing engine such as, for example, a microprocessor, microcontroller or other control logic. In this example, processor **504** is connected to a bus **502** or other communications medium.
>
> Computing system **500** can also include a main memory **508**, such as random access memory (RAM) or other dynamic memory, for storing information and instructions to be executed by processor **504**. Main memory **508** also may be used for storing temporary variables or other intermediate information during execution of instructions to be executed by processor **504**. Computing system **500** may likewise include a read only memory ("ROM") or other static storage device coupled to bus **502** for storing static information and instructions for processor **504**.

47.    As described in the passage above, a processor is involved with "execution of instructions" that are stored in a memory, and can be "implemented using a general or special purpose processing engine," including a microprocessor, microcontroller, or other control logic. In my opinion, this disclosure is generally consistent with the plain and ordinary meaning of a "processor."

48.    In my opinion, the portion of American's proposed construction that recites "configured to receive resource allocation information …, send, over the physical uplink shared channel, data …, send the uplink physical signal …, and receive, on a physical control channel, control information …" is not the plain and ordinary meaning of that term. Rather, American's proposed construction attempts to include other language from claim 1 that goes well beyond the

11

plain and ordinary meaning of a "processor." For at least this reason alone, American's proposed construction is incorrect. In my opinion, a POSITA would understand the term "processor" to refer to a general processing component, not to serve as a substitute for the full functional limitations already recited elsewhere in claim 1.

49.     American's proposed construction improperly collapses the processor limitation into a compilation of other claim elements and functional results. In my opinion, a POSITA would recognize this as an attempt to rewrite the claim rather than construe the term "processor," which already has a well-understood meaning in the art.

50.     American's proposed construction improperly attempts to transform a commonly understood structural term into a compilation of functional claim language. A POSITA would recognize that the claims already expressly recite what signals are received or transmitted and when those operations occur. Redefining the term "processor" to incorporate those surrounding functional limitations would not clarify the meaning of the term, but instead would improperly import limitations from the body of the claim into the construction itself. Such an approach risks rewriting the claim and creating an artificial requirement that a single processor element perform every recited function, even though a POSITA would understand that modern user equipment commonly distributes these functions across multiple cooperating hardware and software components.

51.     The term "processor" is recited four (4) times in claim 1. *See* '000 Patent at 9:56-10:17. These claim recitations do not alter or change the plain and ordinary meaning of "processor." American's proposed construction also incorporates certain language from these recitations, but not other language from these recitations. In my opinion, a POSITA would not construe "processor" in such a manner.

12

52.     American's proposed construction is further incorrect, to the extent it suggests that the processor itself is configured to "send" or "receive" data. As explained below, a POSITA would understand in the context of the '000 Patent that a receiver is a component involved with received wireless signals and a transmitter is a component involved with sending wireless signals. While the recited processor is "configured," along with the recited "transmitter" and "receiver," to send or receive signals, a POSITA would understand that the processor itself does not send or receive such signals. A POSITA would understand that this "configured to" language describes the UE's overall functional capability when the recited components operate together, not that the processor itself performs radio transmission or reception.

53.     For these reasons, it is my opinion that this term should be construed to have its plain and ordinary meaning, and that American's proposed construction is incorrect.

## C.     "a receiver" / "the receiver" (claims 1, 2, 4)

54.     I understand that American alleges that the "receiver" limitation should be construed to mean "one or more receivers, at least one of which is configured to receive resource allocation information …, and receive, on a physical control channel, control information …" I disagree.

55.     I agree that "a receiver" can include one or more receivers. However, a POSITA would not redefine "receiver" based on the specific signals it may receive in a particular claim limitation. Doing so would improperly import functional language from the body of the claim into the meaning of the term itself. I otherwise disagree with American's proposed construction because it is not the plain and ordinary meaning of "receiver."

56.     It is well understood in the context of the '000 Patent that a receiver is a component that receives radio signals. A POSITA would understand, in the context of claim 1, the user equipment or UE receiver receives the radio signals, which are commonly transmitted from a base

13

station. In my opinion, the plain and ordinary meaning of "receiver" applies here. Indeed, the '000 Patent specification is generally consistent with the description of a receiver above. *See, e.g.*, '000 Patent at 1:31-32 ("based upon signals received by the user equipment (UE)"), 2:3-5 ("the use of multiple transmit and/or receive antennas at the network and/or the mobile terminal"), 4:6-7 ("base stations and terminals that transmit and receive …"), 4:9-10 ("base stations are in receive mode when terminals are transmitting"). These citations are exemplary—I am not aware of disclosures in the specification that contradict my understanding.

