# Exhibit 13

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | | |
|---|---|---|
| INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC, | ) ) ) | |
| | ) | Case No. 4:24-cv-980 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| AMERICAN AIRLINES, INC., | ) ) | |
| Defendant. | ) ) | |

**DECLARATION OF DR. DANIEL VAN DER WEIDE
IN SUPPORT OF CLAIM CONSTUCTION**

I, Daniel van der Weide, declare as follows:

1.    I have been retained as an expert witness by American Airlines, Inc. ("American Airlines") to provide information to the Court concerning patent claims from the perspective of the "person of ordinary skill in the art" ("POSITA"). The opinions set forth below are true to the best of my knowledge, and if called to testify, I can testify competently to them.

2.    I have reviewed United States Patent No. 11,032,000 (the '000 Patent), its file history, the August 25, 2025 Amended Complaint, and other documents cited in this declaration.

3.    A list of other recent cases in which I have signed a Protective Order or have testified as an expert either at a trial, hearing, or deposition, or have submitted statements/opinions, is attached in Appendix A of this declaration, and my CV is attached as Appendix B.

4.    My time is being billed at a rate of $900 per hour plus any direct expenses incurred. My compensation is based solely on the amount of time that I devote to activity related to this case and is in no way affected by any opinions that I render. I receive no other compensation from work on this action. My compensation is not dependent on the outcome of this matter. While I am unaware of any such investment, it is conceivable that I may own mutual funds whose portfolios include stock in American Airlines. If this is the case, the value of such holdings would not constitute a material part of my net worth.

## I.  QUALIFICATIONS

5.    I am qualified by education and experience to testify as an expert in the field of telecommunications. Additionally, the following overview of my background pertains to my qualifications for providing expert testimony in this matter.

6.    I am the Grainger Institute for Engineering Professor in the Department of Electrical and Computer Engineering at the University of Wisconsin-Madison and Director of

1

the Wisconsin CHIPS Center, which is focused on integrated circuit technology for computation and communication. I received my Bachelor of Science Degree in Electrical Engineering from the University of Iowa in 1987; my Master of Science Degree in Electrical Engineering from Stanford University in 1990; and my Ph.D. degree in Electrical Engineering from Stanford in 1993. I teach several courses in my area of expertise, which includes high-frequency electrical measurement and communications systems and advanced high-frequency circuit design and measurement.

7. Specifically, I perform research on digital radio and communications systems ranging from RFID tags to lightwave transceivers, with emphasis on wireless and microwave technology. My first full-time employment upon graduation was as an engineer with Motorola Inc. International Cellular Subscriber division. I have conducted tests and research on radio receivers for cellular communications both at Motorola and subsequently using equipment donated by Motorola/Google, e.g., using communications systems analyzers. I have conducted similar tests on fiber-optic analogs, e.g., through founding Optametra and building polarization-diverse coherent receivers, which used Weiner filters to recover phase and polarization. I have used equipment to test transmission power control for cellular communications (both at Motorola and subsequently using equipment donated by Motorola/Google, e.g., using communications systems analyzers).

8. As summarized above, I co-founded Optametra in 2007, a company developing and selling hardware and software for analysis of coherent communications in long-haul single-mode optical fiber using many of the same techniques found in modern wireless communications, such as high-order modulation, equalization, carrier recovery, forward error correction, and multicarrier transmission. Optametra sold its systems worldwide to many major telecommunications vendors and carriers—competing directly and successfully with Agilent

2

Technologies (the major telecom test and measurement vendor)—and was acquired by Tektronix in 2012.

9.      I am a Fellow of the IEEE, the Institute of Electrical and Electronics Engineers that develops standards, publishes technical articles and hosts international conferences on wireless telecommunications. I participate in the IEEE P1765 Working Group to set standards for over-the-air measurements of signal quality in wireless telecommunications.

10.     As indicated in my CV, I have founded several technology companies, including companies that offered products related to telecommunications. I co-developed Optametra's technology, demonstrated and offered it for sale to telecommunications companies such as Corning, Lucent, and Adva, and received and filled purchase orders. From this experience, I have gained extensive knowledge regarding the operations of technology suppliers and the product development, demonstration, and purchase practices of large telecommunication companies. For example, I demonstrated our optical modulation analyzer technology to British Telecom and made measurements of their networks. This eventually resulted in an important sale to British government security organizations based on our representations of the features that were available for sale in our product.

