**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| **INTELLECTUAL VENTURES I LLC AND INTELLECTUAL VENUTRES II, LLC,**<br><br>    **Plaintiff,**<br><br>    **vs.**<br><br>**AMERICAN AIRLINES, INC.,**<br><br>    **Defendant.** | **Civil Action No. 4:24-cv-00980**<br><br><br>**JURY TRIAL** |

<u>**AMERICAN AIRLINES, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**</u>

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................1

II.     LEGAL STANDARDS ..........................................................................................1

III.    PERSON OF ORDINARY SKILL IN THE ART..................................................2

IV.     '841 and '584 Patents............................................................................................2

        A.      "high performance [computing] cluster" ('841 Pat., cl. 9;
                '584 Pat., cls. 1, 10) ..................................................................................3

        B.      "operational and[/or] connectivity problems" and
                "hardware and[/or] software problems" ('841 Pat., cl. 1;
                '584 Pat., cls. 5, 6) ....................................................................................4

        C.      "means … to limit access" ('584 Pat., cl. 8)..............................................7

        D.      "communications within the first and second clusters are
                isolated" / "communications between the first [HPC]
                cluster and the second [HPC] cluster are isolated" ('841
                Pat., claim 8; '584 Pat., cls. 1, 10) ...........................................................9

V.      '282 PATENT.......................................................................................................11

        A.      "appropriate persistent mapping" ('282 Pat., cls. 1, 15)..........................11

        B.      "low-level driver" ('282 Pat., cl. 1) ........................................................13

        C.      "root image" ('282 Pat., cls. 1, 4, 5, 15, 17, 20, 21) ...............................14

        D.      "the modifying" ('282 Pat., cl. 15) .........................................................17

        E.      "at an operational level" ('282 Pat., cl. 26)............................................18

VI.     '080 PATENT.......................................................................................................19

        A.      "distributed parallel computing program" (Claims 1, 4, 5, 6,
                9, 17, and 18) ...........................................................................................19

        B.      "distributed sequential computing program" (Claims 1 and
                9)...............................................................................................................21

        C.      "parallel processing and/or operations" (Claims 1 and 9) .......................23

VII.    '000 Patent ..........................................................................................................24

        A.      "time interval" / "time intervals" (Claims 1, 6, and 13) ..........................24

B.   "a processor/the processor" / "a receiver/the receiver" (Claims 1, 2, and 4) / "a transmitter/the transmitter" (Claim 1) ........................................................................................................28

C.   "in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval" (Claim 1)...........................................................29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AstraZeneca LP v. Apotex, Inc.*,
    633 F.3d 1042 (Fed. Cir. 2010).................................................................................................1

*Aylus Networks, Inc. v. Apple Inc.*,
    856 F.3d 1353 (Fed. Cir. 2017).............................................................................1, 23, 25, 26

*BASF Corp. v. Johnson Matthey Inc.*,
    875 F.3d 1360 (Fed. Cir. 2017).................................................................................................6

*Bayer Intellectual Prop. GmbH v. Warner Chilcott Co., LLC*,
    2015 WL 1849015 (D. Del. Apr. 21, 2015), *aff'd*, 645 F. App'x 993 (Fed. Cir. 2016) .............3

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
    713 F.3d 1090 (Fed. Cir. 2013)...............................................................................................24

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
    296 F.3d 1106 (Fed. Cir. 2002).................................................................................................8

*Chewy Inc. v. IBM*,
    571 F. Supp. 3d 133 (S.D.N.Y. 2021).......................................................................................6

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005).....................................................................................5, 11, 13

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
    192 F.3d 973 (Fed. Cir. 1999).................................................................................................25

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
    435 F.3d 1366 (Fed. Cir. 2006)...............................................................................................17

*Finjan LLC v. SonicWall, Inc.*,
    84 F.4th 963 (Fed. Cir. 2023) ...........................................................................................28, 29

*Genuine Enabling Tech. LLC v. Nintendo Co.*,
    29 F.4th 1365 (Fed. Cir. 2022) .................................................................................................2

*Gesture Tech. Partners, LLC v. Huawei Device Co.*,
    No. 2:21-CV-40-JRG, 2021 WL 4760632 (E.D. Tex. Oct. 12, 2021)....................................30

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)...............................................................................................17

*In re McFadden*,
    No. 2024-2107, 2025 WL 2553720 (Fed. Cir. Sept. 5, 2025) ..........................................29, 30

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
 902 F.3d 1372 (Fed. Cir. 2018)..................................................................................3, 5, 13

*Interval Licensing LLC v. AOL, Inc.*,
 766 F.3d 1364 (Fed. Cir. 2014).............................................................................4, 7, 17, 19

*IPXL Holdings, LLC v. Amazon.com, Inc.*,
 430 F.3d 1377 (Fed. Cir. 2005)........................................................................................29

*Liberty Ammunition, Inc. v. United States*,
 835 F.3d 1388 (Fed. Cir. 2016).........................................................................................5

*LT v. Bright Data Ltd.*,
 No. 2:22-cv-011-JRG-RSP, 2022 U.S. Dist. LEXIS 236653 (E.D. Tex. Dec. 19,
 2022) ................................................................................................................................25

*Marine Polymer Techs., Inc. v. HemCon, Inc.*,
 672 F.3d 1350 (Fed. Cir. 2012) (en banc)........................................................................27

*MBO Lab'ys, Inc. v. Becton, Dickinson & Co.*,
 474 F.3d 1323 (Fed. Cir. 2007)..........................................................................................1

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
 30 F.4th 1339 (Fed. Cir. 2022) ..........................................................................................3

*NTP, Inc. v. Research in Motion, Ltd.*,
 418 F.3d 1282 (Fed. Cir. 2005)........................................................................................14

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
 521 F.3d 1351 (Fed. Cir. 2008).....................................................................................2, 11

*Optimum Imaging Techs. LLC v. Canon Inc*,
 No. 2:19-CV-00246-JRG, 2020 WL 3104290 (E.D. Tex. June 11, 2020) ............................30

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) (en banc)..................................................................... passim

*Rembrandt Data Tech., LP v. AOL, LLC*,
 641 F.3d 1331 (Fed. Cir. 2011).........................................................................................29

*Salazar v. AT&T Mobility LLC*,
 64 F.4th 1311 (Fed. Cir. 2023) ........................................................................................28

*Sinorgchem Co. v. It'l Trade Comm'n*,
 511 F.3d 1132 (Fed. Cir. 2007).....................................................................................16, 20

*SkinMedica, Inc. v. Histogen*,
 727 F.3d 1187 (Fed. Cir. 2013).....................................................................................21, 22

iv

*SRI Int'l v. Matsushita Elec. Corp.*,
   775 F.2d 1107 (Fed. Cir. 1985)..................................................................................29

*U.S. Well Servs., Inc. v. Halliburton Co.*,
   2022 WL 819548 (W.D. Tex. Jan. 17, 2022), *aff'd*, 2025 WL 798863 (Fed. Cir. Mar.
   13, 2025) ......................................................................................................................3

