# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MUNICH RE AMERICA SERVICES, INC., MUNICH AMERICAN REASSURANCE COMPANY,  MUNICH LIFE MANAGEMENT CORPORATION LTD., and MÜNCHENER RÜCKVERSICHERUNGS-GESELLSCHAFT AKTIENGESELLSCHAFT IN MÜNCHEN,<br><br>            Plaintiffs,<br><br>    v.<br><br>INTELLECTUAL VENTURES I LLC, INTELLECTUAL VENTURES II LLC, CALLAHAN CELLULAR LLC, and OL SECURITY LLC<br><br>            Defendants. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR DECLARATORY JUDGMENT OF NON-INFRINGEMENT**

Plaintiffs Munich Re America Services, Inc., Munich American Reassurance Company, Munich Life Management Corporation Ltd., and Münchener Rückversicherungs-Gesellschaft Aktiengesellschaft in München (collectively, "Munich Re") bring this Complaint for Declaratory Judgment against Defendants Intellectual Ventures I LLC ("IV I"), Intellectual Ventures II LLC ("IV II"), Callahan Cellular LLC, and  OL Security LLC (collectively, "IV" or "Defendants"). Munich Re alleges as follows:

**NATURE OF THE ACTION**

1.     This is an action for declaratory judgment of non-infringement arising under the patent laws of the United States, Title 35 of the United States Code. Munich Re requests this relief because IV has accused Munich Re of infringing certain patents allegedly owned by IV or its subsidiaries, including U.S. Patent Nos. 8,332,844 ("844 Patent"), 7,257,582 ("582 Patent"),

1

7,669,081 (the "081 Patent"), 8,352,584 (the "584 Patent") and 8,266,124 ("124 Patent") (collectively, the "DJ Patents;" attached as Exs. 1-5 hereto), by the alleged use of certain software, including third-party software known as Docker, Kubernetes, and Spark. IV has threatened to sue Munich Re under the DJ Patents if Munich Re does not pay IV a license fee.

2.    Munich Re, however, has not and does not infringe any claim of the DJ Patents, and Munich Re is not required to pay IV a license fee. IV's assertion of the DJ patents against Munich Re is impacting Munich Re's business and relationships with its vendors and customers, creating a justiciable controversy between Munich Re and IV. A judicial declaration is necessary and appropriate so that Munich Re may ascertain its rights with respect to the DJ Patents.

## THE PARTIES

3.    Plaintiff Munich Re America Services, Inc. is a domestic corporation organized under the laws of the State of Delaware, with its principal place of business located at 555 College Road East, P.O. Box 5241, Princeton, New Jersey 08543. Munich Re America Services is a leading provider of reinsurance, primary insurance, and insurance-related risk solutions.

4.    Plaintiff Munich American Reassurance Company is a domestic corporation organized under the laws of the State of Georgia, with its principal place of business located at 3500 Lenox Road NE, Suite 900, Atlanta, Georgia 30326. Munich American Reassurance Company is a leading provider of life and health reinsurance solutions.

5.    Plaintiff Munich Life Management Corporation Limited is a corporation organized under the laws of Canada, with its principal place of business located at 390 Bay Street, 26th Floor, Toronto, Ontario M5H 2Y2, Canada. Munich Life Management Corporation Limited is a leading provider of life and health reinsurance solutions, including coverage for individual life, disability, critical illness, long-term care, and group life and health insurance.

6.      Plaintiff Münchener Rückversicherungs-Gesellschaft Aktiengesellschaft in München is a corporation organized under the laws of Germany, with its principal place of business located at Königinstraße 107, 80802 Munich, Germany. Münchener Rückversicherungs-Gesellschaft Aktiengesellschaft in München is a leading global provider of reinsurance, primary insurance, and insurance-related risk solutions.

7.      On information and belief, Defendant Intellectual Ventures I LLC is a Delaware limited liability company, with its principal place of business located at 3150 139th Avenue SE, Bellevue, Washington 98005.

8.      On information and belief, Defendant Intellectual Ventures II LLC is a Delaware limited liability company, with its principal place of business located at 3150 139th Avenue SE, Bellevue, Washington 98005.

9.      On information and belief, Defendant Callahan Cellular, LLC is a Delaware limited liability company, with its principal place of business located at 2711 Centerville Road, Suite 400 Wilmington, Delaware 19808.

10.     On information and belief, Defendant OL Security LLC is a Delaware limited liability company, with its principal place of business located at 160 Greentree Drive Suite 101 Dover, Delaware 19904.

## JURISDICTION AND VENUE

11.     This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201, and under the patent laws of the United States, 35 U.S.C. § 1, et seq.

12.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 1338, 2201, and 2202. An actual, substantial, immediate, and continuing controversy exists between IV and Munich Re that requires a declaration of rights by this Court regarding the DJ

3

Patents. Among other things and as detailed herein, beginning in January 2024, escalating thereafter, IV has repeatedly targeted Munich Re as part of a patent licensing and enforcement campaign, asserting that Munich Re was required to obtain a patent license from IV to avoid being sued for infringement. For example, on June 6, 2025, IV sent Munich Re a "formal notice" letter (attached as Ex. 6 hereto) expressly accusing Munich Re of infringing the DJ Patents based on its alleged use of specific software technologies and stating that IV does not authorize Munich Re to practice the DJ Patents without a license. In these and other communications, IV has accused Munich Re of infringing the DJ Patents and threatened that failure to engage with IV to obtain a license would result in IV filing a patent infringement suit against Munich Re (which, as discussed below, IV has done against numerous other companies that did not agree to license IV's patents). Munich Re denies that it infringes any claim of any of the DJ Patents and denies that it is required to obtain a license from or to pay IV. IV's accusations, demands, and escalations have created a real, live, immediate, and justiciable controversy between the parties concerning infringement, validity, and enforceability of the DJ Patents.

13.     This Court has personal jurisdiction over each Defendant under the laws of this State and consistent with the underlying due process principles of the United States Constitution, including because each Defendant is incorporated in, does business in, or has otherwise purposefully availed itself of the laws of the State of Delaware.

14.     This Court has personal jurisdiction over IV I under the laws of this State and consistent with the underlying due process principles of the United States Constitution. IV I also is subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

4

15.     This Court has personal jurisdiction over IV II under the laws of this State and consistent with the underlying due process principles of the United States Constitution. IV II also is subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

16.     This Court has personal jurisdiction over Callahan Cellular LLC under the laws of this State and consistent with the underlying due process principles of the United States Constitution. Callahan Cellular LLC also is subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

17.     This Court has personal jurisdiction over OL Security LLC under the laws of this State and consistent with the underlying due process principles of the United States Constitution. OL Security LLC also is subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

18.     The IV entities also have purposefully availed themselves of this forum by bringing prior actions seeking to enforce their patent rights in Delaware. *See e.g., Intellectual Ventures I LLC v. Ubiquiti Inc.*, No. 23-cv-865, D.I. 1 (D. Del. Aug. 8, 2023). On information and belief, the IV entities also have entered into licensing agreements for the use of their patents in Delaware, and they have each sent other cease and desist letters into the forum to other entities regarding their patents.

19.     Venue is proper in this judicial district under at least 28 U.S.C. § 1391(b), (c) because each Defendant is a resident of, incorporated in, or subject to personal jurisdiction in this District.

**THE DJ PATENTS**

20. IV II alleges it is the owner of all rights, title, and interest in and to the 844 and 584 Patents. *See, e.g.,* Ex. 6; *IV v. American Airlines, Inc.*, No. 24-cv-980 (E.D. Tex. filed Nov. 2, 2024) at D.I. 1 ¶4, 25 and D.I. 84 ¶5, 43. As noted previously, the 844 and 584 Patents are attached as Exs. 1 and 4, respectively.

21. IV I alleges it is the owner of all rights, title, and interest in and to the 582 Patent. *See, e.g.,* Ex. 6. As noted previously, the 582 Patent is attached as Ex. 2.

22. IV alleges that OL Security LLC is a wholly owned subsidiary of the IV entities and that OL Security LLC is the assignee of the 081 Patent. *See, e.g.*, *Travelers Indemnity Co. v. IV*, No. 26-cv-397, D.I. 1-18 (D. Del. Apr. 8, 2026) (attached as Ex. 7 hereto). As noted previously, the 081 Patent is attached as Ex. 3.

23. IV alleges that Callahan Cellular LLC is a wholly owned subsidiary of the IV entities and that Callahan Cellular LLC is the assignee of the 124 Patent. *See* Ex. 6. As noted previously, the 124 Patent is attached as Ex. 5.