57.     American's proposed construction likewise attempts to redefine the term "receiver" by incorporating functional language already recited in the claim. A POSITA would understand that the receiver is a conventional structural component responsible for receiving radio signals, and that the particular types of information received are addressed by the separate functional limitations in the claim. Importing those limitations into the term itself does not reflect the plain meaning of "receiver" and improperly conflates the component with the operations recited elsewhere in the claim.

58.     American's proposed construction attempts to include other language from claim 1 that goes well beyond the plain and ordinary meaning of a "receiver." For at least this reason alone, American's proposed construction is incorrect.

59.     Claim 1 recites receiver in two locations: "*a receiver* and a processor are configured to receive resource allocation information associated with an uplink physical signal, wherein the uplink physical signal and a physical uplink shared channel have different resources;" and "*the receiver* and the processor are further configured to receive, on a physical control channel, control information, wherein the control information is based on the determined channel conditions, wherein physical control channels are transmitted in a same time slot with other physical channels

14

in a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel, wherein a number of bits sent over the physical control channel is based on a number of fields of control information to be sent to the UE." '000 Patent at 9:56-60, 10:6-17. These claim recitations do not alter or change the plain and ordinary meaning of "receiver." American's proposed construction also incorporates certain language from these recitations, but not other language from these recitations. In my opinion, a POSITA would not construe "receiver" in such a manner.

60.    For these reasons, it is my opinion that this term should be construed to have its plain and ordinary meaning, and that American's proposed construction is not the plain and ordinary meaning.

**D.    "a transmitter" / "the transmitter" (claim 1)**

61.    I understand that American alleges that the "transmitter" limitation should be construed to mean "one or more transmitters, at least one of which is configured to send, over the physical uplink shared channel, data …, and send the uplink physical signal …"

62.    I agree that "a transmitter" can include one or more transmitters. I otherwise disagree with American's proposed construction because it is not the plain and ordinary meaning of "transmitter" and it unnecessarily incorporates language that goes beyond the plain and ordinary meaning of that term.

63.    It is well understood in the context of the '000 Patent that a transmitter is a component that transmits radio signals. A POSITA would understand, in the context of claim 1, the user equipment or UE transmitter transmits the radio signals, which are commonly received by a base station. In my opinion, the plain and ordinary meaning of "transmitter" applies here. Indeed, the '000 Patent specification is generally consistent with the description of a transmitter above. *See, e.g.,* '000 Patent at 2:4-5 ("use of multiple transmit and/or receive antennas at the network

15

and/or the mobile terminal"), 2:33-34 ("a terminal to transmit the uplink physical channel control signal"), 2:40 ("the base station to transmit a control signal"), 2:53 ("the UES that are transmitting … signals"), 4:6-7 ("base stations and terminals that transmit and receive"), 4:8-9 ("when the base station is transmitting"), 4:9-10 ("when terminals are transmitting"). These citations are exemplary—I am not aware of disclosures in the specification that are otherwise inconsistent with this understanding.

64.    Similarly, American's construction improperly defines "transmitter" in terms of the specific signals transmitted in claim 1, rather than according to its ordinary structural meaning. A POSITA would understand that a transmitter is a conventional UE component responsible for radio transmission, and that the claim separately specifies what is transmitted and when. American's approach therefore risks rewriting the claim by collapsing distinct functional limitations into the meaning of the term "transmitter."

65.    American's proposed construction does not attempt to construe a "transmitter" according to its plain and ordinary meaning, but rather attempts to include other language from claim 1 that goes well beyond the plain and ordinary meaning of a "transmitter." In other words, American's proposed construction defines "transmitter" in terms of its function, rather than defining the term itself. In my opinion, a POSITA would understand that the transmitter is a structural component responsible for radio transmission, and that the particular signals transmitted, or when they are transmitted, are addressed by other limitations in the claim. American's proposed construction improperly merges these distinct concepts. A POSITA would understand that the claim separately recites what is transmitted and when it is transmitted, and those limitations do not redefine the meaning of the term "transmitter" itself. For at least this reason alone, I disagree with American's proposed construction.

16

66.      Claim 1 recites transmitter in two locations: "*a transmitter* and the processor are configured to send, over the physical uplink shared channel, data in assigned time intervals;" and "*the transmitter* and the processor are further configured, in a time interval that it is not sending information over the physical uplink shared channel, to send the uplink physical signal based on the received resource allocation information, wherein the uplink physical signal is used to determine channel conditions by a base station and in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval." '000 Patent at 9:61-10:5. These two limitations do not alter or change the plain and ordinary meaning of "transmitter." American's proposed construction also incorporates certain language from these limitations, but not other language from these limitations. In my opinion, a POSITA would not construe "transmitter" in such a manner.