## II.   PERSON OF ORDINARY SKILL IN THE ART

11.     I have been informed and understand that, in the context of an invalidity analysis, a person having ordinary skill in the art ("POSITA") is a hypothetical person who looks to prior art at the time of the invention. I further understand that the factors that may be considered in determining the level of ordinary skill include: (1) the problems encountered in the art; (2) the prior art solutions to the problems encountered in the art; (3) the rapidity of innovation; (4) the sophistication of the technology; and (5) the education level of active workers in the field. I

3

understand that these factors need not all be considered for the analysis and that one or more of these factors may control.

12. I was asked to provide my opinion on the level of one of ordinary skill in the art with respect to the alleged invention of the '000 Patent as of December 27, 2006. The '000 Patent relates to an air interface between user equipment and base stations, where active feedback control is accomplished using uplink and downlink signals and channels. Ex-1001, Abstract; 2:15-29.

13. In my opinion a POSITA relevant to this patent at the time of its invention would have had at least a bachelor's degree in electrical engineering, computer engineering, or related field, with at least three to four years of experience in wireless communication technology, or a master's degree in electrical engineering, computer engineering, or equivalent. Additional education could substitute for professional experience and vice versa.

14. As of December 27, 2006, I met the qualifications of a person of ordinary skill in the art. To be clear, all of my opinions in this declaration are from the perspective of one of ordinary skill in the art as I have defined it here during the relevant timeframe.

## III. LEGAL UNDERSTANDINGS

15. I am not a lawyer, but I understand that claim construction is the process by which a court determines the scope and meaning of terms used in the claims of a patent, and that the goal of this process is to give claim terms the ordinary and customary meaning they would have had to a POSITA as of the effective filing date, after reading the entire patent and prosecution history.

16. I understand that the prosecution history of a patent can inform the meaning of some claim language and must be taken into account in construing the claims.

4

17.    I further understand that it is possible that the specification or prosecution history may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise have to a POSITA. In such cases, I understand that the patentee's definition usually controls.

18.    I understand that the patentee may also disavow the full scope of a claim term through clear and unmistakable statements in the specification or prosecution history.

19.    I understand that, in some cases, the court may consider extrinsic evidence, such as technical dictionaries, treatises, and expert opinions, to understand the underlying technology and the way in which claim terms would be understood by a POSITA at the relevant time. However, such extrinsic evidence should not be used to vary, contradict, expand, or limit the claim language from how it is defined in the specification or prosecution history.

20.    I understand that a patent claim may be held invalid for indefiniteness if the claim, viewed in light of the specification and prosecution history, fails to inform with reasonable certainty those skilled in the art about the scope of the invention. I further understand that definiteness is to be evaluated from the perspective of someone with skill in the relevant art at the time the invention was made (pre-AIA) or at the time the patent was filed (post-AIA).

21.    I understand that a patent claim that covers both an apparatus and the method steps of using the apparatus may be held invalid for indefiniteness, as such a claim fails to apprise a person of ordinary skill in the art of its scope. I further understand that such a claim is not indefinite when it merely describes the network environment in which a system or apparatus must be used.

5

## IV.  TECHNICAL BACKGROUND

### A.  3GPP and LTE Development

22.    The Third Generation Partnership Project (3GPP) is the global standards development body responsible for the evolution of mobile communication technologies including GSM, UMTS, and LTE. Its work is organized through Technical Specification Groups (TSGs), which include Radio Access Network (RAN), Service and System Aspects (SA), and Core Network and Terminals (CT).

23.    The work of 3GPP is advanced through a formal process of contributions. Companies and organizations submit temporary documents known as Tdocs prior to or during a meeting. These Tdocs contain proposals, simulation studies, technical clarifications, or draft normative text. At the meetings, Tdocs are presented, discussed, and modified if necessary. Accepted contributions are incorporated into work items that are tracked by rapporteurs and working group chairs. Once technical consensus has been reached within the working group, the material progresses to the Technical Specification Groups and finally to publication as a Technical Specification (TS) or Technical Report (TR).

### B.  Physical Layer

24.    Orthogonal Frequency Division Multiplexing (OFDM) is the fundamental modulation technique adopted in LTE. OFDM divides the available spectrum into a large number of narrowband, closely spaced subcarriers. Each subcarrier carries a lower rate data stream, and because the subcarriers are mathematically orthogonal, they can overlap in frequency without causing inter-carrier interference. The transmission of multiple parallel low-rate streams enables high spectral efficiency and robustness against multipath fading. Each OFDM symbol has a fixed duration determined by the subcarrier spacing, and a cyclic prefix is added to absorb multipath delay spread.