**TABLE OF EXHIBITS**

| Exhibits attached to Dkt. No. 139 | | |
|---|---|---|
| **Ex. No.** | **Description** | **Dkt. No. (attached to Dkt. No. 139)** |
| 1. | U.S. Patent No. 7,822,841 (the "'841 Patent") | Dkt. No. 139-2 |
| 2. | Declaration of Mahdi Eslamimehr, Ph.D. in support of Claim Construction, dated February 12, 2026 | Dkt. No. 139-3 |
| 3. | Excerpts from the Transcript of the March 12, 2026 Deposition of Michael T. Goodrich, Ph.D. | Dkt. No. 139-4 |
| 4. | Declaration of Michael T. Goodrich in support of Claim Construction, dated February 12, 2026 | Dkt. No. 139-5 |
| 5. | U.S. Patent No. 8,352,584 (the "'584 Patent") | Dkt. No. 139-6 |
| 6. | U.S. Patent No. 7,721,282 (the "'282 Patent") | Dkt. No. 139-7 |
| 7. | U.S. Patent No. 7,712,080 (the "'080 Patent") | Dkt. No. 139-8 |
| 8. | Declaration of Michael Shamos, Ph.D. (Markman Declaration), dated February 12, 2026 | Dkt. No. 139-9 |
| 9. | Excerpts from the Transcript of the March 16, 2026 Deposition of Michael Shamos, Ph.D. | Dkt. No. 139-10 |
| 10. | U.S. Patent No. 11,032,000 (the "'000 Patent") | Dkt. No. 139-11 |
| 11. | Declaration of Joseph D. Camp, dated February 12, 2026 | Dkt. No. 139-12 |
| 12. | Excerpts from the Transcript of the March 17, 2026 Deposition of Joseph D. Camp, Ph.D. | Dkt. No. 139-13 |
| 13. | Declaration of Dr. Daniel van der Weide in support of Claim Construction, dated February 12, 2026 | Dkt. No. 139-14 |

| Exhibits attached to this Brief | |
|---|---|
| **Ex. No.** | **Description** |
| A. | Transcript of the March 16, 2026 Deposition of Michael Shamos, Ph.D. |
| B. | '080 File History — July 22, 2008 Office Action |
| C. | '080 File History — January 21, 2009 Office Action Response |
| D. | IPR2022-01130 Patent Owner's Preliminary Response ('356 POPR) |
| E. | U.S. Patent No. 8,811,356 |
| F. | Transcript of the March 17, 2026 Deposition of Joseph Camp |

## I.    INTRODUCTION

IV contends that nearly every disputed claim term should be construed with its "plain meaning". IV's arguments belie the record. American's constructions account for the patentee's lexicography and disavowal, as required by Federal Circuit law.

## II.    LEGAL STANDARDS

The plain meaning controls unless the patentee acts as his own lexicographer and provides a special definition for a claim term or the patentee disavows the ordinary scope of a claim term. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

"[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1051-52 (Fed. Cir. 2010) (quoting *Phillips*, 415 F.3d at 1316). The specification need not reveal such a definition explicitly. *Id.* (citing *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001). "[W]hen a patentee uses a claim term throughout the entire patent specification in a manner consistent with only a single meaning, he has defined that term 'by implication.'" *Id.* (quoting *Bell Atlantic*, 262 F.3d at 1271).

"Prosecution disclaimer 'preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.'" *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017) (quoting *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003)). "[T]he doctrine of prosecution disclaimer ensures that claims are not 'construed one way in order to obtain their allowance and in a different way against accused infringers.'" *Id.* at 1360. Disclaimer may occur through amendment or argument. *Id.* at 1359. These include arguments made to convince the Patent Office of patentability, such as "distinctions between the patented invention and the prior art." *MBO Lab'ys, Inc. v. Becton,*

1

*Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007). Prosecution disclaimer "protects the public's reliance on definitive statements made during prosecution." *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374 (Fed. Cir. 2022) (quoting *Omega*, 334 F.3d at 1324).

## III.    PERSON OF ORDINARY SKILL IN THE ART

A court determines the proper construction of a claim term from the viewpoint of the hypothetical person of ordinary skill in the art (POSITA). *Phillips*, 415 F.3d at 1313. The Asserted Patents relate to computational devices and networking. A person of ordinary skill in the art as of the respective priority dates for the Asserted Patents would have had a bachelor's degree in electrical engineering, computer science, or the like, and/or two or more years of industry experience in networking and distributed computing. Additional experience may make up for a lack of education and *vice versa*. Ex. 4 ¶18; Ex. 8 ¶36; Ex. 13 ¶13.

## IV.    '841 AND '584 PATENTS

The '584 Patent is a continuation of the '841 Patent, '584 Patent at 1:7–10, sharing the same specification. The patents describe a computer system for remotely hosting multiple computing clusters, each tailored to the needs of individual clients. '841 Patent at 2:57–63, 4:10–14. The system provides clusters at a central hosting facility that clients access over a public network such as the internet. '841 Patent at 3:1–3, 6:31–38. Each cluster is independently configured so that each cluster's computing environment is optimized for a particular client's task.[1] *Id.* at 3:20–25.

The patents also disclose a monitoring framework comprising per-node monitors and a

---

[1] IV refuses to state the "plain meaning" of "wherein the first configuration differs from the second configuration" in the '841 and '584 claims. This term does not require construction at this time, but if IV applies it in a way that creates a dispute, American will raise that dispute when appropriate. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

central monitoring system that oversees network connectivity and overall cluster health. *Id.* at 7:43–52, 8:29–36. Client access is controlled through firewall and authentication mechanisms that verify the destination cluster and the requesting user's authorization. *Id.* at 5:47–60. Gateway devices isolate each cluster's private network traffic, preventing cross-cluster interference. *Id.* at 5:27–32.

### A. "high performance [computing] cluster" ('841 Pat., cl. 9; '584 Pat., cls. 1, 10)

| American's Construction | Plaintiffs' Position |
|---|---|
| Indefinite | not indefinite |

The term "high performance [computing] cluster" is indefinite because it is a term of degree with no objective boundary in the intrinsic record. *Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1348–49 (Fed. Cir. 2022). Terms of degree must be anchored by a baseline discernible to a POSITA. *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018). Courts routinely hold "high"/"low" modifiers indefinite when the intrinsic record supplies no measurable criteria for comparison. *E.g.*, *U.S. Well Servs., Inc. v. Halliburton Co.*, 2022 WL 819548, at *6–7, 9 (W.D. Tex. Jan. 17, 2022), *aff'd*, 2025 WL 798863 (Fed. Cir. Mar. 13, 2025) (finding "high pressure" indefinite); *Bayer Intellectual Prop. GmbH v. Warner Chilcott Co., LLC*, 2015 WL 1849015, at *1 (D. Del. Apr. 21, 2015), *aff'd*, 645 F. App'x 993 (Fed. Cir. 2016) (concluding claim terms containing "high" and "low" indefinite). This Court previously applied this framework to find a similar term indefinite. Dkt. 127 at 33–36.

The intrinsic record fails to state how a POSITA would distinguish a "high performance" cluster from a "medium" or "low" performance cluster or an "average" or "poor" performance cluster. Ex. 4 at ¶ 63. The specification uses "high performance" as an undefined marketing label untethered to measurable attributes. '841 Patent at 2:5–18, 5:1–11; '584 Patent at 2:12–25, 5:10–20; Ex. 4 at ¶¶ 61, 63, 71. IV's cited passages merely provide undefined rhetoric that "high

3

performance" clusters are "difficult to setup, configure, and manage," use "the most computers of any cluster type," and allow multiple computers to work together on a large problem. *Id.*; '841 Patent at 1:32–2:18. These characterizations provide no objective boundary to determine a "high performance" cluster from the performance of a "medium" or "low" performance cluster.

The indefiniteness problem is compounded by the breadth of the underlying "cluster" concept. The patents state that grouped resources are "often labeled" clusters and that such clusters "may be configured for high availability, for higher performance, or to suit other functional parameters," using virtually any combination of hardware and software. '841 Patent at 1:15–24. The same architecture, running different workloads or configured with modest hardware upgrades, might be called "high performance" by one POSITA and not another— precisely the situation in which courts find indefiniteness. *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

IV also relies on later references to "HPC clusters" and asserts that these are "consistent" with the initial description. Dkt. 139 at 7. Merely re-using the marketing label rhetoric does nothing to define the scope or provide the legally required objective boundaries. The specification provides no quantitative benchmark, test, or external standard that would anchor the "high" term. Because the specification does not provide an objective baseline to distinguish what is a "high" performance cluster from other clusters, the term is indefinite.