**FACTUAL BACKGROUND**

24. IV is in the business of monetizing patents, including through licensing campaigns and by filing patent litigations. IV's typical approach includes engaging in licensing campaigns targeting a given set of companies, repeatedly contacting target companies, attempting to negotiate licenses with companies that respond, and filing – and aggressively pursuing – patent litigation against companies that decline to engage or pay IV to license IV's patents. This strategy is designed to apply sustained pressure, to use litigation as leverage, and to extract substantial portfolio-level license fees irrespective of whether the asserted patents are actually infringed, valid, or enforceable.

6

**A.      IV's Assertion of the DJ Patents Against Munich Re**

25.      On January 3, 2024, IV first contacted Munich Re by email to "initiate a dialogue concerning intellectual property and licensing matters" between IV and Munich Re. *See* IV's Email Correspondence with Munich Re, dated Jan. 3, 2024, through June 6, 2025 (attached as Ex. 8 hereto) at 5-6. IV proposed an "initial discussion" regarding IV's "expansive patent portfolio" and asserted that its patents "cover some of the technology integral to Munich Re's daily operations, including cloud computing, networking, security, storage, digital payments, and utilization of open-source software." *Id.* IV identified itself as a "pioneer in patent aggregation, licensing, and sales" with "over 7,000 active patents" and invited Munich Re to propose dates for a licensing discussion. *Id.*

26.      Between January and March 2024, IV sent multiple follow-up emails to Munich Re asserting that Munich Re's lack of engagement was unacceptable and reiterating IV's demand for a patent license. In those communications, IV accused Munich Re of "efficient infringement," asserted that IV's licensing program was "not an offer that can be refused," and claimed that numerous financial services companies had already taken licenses under IV's "fixed-price, non-negotiable licensing program." Ex. 8 at 1, 4-5. IV repeatedly warned that Munich Re was required to obtain a license and pressed Munich Re to schedule a meeting. *Id.*

27.      In one of his email communications, IV attached a "pricing sheet" entitled "Invention Investment Fund (IIF) Insurance Licensing." IV's pricing sheet (attached as Ex. 9 hereto) set forth a tiered "Insurance License Fee" ranging from $1.0 million to $5.25 million based on the target company's "U.S. Revenue." IV's pricing sheet concluded by stating that IV "seeks to enforce its patent rights, with patent litigations pending against JPMC, Liberty Mutual, and Comerica, with further actions planned." Ex. 9.

7

28.     On August 26, 2024, IV again escalated its demands, asserting that "one way or another, Munich Re is also [required to be] properly licensed" and stating that "maintaining silence is not an option." Ex. 8 at 1-2. IV emphasized that dozens of financial services companies had already secured licenses and urged Munich Re to connect immediately to discuss "next steps," reinforcing IV's position that a license was mandatory. Ex. 8 at 1.

29.     On June 6, 2025, IV sent a "formal notice letter" to Munich Re's Chief Legal Officer (Ex. 6). In that letter, IV asserted that it owned or exclusively controlled a portfolio of approximately 4,400 worldwide patents and applications and identified specific "sample" patents that allegedly covered technologies used by Munich Re. IV expressly accused Munich Re of infringing by making, using, selling, offering for sale, importing, and encouraging others to use products and services allegedly covered by the 582, 124, and 844 Patents, including Munich Re's alleged use of open-source technologies such as Spark, Kubernetes, and Docker. IV enclosed copies of those patents with the letter.

| US Patent No. | Title | Assignee | Example Claim | Example Product/Feature |
|---|---|---|---|---|
| 7,257,582 | LOAD BALANCING WITH SHARED DATA | INTELLECTUAL VENTURES I LLC | 1 | Open Source Software: Munich's use of Spark and/or PySpark See Screen Shots enclosure. |
| 8,266,124 | INTEGRATED ASSET MANAGEMENT | CALLAHAN CELLULAR L.L.C. a wholly owned subsidiary of IIF2 | 1 | Open Source Software: Munich's use of Kubernetes See Screen Shots enclosure. |
| 8,332,844 | ROOT IMAGE CACHING AND INDEXING FOR BLOCK-LEVEL DISTRIBUTED APPLICATION MANAGEMENT | INTELLECTUAL VENTURES II LLC | 7 | Open Source Software: Munich's use of Docker / Containerization See ScreenvShots enclosure. |

30.     IV's June 6, 2025 notice letter further stated that listed products/features were only "example infringing products" and that IV's "investigation of Munich Re products and services is ongoing." IV expressly asserted that it "does not authorize Munich Re or Munich Re's customers or partners to practice any of the above patents and/or other IV patent rights without a license" and stated that IV was willing to offer a patent license either to the referenced patents or to a broader subset of IV's portfolio.

8

31.     On August 1, 2025, IV sent claim charts to Munich Re containing IV's infringement allegations. *See* IV's Claim Chart Package for Munich Re (attached as Ex. 10 hereto). IV also asserted two additional patents, namely the 081 and 584 Patents, and provided claim charts accusing Munich Re of infringing the 081 and 584 Patents. *See id.*

32.     On January 30, 2026, IV emailed Munich Re to follow up and request an answer on how Munich Re would like to proceed in light of IV's infringement allegations and claim charts. *See* 1/30/2026 Email from IV (attached as Ex. 11 hereto).

**B.      IV's Litigations Against the Same Products Accused at Munich Re**

33.     IV has filed patent infringement complaints against at least 10 companies to date asserting infringement of the DJ Patents and other patents by the same third-party software products IV has accused at Munich Re. IV's infringement allegations, summarized below and shown in claim charts attached to IV's other complaints, focus on off-the-shelf/built-in functionality in the underlying accused software products, not on any feature, customization, or configuration unique to Munich Re or any other accused defendant.

34.     IV accuses the following third-party software at Munich Re of infringement:

    a.  IV asserts the 844 Patent against Docker

    b.  IV asserts the 582 Patent against Spark

    c.  IV asserts the 081 Patent against Spark

    d.  IV asserts the 584 Patent against Kubernetes

    e.  IV asserts the 124 Patent against Kubernetes

*See* Exs. 6 and 10 (IV "formal notice letter" and IV's claim charts to Munich Re).

35.     IV does not allege Munich Re makes the underlying accused Docker, Kubernetes, or Spark software. Rather, the software and products that IV accused of infringement are allegedly

9

provided by third parties or are open source, and IV alleges Munich Re uses the accused software and products.

36.    IV has filed several waves of litigation asserting the DJ Patents and other patents accusing the exact same third-party software IV accuses at Munich Re, as summarized below:

| # | Case | Accused Products |
|---|---|---|
| 1. | *IV v. JP Morgan Chase & Co.*, No. 23-cv-523 (E.D. Tex. Nov. 15, 2023) | • 844 Patent vs. Docker |
| 2. | *IV v. Comerica Inc.*, No. 23-cv-524 (E.D. Tex. Nov. 15, 2023) | • 844 Patent vs. Docker |
| 3. | *IV v. Liberty Mutual Holding Co. Inc.*, No. 23-cv-525 (E.D. Tex. Nov. 15, 2023) | • 844 Patent vs. Docker |
| 4. | *IV v. American Airlines, Inc.*, No. 24-cv-980 (E.D. Tex. Nov. 2, 2024) | • 844 Patent vs. Docker<br>• 582 Patent vs. Spark<br>• 584 Patent vs. Kubernetes |
| 5. | *IV v. Southwest Airlines Co.*, No. 24-cv-277 (W.D. Tex. Nov. 2, 2024) | • 844 Patent vs. Docker<br>• 582 Patent vs. Spark<br>• 584 Patent vs. Kubernetes |
| 6. | *IV v. The Bank of New York Mellon Corp.*, No. 25-cv-631 (N.D. Tex. Mar. 15, 2025) | • 844 Patent vs. Docker<br>• 584 Patent vs. Kubernetes |
| 7. | *IV v. Nationwide Mutual Insurance Co.*, No. 25-cv-632 (N.D. Tex. Mar. 15, 2025) | • 844 Patent vs. Docker |
| 8. | *IV v. The Home Depot, Inc. et al*, No. 25-cv-1147 (W.D. Tex. July 23, 2025) | • 844 Patent vs. Docker<br>• 582 Patent vs. Spark<br>• 584 Patent vs. Kubernetes |
| 9. | *IV v. Deere & Co.*, No. 26-cv-425 (W.D. Tex. Feb. 24, 2026) | • 844 Patent vs. Docker<br>• 584 Patent vs. Kubernetes |
| 10. | *IV v. Government Employees Insurance Co.*, No. 26-cv-978 (N.D. Tex. Mar. 26, 2026) | • 844 Patent vs. Docker<br>• 584 Patent vs. Kubernetes |