67.      For these reasons, it is my opinion that this term should be construed to have its plain and ordinary meaning, and that American's proposed construction is not the plain and ordinary meaning.

### E.      "in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval" (claim 1)

68.      Based on American's claim construction disclosures, I understand that American alleges that this limitation is "indefinite under *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005)."

69.      Claim 1 recites in part a "user equipment (UE)" that includes a "transmitter" and a "processor."[2] The claim recites that "the transmitter and the processor are further configured, in a time interval that it is not sending information over the physical uplink shared channel, to send the uplink physical signal based on the received resource allocation information, wherein the uplink

---

[2] '000 Patent at 9:55-10:17.

physical signal is used to determine channel conditions by a base station and *in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval*." '000 Patent at 10:3-5.

70.     In my opinion, a POSITA would find this limitation is definite because it reasonably apprises a POSITA of the scope of this claim, particularly when this limitation is considered in context of claim 1.

71.     Claim 1 does not recite method steps performed by a user, nor does it create ambiguity as to whether infringement occurs upon making or using the claimed UE. Instead, claim 1 recites an apparatus with components "configured to" operate in a particular manner. A POSITA would readily understand this to define the structural and functional capabilities of the UE, not a sequence of user-performed actions. From the perspective of a POSITA, infringement analysis would focus on whether a UE includes the recited receiver, transmitter, and processor configured as claimed, not on when or how a user operates the device.

72.     As recited in claim 1, the UE includes a transmitter and a processor that are configured in a manner to send the recited uplink physical signal "based on the received resource allocation information." The configuration to send the uplink physical signal must be in a manner such that it is in a "time interval that is not sending information over the physical uplink shared channel." The "uplink physical signal" is used to determine channel conditions by a base station, and the signal is sent in the same time interval that other "UEs transmit uplink physical signals."

73.     As best I understand American's proposed construction based on indefiniteness, it alleges that claim 1 is indefinite because it is unclear when infringement occurs. However, when the limitation at issue is considered in the context of claim 1, the scope of that claim can be determined with reasonable certainty, and it is thus my opinion that this limitation is not indefinite.

18

Even considering American's contention, a POSITA would understand claim 1's scope with reasonable certainty because it recites an apparatus and its functional capabilities using conventional "configured to" language, not a mixed apparatus-and-method format that obscures the boundary of infringement. Specifically, claim 1 recites a UE that includes a receiver, a processor, and a transmitter that are configured in a particular manner as recited in that claim. A POSITA would understand the scope of claim 1 to have a reasonably certain scope, as there are no method steps recited in the preamble.

74.     For at least these reasons, it is my opinion that this term is not indefinite.

F.     **"a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel" (claim 13)**

75.     Based on American's claim construction disclosures, I understand that American alleges that this limitation is "indefinite under *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005)."

76.     Claim 13 recites in part a method "performed by user equipment (UE)" that recites the step of "receiving, on a physical control channel, control information, wherein the control information is based on the determined channel conditions, wherein physical control channels are transmitted in a same time slot with other physical channels in *a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel ....*" '000 Patent at 11:15-40.

77.     In my opinion, a POSITA would find this limitation is definite because it reasonably apprises a POSITA of the scope of this claim, particularly when this limitation is considered in context of claim 13.

78.     The limitation does not create uncertainty about claim scope; rather, it describes the structure of a downlink frame and the conditions under which physical control channels are present

or absent. A POSITA would understand this as a conventional framing of wireless protocol behavior, not an ambiguous or indefinite requirement. Claim 13 does not mix apparatus and method concepts in a way that obscures the boundary of infringement. It recites a method performed by a UE, and a POSITA would understand with reasonable certainty when the method is practiced.

79.    As recited in claim 13, the UE "receiv[es], on a physical control channel, control information" that is "based on the determined channel conditions," where "physical control channels" are transmitted in a "same time slot with other physical channels in a plurality of predetermined time slots in a downlink frame," and where other time slots of the downlink frame "do not include a physical control channel." This limitation places a condition on the "same time slot," where physical control channels are received by the UE and where "other time slots" of the downlink frame received by the UE do not include a "physical control channel." In my opinion, a POSITA would understand with reasonable certainty the scope of this claim, and specifically that the scope of the claim is reasonably certain because it recites concrete method steps performed by a UE within a downlink frame structure that specifies which time slots include a physical control channel and which do not.

80.    As best I understand American's proposed construction based on indefiniteness, it alleges that method claim 13 is indefinite because it is unclear when infringement occurs. However, when the limitation at issue is considered in the context of claim 13, the scope of that claim can be determined with reasonable certainty, and it is thus my opinion that this limitation is not indefinite.

Executed on the 12th day of February 2026, in Dallas, Texas.

Joseph D. Camp