25.     Orthogonal Frequency Division Multiple Access (OFDMA) extends OFDM into a multi-user access scheme. In OFDMA, the subcarriers are grouped into resource blocks that can be flexibly allocated to different users in time and frequency. This allows simultaneous transmission to and from multiple users, with dynamic allocation depending on channel quality and scheduling policy. OFDMA is used for the downlink in LTE, where the base station schedules and transmits data to multiple users concurrently.

26.     For the uplink, LTE uses single-carrier FDMA (SC-FDMA), which is based on a DFT-spread OFDM scheme. SC-FDMA was selected to reduce the peak-to-average power ratio of the transmitted signal, improving the power efficiency of the UE power amplifier.

27.     The time-frequency structure of OFDM symbols is organized into frames and slots. In LTE, a radio frame has a duration of ten milliseconds and is divided into ten subframes of one millisecond each. Each subframe is further divided into slots, and each slot typically contains seven OFDM symbols when a normal cyclic prefix is used.

28.     The figure below illustrates the LTE OFDM frame and slot structure. Each slot consists of a fixed number of OFDM symbols, and the frequency axis is divided into subcarriers that are grouped into resource blocks.



Figure 6.1  Basic time-frequency resource structure of LTE (normal cyclic prefix case).

Stefania Sesia, Issam Toufik & Matthew Baker Eds., LTE: The UMTS Long Term Evolution: From Theory to Practice, at 136 (1st ed. 2009).

### C.  Channel Structure

29.    The mapping of logical data flows onto the physical layer in 3GPP systems is defined by a set of physical channels. In the downlink, the Physical Downlink Shared Channel (PDSCH) carries user data and is mapped onto the assigned OFDM symbols and subcarriers. The Physical Downlink Control Channel (PDCCH) conveys scheduling information and control messages that inform user equipment of its resource allocations. In the uplink, the Physical Uplink Shared Channel (PUSCH) carries user data using either SC-FDMA or OFDMA. The

8

Physical Uplink Control Channel (PUCCH) carries uplink control signaling such as acknowledgments, scheduling requests, or channel state feedback.

30.    Reference signals such as the Demodulation Reference Signal (DMRS), Channel State Information Reference Signal (CSI-RS), and Sounding Reference Signal (SRS) are embedded in the time-frequency grid to support channel estimation, link adaptation, and beamforming.

### D.  Reference Signals

The reference signals mentioned above are implemented using the Constant Amplitude Zero Auto Correlation (CAZAC) property derived from Zadoff-Chu sequences. One of the useful properties of CAZAC sequences is the ability to generate many sequences from one initial sequence using cyclic shifting, where the resulting set of sequences all exhibit low cross-correlation (correlation between different CAZAC sequences). In other words, the transmitted sequences are orthogonal. This allows multiple devices to simultaneously transmit these sequences using the same frequency resources with minimal interference.

## V.  THE '000 PATENT

### A.  Overview

31.    The '000 Patent describes a closed loop method to "enable active feedback control between a base station and user equipment (UE)" where "the operation of a system designed for TDD, or unpaired operation, is expanded to operate in FDD, or paired, mode." '000 Patent, 2:25-29. The '000 Patent explains that Time Division Duplex (TDD) "uses the same radio channel for both uplink and downlink communications and discriminates between signals by separating the transmissions in time." '000 Patent, 1:23-26. Further, such a TDD system "can be adjusted to operate in Frequency Division Duplex (FDD) mode, where the uplink and downlink communications occur on different frequencies." '000 Patent, 4:15-17.

32. The '000 Patent explains that TDD enables channel reciprocity that "gives equipment the ability to derive information about uplink channel conditions from downlink channel conditions based upon signals received by the user equipment (UE)" and that "[p]athloss is one example of channel information that can be obtained from channel reciprocity." '000 Patent, 1:29-33. This is known as open-loop power control because there is no feedback back mechanism between the base station and (UE).

33. Further, the '000 Patent explains that channel reciprocity is not available when a system is operated in FDD mode but, "modifications may be made for the correct operation of uplink power control" by "defining an uplink physical control channel used for estimating the uplink channel conditions and a downlink channel used to feed back control information to the terminal" where "[t]hese channels may not need an associated data physical channel to be operational." '000 Patent, 4:31-38. This is known as a closed-loop power control because there is a feedback mechanism between the base station and (UE).