### B.    "operational and[/or] connectivity problems" and "hardware and[/or] software problems" ('841 Pat., cl. 1; '584 Pat., cls. 5, 6)

| American's Construction | Plaintiffs' Position |
| --- | --- |
| Indefinite | not indefinite |

Both sets of terms—"operational and[/or] connectivity problems" and "hardware and[/or] software problems"—are indefinite because the shared specification does not provide objective

4

boundaries for what counts as a "problem," leaving a POSITA to draw subjective, ad hoc lines between normal (but not perfect) operation and a "problem."[2,3] IV argues these are "well-understood categories of failures" a POSITA would "readily" recognize. Dkt. 139 at 2, 4. Not so.

A claim term is indefinite when it is "completely dependent on a person's subjective opinion." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005); *see also T-Mobile*, 902 F.3d at 1381 ("[A] term of degree that is purely subjective and depends on the unpredictable vagaries of any one person's opinion is indefinite.") (internal citations omitted). Functional or degree-type language is indefinite where the intrinsic record provides insufficient guidance as to any objective boundaries for the claims, even if the general subject matter is familiar to a POSITA. *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1395-96 (Fed. Cir. 2016).

The specifications provide no objective criteria. The only mention of "connectivity and availability or other operational problems" appears at '841 Patent at 3:26–31, 8:27–9:6 (discussing hardware or software problems once) and Fig. 5 (steps 502, 505, 510, 515); Ex. 4 at ¶¶ 32–33, 39–40, 78, 81. But these passages describe what happens *after* a "problem" is detected—the monitoring system detects "connectivity and availability or other operational problems" or "a problem with the node hardware or software," then issues alerts. Ex. 4 at ¶¶ 32, 34, 39, 41, 78, 81. But the specifications never give a single example, threshold, or metric for what qualifies as a "problem"—no error rates, downtime levels, packet-loss thresholds, crash counts, resource-utilization benchmarks, or any other objective criterion. *Id.* at ¶¶ 32–43, 78, 81.

---

[2] These terms are addressed jointly because IV cites undifferentiated specification passages for both (*compare* Dkt. 139 at 3–4 *with* Dkt. 139 at 2–3), and the indefiniteness defect is identical.

[3] The "or" formulation in the '584 claims does not narrow or clarify the scope; it simply restates the same indefinite concept in the disjunctive. Ex. 4 at ¶¶ 76–82.

Examples illustrate the subjectivity: a user streaming a movie that reduces available bandwidth, a forgotten password with repeated login attempts, or a task that runs for hours could each be viewed as either normal (but less than perfect) operation or a "problem." The specification provides no guidance as to which it is. Ex. 4 at ¶ 35; *see also id.* at ¶¶ 42, 78, 81. For connectivity, industry guidance treats 3% packet loss as "good," 15% as "medium," and 25% as "poor," yet the specification provides no indication whether any of these levels constitute "connectivity problems." *Id.* at ¶¶ 36, 78. Similarly, a RAID disk failure that is automatically reconstructed, an OS upgrade that temporarily takes a node offline, or a long-running task that may be computationally intensive or a runaway process cannot be classified as a "problem" or "normal" based on the intrinsic record. *Id.* at ¶¶ 42, 81. Moreover, whether a given scenario is a "problem" depends on the customer, workload, and service expectations, which the patents acknowledge may differ from one organization to another. '841 Patent at 6:24–7:8. Two POSITAs could disagree about whether the same cluster behavior is a "problem" or normal operation and nothing in the specification resolves that disagreement.

IV's arguments do not cure the indefiniteness. IV attempts to define the terms by arguing that "operational problems" are "issues affecting cluster operations" and "connectivity problems" are "issues affecting cluster network communications." Dkt. 139 at 2. This simply replaces the word "problems" with "issues" without providing any objective boundaries. Nor does *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360 (Fed. Cir. 2017), which IV relies on, permit a patentee to rely on an expert's say-so where the claim uses a broad, functional phrase with no objective limits in the specification. *Phillips*, 415 F.3d at 1318 ("conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court"); *see also Chewy Inc. v. IBM*, 571 F. Supp. 3d 133, 146 (S.D.N.Y. 2021) ("[Plaintiff's] arguments for

ambiguity are only cursorily stated without substantiation beyond expert say-so and thus not convincing."). Additionally, neither set of terms constitutes a term of art with a well-settled, uniform meaning. Ex. 4 at ¶ 34, 41, 78, 81.

The overlap between the two sets of terms underscores indefiniteness. IV's expert confirms this overlap, defining "operational problems" as issues affecting cluster operations, such as execution failures and performance degradation, and "hardware problems" as malfunctions of physical components like processors, memory, and storage. Ex. 2 at ¶¶ 48, 64. But those same hardware "problems," which are not mentioned in the specifications, are the very execution failures and performance degradations that constitute "operational problems," so IV's arguments offer no way to distinguish the terms from each other—let alone define the scope of either. *Id.* at ¶ 58. ("hardware/software failures are operational problems"). As in *Interval Licensing*, the specification leaves POSITAs to pick among characterizations that "might mean several different things" with no objective guidance as to the proper meaning. 766 F.3d at 1371.

Because the specification provides no objective baseline for a "problem," "operational and[/or] connectivity problems" and "hardware and[/or] software problems" are indefinite.

### C.      "means … to limit access" ('584 Pat., cl. 8)

| American's Construction | Plaintiffs' Position |
|---|---|
| *Structure*: firewall and authentication mechanism 210 | *Structure*: Firewall and authentication system/mechanism (e.g., 210), including implementations such as per-cluster firewall/authentication systems/mechanisms (e.g., 410/411/412), and associated software/hardware configured to (1) direct incoming connections to the correct cluster and (2) authenticate the user/client to ensure access only to the authorized cluster, and equivalents thereof. |

The parties agree on the function: "limit access to the first cluster to communication access from a first client associated with the first client task and limit access to the second cluster to communication access from a second client associated with the second client task." The disputed

corresponding structure is limited to what the specification associates to the claimed function. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113–14 (Fed. Cir. 2002).

The specification clearly links firewall and authentication mechanism 210 to the claimed function: "Access control to the individual clusters 250, 251, 252 is governed by the firewall and authentication mechanism 210. This mechanism 210 may be implemented with several configurations to achieve the goal of ensuring that clients have access to their cluster, and only to their cluster." '841 Patent at 5:57–6:3; '584 Patent at 5:57–6:3; Ex. 4 at ¶¶ 87–88. The specification's language thus confirms that the various access-control approaches (public-address-based routing, service-based routing, user authentication at the firewall) are *configurations of mechanism 210*, not separate structures. *Id.* The per-cluster components 410/411/412 are likewise alternative configurations of the same firewall/authentication system 210 placing the firewall closer to individual clusters—not distinct structures separately linked to the function. '841 Patent at 9:7–29; Ex. 4 at ¶¶ 87–91.

IV improperly adds additional functions to its proposed structure: i.e., "(1) directing incoming connections" and "(2) authenticating the user/client" is functionality that is not part of the claimed function. IV cannot add additional functions through the corresponding structure.

Because the specification clearly links mechanism 210 to the claimed function of ensuring clients access to "their cluster, and only their cluster," the corresponding structure is mechanism 210. *Mettler-Toledo*, 671 F.3d at 1296. Allowing IV to expand beyond mechanism 210 to any "firewall and authentication systems/mechanisms" plus unspecified "associated software/hardware" to perform other functions would convert a means-plus-function element into an open-ended functional claim untethered to the specific structure in the specification.

**D.** **"communications within the first and second clusters are isolated" / "communications between the first [HPC] cluster and the second [HPC] cluster are isolated" ('841 Pat., claim 8; '584 Pat., cls. 1, 10)**

| American's Construction | Plaintiffs' Position |
|---|---|
| Network traffic within each cluster is maintained separate from other clusters by a gateway positioned between the private cluster network and the private company network that manages traffic destined for its corresponding cluster | No construction or meaning provided |

Claim 8 of the '841 Patent recites "whereby the communications within the first and second clusters are isolated" in the context of clusters that "each comprise a private cluster network … and a gateway mechanism positioned between the private cluster network and the private communications network." '841 Patent at 12:21–31. Claims 1 and 10 of the '584 Patent similarly require that "communications between the first [HPC] cluster and the second [HPC] cluster are isolated." '584 Patent at 11:42–43, 12:60–61. IV argues for "plain and ordinary meaning," but its own expert offers three different definitions that ultimately agree with the gateway-mediated topology American proposes. Ex. 2 at ¶¶ 84, 91, 113.