37.    IV also has targeted other companies with at least some of the DJ Patents and alleged infringement of the exact same third-party software IV accuses at Munich Re. Based on IV's infringement allegations, several companies have filed declaratory judgment complaints against IV seeking non-infringement rulings, as summarized below:

| # | Case | Accused Products |
|---|---|---|
| 1. | *Assurant, Inc. v. IV*, No. 24-cv-344 (D. Del. Mar. 15, 2024) | • 844 Patent vs. Docker |

| # | Case | Accused Products |
|---|------|------------------|
| 2. | *First Horizon Bank v. IV*, No. 25-cv-02956 (W.D. Tenn. Oct. 16, 2025) | • 844 Patent vs. Docker<br>• 584 Patent vs. Kubernetes |
| 3. | *The Hanover Insurance Group, Inc. v. IV*, No. 26-cv-11633 (D. Mass. Apr. 7, 2026) | • 844 Patent vs. Docker<br>• 584 Patent vs. Kubernetes |
| 4. | *Hartford Fire Insurance Co. v. IV*, No. 26-cv-392 (D. Del. Apr. 7, 2026) | • 844 Patent vs. Docker<br>• 081 Patent vs. Spark<br>• 584 Patent vs. Kubernetes<br>• 124 Patent vs. Kubernetes |
| 5. | *The Travelers Indemnity Co. v. IV*, No. 26-cv-397 (D. Del. Apr. 8, 2026) | • 844 Patent vs. Docker<br>• 582 Patent vs. Spark<br>• 081 Patent vs. Spark<br>• 584 Patent vs. Kubernetes<br>• 124 Patent vs. Kubernetes |

38. IV's infringement allegations against the third-party Docker, Kubernetes, and Spark software that IV accuses at Munich Re are illustrated by claim charts IV sent to Munich Re or that IV has filed in its recent litigation campaigns against various parties accusing the same third-party software of infringement. *See, e.g.*:

    a. IV's infringement claim charts to Munich Re for the 844, 081, and 584 Patents. *See* Ex. 10.[1]

    b. IV's infringement claim chart for the 582 Patent vs. Spark. *See IV v. American Airlines* (attached as Ex. 14 hereto).

    c. IV has not yet asserted the 124 Patent in litigation, but as noted above, IV has threatened to sue other companies for infringement of the 124 Patent based on the same third-party Kubernetes software that IV accuses Munich Re of using. *See, e.g., Hartford v. IV*, D.I. 1 ¶15; *Travelers v. IV*, D.I. 1 ¶235; Ex. 7.

---

[1] *See also* IV's infringement claim chart for the 844 Patent vs. Docker in *IV v. Nationwide* (attached as Ex. 11 hereto) and IV's infringement claim chart for the 584 Patent vs. Kubernetes in *IV v. BNY Mellon* (attached as Ex. 12 hereto).

39.    As IV's claim charts show, IV's allegations focus on the underlying third-party Docker, Kubernetes, and Spark software itself to allege infringement. *See*, *e.g.*, Exs. 10-14.

## COUNT I
## <u>DECLARATION OF NON-INFRINGEMENT OF THE 844 PATENT</u>

40.    Munich Re incorporates by reference paragraphs 1-39 as if fully set forth herein.

41.    The 844 Patent is titled "Root Image Caching and Indexing for Block-Level Distributed Application Management." The 844 Patent's Abstract states:

> Described herein is technology for, among other things root image caching and indexing for block-level distributed application management. The technology involves storing blocks of a root image on a first storage unit and storing blocks of leaf images on respective second storage units. The leaf images include additional data blocks not previously contained in the root image and changes made by respective compute nodes to the blocks of the root image. The technology includes caching blocks of the root image that have been accessed by at least one compute node. The technology also includes receiving indexing results pertaining to the root image from one compute node and providing the results for other compute nodes.

42.    IV has asserted that third-party software called Docker that IV alleges Munich Re is using (the "<u>844 Accused System</u>") infringes the 844 Patent. In particular, IV asserts that Munich Re "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 844 Accused System in a manner that infringes Claim 7 of the 844 Patent. *See e.g.,* Ex. 6; Ex. 10 at PDF p. 19-35.

43.    Contrary to IV's assertions, Munich Re has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 844 Patent, including through any making, use, offering to sell, selling, and/or importing and/or encouraging the making, using, selling, offering to sell, and/or importation of the 844 Accused System or Docker, at least because the 844 Accused System and Docker do not employ, incorporate, use, or otherwise include all of the limitations of the 844 Patent's claims. IV's

12

infringement contentions for the 844 Patent (Exs. 10 and 12) also fail to show any infringement by the 844 Accused System or Docker.

44.    Although there are additional reasons why Munich Re, the 844 Accused System, and Docker do not infringe the 844 Patent, non-limiting examples are discussed below.

45.    IV has only identified independent claim 7 of the 844 Patent as asserted. Claim 7 recites:[2]

> 7. A method for providing data to a plurality of *compute nodes*, comprising:
>
> storing blocks of a root image of said compute nodes on a first storage unit;
>
> storing *leaf images* for respective compute nodes on respective second storage units, *said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes*;
>
> and caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory.

46.    With respect to the "leaf image" limitation recited in each independent claim of the 844 Patent, this "leaf image" includes "only additional data blocks not previously contained in said[/the] root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes."

47.    IV alleges that as a part of the 844 Accused System "Docker stores leaf images including thin R/W layer in a runnable container for respective compute nodes," "Docker includes a writable per runnable container layer for new data such as new files and including a copy on write strategy for changes made to the blocks of the root image," and "Docker contains a writable

---

[2] All emphasis in quotations has been added unless otherwise noted.

13

layer using copy on write, leaving unchanged image data in their original image layers." Ex. 12 at 12, 20, 25; *see also* Ex. 10 at PDF p. 29-33. According to IV, the thin R/W layer in a runnable Docker container layer (accused "leaf image"), the read-only layers in a Docker image layer (accused "root image"), and Docker's copy on write approach to the R/W layer that leaves unchanged data in the original image layer (accused "only additional data blocks not [] in [the root image] ... and changes made ... to the blocks of the root image," but "not []blocks of [the] root image that are unchanged") are illustrated by the figures below from the Docker documentation:



Source: https://docs.docker.com/storage/storagedriver/.



Source: https://docs.docker.com/engine/storage/drivers/overlayfs-driver/.

*See, e.g.*, Ex. 12 at 16, 28; *see also* Ex. 10 at PDF p. 29-35.

48.    The 844 Accused System and Docker, however, do not infringe the 844 Patent's recited limitation a "leaf image" that includes "only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes." For example, documentation indicates that Docker's thin R/W layer in a runnable container (accused "leaf image") does not include only additional data blocks not previously contained in the read-only layers of a Docker image (accused "root image"), only changes made by respective compute nodes to the read-only layers of a Docker image and no blocks of the read-only layers of a Docker image that are unchanged by respective compute nodes (accused "only additional data blocks not [] in [the root image] ... and changes made ... to the blocks of the root image," but "not []blocks of [the] root image that are unchanged"). Documentation states that modified files created in Docker's thin R/W layer contain the entire file from the read-only layers of a Docker image, not only the modified data for the file. *See* https://docs.docker.com/engine/storage/drivers/overlayfs-driver/. Indeed, the Docker figure that IV cites above specifically shows "file 2" from the read-only "image layer" (accused "root image") as being the "same file" contained in the read/write "container layer"

15

(accused "leaf image"). *See id.* ("Where the image layer and the container layer contain the same files, the container layer (upperdir) takes precedence and obscures the existence of the same files in the image layer. ... The image's layers are the lowerdirs in the overlay and are read-only. The new directory for the container is the upperdir and is writable.").

49.     The 844 Accused System and Docker also do not infringe the 844 Patent's a plurality of "compute nodes" limitation. The 844 Patent specification explains "[i]n its most basic configuration, compute node 100 typically includes at least one processing unit 102 and memory 104." 844 Patent 4:29-31, Fig. 1. IV alleges that as a part of the 844 Accused System, Docker "containers" correspond to the plurality of "compute nodes." *See* Ex. 12 at 3-4; *see also* Ex. 10 at PDF p. 26. 8. The accused Docker containers (i.e., process/files/software), however, do not infringe at least because they are not "compute nodes" having a processor and memory. *See, e.g.*, https://docs.docker.com/get-started/docker-concepts/the-basics/what-is-a-container/    ("Without getting too deep, a VM is an entire operating system with its own kernel, hardware drivers, programs, and applications. Spinning up a VM only to isolate a single application is a lot of overhead. A container is simply an isolated process with all of the files it needs to run."); https://www.docker.com/resources/what-container/  ("A    container    is    a    standard    unit    of software....").