34. The '000 Patent explains that "[w]hen pathloss reciprocity is not available, the combination of an uplink physical channel control signal with a downlink feedback channel may be used to keep the terminal informed of the condition of the uplink channel," where the "uplink physical control signal is referred to herein as an 'Uplink Beacon' (UL_Beacon)." '000 Patent, 4:45-51. Here, the UL_Beacon signal may be combined with a physical layer common control channel (PLCCH) to form a feedback system." '000 Patent, 2:43-45.

35. Figure 2 shows an exemplary TD-CDMA uplink and downlink frame structure "modified to support FDD." '000 Patent, 5:62-65. The uplink frame includes "a UL_Beacon control timeslot 216, an access control timeslot 218, and normal traffic carrying timeslots 214" and the downlink frame includes "a downlink beacon timeslot 206, an access control timeslot 208, and normal traffic carrying timeslots 210." '000 Patent, 6:1-6.

10



FIG. 2

'000 Patent at Fig. 2.

36. The allocated regions for downlink data traffic (green) are called the "physical downlink shared channel," "PDSCH 210." '000 Patent, 6:1-3, 10:18-20. The allocated region for downlink control transmissions (yellow) is called the "downlink control channel" or "physical layer common control channel," "PLCCH 212." '000 Patent, 2:43-55, Abstract. The allocated regions for uplink data traffic (blue) are called the "physical uplink shared channel," "PUSCH 214." '000 Patent, 6:3-6, 9:61-63. The allocated region for uplink control transmissions (orange) is called the "uplink physical control channel," "UL-Beacon 216." '000 Patent, 6:3-6, 4:33-37.

37. In operation, the UE sends a UL-Beacon signal to the base station using the uplink physical control channel. The base station processes the UL-Beacon signal and provides feedback information to the UE using the downlink control channel. '000 Patent, 2:25-45, 2:49-55, 4:46-51. For example, the base station may determine a received power from the signal and based on the received power, send power control information as feedback. '000 Patent, 5:5-13, 10:24-26. UEs additionally send data to the base station over the physical uplink shared channel, while the

11

base station sends data to UEs over the physical downlink shared channel. '000 Patent, 10:17-20, 10:65-67.

### B. Prosecution History

38.    The application for the '000 Patent was filed on November 13, 2019, containing 24 claims. Throughout prosecution, the Examiner issued multiple rejections, citing grounds under 35 U.S.C. § 103, based on several prior art references.

## VI.  CLAIM CONSTRUCTIONS

### A.  "time interval"/"time intervals" [claims 1, 6, 13, 18]

39.    Claims 1, 6, 13, and 18 of the '000 Patent recite the transmission of data and uplink physical control signals in "time intervals." In my opinion, a person of ordinary skill in the art reading the '000 Patent would understand the "time interval" of the above claims to mean "timeslot." I understand that Intellectual Ventures has contended that this term should be given its plain and ordinary meaning.

40.     The '000 Patent's specification does not use the phrase "time interval." The only places the phrase "time interval" appears in the '000 Patent are in the '000 Patent's abstract ("A user equipment (UE) may, in a time interval that it is not sending information over a physical uplink shared channel…") and its claims. Neither the abstract nor the claims explain how a time interval differs from a time slot.

41.    Further, "time interval" is not a specific term of this art. On the other hand, "timeslots" have a specific and well-understood meaning in the context of CDMA/TDD architectures. *E.g.,* U.S. Patent App. No. 2004/0170132 at Abstract ("A method for determining uplink power requirements … includes obtaining measurements from a beacon signal occupying a first timeslot in a frame."). Indeed, as I note above in Section IV.B, LTE systems divide time

12

using a specific structure, including frames, subframes, and timeslots. By contrast, the term "time interval" is not well-known in this context.