The specification is "the single best guide to the meaning of a disputed term," and where it consistently uses a term in connection with a particular structure, the construction should reflect that usage. *Phillips*, 415 F.3d at 1315–16. The specification consistently ties "isolation" to gateway-based segregation: "Gateway mechanisms isolate each cluster such that communications within a cluster or on a private cluster communications network are maintained separate (e.g., do not have to share bandwidth of a single system network)." '841 Patent at Abstract, 3:43–47. Gateway 240 provides "efficient separation of the individual cluster network traffic to prevent one cluster from interfering with other clusters." '841 Patent at 5:27–36. Thus, the claimed "communications … are isolated" refers to this gateway-based separation described in the specification: each cluster's internal traffic stays on its private cluster network and only

9

shares bandwidth with other clusters through the gateways. Ex. 4 at ¶¶ 51–57, 70–72. Clusters are not isolated from all external communication; rather gateway mechanisms maintain separation so clusters do not interfere with one another. *Id.* at ¶¶ 55–57.

IV's expert offers three "plain and ordinary meaning" definitions, none of which are the plain meaning of the term in light of the specification. First, IV's expert states that isolation means communications within each cluster "are kept separate from communications occurring outside that cluster," with no mention of a gateway mechanism described in the specification. Ex. 2 at ¶ 84. Next, IV's expert shifts to a topology-based definition: "internal communications within each cluster occur on a private cluster network that is segregated from other clusters and from broader networks, with access mediated through the claimed gateway mechanism"— effectively agreeing with American's construction requiring the gateway mechanism. *Id.* at ¶ 91. Last, IV's expert offers yet another formulation: clusters "do not directly exchange communications with one another or can only do so in a controlled and segregated manner," with no explicit mention of a gateway mechanism described in the specification although the gateway mechanism is the only mechanism to have the "controlled and segregated manner" required. *Id.* at ¶ 113. The coherent anchor across the three proposals is that communications are segregated/separated and the specification teaches the gateway as required for such separation.

IV suggests a different meaning for "isolated" in '841 claim 8 versus '584 claims 1 and 10 but in both claims, isolation necessitates the same gateway-based segregation. The only difference is whether the claim focuses on intra-cluster traffic ('841 claim 8) or inter-cluster traffic ('584 claims 1/10), both of which must pass through the gateways. Dkt. 139 at 8. IV's expert's shifting formulations confirm he does not apply a single, consistent plain meaning based on the specification. Ex. 2 at ¶ 113.

Because the specification ties "isolated" communications to gateway mechanisms that segregate each cluster's traffic, and because IV's expert's definitions converge on that same topology, the Court should adopt American's construction.

## V.    '282 PATENT

The '282 Patent addresses caching and indexing in block-level distributed application management. '282 Patent at 1:16–19. The disclosed system employs a first storage unit that holds blocks of a root image for a compute node and a second storage unit that stores a leaf image containing new data blocks[4] and modifications to the root image's blocks. *Id.* at 2:19–23. A union block device ("UBD") between the compute node and these storage units constructs the compute node's application environment by merging root and leaf image blocks. *Id.* at Abstract, 2:23–30. Because the system operates at the block level beneath the file system layer, it is independent of any particular file system or operating system. *Id.* at 4:48–51.

### A.    "appropriate persistent mapping" ('282 Pat., cls. 1, 15)

| American's Construction | Plaintiffs' Position |
| --- | --- |
| Indefinite as to "appropriate persistent" | No construction or meaning provided |

Claims 1 and 15 recite "upon receiving a write request from the compute node for a sector X, creating an appropriate persistent mapping for sector X." '282 Patent at 8:21–24. However, the '282 patent never provides objective boundaries for what makes a mapping "appropriate persistent." Ex. 4 at ¶¶ 108–113. "[A]ppropriate persistent mapping" is thus indefinite. *Datamize*, 417 F.3d at 1350; *see also* Dkt. 127 at 33–36.

The passage IV cites to states that, upon a write request for sector X, the union block

---

[4] IV refuses to state the plain meaning of "new data blocks" ('282 Pat., cls. 1, 15). "New data blocks" does not need construction at this time, but if IV applies this term in a way that creates a claim construction dispute, American will raise that dispute when appropriate. *O2 Micro*, 521 F.3d at 1362. The same holds true for the term "sector" ('282 Pat., cls. 1, 10, 15).

devices "will create an appropriate persistent mapping for sector X and then write sector X onto their respective second storage units," and that, if the data block already exists in the leaf image, "it does not need to be mapped and copied from the root image before modification because a persistent mapping already exists." Dkt. 139 at 14 (citing '282 Patent at 5:3–11). But that language merely restates the functional result—that some mapping exists and can be reused—without giving a POSITA any objective criteria for determining whether a mapping is "appropriate persistent." Ex. 4 at ¶¶ 109–110.

"Appropriate" is a term of degree, but the specification never supplies the degree. A POSITA would recognize multiple reasonable mapping strategies, yet the intrinsic record provides no thresholds, correctness conditions, or algorithmic constraints separating "appropriate" and inappropriate mappings. Ex. 4 at ¶ 110. As in *Datamize*, the term leaves infringement to subjective judgment rather than objective boundaries. 417 F.3d at 1350–51 (holding "aesthetically pleasing" as indefinite because of "the unpredictable vagaries of any one person's opinion"). Without such criteria, one engineer might deem a particular mapping approach "appropriate," another might not, and the patent gives no way to choose between them.

IV argues that "appropriate persistent" reflects that the mapping depends on system state—specifically, whether the sector is already stored in the leaf image or must be newly mapped from the root image before modification. Dkt. 139 at 14; Ex. 2 at ¶¶ 184–186. But the claim language does not require a "new mapping if necessary"; the claim language requires an "appropriate persistent" mapping with no guidance as to what this means. The specification does not tell a POSITA when (or how) a mapping is "appropriate", nor what boundaries distinguish an "appropriate" mapping from an "inappropriate" one. What is "appropriate" is a classically subjective term—different people consider different things "appropriate" or "inappropriate." A

12

claim term is indefinite when it is "completely dependent on a person's subjective opinion." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005); *see also T-Mobile*, 902 F.3d at 1381. "Appropriate persistent mapping" has with no intrinsic boundary between infringing ("appropriate") and non-infringing ("inappropriate") implementations. Because the specification does not provide objective criteria for what makes a mapping "appropriate persistent," the phrase is indefinite.

### B.    "low-level driver" ('282 Pat., cl. 1)

| American's Construction | Plaintiffs' Position |
|---|---|
| Driver that operates below the file system | No construction or meaning provided |

Claim 1 recites "the union block device comprises a low-level driver for interfacing between the first and second storage units and the file system of the compute node." '282 Patent at 7:32–34. "Low-level" means "a driver that operates below the file system," consistent with the intrinsic record. By using the specific phrase "low-level driver" instead of just "driver," the patentee defined the layer at which the driver operates as part of the claim.

The specification states that the UBDs are "effectively low-level drivers" that interface between the storage devices and the file system, and that "[b]ecause UBDs 130a–n *operate below the file system*, they are concerned merely with the blocks of data themselves, rather than files they form." '282 Patent at 4:42–51 (emphasis added). This defines a "low-level driver" as a driver beneath the file system that handles blocks and sectors while the file system manages files. Ex. 4 at ¶¶ 119–122. That definition is consistent with the plain meaning of the term. The UBD merges blocks of root and leaf images and operates on sectors/blocks, not files. '282 Patent at 4:42–51. A file system, by contrast, manages named files and directories at a higher level of abstraction. Ex. 4 at ¶ 121. The UBD "for interfacing between the … storage units and the file system" therefore must occupy the lower layer, between physical storage and the file system,

13

which is where a low-level block driver is conventionally located. *Id.* at ¶¶ 121–122. This separation is critical for the patent advantage of system modularity: it allows the file system to remain device-agnostic because the low-level driver handles physical storage details. *Id.* at ¶ 122.