50.     At least because of the absence of the "leaf image" and "compute nodes" as discussed above, Munich Re does not directly infringe the 844 Patent, either literally or under the doctrine of equivalents.

51.     Likewise, at least because there is no direct infringement, Munich Re does not indirectly infringe the 844 Patent, including no induced or contributory infringement of the 844 Patent.

52.    Absent a declaration of non-infringement, IV will continue to wrongfully allege that Munich Re infringes the 844 Patent, and thereby cause Munich Re irreparable injury and damage.

53.    For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Munich Re and IV regarding whether Munich Re infringes or has infringed the 844 Patent.

54.    Munich Re therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., finding that Munich Re (including through its alleged use of the 844 Accused System and Docker) does not infringe the 844 Patent.

**COUNT II**
**DECLARATION OF NON-INFRINGEMENT OF THE 582 PATENT**

55.    Munich Re incorporates by reference paragraphs 1-39 as if fully set forth herein.

56.    The 582 Patent is titled "Load Balancing with Shared Data." The 582 Patent's Abstract states:

> The input of a computer executable process, is logically subdivided, without reading, into a plurality of partitions which are distributed to a plurality of processors in which respective subtasks including the reading of those partitions, are carried out. The method allows distribution of processing of a large amount of data to a plurality of processors cooperating in a way that the load imposed on each processor is proportional to its capacity to do the work.

57.    IV has asserted that third-party software called Spark that IV alleges Munich Re is using ("the 582 Accused System") infringes the 582 Patent. In particular, IV asserts that Munich Re "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 582 Accused System in a manner that infringes Claim 1 of the 582 Patent. *See* Ex. 6.

58.     Contrary to IV's assertions, Munich Re has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 582 Patent, including through any making, use, offering to sell, selling, and/or importing and/or encouraging the making, using, selling, offering to sell, and/or importation of the 582 Accused System or Spark, at least because the 582 Accused System and Spark do not employ, incorporate, use, or otherwise include all of the limitations of the 582 Patent's claims. IV's infringement contentions for the 582 Patent (Ex. 14) also fail to show any infringement by the 582 Accused System or Spark.

59.     Although there are additional reasons why Munich Re, the 582 Accused System, and Spark do not infringe the 582 Patent, non-limiting examples are discussed below.

60.     The sole independent claim of the 582 Patent recites:

1. A method of effecting on a preexisting input file a computer-executable process comprised of a plurality of subtasks, the method comprising the steps of:

(a) automatically determining file allocation and logically subdividing records of said input file into a plurality of partitions;

(b) *distributing descriptions of __all__* of said partitions *to __each__* of a plurality of subtask processors [sic]

(c) [sic] simultaneously executing at least a respective one of the subtasks of the computer-executable process in each of at least some of said processors on a respective one of the partitions with each subtask reading and processing the respective partition so as to process the respective partition and produce respective subtask output and;

(d) [sic] thereafter *repeating step (c)* in at least some of the subtask processors each with another unprocessed partition *on a first-come/first-served basis*; and

(e) generating at least one output combining all of the subtask outputs and reflecting the processing of all of said subtasks.

18

61.    With respect to Claim 1's step (b) limitation ("distributing descriptions of all of said partitions to each of a plurality of subtask processors"), IV alleges that as a part of the 582 Accused System "Spark creates an [Resilient Distributed Dataset ('RDD')] from datasets including files," "[t]his process includes forming a logical division of the dataset," and "[a]n RDD results in an automatic file allocation across multiple nodes in a cluster, so that the nodes of the cluster can operate on the RDD in parallel." Ex. 14 at 6. IV further alleges "Spark distributes partitions to clusters which includes multiple machines or nodes for processing." Ex. 14 at 7. According to IV, the Spark documentation below shows that Spark's RDD is split into "partitions" and that Spark distributes descriptions "of all" of said partitions "to each" of a plurality of subtask processors:

## Overview 🔗

At a high level, every Spark application consists of a *driver program* that runs the user's `main` function and executes various *parallel operations* on a cluster. The main abstraction Spark provides is a *resilient distributed dataset* (RDD), which is a collection of elements partitioned across the nodes of the cluster that can be operated on in parallel. RDDs are created by starting with a file in the Hadoop file system (or any other Hadoop-supported file system), or an existing Scala collection in the driver program, and transforming it. Users may also ask Spark to *persist* an RDD in memory, allowing it to be reused efficiently across parallel operations. Finally, RDDs automatically recover from node failures.

Source: https://spark.apache.org/docs/latest/rdd-programming-guide.html.

One important parameter for parallel collections is the number of *partitions* to cut the dataset into. Spark will run one task for each partition of the cluster. Typically you want 2–4 partitions for each CPU in your cluster. Normally, Spark tries to set the number of partitions automatically based on your cluster. However, you can also set it manually by passing it as a second parameter to `parallelize` (e.g. `sc.parallelize(data, 10)`). Note: some places in the code use the term slices (a synonym for partitions) to maintain backward compatibility.

Source: https://spark.apache.org/docs/latest/rdd-programming-guide.html.

Apache Spark's Resilient Distributed Datasets (RDD) are a collection of various data that are so big in size, that they cannot fit into a single node and should be partitioned across various nodes. Apache Spark automatically partitions RDDs and distributes the partitions across different nodes. They are evaluated lazily (i.e, the execution will not start until an action is triggered which increases manageability, saves computation and thus increases optimization and speed) and the transformations are stored as directed acyclic graphs (DAG). So, every action on the RDD will make Apache Spark recompute the DAG.

Source: https://www.talend.com/resources/intro-apache-spark-partitioning/.

Ex. 14 at 7.

19

62.    The Accused 582 System and Spark, however, do not infringe the 582 Patent's step (b) limitation of distributing "descriptions" "of all" of said partitions "to each" of a plurality of subtask processors. For example, the portion of a Spark RDD (accused "partitions") at each Spark compute node does not include a description of the RDD at all, much less a description of the entire RDD (accused distributing "descriptions" "of all" of said partitions "to each" of a plurality of subtask processors), at least because Spark's RDD "is a collection of elements [(i.e., data, not descriptions of data)" distributed across the nodes. *See* https://spark.apache.org/docs/latest/rdd-programming-guide.html#overview.

63.    With respect to Claim 1's step (d) limitation ("repeating step (c) [(subtask processor reads partition and processes partition to produce output)] in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis"), IV alleges that as a part of the 582 Accused System "Spark task output produced by each worker node is combined to produce processed output for the related partition," as illustrated below. Ex. 14 at 12.

20



Source: https://spark.apache.org/docs/latest/cluster-overview.html.

By default, Spark's scheduler runs jobs in FIFO fashion. Each job is divided into "stages" (e.g. map and reduce phases), and the first job gets priority on all available resources while its stages have tasks to launch, then the second job gets priority, etc. If the jobs at the head of the queue don't need to use the whole cluster, later jobs can start to run right away, but if the jobs at the head of the queue are large, then later jobs may be delayed significantly.

Source: https://spark.apache.org/docs/latest/job-scheduling.html.

In Spark, data is generally not distributed across partitions to be in the necessary place for a specific operation. During computations, a single task will operate on a single partition – thus, to organize all the data for a single reduceByKey reduce task to execute, Spark needs to perform an all-to-all operation. It must read from all partitions to find all the values for all keys, and then bring together values across partitions to compute the final result for each key – this is called the **shuffle**.

Source: https://spark.apache.org/docs/latest/rdd-programming-guide.html.

Ex. 14 at 13-14.

64.     The Accused 582 System and Spark, however, do not infringe the 582 Patent's step (d) limitation of "thereafter repeating step (c) [(subtask processor reads partition and processes partition to produce output)] in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis" for several reasons. For example, a task on a particular Spark worker node does not read and process unprocessed portions of the RDD that are located outside of that particular Spark worker node (accused "repeating step (c) [(subtask processor reads partition and processes partition to produce output)] in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis"). Rather,

documentation states that during computations in Spark, a single task on a Spark worker node operates on the portion of the RDD on that worker node. *See* https://spark.apache.org/docs/latest/rdd-programming-guide.html#shuffle-operations.