42.    Moreover, the '000 Patent's use of "time interval" is interchangeable with its use of "timeslot." For example, claim 1 of the '000 Patent recites a transmitter and processor that are "further configured, in a time interval that it is not sending information over the physical uplink shared channel, to send the uplink physical signal based on the received resource allocation information." Similarly, the '000 Patent specification recites "a UE *allocates a time slot* for a beacon signal separated from the time slots for data in a frame." '000 Patent 2:37-39. The '000 Patent also recites that "it is possible to adapt the TDMA frame structure to provide separation between the UL_Beacon and the normal physical channels by dedicating *at least one uplink time slot per frame* . . . to carrying UL_Beacon signals." *Id.* at 5:28-32. The '000 Patent also recites that "[w]hen fractionation is employed, the RNC or other controller may allocate the *UL_Beacon timeslot* in a given frame to a group of terminals." *Id.* at 5:54-56. A POSITA interpreting claim 1 of the '000 Patent would understand that the "uplink physical signal" of claim 1 corresponds to the "beacon signal" and "UL_Beacon" disclosed in the specification, and accordingly that "time interval" is synonymous with "time slot."

43.    I understand that in related IPR2022-01130, the Patent Trial and Appeal Board stated that "we interpret 'time interval' to mean a 'timeslot' and the processor sends a signal over an uplink physical control channel 'in a timeslot that is not sending information over the physical uplink shared channel, e.g., a timeslot separated from timeslots used to send data.' … We have no persuasive evidence that a 'time interval' must be allotted between data transmission timeslots to provide closed loop feedback control." *Toyota Motor Corp. v. Intellectual Ventures II LLC,* IPR2022-01130, Paper 13 at 12, 17 (P.T.A.B. Dec. 12, 2023).

44.    The Board's construction is consistent with and further supports my above-described opinion.

45.    Accordingly, a POSITA would interpret "time interval" as used in claims 1, 6, 13, and 18 of the '000 Patent to mean "timeslot."

### B.  "in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval" [claim 1]

46.    Claim 1 of the '000 Patent is styled as an apparatus claim that recites "in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval." I understand that Intellectual Ventures has contended that this term should be given its plain and ordinary meaning.

47.    The '000 Patent's specification does not use the phrase "a plurality of UEs transmit uplink physical signals in the same time interval." The only place the phrase "a plurality of UEs transmit uplink physical signals in the same time interval" appears in the '000 Patent is in the '000 Patent's claims.

48.    However, the '000 Patent's specification discloses "A dedicated timeslot groups all of the UL_Beacon signals from multiple UEs in a specific uplink timeslot." '000 Patent at 2:45-46. Moreover, the patent also discloses that "According to embodiments of the invention, the RNC or other controller (e.g., other controller having its functionality in the core network) allocates resources so that the physical channel control signal is separate from the uplink (shared) physical channel." '000 Patent at 2:60-64. The '000 Patent also discloses "When fractionation is employed, the RNC or other controller may allocate the UL_Beacon timeslot in a given frame to a group of terminals depending on the current fractionation phase." '000 Patent at 5:54-57.

14

49.    Thus, a POSITA would understand that claim 1 of the '000 patent covers both an apparatus (the UE) and a method step (the network determines a time interval wherein the claimed UE and a plurality of UEs transmit uplink physical signals simultaneously).

50.    A POSITA would not understand the phrase "in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval" to merely describe the network environment in which the system must be used. Instead, a POSITA would understand that the claim requires that both the claimed UE and a distinct plurality of UEs simultaneously transmit uplink physical signals in the same time interval. Thus, the claim requires the UE to have various attributes as described in the claim and to perform a method step of transmitting an uplink physical signal in the same time interval as a plurality of other UEs.  Thus, the claim covers not only a system (i.e., the claimed UE) but also a method of using that system.

### C. "a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel" [claim 13]

51.    The preamble of claim 13 of the '000 Patent describes a method performed by a UE. Claim 13 further recites "a plurality of predetermined time slots in a downlink frame, wherein other time slots of the downlink frame do not include a physical control channel." I understand that Intellectual Ventures contends that this term should be given its plain and ordinary meaning.

52.    A person of skill in the art interpreting claim 13 in light of the '000 Patent's specification would understand the downlink frame element to be a physical-layer networking construct originating from a base station, not the UE. For example, Figure 2 of the '000 Patent depicts a downlink frame which a POSITA would understand to be transmitted from a base station to a terminal/UE. A POSITA would further understand that the configuration of time slots

within said downlink frame refers to the structure of the downlink frame, which is determined by the base station. Thus, a person of skill in the art would understand that the claimed downlink frame describes a system element that is independent of the claimed method.

53.    Thus, a POSITA would understand that claim 13 of the '000 Patent covers both a method (the method performed by the UE) and a system element (the structure of the downlink frame).

Date: February 12, 2026 at Madison, WI Daniel W. van der Weide, Ph.D.

16