IV argues that "operate below the file system" describes only one embodiment. Dkt. 139 at 15. But the specification's sole use of "low-level driver" equates it with operation below the file system (consistent with the term's plain meaning), and the claim repeats that same role. '282 Patent at 4:42–51, 7:32–34. There is no disclosure in which a "low-level driver" sits at or above the file-system layer, nor any disclosure of a driver at another layer labeled "low-level." Ex. 4 at ¶¶ 119–120. IV simply ignores "below the file system" language in the specification and the term's plain meaning. IV's expert, in contrast, describes the low-level driver as "processing … write requests and creating mappings to redirect writes to the appropriate storage unit," which is block-level functionality below the file system. Ex. 2 at ¶¶ 199, 202–203.

### C.    "root image" ('282 Pat., cls. 1, 4, 5, 15, 17, 20, 21)

| American's Construction | Plaintiffs' Position |
| --- | --- |
| A read-only base set of data blocks, operating beneath the file system, that provide the common portion of the application environment | No construction or meaning provided |

American's construction aligns with the patent's description of the root image's role and location and is consistent with the Court's prior construction of the term in a related patent. Ex. 4 at ¶¶ 93–103. The '844 Patent, previously construed by the Court and which is a continuation-in-part of the '282 Patent being discussed in this instance, shares the same root/leaf architecture. In construing "root image" there, this Court adopted the construction: "a common set of data blocks that are unchanged by the plurality of compute nodes." Dkt. 127 at 18. The term carries a consistent meaning across the patent family. *NTP*, *Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005).

The '282 Patent expressly characterizes the root image as "a read-only base image (or 'root' image) of the application environment" that is "accessible by all compute nodes in the cluster," with changes stored in a "'leaf' image unique to that compute node." '282 Patent at 1:62–67. This read-only nature is what allows multiple compute nodes to share the same blocks while recording individual modifications only in their respective leaf images. Ex. 4 at ¶¶ 94, 99. If compute nodes could modify the root image blocks directly, the entire root/leaf overlay scheme would lose its storage benefits and coherence guarantees. *Id.* at ¶ 99. The '282 Patent further describes "distributed application environments" delivered to compute nodes by "merging the blocks of the root image stored on the first storage unit with the leaf image stored on the second storage unit." '282 Patent at 2:28–30. The commonality across nodes comes from the shared root image; nodes differ only in their leaf images. Ex. 4 at ¶¶ 94, 99, 103.

The specification further explains that the root/leaf mechanism operates at the block level, below the file system: "By storing data at the block level, embodiments are able to operate beneath the file system and thus are designed to be file system and operating system independent." '282 Patent at 5:65–6:2. Because the UBD merges blocks of the root and leaf images and comprises a low-level driver for interfacing between the storage units and the file system, a POSITA would understand that the blocks of the root image necessarily operate beneath the file system. Ex. 4 at ¶¶ 95–98.

IV argues that the claims do not require the root image to be read-only, pointing to dependent claims 13 and 29 and to the specification's description of merging, where root and leaf images are combined "to form a new root image." Dkt. 139 at 11–12 (citing '282 Patent at 6:31–37); Ex. 2 at ¶¶ 170–172. The specification explains that the filter "merges the changes recorded on the leaf images with the root image and delivers the result to the appropriate

15

compute node[.]" It describes a transient, computed view presented to a compute node, not a change to the underlying root image stored on the first storage unit. Ex. 6 at 2:1:4. That combined view is what the node "sees" as "its own unique and cohesive instance of the application environment," but the patent is clear that the shared root image remains a read-only base while node-specific changes are recorded only in the leaf images. *Id.* at 2:4-5. In other words, there is no dispute that merging creates a *new* root image instance, but that does not change the fact that the shared root image is read-only.

The root image's read-only character is established by the patent's lexicography. Ex. 4 at ¶¶ 99, 103. The specification equates the "root image" with a "read-only base image," and does so in definitional, not merely descriptive, language: it introduces the term using quotation marks around "root" image and consistently uses "root image" thereafter to refer to that read-only base. Ex. 6 at 1:62-64, 4:12-16. When a patentee sets off a term by quotation marks, it is a "strong indication that what follows is a definition." *Sinorgchem Co. v. It'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (citing *Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1331 (Fed. Cir. 2000)).

IV's reliance on dependent claims 13 and 29 is misplaced. Ex. 2 at ¶¶ 170–172. Nothing in those claims suggests that the root image itself becomes writable; instead, they address where blocks of the root image and leaf images are physically stored. The ability for a *storage unit* to be read only is irrelevant to the defined characteristics of the root image. Allowing "root image" to cover per-node-modifiable, file-system-level images contradicts the patent's repeated description of a read-only, block-level base image shared across compute nodes, with node-specific changes going into leaf images. The Court should adopt American's construction.

16

### D.      "the modifying" ('282 Pat., cl. 15)

| American's Construction | Plaintiffs' Position |
|---|---|
| Indefinite | No construction or meaning provided |

"The modifying" in claim 15 is indefinite because it lacks antecedent basis and the intrinsic record does not supply a clear referent. Ex. 4 at ¶¶ 126–128. A lack of antecedent basis renders a claim indefinite when the missing reference leaves a POSITA unable to determine the claim's scope. *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249–50 (Fed. Cir. 2008). Although some errors can be cured by implication where the referent is inherent, dependent claims cannot repair ambiguity in an independent claim. *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370–71 (Fed. Cir. 2006).

Claim 15 states that the UBD receives a write request for sector X, creates an appropriate persistent mapping, and performs "the modifying" of sector X, but never introduces a "modifying" that "the modifying" could refer to. '282 Patent at 8:3–24; Ex. 4 at ¶ 127. The surrounding limitations do not label any act as "modifying." '282 Patent at 8:21–24. Because the patent provides no instruction, a POSITA could read "the modifying" as referring to various acts such as modification of a leaf block, a mapped block copied from the root image, or the application environment. Ex. 4 at ¶¶ 127–128; *Interval Licensing*, 766 F.3d at 1371.

IV argues that a POSTIA would have understood "the modifying" with "reasonable certainty," and that dependent claim 16, which recites "modifying the leaf image in response to the compute node's access to the application environment," "clarif[ies] … the modifying operation recited in claim 15." Dkt. 139 at 16–17; Ex. 2 at ¶¶ 208–9. But claim 16 depends on claim 15 and incorporates its limitations, so it cannot cure a defect in the independent claim. 37 C.F.R. § 1.75(c) ("One or more claims may be presented in dependent form, *referring back to and further limiting* another claim or claims in the same application.") (emphasis added). Claim

17

16 can narrow or add to "the modifying," but it cannot create an antecedent basis for a term never properly introduced. Nor do the specification passages IV cites—describing "modifying the leaf image in response to the compute node's access to its instance of the application environment" ('282 Patent at 6:23–30, Fig. 3, Step 350)—supply the missing antecedent. Ex. 2 at ¶ 210. These passages describe general operation, not what "the modifying" in claim 15 refers back to. Because "the modifying" lacks antecedent basis, the term is indefinite.

E.      "at an operational level" ('282 Pat., cl. 26)

| American's Construction | Plaintiffs' Position |
| --- | --- |
| Indefinite | No construction or meaning provided |

Claim 26 recites "wherein merging occurs at an operational level between the first and second storage units and file system of the compute node." '282 Patent at 8:51–53. This phrase is indefinite because the patent lacks objective boundaries for what it means. Ex. 4 at ¶¶ 129–132.