65.    The 582 Accused System and Spark also do not perform the step (d) limitation of "thereafter repeating step (c) [(subtasks on processors read and process respective partitions)] in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis" for another reason. In the 582 Patent at step (c), the subtasks read and process their respective partitions/data simultaneously to do the processing work faster; and then in step (d), subtasks that have finished their processing work repeatedly ask for unprocessed partitions/data and then read and process the unprocessed partitions/data on a first-come/first-served basis until all of the processing work is done. *See, e.g.*, 582 Patent 3:67-4:3, 6:14-22, Fig. 4. The 582 Accused System and Spark, however, does not infringe because Spark worker nodes do not request or pull new processing jobs on their own. *See e.g.,* https://spark.apache.org/docs/latest/job-scheduling.html.

66.    At least because of the absence of the limitations at step (b) for distributing "descriptions" "of all" of said partitions "to each" of a plurality of subtask processors and at step (d) for "repeating step (c) [(subtask processor reads partition and processes partition to produce output)] in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis" as discussed above, Munich Re does not directly infringe the 582 Patent, either literally or under the doctrine of equivalents.

67.    Likewise, at least because there is no direct infringement, Munich Re does not indirectly infringe the 582 Patent, including no induced or contributory infringement of the 582 Patent.

68.    Absent a declaration of non-infringement, IV will continue to wrongfully allege that Munich Re infringes the 582 Patent, and thereby cause Munich Re irreparable injury and damage.

69.    For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Munich Re and IV regarding whether Munich Re infringes or has infringed the 582 Patent.

70.    Munich Re therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., finding that Munich Re (including through its alleged use of the 582 Accused System and Spark) does not infringe the 582 Patent.

## COUNT III
## DECLARATION OF NON-INFRINGEMENT OF THE 081 PATENT

71.    Munich Re incorporates by reference paragraphs 1-39 as if fully set forth herein.

72.    The 081 Patent is titled "Systems and Methods for Scheduling, Processing, and Monitoring Tasks." The 081 Patent's Abstract states:

> A computer-implemented method for performing a process is provided. The method comprises: (a) receiving a request to perform a process, the process comprising a plurality of tasks and at least a scheduler rule; (b) receiving a plurality of checkpoints associated with the process, each checkpoint comprising checkpoint state data and at least a respective checkpoint rule governing execution of the process; (c) determining a first task of the plurality of tasks to be scheduled into a priority queue, in accordance with the scheduler rule; (d) determining the first checkpoint of the plurality of checkpoints that is to be the first checkpoint used in processing the first task, in accordance with the scheduler rule; (e) creating the checkpoint state data for the first checkpoint; (f) saving the checkpoint state data for the first checkpoint; (g) processing the first task in accordance with the checkpoint rule associated with the first checkpoint; (h) determining the next task in the plurality of tasks to perform, based on the checkpoint rule associated with the first checkpoint; (i) updating the saved checkpoint data for the first checkpoint with the data and state associated with the first task; and (j) repeating steps (c) through (i) for each subsequent task and checkpoint, in accordance with the respective scheduler and checkpoint rules, until a predetermined condition has been reached.

23

73.     IV has asserted that third-party software called Spark that IV alleges Munich Re is using (the "081 Accused System") infringes the 081 Patent. *See* Ex. 10 at PDF p. 1-17. In particular, IV asserts that "at least claim 1 of Patent No. 7, 669,081 reads on Munich RE's use of Apache Spark and/or PySpark." *See id.* at 4.

74.     Contrary to IV's assertions, Munich Re has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 081 Patent, including through any making, use, offering to sell, selling, and/or importing and/or encouraging the making, using, selling, offering to sell, and/or importation of the 081 Accused System or Spark, at least because the 081 Accused System and Spark do not employ, incorporate, use, or otherwise include all of the limitations of the 081 Patent's claims. IV's infringement claim chart for the 081 Patent (Ex. 10) also fails to show any infringement by the 081 Accused System or Spark.

75.     Although there are additional reasons why Munich Re, the 081 Accused System, and Spark do not infringe the 081 Patent, non-limiting examples are discussed below.

76.     IV has only identified independent Claim 1 of the 081 Patent as asserted. Claim 1 recites:

1. A computer-implemented method for performing a process, the method comprising:

   (a) receiving a request to perform a process, the process having a state and comprising a plurality of tasks and at least a scheduler rule;

   (b) receiving a plurality of checkpoints associated with the process, *each checkpoint comprising* checkpoint state data and *at least a respective checkpoint rule governing execution of the process*, wherein the checkpoint state data comprises information about the state of the process and *wherein the checkpoint rule defines*, based at least in part on at least one of the checkpoint state data and a first predetermined condition, *one or more of the plurality of tasks to be executed and the way in which the one or more tasks will execute*;

24

(c) determining a first task of the plurality of tasks to be scheduled into a priority queue, in accordance with the scheduler rule;

(d) determining the first checkpoint of the plurality of checkpoints that is to be the first checkpoint used in processing the first task, in accordance with the scheduler rule;

(e) creating the checkpoint state data for the first checkpoint; and

(f) saving the checkpoint state data for the first checkpoint.

77. With respect to Claim 1's limitation "each checkpoint comprising state data **_and at least a respective checkpoint rule_** governing execution of the process ... [that] defines ... one or more of the plurality of tasks to be executed and the way in which the one or more tasks will execute," the 081 specification states "each process can be divided into checkpoints 136 (e.g., checkpoints 136A, 136B, and 136D of FIG. 3)" and "*[e]ach checkpoint 136 effectively has 'intelligence' because the checkpoint includes and is associated with one or more rules that tell how the checkpoint 136 is to proceed*." *See, e.g.*, 081 Patent 12:18-22. The "rule[s (e.g., 'developer-provided rules' or 'strategy patterns')] encapsulate[] the decision making necessary for selecting the next processor function." *Id.* 4:16-20.

78. The 081 Accused System and Spark do not infringe the 081 Patent at least because they lack a checkpoint comprising a "checkpoint rule governing execution of the process ... [that] defines ... one or more of the plurality of tasks to be executed and the way in which the one or more tasks will execute." Spark documentation states that "RDD.checkpoint()" will "[m]ark this RDD for checkpointing," so the RDD "will be saved to a file ... and all references to its parent RDDs will be removed." *See* https://spark.apache.org/docs/latest/api/python/reference/api/pyspark.RDD.checkpoint.html. "Resilient distributed dataset" (RDD) checkpoints do not contain instructions or rules governing execution of a process that define one or more of the plurality of tasks to be executed and the way

25

in which the one or more tasks will execute. *See, e.g., id.* For example, the documentation below

describes checkpointing the RDD "nums" and recovering that checkpoint to "numsRecovered:"

```
import org.apache.spark.sql.functions.rand
val nums = spark.range(5).withColumn("random",
rand()).filter($"random" > 0.5)
scala> nums.show
+---+------------------+
| id|            random|
+---+------------------+
|  0| 0.752877642067488|
|  1|0.5271005540026181|
+---+------------------+

...

// Set org.apache.spark.rdd.ReliableRDDCheckpointData logger to INFO
// to see what happens while an RDD is checkpointed
// Let's use log4j API
import org.apache.log4j.{Level, Logger}
Logger.getLogger("org.apache.spark.rdd.ReliableRDDCheckpointData").
setLevel(Level.INFO)

scala> nums.checkpoint
18/03/23 00:05:15 INFO ReliableRDDCheckpointData: Done checkpointing
RDD 12 to file:/tmp/checkpoints/b1f413dc-3eaf-46a0-99de-
d795252035e0/rdd-12, new parent is RDD 13
res7: org.apache.spark.sql.Dataset[org.apache.spark.sql.Row] = [id:
bigint, random: double]

...

// Recover nums dataset from the checkpoint files
// Start from recovering the underlying RDD
// And create a Dataset based on the RDD

...

import org.apache.spark.sql.my2
val numsRecovered = my2.createDataFrame(spark, numsRddRecovered,
schema)
scala> numsRecovered.show
+---+------------------+
| id|            random|
+---+------------------+
|  0| 0.752877642067488|
|  1|0.5271005540026181|
+---+------------------+
```

*See* https://books.japila.pl/spark-sql-internals/checkpointing/.

79.    At least because of the absence of a checkpoint comprising a "checkpoint rule governing execution of the process ... [that] defines ... one or more of the plurality of tasks to be executed and the way in which the one or more tasks will execute" as discussed above, Munich Re does not directly infringe the 081 Patent, either literally or under the doctrine of equivalents.