The word "operational" is not in the specification; it only appears in claim 26. Ex. 4 at ¶ 131. A POSITA would thus have no guidance on whether "operational level" refers to block-level versus file-system-level operation, kernel-mode versus user-mode execution, or some other abstraction. *Id.* at ¶¶ 131–132. Although the specification discusses low-level drivers operating below the file system, it never equates "operational level" with any layer. '282 Patent at 4:42–51. Under *Phillips*, courts cannot rewrite the claim to say "at a block level" when the patentee chose the different phrase "at an operational level." 415 F.3d at 1315–17.

IV's expert suggests that "operational" refers to the system's functioning during normal use. Ex. 2 at ¶ 214. But plugging that definition into the claim produces a tautology: "merging occurs at [normal use]" does not distinguish any particular technical layer and collapses into a vague statement that the system works. That construction neither rests on specific disclosure nor distinguishes infringing from non-infringing systems. The term "might mean several different

18

things and no informed and confident choice is available among the contending definitions."

*Interval Licensing*, 766 F.3d at 1371 (internal citations omitted). Thus, the term is indefinite.

## VI.    '080 PATENT

The '080 Patent addresses the construction of software programs that distribute processing over multiple processors and multiple memories, referred to as "parallel distributed programs." '080 Patent at 1:25-30. The "present invention" of the '080 patent is expressly directed to a specific type of "parallel distributed programs" called "navigational programming." *Id.* at 1:13-15; 2:9-10. Navigational programming "includes the programming and use of self-migrating threads or tasks, which are threads or tasks that can migrate from one processor to another." '080 Patent at 3:15-8. "Navigation" in this context refers to execution threads moving to the processor at which they are needed. Ex. 8 at ¶ 39.

The '080 Patent discloses that one feature of "navigational programming" is what it calls "distributed parallel computing," or DPC," which is computing using multiple concurrent distributed sequential computing "DSC" programs. '080 Patent at 5:57-59. A DPC program is a combination of a DSC program and a fetching DSC program. *Id*. at 6:61-65. The '080 Patent explains that a DSC program "injects" or "spawns" a separate DSC program that performs "fetching" of data. *Id*. at 6:43-47. "Fetch" was long a common term in the art for retrieving data from a memory. Ex. 8 at ¶ 41. Spawning occurs in the '080 Patent by executing an "Inject()" statement. '080 Patent at 9:15-16.

### A.    "distributed parallel computing program" (Claims 1, 4, 5, 6, 9, 17, and 18)

| American's Construction | Plaintiffs' Position |
|---|---|
| program that computes using multiple concurrent distributed sequential computing programs configured to operate across multiple processors/nodes and multiple memories | No construction or meaning provided |

The patentees acted as their own lexicographers for the term "distributed parallel

19

computing program" by providing a definition in the specification. The patentees' definition governs. *Phillips*, 415 F.3d at 1316.

Claim 1 is directed to "[a] method of developing a distributed parallel computing program." According to the claim, a distributed parallel computing program is created by "transforming the at least one distributed sequential computing program into at least one distributed parallel computing program by spawning at least one child distributed sequential computing program from the at least one distributed sequential computing program." '080 Patent at 11:14-18. As the term "distributed parallel computing program" does not have a plain and ordinary meaning, a POSITA would have reviewed the specification for guidance. Ex. 8 at ¶ 50. The '080 Patent contains definitions of the similar terms, "distributed parallel computing" and "parallel distributed program." As the "present invention" of the '080 patent is directed to "parallel distributed programs" ('080 Patent at 1:13-15; 2:9-10) and as the claims are directed to "distributed parallel computing programs," a POSITA would have equated the two terms. Ex. 8 at ¶ 53. The patentees defined the term "parallel distributed program" in the specification as:

> On the other hand, a software application for operation on multiple processors that uses multiple memory areas may be more complex. Such applications are often referred to as "parallel distributed programs," and there are generally two approaches to developing such programs.

'080 Patent at 1:25-30; *see also* 2:10-12 ("Generally, a parallel distributed program is configured to operate across multiple processors/nodes and multiple memories."); *Sinorgchem Co. v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) ("The term 'controlled amount' is set off by quotation marks—often a strong indication that what follows is a definition.").

The patentees further defined the term "distributed parallel computing" as "computing using multiple concurrent DSC programs." '080 Patent at 5:58-59. Combining the definitions, a "distributed parallel computing program" uses multiple concurrent DSC programs, which are

20

configured to operate across multiple processors/nodes and multiple memories. Thus, patentee's own language confirms that "distributed parallel computing program" means "program that computes using multiple concurrent distributed sequential computing programs configured to operate across multiple processors/nodes and multiple memories." Ex. 8 at ¶ 54.

IV contends that "distributed parallel computing program" should be construed to have its ordinary and customary meaning, "*i.e.* a program that enables parallel processing through concurrent execution," which its expert opines is consistent with the ordinary technical meaning of a different term, "distributed parallel computing." Dkt. 139 at 18; Ex. 2 at ¶ 224. IV's expert's testimony is conclusory, irrelevant, and, as it conflicts with the specification, fails to align with a POSITA's perspective in light of the entire patent at the time of the invention. It should be given no weight. *SkinMedica, Inc. v. Histogen*, 727 F.3d 1187, 1210 (Fed. Cir. 2013).

IV further argues that the statement in the specification that "a DPC application targeted to multi-processor environments may be utilized on a uni-processor and operates as a multi-threaded application" ('080 Patent at 6:2-4) means that "a distributed computing program is not limited to execution across multiple processors or multiple nodes." Doc. 139 at 19. But the "uni-processor" disclosure does not change the meaning of "distributed parallel computing program," because "[y]ou can run the code on a uniprocessor. It's no longer a DPC program. It's not running in parallel and it's not distributing. It's not a DPC application." Ex. A at 20:8-13.

### B.    "distributed sequential computing program" (Claims 1 and 9)

| American's Construction | Plaintiffs' Position |
|---|---|
| program using a single locus of computation over distributed data | No construction or meaning provided |

The patentees acted as their own lexicographers as to the term "distributed sequential computing program" by providing a controlling definition in the specification. *Phillips*, 415 F.3d at 1316. The patentees defined "distributed sequential computing program" in the specification

as "computing using a single locus of computation over distributed data[.]" '080 Patent at 3:50-53; Ex. 8 at ¶¶ 57-58.

IV argues that the Court should ignore the patentees' definition of "distributed sequential computing program" and instead should construe it as "a program that performs computation sequentially while accessing distributed data." Dkt. 139 at 19-20. IV's expert's testimony here (Ex. 2 at ¶ 238) is again conclusory, unsupported, and irrelevant as it conflicts with the specification and is thus not from the perspective of a POSITA after reading the entire patent at the time of the invention. It is therefore not entitled to any weight. *SkinMedica*, 727 F.3d at 1210.

IV argues that American's construction is improper, because "'distributed sequential computing program' describes the manner of computation, sequential execution, rather than imposing a rigid structural or architectural limitation on how or where computation must occur." Dkt. No. 139 at 20. This statement is not supported by IV's expert, who states in his declaration, contrary to IV's alleged plain meaning construction, that the specification at 3:60-4:14 "confirms that a distributed sequential computing program involves a 'single locus of computation,' meaning a single location or execution point where the computation proceeds, rather than multiple concurrent execution locations." Ex. 2 at ¶ 243. He then concludes, *without any support*, that, despite the specification's definition that a "distributed sequential computing program" involves a "single locus of computation," a POSITA would understand that the specification is describing something else—"the sequential nature of the computation, not a requirement that execution remain fixed on a single processor, node, or memory." *Id.* The Court should give no weight to the expert's unsupported conclusory testimony that contradicts the specification. *SkinMedica*, 727 F.3d at 1210.

22

### C.    "parallel processing and/or operations" (Claims 1 and 9)

| American's Construction | Plaintiffs' Position |
| --- | --- |
| system that uses a globally accessible memory space built on distributed memories | No construction or meaning provided |

The patentees disclaimed the scope of "parallel processing and/or operations" during prosecution. "Prosecution disclaimer 'preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution.'" *Aylus Networks*, 856 F.3d at 1359. "[T]he doctrine of prosecution disclaimer ensures that claims are not 'construed one way in order to obtain their allowance and in a different way against accused infringers.'" *Id.* at 1360.