80.    Likewise, at least because there is no direct infringement, Munich Re does not indirectly infringe the 081 Patent, including no induced or contributory infringement of the 081 Patent.

81.    Absent a declaration of non-infringement, IV will continue to wrongfully allege that Munich Re infringes the 081 Patent and thereby cause Munich Re irreparable injury and damage.

82.    For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Munich Re and IV regarding whether Munich Re infringes or has infringed the 081 Patent.

83.    Munich Re therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., finding that Munich Re (including through its alleged use of the 081 Accused System and Spark) does not infringe the 081 Patent.

## COUNT IV
## DECLARATION OF NON-INFRINGEMENT OF THE 584 PATENT

84.    Munich Re incorporates by reference paragraphs 1-39 as if fully set forth herein.

85.    The 584 Patent is titled "System for Hosting Customized Computing Clusters." The 584 Patent's Abstract states:

> A computer system for hosting computing clusters for clients. The system includes clusters each including a set of computing resources and each implemented in custom or differing configurations. Each of the configurations provides a customized computing environment for performing particular client tasks. The configurations may differ due to configuration of the processing nodes, the data storage, or the private cluster network or its connections. The system includes a

27

monitoring system that monitors the clusters for operational problems on a cluster level and also on a per-node basis such as with monitors provided for each node. The system controls client access to the clusters via a public communications by only allowing clients to access their assigned cluster or the cluster configured per their specifications and performing their computing task. Gateway mechanisms isolate each cluster such that communications within a cluster or on a private cluster communications network are maintained separate.

86.    IV has asserted that third-party software called Kubernetes that IV alleges Munich Re is using (the "584 Accused System") infringes the 584 Patent. In particular, IV asserts that Munich Re "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 584 Accused System in a manner that infringes Claim 1 of the 584 Patent. *See* Ex. 6; *see also* Ex. 10 at PDF p. 37-53.

87.    Contrary to IV's assertions, Munich Re has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 584 Patent, including through any making, use, offering to sell, selling, and/or importing and/or encouraging the making, using, selling, offering to sell, and/or importation of the 584 Accused System or Kubernetes, at least because the 584 Accused System and Kubernetes do not employ, incorporate, use, or otherwise include all of the limitations of the 584 Patent's claims. IV's infringement contentions for the 584 Patent (Ex. 10 at PDF p. 37-53 and Ex. 13) also fail to show any infringement by the 584 Accused System or Kubernetes.

88.    Although there are additional reasons why Munich Re, the 584 Accused System and Kubernetes do not infringe the 584 Patent, non-limiting examples are discussed below.

89.    IV has only identified independent Claim 1 of the 584 Patent as asserted. Claim 1 recites:

28

1. A computer system, comprising:

a private communications network linked to a public communication network;

a first cluster comprising a set of computing resources, including at least *one hardware processor*, in a first configuration, wherein the first cluster is communicatively linked to the private communications network;

a second cluster comprising a set of computing resources, including at least *one hardware processor*, in a second configuration, wherein the second cluster is communicatively linked to the private communications network; and

a monitoring system to monitor operations of the first cluster and the second cluster for communications problems;

wherein the first configuration differs from the second configuration;

wherein the first configuration provides a first computing environment to perform a first client task and the second configuration provides a second computing environment to perform a second client task; and

wherein the computing resources comprise processing nodes, data storage shared by the processing nodes, and at least one communications network to link the processing nodes to each other and to the data storage;

wherein the first cluster establishes communications between the set of computing resources of the first cluster and a first gateway communicatively linked between the first cluster and the private communications network;

wherein the second cluster establishes communications among the set of computing resources of the second cluster and a second gateway communicatively linked between the second cluster and the private communications network;

wherein communications between the first cluster and the second cluster are isolated;

wherein the first cluster is a high performance cluster; and

wherein the second cluster is a high performance cluster.

90.    With respect to the Claim 1's limitations of "a first cluster comprising a set of computing resources, including at least *one hardware processor*, in a first configuration, wherein the first cluster is communicatively linked to the private communications network," and "a second cluster comprising a set of computing resources, including at least *one hardware processor*, in a second configuration, wherein the second cluster is communicatively linked to the private communications network," IV alleges that as a part of the 584 Accused System "Kubernetes uses clusters, which are groups of nodes that run containerized applications on behalf of a client" and

29

"include workload computing resources as processors and memory, and are connected to a private communications network. Ex. 13 at 11; *see also* Ex. 10 at PDF p. 44-45.

91.     IV accuses a Kubernetes "node" of meeting the "at least one hardware processor" limitation in Claim 1 because, according to the Kubernetes documentation below, "[a] node may be a virtual *or physical machine*, depending on the cluster" and is " a worker machine that contains the necessary services to run pods, including the CPU and memory resources they need to run." Ex. 13 at 11; *see also* Ex. 10 at PDF p. 44-45.

> A Kubernetes node is either a virtual or physical machine that one or more Kubernetes pods run on. It is a worker machine that contains the necessary services to run pods, including the CPU and memory resources they need to run.
>
> Source: https://www.cloudzero.com/blog/kubernetes-node-vs-pod/.

*See, e.g.,* Ex. 13 at 11.

92.     The prosecution history of the 584 Patent informs the understanding Claim 1's "at least one hardware processor" limitation. The 584 Patent is a continuation of application No. 11/927,921 (the "921 parent application"), which was filed on October 30, 2007 and issued as U.S. Pat. No. 7,822,841 (the "841 Patent"), entitled "Method and system for hosting multiple, customized computing clusters." The 841 Patent is attached as Ex. 15 hereto.

93.     The "at least one hardware processor" limitation of Claim 1 of the 584 Patent is also found and derives from the 841 Patent, of which the 584 Patent was a continuation. Specifically, Claim 1 of the 841 Patent recites:

> 1. A computer system for hosting computing clusters for clients, comprising:
>     a private communications network linked to a public communications network;
>     a first cluster comprising a set of computing resources, including *at least one hardware processor*, in a first configuration, wherein the first cluster is communicatively linked to the private communications network;
>     a second cluster comprising a set of computing resources, including *at least one hardware processor*, in a second configuration, wherein the second cluster is communicatively linked to the private communications network; and

30

a monitoring system monitoring operations of the first and second clusters, identifying operational and connectivity problems, and issuing an alert in response to the identified problems indicating a corresponding one of the first and second clusters associated with the identified problems;

wherein the first configuration differs from the second configuration and wherein the first configuration provides a first computing environment for performing a first client task and the second configuration provides a second computing environment for performing a second client task;

wherein the monitoring system comprises a main monitor that operates to monitor the first and second clusters to identify the operation and connectivity problems and further comprises monitors for each node of the first and second clusters operating to check for hardware and software problems within a particular node and to report the hardware and software problems to the main monitor.

94.     During prosecution of the 841 Patent, the examiner rejected the patentee's claims specifically because they did "not contain components that are limited to hardware." *See* 921 Application, OA 2/25/2010 at 2-3 (attached as <u>Ex. 16</u> hereto).

> 5.     Claims 1-8 are rejected under 35 U.S.C. 101 because the claimed invention is directed to a non-statutory subject matter. The claims 1-8 claim a system that does not contain components that are limited to hardware. Addition of --at least one hardware processing unit;-- (of the system) in the body of the claim for the claimed system is suggested to overcome the 35 U.S.C. 101 rejections.

95.     The patentee amended the claims to add "hardware processor." *See* 921 Application, Applicant's Amendment in Response to OA 2/25/10 (attached as <u>Ex. 17</u> hereto) at 4, 9.

Appl. No. 11/927,921
Response to Office Action of February 25, 2010

**Amendments to the Claims:**

This listing of claims will replace all prior versions and listings of claims in the application:

**Listing of Claims:**

1. (CURRENTLY AMENDED) A computer system for hosting computing clusters for clients, comprising:

a private communications network linked to a public communications network;

a first cluster comprising a set of computing resources, including at least one hardware processor, in a first configuration, wherein the first cluster is communicatively linked to the private communications network; and

a second cluster comprising a set of computing resources, including at least one hardware processor, in a second configuration, wherein the second cluster is communicatively linked to the private communications network;

wherein the first configuration differs from the second configuration and wherein the first configuration provides a first computing environment for performing a first client task and the second configuration provides a second computing environment for performing a second client task.

Ex. 17 at 4.

**Claim Rejections Under 35 U.S.C. §101**

Claims 1-8 are rejected under 35 U.S.C. §101 as being directed toward non-statutory subject matter. Independent claim 1 is amended to include hardware components. Claims 2-8 depend from claim 1, and, hence, the amendment of claim 1 is believed to address the rejection of these claims.