During prosecution, the examiner rejected the claims over a reference to Suzuki. Ex. B (Office Action, July 22, 2008) at 4. In response, the patentees distinguished their claims, which at the time required parallel processing as they were directed to a "method of developing a *parallel* distributed application," because "[n]othing in Suzuki discloses a parallel system" and "[o]ne of ordinary skill in the art would readily recognize that *parallel processing enables many calculations to be carried out simultaneously, i.e., without terminating and resuming thread processes*." Ex. C (January 21, 2009 Response to Office Action) at 5-6 (emphases added); Ex. 8 at ¶¶ 67-69. Thus, to overcome the rejection, the patentees voluntarily disclaimed the scope of the claim to include only parallel processing that enables many calculations to be carried out simultaneously, *i.e.*, without terminating and resuming thread processes. Ex. 8 at ¶ 71. Therefore, as used in the '080 Patent, "parallel processing and/or operations" means "handling multiple threads concurrently without terminating and resuming thread processes." *Id.*

IV argues that there could not have been any disclaimer because the term "parallel processing and/or operations" was not yet in the claims, as it would be added to the claims later. Doc. 139 at 21. IV ignores the fact that, at that time, the claims were directed to "a *parallel* distributed application," the examiner's rejection included a finding that Suzuki disclosed a

23

"parallel distributed system" (Ex. B (Office Action, July 22, 2008) at 4-5), and the patentees argued that the claims were patentable because the examiner made "clear that Suzuki discloses a computing paradigm comprising a set of autonomous self-migrating threads that operates in a sequential sense *and not in the parallel sense as claimed by Applicants*." Ex. C (January 21, 2009 Response to Office Action) at 5-6 (emphasis added).

The disclaimer is clear and unmistakable. As the patentees argued, "in order for a thread to recommence, i.e., resume, it must have been terminated prior to migration" and "Suzuki simply does not disclose a system that can handle multiple threads concurrently." *Id.* "Nothing in Suzuki discloses a parallel system," because "[o]ne of ordinary skill in the art would readily recognize that parallel processing enables many calculations to be carried out simultaneously, i.e., without terminating and resuming thread processes." Ex. C (January 21, 2009 Response to Office Action) at 6; *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cir. 2013); *Computer Docking Station*, 519 F.3d at 1374.

## VII.    '000 PATENT

The alleged invention of the '000 patent relates to a closed loop method to "enable active feedback control between a base station and user equipment (UE)." '000 Patent at 2:25–27. According to the patent, "a UE allocates a time slot for a beacon signal separated from the time slots for data in a frame." *Id.* at 2:37–39. Beacon signals from multiple UEs can be grouped in a specific uplink timeslot. *Id.* at 2:45–46.

### A.    "time interval" / "time intervals" (Claims 1, 6, and 13)

| American's Construction | Plaintiffs' Position |
|---|---|
| "time slot" and "time slots" | Plain and ordinary meaning |

In an IPR proceeding for the '000 Patent's grandparent (U.S. Patent No. 8,811,356, the "'356 patent") IV told the PTAB that "[t]he term 'time interval' and 'time slot' are used

24

synonymously." Ex. D ('356 POPR) at 11. Now, IV wants "time interval" to mean something "broader" than "time slot," although how much broader is unclear. Dkt. 139 at 23–24. IV's prior arguments for the grandparent '356 patent represent prosecution disclaimer for the '000 Patent— the Court should enforce this disclaimer and adopt American's construction.

The '000 Patent shares a specification with its grandparent '356 patent, and the claims of both patents use "time interval" in similar limitations. Both patents claim a UE with a processor configured to send data "in assigned time intervals" and send uplink physical signals "in a time interval that it is not sending information over the physical uplink shared channel." '000 Patent at cl. 1; '356 patent at cl. 1. Thus, IV's statements in the '356 prosecution history "appl[y] with equal force" to the '000 patent. *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation."). The record of the IPR for the '356 patent is part of the prosecution history. *LT v. Bright Data Ltd.*, No. 2:22-cv-011-JRG-RSP, 2022 U.S. Dist. LEXIS 236653, at *3 (E.D. Tex. Dec. 19, 2022), *report and recommendation adopted*, 2023 U.S. Dist. LEXIS 12791 ("The prosecution history also includes . . . *inter partes review*") (citing *Aylus Networks, Inc. v. Apple, Inc.*, 856 F.3d 1353, 1362 n.3 (Fed. Cir. 2017)) (other internal citation and quotation omitted). Thus, IV's express disclaimer in the IPR for the grandparent '356 patent—*i.e.*, a disclaimer of any meaning of "time interval" that is broader than "time slot"—effects prosecution disclaimer on the same term in the grandchild '000 patent. *Aylus*, 856 F.3d at 1362 ("[S]tatements made by a patent owner during an IPR proceeding, whether before or after an institution decision, can be considered for claim construction and relied upon to support a finding of prosecution disclaimer."). IV told the patent office that "time

25

interval" means "time slot," and it should be held to that disclaimer.

IV's statements in the '356 IPR were a clear and unmistakable surrender of claim scope. Although "when a prosecution argument is subject to more than one reasonable interpretation, it cannot rise to the level of a clear and unmistakable disclaimer," any alternative IV may offer is not reasonable. *Id.* at 1363 (finding prosecution disclaimer and rejecting patentee's interpretation of the disclaiming statements as "not reasonable"). In the '356 IPR, IV was unequivocal: "The term 'time interval' and 'time slot' are used synonymously in the '356 Patent. In *every* instance, the term refers to *a time slot within a frame* … ." Ex. D ('356 POPR) at 11 (emphasis in original). IV told the patent office, clearly and unmistakably, that "time interval" is synonymous with "time slot," and it should be held to that express disclaimer.

The '000 Patent itself confirms that "time interval" should be construed as "time slot." Ex. 13 (van der Weide Decl.) ¶ 39. The term "time interval" appears only in the '000 Patent's abstract and claims, not in its specification. '000 Patent. Although neither the abstract nor the claims directly explain what a "time interval" is, the term's use is synonymous with "time slot" in both. Ex. 13 ¶¶ 40-42. For example, the '000 Patent claims a transmitter and a processor that are configured "in a time interval that it is not sending information over the physical uplink shared channel, to send the uplink physical signal based on the received resource allocation information." '000 Patent at cl. 1. In other words, the UE is configured to send the uplink physical signal and data at different time intervals.[5] *Id.* Similarly, the specification consistently explains the UE is configured to send the UL_Beacon and data in different time slots, reflecting the claims' use of "time interval." *E.g.*, '000 Patent at 2:37–39 ("In one embodiment, a UE

---

[5] The '000 specification explains—and IV agrees—that this "uplink physical signal" is the "UL_Beacon" or "beacon signal." *Id.* at 2:37–39, 5:28–32, 5:54–56; Dkt. 139 at 24–25; Ex. 13 (van der Weide Decl.) ¶ 42.

allocates a time slot for a beacon signal separated from the time slots for data in a frame."); 5:28–32 ("[I]t is possible to adapt the TDMA frame structure to provide separation between the UL_Beacon and the normal physical channels by dedicating at least one uplink time slot per frame (or at least one time slot per multi-frame) to carrying UL_Beacon signals.").

IV wrongly alleges that American's construction excludes two of the three '000 embodiments. Dkt. 139 at 24–25. On the contrary, both embodiments identified by IV align with the construction that "time interval" means "time slot." As to embodiment (2) in IV's brief ("fractionating"), the '000 Patent states "[w]hen fractionation is employed, the RNC or other controller may allocate the UL_Beacon timeslot in a given frame to a group of terminals depending on the current fractionation phase." '000 Patent at 5:54–57. And for embodiment (3), the quote in IV's brief proves American's point: "In particular, this may also apply for the case where there are more than one UL_Beacon timeslot per, frame." Dkt. 139 at 25 (quoting '000 Patent at 5:47–49). Neither of these embodiments use the term "time interval." Instead, they both confirm that, in the '000 Patent, the term "time interval" means "time slot."