Ex. 17 at 9.

96.     The claims were allowed over the prior art as a result of patentee's amendment to add this "at least one hardware processor" limitation, expressly disclaiming in the process any software or virtualized processor as being able to meet this particular element of the claim. *See* 921 Application, Supplemental Notice of Allowability (attached as Ex. 18 hereto) at 2-3. *See, e.g.,*

*In re McDonald*, 43 F.4th 1340, 1347 (Fed. Cir. 2022) (claim amended to overcome 101 rejection by adding "processor" limitation cannot be broadened during reissue to recapture surrendered "no processor" subject matter); *Lighthouse Consulting Grp., LLC v. BB&T Corp.,* 476 F. Supp. 3d 532, 543-44 (W.D. Tex. 2020) (granting motion to dismiss and finding claim term "carrier" in a check processing patent construed to be limited to "physical object" (e.g., sheet of paper to which the check is attached) cannot be expanded to capture mobile banking application software).

97.     The 584 Accused System and Kubernetes do not infringe the 584 Patent because Kubernetes, among other things, does not meet the "at least one hardware processor" limitation. For example, the Kubernetes's documentation explains that it is a software program—specifically, an open-source container orchestration platform for automating deployment, scaling, and management      of      containerized      applications      (e.g.,      software).      *See* https://kubernetes.io/docs/concepts/overview/ ("Kubernetes is a portable, extensible, open source platform for managing containerized workloads and services.")

98.     Documentation states that Kubernetes normally runs in a virtualized environment (e.g., virtualized processors), not on bare metal (e.g., physical processors). *See, e.g.,* https://medium.com/@zemim/guide-to-bare-metal-kubernetes-everything-you-need-to-know-e15aedf013a3 ("When setting up your deployment, you'll need to choose between bare metal and VM- (virtual machine) based Kubernetes"). According to documentation, bare metal Kubernetes is the exception, and not the norm. *See* https://www.spectrocloud.com/blog/introducing-bare-metal-kubernetes-what-you-need-to-know ("Bare metal Kubernetes means deploying Kubernetes clusters and their containers directly on physical servers, instead of inside traditional virtual machines (VMs) managed by a hypervisor layer."). No bare metal Kubernetes exists at Munich Re, so the "at least one hardware processor" limitation of Claim 1 of the 584 Patent is not met.

33

99.    At least because of the absence of "at least one hardware processor" as discussed above, Munich Re does not directly infringe the 584 Patent, either literally or under the doctrine of equivalents.

100.   Likewise, at least because there is no direct infringement, Munich Re does not indirectly infringe the 584 Patent, including no induced or contributory infringement of the 584 Patent.

101.   Absent a declaration of non-infringement, IV will continue to wrongfully allege that Munich Re infringes the 584 Patent, and thereby cause Munich Re irreparable injury and damage.

102.   For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Munich Re and IV regarding whether Munich Re infringes or has infringed the 584 Patent.

103.   Munich Re therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, finding that Munich Re (including through its alleged use of the 584 Accused System and Kubernetes) does not infringe the 584 Patent.

**COUNT V**
**DECLARATION OF NON-INFRINGEMENT OF THE 124 PATENT**

104.   Munich Re incorporates by reference paragraphs 1-39 as if fully set forth herein.

105.   The 124 Patent is titled "Integrated Asset Management." The 124 Patent's Abstract states:

> The method and system of the present invention provides an improved technique for integrated asset management. Information is aggregated from a variety of sources into a centralized computerized database. Thereafter, asset transition events are scheduled. Information from the centralized computerized database is used in the performance of the asset transition events and information relating to the asset transition events is added to the centralized computerized database. Subsequent changes to the asset are also recorded into the centralized computerized database.

34

As a result, a plethora of information is available within said database for the purpose of a managing future asset transition events.

106.    IV has asserted that third-party software called Kubernetes that IV alleges Munich Re is using ("the 124 Accused System") infringes the 124 Patent. In particular, IV asserts that Munich Re "makes, uses, sells, offers for sale, imports, and/or encourages its customers and partners to make, use, sell, offer to sell and/or import" the 124 Accused System in a manner that infringes Claim 1 of the 124 Patent. *See* Ex. 6.

107.    Contrary to IV's assertions, Munich Re has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 124 Patent, including through any making, use, offering to sell, selling, and/or importing and/or encouraging the making, using, selling, offering to sell, and/or importation of the 124 Accused System or Kubernetes, at least because the 124 Accused System and Kubernetes do not employ, incorporate, or otherwise include all of the limitations of the 124 Patent's claims.

108.    Although there are additional reasons why Munich Re, the 124 Accused System, and Kubernetes do not infringe the 124 Patent, non-limiting examples are discussed below.

109.    IV has only identified Independent Claim 1 of the 124 Patent as asserted. Claim 1 recites:

> 1. A method comprising:
>
> (a) receiving an indication of an occurrence of at least one *transition event* performed for at least one of a plurality of *computer-related hardware devices*, wherein the plurality of *computer-related hardware devices* include respective processors;
>
> (b) recording information from the *transition event* into a centralized computerized database;
>
> (c) monitoring for at least one change to the plurality of *computer-related hardware devices* and recording

35

information associated with the change into the centralized computerized database; and

(d) managing at least one additional *transition event* for at least one of the plurality of *computer related <u>hardware devices</u>* using information available in the centralized computerized database

110. Claim 1 requires a method focused on *physical* "computer-related *<u>hardware devices</u>*" (e.g., desktops, laptops, printers with processors) and their "transition events" (e.g., physical installation, relocation, disposition, maintenance). For example, Claim 1's step (a) limitation expressly requires "receiving an indication of an occurrence of at least *one transition event* performed for at least one of a plurality of *computer-related <u>hardware devices</u>* ...," expressly limiting the claimed step to being performed for *physical* computer-related hardware devices.

111. This limitation requiring physical computer-related hardware devices is repeated and reinforced in multiple subsequent steps of Claim 1, including: Claim 1's step (c) of "monitoring for at least one change to the plurality of *computer-related <u>hardware devices</u>*" and Claim 1's step (d) of "managing at least one additional transition event for at least one of the plurality of *computer related <u>hardware devices</u>*." The plain language of Claim 1 thus makes clear that the claimed invention is limited to methods involving physical hardware assets and their physical transition events, not software programs, virtual resources, or software updates.

112. During prosecution of the 124 Patent, the patentee, in response to an office action rejecting the claims over prior art, limited the alleged invention to a physical hardware device, expressly disclaiming software or any virtualized process or non-physical device. *See* Patentee's Office Action Response dated 2/18/2009 (attached as <u>Ex. 19</u> hereto) at 15 ("Applicant respectfully submits that *a software program is not a computer-related hardware device* that includes a processor, as claimed.") shown below:

> In making out the rejection of this claim, the Office argues that claim 1 is anticipated by Nakamura. Applicant has amended claim 1 to recite a plurality of computer-related hardware *devices*, wherein each of the plurality of computer-related hardware devices *includes a processor*. Applicant respectfully submits that Nakamura does not teach or in any way suggest performing a transition event for at least one of a plurality of computer-related hardware devices that each includes a processor, as recited in claim 1. Rather, Nakamura discusses the production of "products", such as a software "program". (*Nakamura*, column 1, line 38). Applicant respectfully submits that a software program is not a computer-related hardware device that includes a processor, as claimed.

113. Patentee reiterated this *physical* hardware limitation in a subsequent appeal, where it argued again that the patent's claimed "transition event" (e.g., "an asset installation, asset relocation, asset disposition or asset maintenance activity," *see* 124 Patent at 2:51-52) does *not* and could *not* include "an update to a program or software in a computer," or a "change" to a "data element." *See* Patentee/Appellant Reply Brief at 3-4, dated December 9, 2010 (attached as <u>Ex. 20</u> hereto) shown below:

> This statement by the Office [about the prior art] clarifies that the Office considers that an 'update to a program or software in a computer' or a 'change' to a 'data element' anticipates a 'transition event,' as claimed. It is respectfully submitted, however, that an 'update to a program or software in a computer' or a 'change' to a 'data element' cannot be considered a 'transition event,' as claimed and described in Appellant's specification. ***Appellant notes that 'computer-related <u>hardware devices,</u>' as described in the specification, may include without limitation 'desktop computers, laptop computers, handheld computers, printers, scanners, networking devices and storage devices'*** (Appellant's specification, page 9, lines 2 and 3).
>
> A 'transition event,' as described in the specification, may include without limitation 'an asset installation, asset relocation, asset disposition or asset maintenance activity' (Appellant's specification, page 5, line 23 to page 6, line 1). ***Therefore, 'receiving an update to a program' or 'receiving an indication of a change to a data element' simply does not disclose, teach or in any way suggest or suggest the receipt of an occurrence of at least one <u>transition event</u> performed for at least one of a plurality of <u>computer-related hardware devices,</u> as claimed.*** **(underlined emphasis original.)**

37

The Board of Patent Appeals and Interferences accepted patentee's argument, finding that the prior art at issue did not disclose "receiving an indication of a transition event (i.e., an occurrence of a change) performed for a computer-related hardware device." *See* 2/24/2012 Board Decision at 4 (attached as <u>Ex. 21</u> hereto).