IV also suggests that claim differentiation mandates a broader meaning for "time interval." Not so. Here, the overwhelming weight of the specification and IV's statement to the PTAB must govern. *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1359 (Fed. Cir. 2012) (en banc) ("[C]laim differentiation is not a hard and fast rule and will be overcome by a contrary construction dictated by the written description or prosecution history."). The term "time interval" does not appear once in the specification, and IV has previously argued that it is "synonymous" with "time slot." The Court should adopt American's construction.

B.    "a processor/the processor" / "a receiver/the receiver" (Claims 1, 2, and 4) / "a transmitter/the transmitter" (Claim 1)

| American's Construction | Plaintiffs' Position |
|---|---|
| one or more processors, at least one of which is configured to receive resource allocation information . . ., send, over the physical uplink shared channel, data . . ., send the uplink physical signal . . ., and receive, on a physical control channel, control information . . . | Plain and ordinary meaning |
| one or more receivers, at least one of which is configured to receive resource allocation information . . ., and receive, on a physical control channel, control information . . . | Plain and ordinary meaning |
| one or more transmitters, at least one of which is configured to send, over the physical uplink shared channel, data . . ., and send the uplink physical signal . . . | Plain and ordinary meaning |

Federal Circuit precedent, along with the claims and specification, mandate American's construction, which is that claim 1 requires at least one processor, receiver, and transmitter configured to perform each of the corresponding claimed functions. The Federal Circuit recently construed claims precisely like this one, explaining that while the indefinite article "a" does allow for "one or more," the rule of antecedent basis still applies: subsequent limitations referring back to "the" component require that at least one component be capable of performing each of the claimed functions. *Finjan LLC v. SonicWall, Inc.*, 84 F.4th 963, 975 (Fed. Cir. 2023) (construing "a computer/the computer": "[e]ven if an infringing system can use 'one or more computers,' the plain language of the claims requires at least one of those computers to perform all the functions listed in the claims"); *Salazar v. AT&T Mobility LLC*, 64 F.4th 1311, 1315, 1318 (Fed. Cir. 2023) (same for "a/said microprocessor").

The claims here are like those the Federal Circuit construed in *Finjan* and *Salazar*: the '000 Patent claims recite "a processor," and then recite the processor's additional characteristics by using the definite article "the." '000 Patent at cls. 1, 2, 4. By their plain language, the claims require at least one processor that is configured to: "receive resource allocation information," "send, over the physical uplink shared channel, data," "send the uplink physical signal," and

28

"receive, on a physical control channel, control information." *Id.*; *Finjan*, 84 F.4th at 975. This antecedent basis rule also applies to "a/the receiver" and "a/the transmitter." *Id.*

IV argues that the specification discloses multiple processors, receivers, and transmitters, but "that is a separate issue from whether the claims require the same component to perform multiple functions or satisfy multiple limitations of a claim." *Finjan*, 84 F.4th at 974. American's construction accounts for the specification's disclosure of "one or more processors," '000 Patent at 8:4–5) while staying true to the claim language and the case law. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) ("It is the *claims* that measure the invention."). The Court should adopt American's constructions.

### C.    "in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval" (Claim 1)

| American's Construction | Plaintiffs' Position |
|---|---|
| indefinite under *IPXL Holdings* | Not indefinite |

Claim 1 of the '000 Patent is invalid as indefinite because it claims both a system and a method. A claim is invalid as indefinite when it "recites both a system and the method for using that system." *IPXL*, 430 F.3d at 1384. Claim 1 recites the apparatus user equipment, with a number of structural limitations. '000 Patent at cl. 1. But it also recites a method step that "a plurality of UEs transmit uplink physical signals in the same time interval" as the claimed UE. *Id.* at 10:3–5. The claim's requirement that "a plurality of UEs transmit …" makes it unclear whether infringement "occurs when one creates a system that allows the user to [infringe the claims]," or "when the user actually [infringes the claims.]" *IPXL*, 430 F.3d at 1384. Importantly, claims are invalid under *IPXL* when they are mixed method and apparatus claims even when the claim does not call for action by a specific user. *Rembrandt Data Tech., LP v. AOL, LLC*, 641 F.3d 1331, 1339 (Fed. Cir. 2011) ("transmitting the trellis encoded frames" is a method element).

IV argues that the "configured to" claim language saves claim 1 from being a hybrid

29

claim, but IV is wrong. Dkt. 139 at 28–29 (citing *In re McFadden*, No. 2024-2107, 2025 WL 2553720, at *4 (Fed. Cir. Sept. 5, 2025)). In *McFadden*, the claim at issue recited "a subsystem configured to use" a method. *Id.* at *1. Here, the problematic limitation recites:

> the transmitter and the processor are further configured, in a time interval that it is not sending information over the physical uplink shared channel, to send the uplink physical signal based on the received resource allocation, wherein the uplink physical signal is used to determine channel conditions by a base station <u>and in the same time interval that the uplink physical signal is sent, a plurality of UEs transmit uplink physical signals in the same time interval</u>.

'000 Patent at cl. 1 (emphasis added). Unlike *McFadden*, claim 1 of the '000 Patent requires other UEs—not the claimed UE—to perform a method. *Id.*; Ex. 13 ¶ 50. Limitations of this sort are indefinite regardless of whether they are preceded by "configured to," because they are "directed to actual use, not merely configuration." *Gesture Tech. Partners, LLC v. Huawei Device Co.*, No. 2:21-CV-40-JRG, 2021 WL 4760632, at *24–25 (E.D. Tex. Oct. 12, 2021) (differentiating between "wherein the computer is operable to determine a gesture" (not indefinite) and "wherein the gesture is performed by a person other than the user of the handheld device" (indefinite)). IV's expert agrees, admitting that "at the beginning of time, the user could not infringe for that one instance until other users joined." Ex. F (Camp Dep. Tr.) at 110:1–4.

Claim 1's requirement that <u>other UEs</u> perform the method differentiates it from the claims analyzed in *Optimum Imaging Techs. LLC v. Canon Inc,* No. 2:19-CV-00246-JRG, 2020 WL 3104290, at *24 (E.D. Tex. June 11, 2020). There, the claim described capabilities of a "digital imaging system" and thus provided sufficient notice "to ascertain whether infringement occurs when the device is manufactured or when the device is used." *Id.* (citing *IPXL*, 430 F.3d at 1384). Here, the requirement that "a plurality of UEs transmit" fails to provide such notice to a POSITA. Ex. 13 ¶ 50. As in *Gesture Tech.*, claim 1 is "directed to actual use, not merely configuration." 2021 WL 4760632, at *25. Claim 1 is thus indefinite under *IPXL.*

30

Dated: April 13, 2026

**McKool Smith, P.C.**

*/s/ John B. Campbell*
John B. Campbell
Texas State Bar No. 24036314
jcampbell@McKoolSmith.com
Kenneth M. Scott
Texas State Bar No. 24137497
kscott@McKoolSmith.com
**McKool Smith, P.C.**
303 Colorado Street Suite 2100
Austin, TX 78701
Telephone: (512) 692-8700
Telecopier: (512) 692-8744

Emily Tannenbaum
New York State Bar No. 5928130
**McKool Smith, P.C.**
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 402-9400
Telecopier: (212) 402-9444

Casey L. Shomaker
Texas State Bar No. 24110359
cshomaker@mckoolsmith.com
**McKool Smith, P.C.**
300 Crescent Court, Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Facsimile: (214) 978-4044

Alan P. Block
California State Bar No. 143783
ablock@mckoolsmith.com
**McKool Smith, P.C.**
300 South Grand Avenue, Suite 2900
Los Angeles, CA 90071
Telephone: (213) 694-1054
Telecopier: (213) 694-1234

ATTORNEYS FOR AMERICAN
AMERICAN AIRLINES, INC.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on April 13, 2026.

/s/ John B. Campbell
John B. Campbell