114.    The 124 Accused System and Kubernetes do not infringe the 124 Patent because Kubernetes, among other things, does not perform Claim 1's step (a) of "receiving an indication of an occurrence of at least one transition event performed for at least one of a plurality of computer-related **hardware devices**." For example, the Kubernetes's documentation explains that "Kubernetes operates at the container level rather than at the hardware level ...." *See* <u>https://kubernetes.io/docs/concepts/overview/</u> ("Kubernetes is a portable, extensible, open source platform for managing containerized workloads and services.") As illustrated below and explained in the documentation, Kubernetes is "decoupled from the underlying infrastructure" hardware and "raises the level of abstraction from running an OS on virtual hardware to running an application on an OS using logical resources." *Id*.



*Id.* In Kubernetes, "a set of worker machines, called nodes, [] run containerized applications. Every cluster needs at least one worker node in order to run ...." *See* https://kubernetes.io/docs/concepts/architecture "A node may be a virtual or physical machine," but "Kubernetes creates a Node object internally (the representation)" and Kubernetes cannot differentiate between physical hardware devices (i.e., "In cases when objects represent a physical entity, like a Node representing a physical host, when the host is re-created under the same name without deleting and re-creating the Node, Kubernetes treats the new host as the old one ..."). *See* https://kubernetes.io/docs/concepts/architecture/nodes; https://kubernetes.io/docs/concepts/overview/working-with-objects/names.        Therefore, Kubernetes cannot and does not satisfy Claim 1's requirement of "at least one transition event performed for at least one of a plurality of computer-related ***hardware devices***."

115.    Kubernetes also does not include Claim 1's recited "transition event" (i.e., "an occurrence of a change") performed for "at least one of a plurality of computer-related hardware devices." For example, "Kubernetes abstracts common resources [(e.g., 'CPU, memory, GPUs, etc')] for allocation to workloads and utilizes operating system primitives (for example, Linux cgroups) to manage consumption by workloads" and sees all "devices" as "infrastructure resources."        *See*        https://kubernetes.io/docs/reference/glossary/?all=true#term-device; https://kubernetes.io/docs/reference/glossary/?all=true#term-infrastructure-resource.

> **Device**
> One or more infrastructure resources that are directly or indirectly attached to your nodes.[-]
> Devices might be commercial products like GPUs, or custom hardware like ASIC boards. Attached devices usually require device drivers that let Kubernetes Pods access the devices.

> **Resource (infrastructure)**
>
> Capabilities provided to one or more nodes (CPU, memory, GPUs, etc), and made available for consumption by Pods running on those nodes.Kubernetes also uses the term *resource* to describe an API resource.[-]
>
> Computers provide fundamental hardware facilities: processing power, storage memory, network, etc. These resources have finite capacity, measured in a unit applicable to that resource (number of CPUs, bytes of memory, etc). Kubernetes abstracts common resources for allocation to workloads and utilizes operating system primitives (for example, Linux cgroups) to manage consumption by workloads).
>
> You can also use dynamic resource allocation to manage complex resource allocations automatically.

Kubernetes cannot differentiate between physical hardware devices (i.e., "In cases when objects represent a physical entity, like a Node representing a physical host, when the host is re-created under the same name without deleting and re-creating the Node, Kubernetes treats the new host as the old one ..."). *See* https://kubernetes.io/docs/concepts/overview/working-with-objects/names. This is so because "Kubernetes abstracts away the hardware infrastructure and exposes your whole datacenter as a single enormous computational resource ... [and this] allows you to deploy and run your software components without having to know about the actual servers underneath." *See* https://gist.github.com/madhub/af18086cc01fdba1ea03893063e3de87. As another example, when Kubernetes detects that a pod running on a node has failed, Kubernetes is detecting a software event (the termination of a containerized process), not a change to any physical hardware device. *See* https://kubernetes.io/docs/concepts/workloads/pods/pod-lifecycle/. As such, Kubernetes only involves precisely the type of "update to a program or software to a computer" or "change to a data element" that the patentee expressly disclaimed multiple times during prosecution of the 124 Patent. *See, e.g.*, Patentee's Office Action Response dated 2/18/2009 (Ex. 19) ("Applicant respectfully submits that *a software program is not a computer-related hardware device* that includes a processor, as claimed"); Patentee/Appellant Reply Brief at 4 (Ex. 20) (asserting "an 'update to a program or software in a computer' or a 'change' to a 'data element' *cannot* be considered a 'transition event,' as claimed and described in [patentee's] specification.")

40

116.    At least because Kubernetes does not perform the steps of "receiving an indication of an occurrence of at least one transition event performed for at least one of a plurality of computer-related hardware devices," "recording information from the transition event into a centralized computerized database, " or "managing at least one additional transition event for at least one of the plurality of computer related hardware devices," Munich Re does not directly infringe any claim of the 124 Patent, either literally or under the doctrine of equivalents.

117.    Likewise, at least because there is no direct infringement, Munich Re does not indirectly infringe the 124 Patent, including no induced or contributory infringement of the 124 Patent.

118.    Absent a declaration of non-infringement, IV will continue to wrongfully allege that Munich Re infringes the 124 Patent, and thereby cause Munich Re irreparable injury and damage.

119.    For at least these reasons, an actual, justiciable, substantial, immediate, and continuing controversy exists between Munich Re and IV regarding whether Munich Re infringes or has infringed the 124 Patent.

120.    Munich Re therefore seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., finding that Munich Re (including through its alleged use of the 124 Accused System and Kubernetes) does not infringe any claim of the 124 Patent.

## PRAYER FOR RELIEF

WHEREFORE, Munich Re respectfully requests the following relief:

1.    A declaratory judgment in favor of Munich Re and against IV on Munich Re's claims;

41

2.      A declaration that Munich Re does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 844 Patent;

3.      A declaration that Munich Re does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 582 Patent;

4.      A declaration that Munich Re does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 081 Patent;

5.      A declaration that Munich Re does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 584 Patent;

6.      A declaration that Munich Re does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 124 Patent;

7.      An order enjoining IV and those in privity with IV from asserting the 844, 582, 081, 584, and 124 Patents against Munich Re and Munich Re's affiliates, subsidiaries, representatives, agents, vendors, and customers;

8.      A finding this is an exceptional case under 35 U.S.C. § 285;

9.      An order awarding attorney fees, expenses of litigation, and costs to Munich Re; and

10.     Such other and further relief as the Court deems just and proper.

**<u>DEMAND FOR A JURY TRIAL</u>**

Munich Re demands a jury trial on all issues and claims so triable.

42

Dated: April 10, 2026

Respectfully submitted,

**LEWIS BRISBOIS BISGAARD SMITH LLP**

OF COUNSEL:

Joshua D. Curry
Jonathan D. Goins
Lewis Brisbois Bisgaard Smith LLP
600 Peachtree St. NE, Suite 4700
Atlanta, GA 30308
josh.curry@lewisbrisbois.com
jonathan.goins@lewisbrisbois.com
Ph 404.348.8585

François O. Ecclesiaste
Lewis Brisbois Bisgaard Smith LLP
90 S 7th Street, Suite 2800
Minneapolis, MN 55402
francois.ecclesiaste@lewisbrisbois.com
Ph 612.428.5048

*/s/ Keith A. Walter*
Keith A. Walter (No. 4157)
Maliheh Zare (No. 7133)
500 Delaware Ave., Suite 700
Wilmington, DE 19801
Ph 302.985.6000
keith.walter@lewisbrisbois.com
maliheh.zare@lewisbrisbois.com

*Attorneys for Plaintiffs Munich Re America Services, Inc., Munich American Reassurance Company, Munich Life Management Corporation Ltd., and Münchener Rückversicherungs-Gesellschaft Aktiengesellschaft In München*